**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND** | ) | |
| **ETHICS IN WASHINGTON** | ) | |
| 1101 K Street, NW, Suite 201 | ) | |
| Washington, D.C. 20005 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ.  Action No. 1:19-cv-03626 (DLF) |
| | ) | |
| **UNITED STATES DEPARTMENT** | ) | |
| **OF JUSTICE** | ) | |
| | ) | |
| 950 Pennsylvania Avenue, NW | ) | |
| Washington, D.C. 20530 | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

I.     Procedural History ............................................................................................ 2

II.    Lethal Injection Regulations and Litigation .................................................... 4

LEGAL STANDARD ................................................................................................... 6

ARGUMENT ................................................................................................................ 8

I.     BOP and DOJ OIP Conducted Adequate Searches for Responsive Records .................... 8

II.    Application of Exemptions ............................................................................. 14

      A.    FOIA Exemption 7 ............................................................................. 15

            1.    The Records Were Compiled for Law Enforcement Purposes ................ 15

            2.    Exemption 7(A) ..................................................................... 17

            3.    Exemption 7(C) and Exemption 6 ......................................... 27

            4.    Exemption 7(E) ..................................................................... 31

            5.    Exemption 7(F) ...................................................................... 33

      B.    FOIA Exemption 4 ............................................................................. 34

      C.    FOIA Exemption 5 ............................................................................. 38

            1.    Deliberative Process, Attorney-Work Product and Attorney-Client Privileges ...................................................................... 39

                (a)    Deliberative Process Privilege .......................................... 39

                (b)    The Attorney Work-Product Doctrine ............................. 40

                (c)    The Attorney-Client Privilege ........................................... 41

             2.    BOP's Application of Exemption 5 and the Privileges ........... 42

CONCLUSION ........................................................................................................... 45

i

## **TABLE OF AUTHORITIES**

**Cases**

*Access Reports v. DOJ,*
   926 F.2d 1192 (D.C. Cir. 1991) ................................................................................ 40

*Am. Civil Liberties Union v. DOJ,*
   655 F.3d 1 (D.C. Cir. 2011) ..................................................................................... 28

*Anderson v. BOP,*
   806 F. Supp. 2d 121 (D.D.C. 2011) ......................................................................... 16

*August v. FBI,*
   328 F.3d 697 (D.C. Cir. 2003) ................................................................................. 20

*Baker & Hostetler LLP v. U.S. Dep't of Commerce,*
   473 F.3d 312 (D.C. Cir. 2006) ................................................................................. 35

*Barnard v. DHS,*
   598 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................. 32

*Baze v. Rees,*
   553 U.S. 35 (2008) ................................................................................................... 19

*Blackwell v. FBI,*
   646 F.3d 37 (D.C. Cir. 2011) ....................................................................... 15, 16, 32

*Boehm v. FBI,*
   948 F. Supp. 2d 9 (D.D.C. 2013) ............................................................................. 34

*Brady v. Maryland,*
   373 U.S. 83 (1963) ................................................................................................... 22

*Brayton v. Office of U.S. Trade,Rep.,*
   641 F.3d 521 (D.C. Cir. 2011) ................................................................................... 7

*Bucklew v. Precythe*,
   139 S. Ct. 1112 (2019) .......................................................................... 19

*Campbell v. DOJ*,
   164 F.3d 20 (D.C. Cir. 1998) ............................................................... 15

*CIA v. Sims*,
   471 U.S. 159 (1985) ............................................................................... 6

*Citizens for Responsibility & Ethics in Washington v. DOJ*,
   978 F. Supp. 2d 1 (D.D.C. 2013) ........................................................... 8

*Clemente v. FBI*,
   867 F.3d 111 (D.C. Cir. 2017) ............................................................. 15

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ................................................... 39, 40, 41

*CREW v. DOJ*,
   746 F.3d 1082 (D.C. Cir. 2014) ........................................................... 17

*Critical Mass Energy Project v. Nuclear Regul. Comm'n*,
   975 F.2d 871 (D.C. Cir. 1992) ............................................................. 35

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*,
   405 F. Supp. 3d 127 (D.D.C. 2019) ...................................................... 30

*Davis v. DOJ*,
   968 F.2d 1276 (D.C. Cir. 1992) ........................................................... 27

*DOJ v. Reporters Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) ....................................................................... 27, 28

*Dudman Commc'ns Corp. v. Dep't of the Air Force*,
   815 F.2d 1565 (D.C. Cir. 1987) ........................................................... 40

*Elec. Privacy Info. Ctr. v. DHS*,
  117 F. Supp. 3d 46 (D.D.C. 2015) ...................................................................... 35, 37

*Elec. Privacy Info. Ctr. v. DHS*,
  777 F.3d 518 (D.C. Cir. 2015) ............................................................................. 16, 17

*Enmund v. Florida*,
  458 U.S. 782 (1982) .............................................................................................. 16, 17

*EPIC v. DHS*,
  384 F. Supp. 2d 100 (D.D.C. 2005) ..................................................................... 30, 41

*EPIC v. DOJ*,
  82 F. Supp. 3d 307 (D.D.C. 2015) ............................................................................ 27

*Eugene Burger Mgmt. Corp. v. U.S. Dep't of Hous. and Urban Dev.*,
  192 F.R.D. 1 (D.D.C. 1999) ...................................................................................... 39

*Execution Protocol Cases*,
  955 F.3d 106 (D.C. Cir. 2020) .................................................................................... 6

*FBI v. Abramson*,
  456 U.S. 615 (1982) ................................................................................................... 7

*Fed. Open Market Comm. v. Merrill*,
  443 U.S. 340 (1979) ................................................................................................. 40

*Food Mktg. Inst. v. Argus Leader*,
  139 S. Ct. 2356 (2019) ................................................................................... 34, 36, 38

*FTC v. Grolier*,
  462 U.S. 19 (1983) .................................................................................................... 41

*Gellman v. DHS*,
  --- F.3d ---, 2020 WL 1323896 (D.D.C. Mar. 20, 2020) .................................... 37, 39

iv

*Glossip v. Gross,*
   576 U.S. 863 (2015) ................................................................ 1, 19, 22, 23

*Gray v. McAuliffe,*
   No. 3:16-cv-982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017) ......................................... 24

*Griffin v. EOUSA,*
   774 F. Supp. 2d 322 (D.D.C. 2011) ...................................................................... 16

*Heggestad v. DOJ,*
   182 F. Supp. 2d 1 (D.D.C. 2000) ........................................................................ 40

*Hill v. McDonough,*
   547 U.S. 573 (2006) ................................................................................ 19

*In re Lombardi,*
   741 F.3d 888 (8th Cir. 2014) .......................................................................... 26

*In re Missouri Dep't of Corr.,*
   839 F.3d 732 (8th Cir. 2016) .......................................................................... 24

*In re Ohio Execution Protocol Litig.,*
   845 F.3d 231 (6th Cir. 2016) .......................................................................... 25

*John Doe Agency v. John Doe Corp.,*
   493 U.S. 146 (1989) .................................................................................. 6, 7

*Jordan v. Comm'r, Miss. Dep't of Corr.,*
   947 F.3d 1322 (11th Cir. 2020) ....................................................................... 23

*Judicial Watch, Inc. v. DOD,*
   715 F.3d 937 (D.C. Cir. 2013) ......................................................................... 7

*Judicial Watch, Inc. v. DOJ,*
   432 F.3d 366 (D.C. Cir. 2005) ........................................................................ 41

v

*Judicial Watch, Inc. v. FDA*,
 449 F.3d 141 (D.C. Cir. 2006) ................................................................. 28

*Karantsalis v. DOJ*,
 635 F.3d 497 (11th Cir. 2011) ............................................................... 16

*Lesar v. DOJ*,
 636 F.2d 472 (D.C. Cir. 1980) ............................................................... 29

*Mapother v. DOJ*,
 3 F.3d 1533 (D.C. Cir. 1993) ................................................................. 17

*Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*,
 819 F.2d 1181 (D.C. Cir. 1987) ............................................................. 39

*Maydak v. DOJ*,
 218 F.3d 760 (D.C. Cir. 2000) ............................................................... 20

*Mayer Brown LLP v. IRS*,
 562 F.3d 1190 (D.C. Cir. 2009) ............................................................. 32

*\*McGehee v. Texas Dep't of Criminal Justice*,
 No. H-18-1546, 2018 WL 3996956 (S.D. Tex. Aug. 21, 2018) ............... 24

*McKinley v. Bd. Of Governors of the Fed. Reserve Sys.*,
 647 F.3d 331 (D.C. Cir. 2011) ............................................................... 41

*Mil. Audit Project v. Casey*,
 656 F.2d 724, 738 (D.C. Cir. 1981) ......................................................... 7

*Mead Data Cent. Inc. v. Dep't of the Air Force*,
 566 F.2d 242 (D.C. Cir. 1977) ............................................................... 41

*Miller v. DOJ*,
 872 F. Supp. 2d 12 (D.D.C. 2012) ........................................................... 7

*Moorefield v. U.S. Secret Serv.*,
611 F.2d 1021 (5th Cir. 1980) ................................................................. 18

*Nadler v. FDIC*,
92 F.3d 93 (2d Cir. 1996) ......................................................................... 35

*Nation Mag., Wash. Bureau v. U.S. Customs Serv.*,
71 F.3d 885 (D.C. Cir. 1995) ..................................................................... 8

*Nat'l Parks & Conservation Ass'n v. Morton*,
498 F.2d 765 (D.C. Cir. 1974) ................................................................. 34

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978) ................................................................................. 17

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) ........................................................................... 39, 40

*\*Oglesby v. U.S. Dep't of Army*,
920 F.2d 57 (D.C. Cir. 1990) ................................................................ 8, 14

*\*Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*,
CIV.A. 04-00377, 2006 WL 1826185 (D.D.C. June 30, 2006) ................ 33

*Petroleum Info. Corp. v. Dep't of the Interior*,
976 F.2d 1429 (D.C. Cir. 1992) ............................................................... 40

*Pub. Citizen Health Research Group v. NIH*,
209 F. Supp. 2d 37 (D.D.C. 2002) ........................................................... 35

*\*Pub. Emps. for Envt. Resp. v. Int'l Boundary & Water Comm'n.*,
740 F.3d 195 (D.C. Cir. 2014) ................................................... 15, 31, 32

*Raulerson v. Ashcroft*,
271 F. Supp. 2d 17 (D.D.C. 2002) ........................................................... 33

vii

*Reed v. NLRB*,
   927 F.2d 1249 (D.C. Cir. 1991) ............................................................................... 28

*\*Sack v. DOD*,
   823 F.3d 687 (D.C. Cir. 2016) ........................................................................... 16, 17

*\*SafeCard Servs. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ...................................................................... *passim*

*\*Sarno v. DOJ*,
   278 F. Supp. 3d 112 (D.D.C. 2017) ........................................................................ 20

*Schrecker v. DOJ*,
   349 F.3d 657 (D.C. Cir. 2003) ................................................................................... 8

*Steinberg v. DOJ*,
   23 F.3d 548 (D.C. Cir. 1994) ................................................................................. 8, 9

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ............................................................................... 27

*\*Texas Dep't of Criminal Justice v. Levin*,
   572 S.W.3d 671 (Tex. 2019) ....................................................................... 24, 34, 37

*U.S. Dep't of State v. Wash. Post Co.*,
   456 U.S. 595 (1982) ................................................................................................ 28

*Vaughn v. Rosen*,
   523 F.2d 1136 (D.C. Cir. 1975) ............................................................................... 40

*Walston v. U.S. Dep't of Def.*,
   238 F. Supp. 3d 57 (D.D.C. 2017) ..................................................................... 28, 30

*Weisberg v. DOJ*,
   627 F.2d 365 (D.C. Cir. 1980) ................................................................................... 7

**Statutes**

5 U.S.C. § 551(2) ................................................................................................ 35

5 U.S.C. § 552(a)(4)(B) ......................................................................................... 7

5 U.S.C. § 552(b)(4) ............................................................................... 14, 34, 35

5 U.S.C. § 552(b)(5) ................................................................................... 14, 39

5 U.S.C. § 552(b)(6) ................................................................................... 14, 28

5 U.S.C. § 552(b)(7) ............................................................................................ 14

5 U.S.C. § 552(b)(7)(A) ............................................................................... 15, 17

5 U.S.C. § 552(b)(7)(B) ...................................................................................... 15

5 U.S.C. § 552(b)(7)(C) ............................................................................... 15, 27

5 U.S.C. § 552(b)(7)(D) ...................................................................................... 15

5 U.S.C. § 552(b)(7)(E) ............................................................................... 15, 31

5 U.S.C. § 552(b)(7)(F) ............................................................................... 15, 33

5 U.S.C. § 8401(17)(D)(i) .................................................................................. 15

18 U.S.C. § 3015 ................................................................................................. 15

18 U.S.C. § 3596(a) ............................................................................................ 19

18 U.S.C. § 4012 ................................................................................................. 15

18 U.S.C. § 4042 ................................................................................................. 15

28 U.S.C. § 2241 ................................................................................................. 19

28 U.S.C. § 2255......................................................................................................... 20, 21

**Rules**

Federal Rules of Civil Procedure 60(b)(6)................................................................... 21

**Regulations**

28 C.F.R. 16.4............................................................................................................... 13

28 C.F.R. § 26.3(a) (1993)....................................................................................... 4, 17

28 C.F.R. § 511............................................................................................................. 15

28 C.F.R. § 552............................................................................................................. 15

57 Fed. Reg. 56,536 (Nov. 30, 1992)........................................................................... 19

## INTRODUCTION

In this Freedom of Information Act ("FOIA") litigation, Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks information from "February 14, 2019 to the present" regarding the Federal Bureau of Prison's ("BOP") procurement of lethal injection substances— specifically "pentobarbital, pentobarbital sodium, or Nembutal," (hereinafter, collectively, "Pentobarbital")—for purposes of carrying out lawful sentences of capital punishment imposed on federal defendants. Compl. ¶ 13, ECF No. 1. After a thorough search and careful review of records responsive to CREW's FOIA request, BOP and the Department of Justice's ("DOJ") Office of Information Policy ("OIP") determined that the vast majority of such records are exempt from disclosure under one or more of the following: FOIA Exemptions 4, 5, 6, 7(A), 7(C), 7(E), and 7(F). Records containing segregable, non-exempt information have been released to CREW.

At bottom, CREW's request seeks records that would severely impact BOP's ability to carry out its law enforcement responsibility to effectuate federal death sentences. Put simply, commercial businesses who supply or offer to supply lethal injection substances such as Pentobarbital to the federal government for purposes of carrying out lawful capital sentences do not want their identities publicly disclosed and will cease providing such substances if disclosure occurs. *See Glossip v. Gross*, 576 U.S. 863, 869-71 (2015) (cataloguing such disruptions stemming from negative publicity and associated financial risk, harassment, and general safety concerns). The absence of lethal injection drugs would significantly obstruct the federal government's ability to carry out the implementation of capital sentences pursuant to its existing regulations. Thus, BOP and DOJ OIP have properly withheld records containing identifying information about persons and companies associated with BOP's procurement of Pentobarbital under FOIA Exemptions 7(A) (interference with law enforcement proceedings) and 7(E) (law enforcement techniques, procedures, and

1

guidelines), as well as other exemptions that protect the privacy and confidentiality of third parties in this context, including Exemption 4 (confidential commercial and financial information), Exemption 6 (privacy of individuals), Exemption 7(C) (privacy of individuals, law enforcement records), and Exemption 7(F) (individual safety, law enforcement records). Similar privacy concerns warrant the protection of personally-identifying information under Exemptions 6, 7(C), and 7(F), for BOP and other DOJ staff associated with BOP's procurement of Pentobarbital.

In addition, other records responsive to CREW's request are protected by the deliberative process privilege, the attorney-client privilege, and attorney work-product, and have been properly withheld under FOIA Exemption 5.

With these concerns in mind, and as demonstrated by the declarations and exhibits filed herewith, BOP and DOJ OIP carefully searched for and reviewed all records responsive to CREW's request and applied the appropriate FOIA exemptions to them. Because there is no genuine issue of material fact in this case, DOJ is entitled to summary judgment.

## BACKGROUND

### I.   PROCEDURAL HISTORY

On August 8, 2019, BOP received a FOIA request from Lauren White, a CREW Press Associate. Decl. of Kara Christenson ("Christenson Decl.") ¶ 11 & Ex. A; *see also* Defendant's Statement of Material Facts as to Which There Is No Genuine Dispute ("DOJ SMF") ¶ 1. Ms. White, on behalf of CREW, sought "all records from February 14, 2019 to the present related to the procurement of pentobarbital, pentobarbital sodium, or Nembutal to be used in federal executions, including without limitation any notifications to or communications with vendors, solicitation information, requests for information, subcontracting leads, and contract awards."

2

Christenson Decl. ¶ 11 & Ex. A; DOJ SMF ¶ 2.  DOJ OIP received the identical request on August 9, 2019, except that it was directed particularly to the Offices of the Attorney General ("OAG"), the Deputy Attorney General ("ODAG"), and the Associate Attorney General ("OASG").  Decl. of Vanessa R. Brinkmann ("Brinkmann Decl.") ¶¶ 2, 10 & Ex. A; DOJ SMF ¶¶ 10, 48.

CREW's request was accepted by BOP and assigned FOIA Request No. 2019-05579.  On August 14, 2019, BOP sent CREW an acknowledgment letter indicating that the FOIA request had been received and was assigned to the complex processing track.  Christenson Decl. ¶ 12 & Ex. B (August 14, 2019 letter to CREW); DOJ SMF ¶¶ 3-4.  DOJ OIP acknowledged CREW's FOIA request on September 6, 2019 and assigned it tracking number DOJ-2019-006390.  Brinkmann Decl. ¶ 3 & Ex. B (September 6, 2019 acknowledgement letter); DOJ SMF ¶ 11.

BOP initially determined that any records responsive to CREW's request would be categorically exempt from disclosure under the FOIA, pursuant to Exemptions 5, 6, 7(A), 7(B), 7(C), 7(E) and 7(F).  Christenson Decl. ¶ 14; DOJ SMF ¶ 5.  On September 30, 2019, BOP informed CREW of the release determination, the nature of the exemptions applied, and advised CREW of its right to appeal.  Christenson Decl. ¶ 14 & Ex. C (September 30, 2019 Response Letter); DOJ SMF ¶ 6.  On October 10, 2019, CREW filed an appeal with OIP regarding BOP's withholding of the documents responsive to FOIA Request No. 2019-05579.  Christenson Decl. ¶ 15 & Ex. D (Oct. 10, 2019 CREW letter); DOJ SMF ¶ 7. The appeal was assigned Appeal No. DOJ-AP-2020-000362.  Christenson Decl. ¶ 15; DOJ SMF ¶ 8.

CREW filed the instant lawsuit on December 4, 2019.  Compl., ECF No. 1; DOJ SMF ¶ 12. DOJ filed its Answer on January 15, 2020.  Answer, ECF No. 6; DOJ SMF ¶ 13.  On February 19, 2020, OIP issued its response to CREW's appeal of BOP's determination, stating because CREW

had filed a lawsuit challenging BOP's determination, pursuant to DOJ regulations, OIP would close CREW's appeal.  Christenson Decl. ¶ 15 & Ex. E (February 19, 2020 OIP Determination Letter); DOJ SMF ¶ 9.  The parties subsequently agreed to a processing schedule and filed six joint status reports.  *See* ECF Nos. 7-9, 12, 13, & 15; DOJ SMF ¶ 14.  In the parties' last joint status report, they agreed upon a briefing schedule, *see* ECF No. 15, which has since been modified with the consent of the Parties and the Court.  Minute Order (Oct. 22, 2020); DOJ SMF ¶ 15.

## II.    LETHAL INJECTION REGULATIONS AND LITIGATION

BOP is tasked with setting the date, time, place and method of execution when a sentence of death has been imposed.  *See* 28 C.F.R. § 26.3(a) (1993); Christenson Decl. ¶ 68.  Prior to this year, BOP had fulfilled its law-enforcement mandate associated with the implementation of the death penalty pursuant to 28 C.F.R. § 26.3(a) three times since 1993:  Timothy McVeigh and Juan Garza in June 2001, and Louis Jones in March 2003.  Christenson Decl. ¶ 69.  Beginning in 2005, several federal condemned inmates filed civil actions in this Court alleging constitutional and statutory violations related to BOP's use of a three-drug lethal injection protocol consisting of sodium thiopental, pancuronium bromide and potassium chloride.  *See Roane. v. Gonzales*, No. 05-2337 (D.D.C.); *Robinson v. Mukasey*, No. 07-2145 (D.D.C.); *Bourgeois v. DOJ*, No. 12-00782 (D.D.C.), and *Fulks v. DOJ*, No. 13-00938 (D.D.C.).  Christenson Decl. ¶ 70.  On March 4, 2011, DOJ announced that "at the present time, the federal government does not have any reserves of sodium thiopental for lethal injections."  *See Roane*, 05-02337, ECF No. 281; Christenson Decl. ¶ 71.  Due to the unavailability of sodium thiopental, each of the cases was stayed pending BOP's completion of its re-evaluation and revision of the lethal injection protocol.  *See Roane,* Minute

Orders (July 29 & Nov. 3, 2011); *Robinson*, ECF No. 9 & Minute Order (Jan. 13, 2012); *Bourgeois*, ECF Nos. 14 & 15; and *Fulks*, ECF Nos. 6 & 7.[1]  Christenson Decl. ¶ 72.

Following the stays of execution in *Roane*, *Robinson*, *Bourgeios*, and *Fulks*, and in accordance with the regulations requiring BOP to select lethal injection substances to implement the death penalty, BOP and DOJ engaged in a comprehensive review and revision of the federal execution protocol.   On July 25, 2019, BOP adopted and DOJ announced an addendum ("Addendum") to the federal execution protocol ("Protocol") and scheduled executions for five condemned inmates.  *See Roane*, 05-02338, at ECF No. 385; *see* Christenson Decl. ¶ 73 & Ex. K (DOJ press release, July 25, 2019).

On August 20, 2019, the *Roane* court consolidated each of the four pending protocol cases into a newly established Master Consolidated Case:  *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-00145 (TSC) (D.D.C.) (hereinafter "*Execution Protocol Cases*").  *See Roane*, ECF No. 392.[2]  Thereafter, four of the five inmates who had been scheduled for execution filed motions seeking an injunction barring their execution.  *See Execution Protocol Cases*, 19-mc-145, at ECF Nos. 2, 13, 29, 34.  Christenson Decl. ¶ 75.

---

[1] While the Court in *Roane* granted a preliminary injunction barring Defendants from setting an execution date and executing plaintiffs in that matter (*see Roane*, ECF Nos. 5, 27, 67, 68, 336 (Orders Granting Motions for Injunction)), in *Robinson*, *Bourgeois* and *Fulks*, the Defendants simply represented that no execution warrant would be sought and no execution would be carried out against the plaintiffs until revision of the lethal injection protocol was complete. *See Robinson*, ECF No. 9; *Bourgeois,* ECF No. 14; and *Fulks*, ECF No. 6.  Christenson Decl. ¶ 72 n.12.

[2] Since the Master Consolidated Case was established, other federal death row inmates intervened or were otherwise consolidated into the case.  *See* Christenson Decl. ¶ 74 n.14.

On November 20, 2019, the court issued a preliminary injunction barring all federal executions. *Execution Protocol Cases,* ECF No. 51. On April 7, 2020, the Court of Appeals for the District of Columbia vacated the district court's preliminary injunction. *See Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020). Plaintiffs in that case filed an Amended Complaint on June 1, 2020. *Execution Protocol Cases*, 19-mc-145-TSC, ECF No. 92. Since then, the parties there have engaged in extensive litigation, much of which is described in the court's Memorandum Opinion granting summary judgment in the Government's favor as to the majority of the Plaintiffs' collective claims and denying injunctive relief as to the only collective claim on which the court ruled in Plaintiffs' favor. *See id*., ECF No. 261 at 4-8 (describing the litigation history, including multiple decisions by the Supreme Court). Between July 2020 and today, seven federal inmates have been executed. And while nearly all of the claims in that litigation have been decided, it is still active. As of November 5, 2020, Plaintiffs Orlando Hall and Brandon Bernard had filed a motion to stay their executions, *see id*. ECF No. 309-1, pending their appeal (and that of their fellow plaintiffs) of three different orders issued by the district court, *see id*. ECF No. 307. *See also* Christenson Decl. ¶ 77. Other, similar execution-related litigation is also pending. *See, e.g.*, *Hall v. Barr et al.*, No. 1:20-cv-03184 (D.D.C.), Doc. 1; Christenson Decl. ¶ 78.

## LEGAL STANDARD

The FOIA represents a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quotation marks omitted). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). So, in enacting the FOIA, Congress "provided nine specific exemptions under which disclosure could be

6

refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982).  While these "exemptions are to be narrowly construed," *id.* at 630, courts must still give them "meaningful reach and application," *John Doe Agency*, 493 U.S. at 152.

A motion for summary judgment is the procedural vehicle by which FOIA cases are typically decided.  *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment may be afforded to an agency "in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records, and each responsive record that it has located has either been produced to the plaintiff or is exempt from disclosure." *Miller v. DOJ*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012) (citing *Weisberg v. DOJ*, 627 F.2d 365 (D.C. Cir. 1980)).  Courts review agency responses to FOIA requests de novo.  5 U.S.C. § 552(a)(4)(B).

A court may award summary judgment in a FOIA action on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail;" that "demonstrate that the information withheld logically falls within the claimed exemption[s];" and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).  Agency declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal citations omitted).  "An agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Judicial Watch, Inc. v. DoD*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (citation omitted).

7

## ARGUMENT

### I.   BOP AND DOJ OIP CONDUCTED ADEQUATE SEARCHES FOR RESPONSIVE RECORDS

The adequacy of any FOIA search is "dependent upon the circumstances of the case." *Schrecker v. DOJ,* 349 F.3d 657, 662 (D.C. Cir. 2003); *Citizens for Responsibility & Ethics in Washington [ "CREW" ] v. DOJ*, 978 F. Supp. 2d 1, 7 (D.D.C. 2013) (noting that "[i]n some cases . . . agencies are not required to make such a detailed showing: they may categorically deny FOIA requests 'when the range of circumstances included in the category characteristically support[s] an inference that the statutory requirements for exemption are satisfied." (citing *Nation Mag., Wash. Bureau v. U.S. Customs Serv.,* 71 F.3d 885, 893 (D.C. Cir. 1995) (internal quotes omitted)).

When conducting a search in response to a FOIA request, an agency must conduct a "reasonable search." *Oglesby v. U.S. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990).  An agency is not required to search every records system, but need only search those systems in which it believes responsive records are likely located.  *Id.*  A FOIA search is sufficient if the agency makes "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Nation Mag.,* 71 F.3d at 890 (citations omitted).  The adequacy of the search is determined by whether it was "reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard Servs.,* 926 F.2d at 1201.

To demonstrate the reasonableness of its search, the agency may submit non-conclusory affidavits that explain in reasonable detail the scope and method of the agency's search.  *Steinberg v. DOJ,* 23 F.3d 548, 551 (D.C. Cir. 1994).  To be sufficiently detailed, an agency's affidavits must

describe "what records were searched, by whom, and through what process." *Id*. at 552. These affidavits are afforded a "presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs.*, 926 F.2d at 1200 (citations omitted).

Applying these principles, DOJ is entitled to summary judgment with respect to the adequacy of BOP's and DOJ OIP's searches. BOP has conducted searches for records responsive to the various parts of CREW's FOIA request as follows. CREW's FOIA request seeks records related to BOP's procurement of Pentobarbital and specifically requested a search for responsive records regardless of format, to include email communications and any attachments to emails. *See* Christenson Decl. ¶ 17 & Ex. A; *see also* DOJ SMF ¶ 16. BOP uses a Novell GroupWise email system to provide internal and external email communication by staff. To archive email, BOP also uses the Netmail Email Archive System ("Netmail"). Netmail collects email content directly from Novell GroupWise and saves it into its separate system in an SML file format, preserving applicable metadata in the corresponding property page. Regular email messages are flagged for a seven-year retention period and emails flagged as trash are subject to a 45-day retention period. Christenson Decl. ¶ 18; DOJ SMF ¶¶ 17-19. BOP staff email is ordinarily searchable using names, date ranges, and specific search terms. After the email is searched and responsive email is located and collected, that email can be exported from Netmail for review purposes and will automatically include the corresponding property page(s). Christenson Decl. ¶ 19; DOJ SMF ¶¶ 19-21.

In conducting its search for email records responsive to CREW's FOIA request, BOP identified key BOP custodians via its institutional knowledge, including consultation with staff who oversee the United States Penitentiary located in Terre Haute, Indiana ("USP Terre Haute"),

where federal executions are performed.  The twelve custodians BOP identified were all involved in BOP's procurement of Pentobarbital during the relevant time.  Christenson Decl. ¶ 21; DOJ SMF ¶¶ 24-25.  BOP also identified key words based on CREW's FOIA request.  Christenson Decl. ¶ 22; DOJ SMF ¶ 26.  BOP then conducted an email search of the twelve custodians using the following parameters:  a date range of February 14, 2019 through August 8, 2019,[3] and the search terms, "Pentobarbital," "Nembutal," and "pento."  Christenson Decl. ¶ 23; DOJ SMF ¶¶ 26-27.  By using this process, BOP is reasonably certain it located all responsive email records.  Christenson Decl.  ¶ 24.  BOP's search returned 1,248 potentially responsive email records.  Christenson Decl. ¶ 25; DOJ SMF ¶ 28.  BOP ultimately determined that 1095 email records were responsive to CREW's FOIA request.  Christenson Decl. ¶ 31; DOJ SMF ¶ 34.  Among those, 848 records were deemed duplicative.  Christenson Decl. ¶ 31; DOJ SMF ¶ 34.  BOP assigned each email record identified as responsive or duplicative a record number.  Each record number, along with a description of the record and information withheld, as well as the FOIA Exemptions applied, has been enumerated in BOP's *Vaughn* Index.  Christenson Decl. ¶ 32 & Ex. F (BOP's *Vaughn* Index); DOJ SMF ¶ 35.

CREW's FOIA request also sought non-email records, specifically procurement records, to include notifications to or communications with vendors, solicitation information, requests for information, subcontracting leads, and contract awards.  Christenson Decl. ¶ 35 & Ex. A; DOJ SMF ¶ 38.  During the relevant time frame, any Pentobarbital would have been purchased by the

---

[3] CREW's FOIA request requested records from February 19, 2019, "to the present." Christenson Decl. ¶ 11 & n.5 & Ex. A.  As such, CREW's request was interpreted as a request for records from February 14, 2019 through August 8, 2019, the date BOP initiated its search.  *Id.*

10

North Central Regional Office ("NCRO"), Financial Management Department ("FMD"). Christenson Decl. ¶ 36; DOJ SMF ¶ 39.  Any documents related to the purchase of Pentobarbital would be maintained in a locked filing cabinet located at NCRO, FMD, to which only specified staff had access.  Christenson Decl. ¶ 36 & Ex. A; DOJ SMF ¶ 40.  BOP staff at NCRO, FMD were told to conduct a search for records responsive to CREW's FOIA request.  Christenson Decl. ¶ 36.  An authorized NCRO, FMD staff member conducted a search of records generated between February 14, 2019 and August 8, 2019, maintained in the relevant NCRO, FMD locked filing cabinet.  Fifty-seven pages of documents were located.  Christenson Decl. ¶ 37; DOJ SMF ¶ 41. BOP reviewed the 57 pages of records and determined that only one was not responsive. Christenson Decl. ¶ 38; DOJ SMF ¶ 42.  BOP conducted a page-by-page and line-by-line review of the remaining 56 pages of responsive non-email documents.  BOP then grouped similar documents into categories of records and assigned each category of records a record number.  Each record number, along with a brief description of the record and the information withheld, as well as the FOIA Exemptions applied to withheld information, is contained in BOP's *Vaughn* Index. Christenson Decl. ¶ 39 & Ex. F; DOJ SMF ¶¶ 43-46.

By taking these steps, BOP employed a reasonable and adequate search of every location where responsive records could reasonably be expected to be maintained.  BOP has no reason to believe that responsive records are likely to be maintained elsewhere.  Christenson Decl. ¶ 42.

DOJ OIP conducted a search for responsive records within OAG, ODAG, and OASG. Pursuant to the Parties' agreement in their first Joint Status Report, ECF No. 7, OIP prioritized its search of two categories of records:  Category 1 pertaining to "contract awards related to the procurement of pentobarbital," and Category 2 pertaining to "requests for information,

11

solicitations, subcontracting leads, and other non-email materials related to the procurement of pentobarbital." So, OIP initiated contact with knowledgeable officials within OAG, ODAG, and OASG to ascertain whether they possessed records responsive to Categories 1 or 2. Through these inquiries, OIP was able to report that each of the three management offices had no hard-copy documents responsive to Categories 1 and 2. Brinkmann Decl. ¶ 11; DOJ SMF ¶¶ 50-52.

DOJ OIP continued its discussions with officials within OAG, ODAG, and OASG to focus the scope of OIP's search through the development of targeted search criteria and the elimination of searches for records maintained by custodians not reasonably likely to possess records responsive to CREW's request. Brinkmann Decl. ¶ 12; DOJ SMF ¶ 53. Because BOP is overseen directly by ODAG and not OASG in DOJ's management chain, OIP preliminarily determined and then confirmed with OASG that OASG had no role in issues related to the procurement of drugs for use in federal executions. Accordingly, OIP did not search the records of any OASG custodian. Brinkmann Decl. ¶ 13; DOJ SMF ¶¶ 54-57.

OIP identified and spoke directly with the ODAG's primary point of contact for BOP and the lethal injection protocol during the relevant time period. Through these discussions, OIP was able to target its search to this official's ODAG records as well as to the records of four additional officials who were in OAG and ODAG during the relevant time. Brinkmann Decl. ¶ 14; DOJ SMF ¶¶ 59-60. Based on its discussions with OAG, ODAG, and OASG, OIP tailored its search to the five officials identified as being reasonably likely to possess records responsive to CREW's request. These five records custodians included the selected senior leadership employed in OAG and ODAG at the time of the events relevant to this request. For all five custodians, OIP employed a keyword search using the following search terms: "pentobarbital" and "Nembutal."

12

Additionally, for the custodian that was the primary ODAG point of contact for lethal injection protocol issues, OIP employed the following additional search criteria: searches for all communications within a specified Microsoft Outlook inbox subfolder which the custodian identified as containing communications pertaining to the death penalty and execution protocol; and searches for all communications with three BOP officials.  The date range for all searches was inclusive of February 14, 2019 to October 2, 2019.  Brinkmann Decl. ¶ 14; DOJ SMF ¶¶ 61-64.

As a result of these email and hard drive searches, OIP located potentially responsive records in its searches, and, pursuant to Department regulations, initiated consultations with other offices, including BOP, which were "better able to determine whether the record is exempt from disclosure under the FOIA."  *See* 28 C.F.R. 16.4(d).  In the course of processing the records located as a result of its search, DOJ OIP continually reviewed the records to identify any additional "leads," in the form of search terms or additional records custodians that might lead to the discovery of additional records responsive to CREW's request.  OIP identified a limited number of instances where responsive material was forwarded to two officials in OAG who were not included in the records custodians OIP searched. Upon identifying these officials, OIP conducted a secondary search of these officials' email accounts to see if additional records responsive to CREW's request were likely to exist outside of the records OIP's initial search located.  No such records were located.  Brinkmann Decl. ¶ 19; DOJ SMF ¶¶ 66-68.  Additionally, after receiving the results of its searches, OIP carefully reviewed the results for any leads indicating that OLP, OLA, or PAO possessed additional records responsive to CREW's request, and, again, identified no such leads.  Brinkmann Decl. ¶ 19; DOJ SMF ¶ 69.

Ultimately, OIP determined that it had located 40 pages containing records responsive to CREW's request.  OIP released twenty-seven pages containing records responsive to CREW's request, with some redactions of information exempt from mandatory release under FOIA.  OIP also withheld 13 pages containing records responsive to CREW's request because they are fully exempt from mandatory release under FOIA.  Brinkmann Decl. ¶ 15; DOJ SMF ¶¶ 78-79.

DOJ OIP's declarant has attested that, "[b]ased on [her] experience with the Department, [her] familiarity with the records maintained by the leadership offices, discussions with knowledgeable staff, as well as [her] understanding of the scope of Plaintiff's request, and information gathered from the documents themselves," OIP's searches were "reasonably calculated to uncover all potentially responsive records, and that all files likely to contain relevant documents were searched." Brinkmann Decl. ¶ 22.

Accordingly, DOJ is entitled to summary judgment on the adequacy of BOP's and OIP's searches. *See Oglesby*, 920 F.2d at 68.

## II.    APPLICATION OF EXEMPTIONS

In its Complaint, CREW alleges that BOP and DOJ "wrongfully withheld all non-exempt records responsive to Plaintiff's FOIA request."  Compl. ¶¶ 28, 33.  Plaintiff is primarily seeking the Court to "[o]rder Defendant DOJ and its component BoP to immediately and fully process Plaintiff's requests and disclose all non-exempt documents to Plaintiff."  *Id*. at 7-8.  Because BOP and DOJ OIP conducted a reasonable search, produced all non-exempt responsive records, and properly withheld all responsive information pursuant to FOIA Exemptions 4, 5, 6, 7(A), 7(C), 7(E), and 7(F), *see* 5 U.S.C. § 552(b)(4)-(b)(7), DOJ is entitled to summary judgment.

A.     **FOIA Exemption 7**

FOIA Exemption 7 permits agencies to withhold "records or information compiled for law enforcement purposes." *See* 5 U.S.C. § 552(b)(7)(A)-(F). To establish that information or records were compiled for law enforcement purposes, an agency need only "establish a rational nexus between an investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (citing *Campbell v. DOJ*, 164 F.3d 20, 32 (D.C. Cir. 1998)). BOP is a law enforcement agency and its employees perform law enforcement functions. Christenson Decl. ¶ 105; *see* 5 U.S.C. § 8401(17)(D)(i); 18 U.S.C. §§ 3015, 4012, 4042; 28 C.F.R. §§ 511, 552. Here, Exemptions 7(A), 7(C), 7(E), and 7(F) preclude disclosure of one or more of the records responsive to CREW's FOIA request.

1.     **The Records Were Compiled for Law Enforcement Purposes**

As a threshold matter, "[t]o fall within any of the exemptions under the umbrella of Exemption 7[(b)], a record must have been 'compiled for law enforcement purposes.'" *Pub. Emps. for Envt. Resp. v. Int'l Boundary & Water Comm'n.*, 740 F.3d 195, 202-03 (D.C. Cir. 2014) (hereinafter "*PEER*"). The records CREW has requested all qualify because they focus on a core law enforcement function – the implementation of a federal criminal sentence. "To determine whether records are compiled for law enforcement purposes, [the D.C. Circuit] has long emphasized that the focus is on how and under what circumstances the requested files were compiled and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (citation omitted). This is not a burdensome exercise. Documents are "compiled for law enforcement purposes" if

15

they were, for example, "created to prevent crime and keep people safe," *Elec. Privacy Info. Ctr.["EPIC"] v. DHS*, 777 F.3d 518, 522-23 (D.C. Cir. 2015); "deter illegal activity and ensure national security," *Sack v. DOD*, 823 F.3d 687, 694 (D.C. Cir. 2016); or otherwise show a "rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law," *Blackwell*, 646 F.3d at 40 (citations omitted)).

Courts have interpreted the "compiled for law enforcement purposes" threshold broadly and deemed it satisfied for all sorts of non-investigatory records that involve a law enforcement purpose. *See, e.g.*, *Karantsalis v. DOJ*, 635 F.3d 497, 502 (11th Cir. 2011) (explaining that "it is clear the booking photographs were compiled for law enforcement purposes" because the Marshals Service is "tasked" with receipt, processing, and transportation of prisoners, and photographs "were taken pursuant to this duty"); *Anderson v. BOP*, 806 F. Supp. 2d 121, 126-27 (D.D.C. 2011) (finding that BOP's statutory duty to manage correctional institutions satisfies Exemption 7's threshold where, after incident at prison, "BOP determines that it is necessary to transfer an inmate to prevent future violence"); *Griffin v. EOUSA*, 774 F. Supp. 2d 322, 325 (D.D.C. 2011) (finding "Individual Custody/Detention Report" satisfies threshold because it was compiled to assist Marshals Service in carrying out its responsibilities).

Here, there can be no doubt that records responsive to CREW's FOIA request for information related to BOP's procurement of Pentobarbital during the relevant time were compiled for law enforcement purposes under Exemption 7's lenient threshold.  The Supreme Court has "observed that [t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Enmund v. Florida*, 458 U.S. 782, 798

(1982) (internal quotations omitted).  Deterrence is a prime law enforcement purpose, *see Sack*, 823 F.3d at 694, and *EPIC*, 777 F.3d at 523, and BOP is tasked with helping to implement that purpose by, *inter alia*, determining which substance or substances shall be used to implement a federal death sentence. *See* 28 C.F.R. § 26.3(a) (1993); Christenson Decl. ¶¶ 78, 112.  The records CREW seeks all have an unmistakable connection to this task.  Exemption 7's threshold is met.

### 2. Exemption 7(A)

Exemption (7)(A) protects records or information "compiled for law enforcement purposes" when disclosure "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  As the D.C. Circuit has explained, "Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *CREW v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). "To justify withholding, [an agency] must therefore demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *Id*. (quoting *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).  The latter two prongs of this analysis typically may be satisfied by pointing to a pending investigation or proceeding. *See id*. at 1098.

The three prongs of Exemption 7(A) are met here for all records that identify prior, current, or potential sources of Pentobarbital and related critical services.  Courts do not appear to have had the opportunity to address whether the phrase "law enforcement proceedings" under Exemption 7(A) applies to the death penalty context, particularly the carrying out of the capital

17

sentence, but that is not surprising given the *sui generis* nature of such proceedings.  *Moorefield v. U.S. Secret Serv.*, 611 F.2d 1021 (5th Cir. 1980) is instructive in determining whether Exemption 7(A) should apply here.  In that case the plaintiff, who was twice convicted for threatening the life of the President, brought a FOIA action to gain access to his Secret Service file.  *Id*. at 1022.  The plaintiff specifically challenged the Secret Service's invocation of Exemption 7(A).  *Id*. at 1023. He "equate[d] 'enforcement proceedings' with 'judicial proceedings,'" and argued that the Secret Service was merely investigating him, not planning for an adjudicatory proceeding.  *Id*. at 1024. The Fifth Circuit recognized that an "enforcement proceeding can generally be equated with a trial," but it found in plaintiff's case "an exception to this rule."  *Id*. at 1025.  The Fifth Circuit explained further that "[n]otwithstanding that Service investigations are not directed toward trials or hearings, they are certainly directed toward an active and concrete effort to enforce the law." *Id*.  The Court noted that Congress in enacting Exemption 7(A) in 1974 "could not have wanted to open Service files to the public . . . merely because they contain protective rather than prosecutorial investigative materials," *id*. at 1026, and concluded that the agency's protective efforts were "enforcement proceedings for the purposes of the FOIA."  *Id*.  Thus, *Moorefield* stands for an expansive reading of Exemption 7(A) in exceptional cases such as this one.[4]

Here, it is impossible to imagine that Congress, in enacting the Federal Death Penalty Act ("FDPA") in 1994, would have wanted FOIA to be used as a tool to interfere with the government's active and concrete efforts to enforce the law through the carrying out of a lawful capital sentence.

---

[4] DOJ is aware of only one other FOIA case in which similar legal questions have been briefed and are pending resolution on summary judgment: *Buzzfeed v. DOJ*, 18-cv-1556-TSC (D.D.C.), *see* ECF Nos. 35-37 & 39-41.

Congress enacted the FDPA in 1994 under the assumption that lethal injection would be available as a method of execution.  The FDPA requires the federal government to use the State's manner of execution.  *See* 18 U.S.C. § 3596(a).  At the time of its enactment, at least a dozen states had already adopted lethal injection as the method of execution, and it was seen as "increasingly … the method of execution in the states."  57 Fed. Reg. 56,536, 56,536 (Nov. 30, 1992).  While Congress clearly anticipated then that the federal government would execute federal condemned inmates using lethal injection, it likely did not anticipate that anti-death penalty advocates would attempt to undermine the government's ability to carry out federal executions by pressuring suppliers of lethal injection drugs to refuse to supply them.  Applying Exemption 7(A) in this context is consistent with the Supreme Court's declaration that "capital punishment is constitutional," so it "necessarily follows that there must be a means of carrying it out."  *Baze v. Rees*, 553 U.S. 35, 47 (2008) (plurality opinion); *see Glossip*, 576 U.S. at 869 (quoting *Baze*).

And even if enforcement proceedings are equated with judicial proceedings, capital sentences at the state and federal levels engender all sorts of litigation that can delay the imposition of a lawfully issued sentence for decades.  *See Bucklew v. Precythe*, 139 S. Ct. 1112, 1133-34 (2019) (noting that the condemned inmate had continued to file numerous challenges after exhausting his state and federal habeas claims, had received two eleventh-hour stays, and had filed his constitutional challenge to the method of execution just days before his scheduled execution).  *Id*.  These lawsuits include habeas challenges seeking to enjoin the government from carrying out the execution, *see Hill v. McDonough*, 547 U.S. 573, 580-83 (2006) (deeming such suits habeas challenges under 28 U.S.C. § 2241), method-of-execution challenges, *id*., as well as other claims whose intent and effect would be to bar or delay the timely enforcement of a capital sentence.

19

Few cases have touched upon whether collateral challenges to an inmate's conviction and sentence should be considered part of the criminal "law enforcement proceeding."  The D.C. Circuit came close to addressing the issue in *Maydak v. DOJ,* 218 F.3d 760 (D.C. Cir. 2000) and *August v. FBI*, 328 F.3d 697 (D.C. Cir. 2003), but in both cases the government withdrew its Exemption 7(A) argument after the prisoner's conviction was affirmed on direct appeal and the D.C. Circuit assumed that law enforcement proceedings ended at that point.  *See August*, 328 F.3d at 698 (noting in the procedural background that the government dropped its 7(A) argument after the prisoner's conviction had been affirmed); *Maydak*, 218 F.3d at 762 (same).

But more recently, this court, in a decision by Judge Collyer, addressed the application of Exemption 7(A) to case-file information sought by a prisoner who was in the midst of pressing a post-conviction habeas challenge to his conviction under 28 U.S.C. § 2255.  *See Sarno v. DOJ*, 278 F. Supp. 3d 112, 125-126 (D.D.C. 2017).  Judge Collyer considered it a complex area, recognizing that "a § 2255 habeas proceeding constitutes a collateral attack by a prisoner on a fully concluded criminal proceeding."  *Id*. at 126.  However, she concluded that the prisoner's habeas challenge qualified as a "law enforcement proceeding" under Exemption 7(A) even though the criminal proceeding had concluded because the challenge was "an ongoing proceeding in which prosecutors must defend their prosecution and his conviction."  *Id*.  Judge Collyer further held that the release of the prisoner's file could interfere with a later prosecution if the habeas challenge was successful and so Exemption 7(A) permitted the government to withhold the file.  *Id*.

Given that habeas challenges outside the death penalty context are considered "law enforcement proceedings" under Exemption 7(A), it stands to reason that habeas challenges and similar litigation in the death penalty context should also constitute "law enforcement

proceedings" under Exemption 7(A).  And where disclosure of information under FOIA would have the effect of interfering with such proceedings, for example by mooting it out or creating delay through stays, Exemption 7(A) should apply.

There is no question that such enforcement proceedings are pending or reasonably anticipated.  Of the approximately 52 federal inmates on death row, over half have yet to exhaust their habeas challenges.  Christenson Decl.  ¶ 111.  And those who have exhausted their habeas challenges and are scheduled to be executed continue to litigate issues related to their death sentence.  To take one example, federal death row inmate Brandon Bernard was sentenced to death by the United States District Court for the Western District of Texas on June 16, 2000.  *See United States v. Bernard*, Case No. 6:99-cr-070 (W.D. Tex.), ECF No. 290.  After exhausting his direct appeal and petitions for post-conviction relief, Bernard filed a petition for writ of certiorari in the Supreme Court, which was denied on January 19, 2016.  *See Bernard v. United States*, Case No. 14-8071 (2016).  Since that time, Bernard has filed, and continues to file, various challenges to numerous aspects of his federal death sentence.  For example, in November 2017, Bernard filed a motion styled as a Motion for Relief from Judgment pursuant to Federal Rules of Civil Procedure 60(b)(6).  The district court construed the motion as an unauthorized attempt to file successive motion pursuant to 28 U.S.C. § 2255.  *See United States v. Bernard*, 6:99-cr-070 (W.D. Tex.), ECF Nos. 569, 571.  Bernard's appeal to both the Fifth Circuit and the Supreme Court were unsuccessful.  *See United States v. Bernard*, No. 18-70008 (5th Cir. Sept. 14, 2018); *Bernard v. United States*, No. 18-6992 (Jan. 13, 2020).  Approximately two years after filing his first unauthorized successive § 2255 motion, Bernard filed another motion seeking to set aside his sentence, this time raising allegations that the government failed to disclose favorable evidence in

21

violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at ECF No. 661. The district court again construed the motion as an unauthorized attempt to file a successive § 2255 petition, and the Fifth Circuit agreed. *Id.* at ECF No. 664, 696; *United States v. Bernard*, No. 19-70021 (5th Cir. Sept. 9, 2020). The petition was ultimately dismissed on October 15, 2020. *United States v. Bernard*, 6:99-cr-070 (W.D. Tex.), ECF No 696. Additionally, on February 19, 2020, Bernard filed a civil complaint in this court challenging the government's method of execution, which was consolidated into the *Execution Protocol Cases*, and remains pending as described above. *See Bernard v. Barr, et al.*, Case No. 20-cv-00474 (D.D.C. filed Feb. 19, 2020). *See generally* Christenson Decl. ¶ 110.

And, there is no question that the disclosure of the identity of those associated with BOP's procurement of lethal injection substances, including Pentobarbital, is reasonably likely to interfere with such proceedings. As has been well-catalogued in the media,[5] court decisions, and in litigation before this court, the disclosure of the identity of lethal injection suppliers tends to have the effect of obstructing the government's access to lethal injection substances. Perhaps the most oft-cited discussion of this evidence is Justice Alito's recounting of the effects of anti-death penalty advocates' pressure on pharmaceutical companies in *Glossip v. Gross*, 135 S. Ct. 2726 (2015). Justice Alito noted that, as a result of such pressure, the "sole American manufacturer of sodium thiopental . . . was persuaded to cease production of the drug," in the United States and then later in Italy after the manufacturer moved its operations there. In fact, "in January 2011, the company announced that it would exit the sodium thiopental market entirely." *Id.* at 2733 (internal citations

---

[5] For an extended discussion of and citations to media reports on this issue, *see* Declaration of Rick Winter ("Winter Decl.") ¶ 17 & nn. 2-4 (referencing Exhibits B-D); Christenson Decl. ¶¶ 112-113 & nn. 21-23 (referencing Ex. O-Q).

omitted).   Further, when the states switched to pentobarbital, "[a]nti-death-penalty advocates lobbied the Danish manufacturer of the drug to stop selling it for use in executions.   That manufacturer opposed the death penalty and took steps to block the shipment of pentobarbital for use in executions in the United States."   *Id*. at 2733-34 (internal citation omitted).

The departure of the sole U.S. manufacturer of sodium thiopental in approximately 2011 effectively ended the federal government's ability to carry out its lethal injection protocol because the drug was used in BOP's then-existing three-drug methodology.   *See* Christenson Decl. ¶¶ 72-73 (discussing the stays in the proceedings in *Roane*, *Robinson*, *Bourgeois* and *Fulks*, pending BOP's completion of its re-evaluation and revision of the lethal injection protocol).   *See also* Winter Decl. ¶¶ 8.

Cases at the state and federal level following *Glossip* have cited its discussion of the effects of anti-death-penalty advocates' pressure on pharmaceutical companies in blocking the disclosure of the identities of suppliers of lethal injection drugs so as not to jeopardize the lawful implementation of capital sentences.   In reverse chronological order, examples include:

- *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1331–32 (11th Cir. 2020): the Eleventh Circuit quashed a subpoena directed to the Georgia Department of Corrections (GDC) by Mississippi death row inmates seeking specific details about the GDC's source and manner of acquiring pentobarbital.   The Eleventh Circuit noted that "death penalty opponents have vigorously lobbied drug manufacturers to make [pentobarbital] entirely unavailable for use in American executions," *id*. at 1326, and that "the ultimate outcome of this very effective advocacy by death penalty opponents has been to make it difficult—if not impossible—for states to acquire sodium thiopental and pentobarbital for use in executions."   *Id*. at 1331.

- *Texas Dep't of Criminal Justice v. Levin*, 572 S.W.3d 671, 682 (Tex. 2019): Texas's Supreme Court denied a request for information regarding the source of lethal injection drugs used by Texas under the Texas Public Information Act because "disclosing the source's identity would create a substantial threat of

23

physical harm to the source's employees and others, and therefore need not be disclosed." *Id*. at 673. *See id*. at 682 (also recognizing that a fear of negative publicity and declining sales was one of the reasons pharmacies do not want to be publicly identified as supplied lethal injection drugs).

- *McGehee v. Texas Dep't of Criminal Justice*, No. H-18-1546, 2018 WL 3996956, at *8-10 (S.D. Tex. Aug. 21, 2018): district court quashed a subpoena directed to the Texas Department of Corrections (TDC) by Arkansas death row inmates seeking, *inter alia*, the identity of Texas's lethal injection drug supplier. The court noted that it was following Fifth Circuit cases in which courts have denied requests for disclosure of the identity of lethal injection sources. *See id*. at * 8-9 (citing cases). The court noted that Texas's fear of disclosure was not "speculative or insignificant" because it had "already lost a supplier of compounded pentobarbital after . . . disclosure in 2013."[6] *Id*. at *9. Further, the court held that Texas had "persuasively argue[d] that disclosure would also likely impede additional sources from agreeing to supply Texas with pentobarbital," citing a declaration from Texas's anonymous supplier which "show[ed] the chilling effect that possible disclosure has on all potential sources of execution chemicals." *Id*. at *10.

- *Gray v. McAuliffe*, No. 3:16-cv-982-HEH, 2017 WL 102970 (E.D. Va. Jan. 10, 2017): the district court recognized that due to "the pressure waged by death penalty opponents, it has become increasingly difficult to obtain the drugs Virginia traditionally used to render a prisoner unconscious during the initial stage of the execution process," *id*. at *7, and that as a result, Virginia's Department of Corrections (VDC) was "required to enter into a Memorandum of Understanding with a compounding pharmacy before the pharmacy agreed to provide the VDC with the necessary drugs. Total confidentiality about the pharmacy's identity was an essential term of that agreement." *Id*. (citation omitted).

- *In re Missouri Dep't of Corr.*, 839 F.3d 732 (8th Cir. 2016): the Eighth Circuit, granted writs of mandamus to Missouri's Department of Correction (MDC) and prohibiting discovery by Mississippi death row inmates seeking the identity of MDC's anonymous supplier of pentobarbital. The court based its decision in part on the pharmacy's declaration that it would not continue to supply Missouri with a lethal injection drug after disclosure. *Id*. at 736.

- *In re Ohio Execution Protocol Litig.*, 845 F.3d 231 (6th Cir. 2016): the Sixth Circuit upheld a protective order against the disclosure of Ohio's supplier of lethal injection drugs after finding that the district court "correctly found . . . . [evidence of] burdens on the willingness [of suppliers] to provide lethal-injection drugs to Ohio," *id*. at

---

[6] For an extended discussion of this incident, *see* Christenson Decl. ¶¶ 53-55 & nn. 7-9.

238, including "an undeniable . . . risk to pharmacies or compounders, including the personnel that work at such entities." *Id*. at 237 (citations omitted).

This is not mere speculation. As recently as two months ago, a news agency report purportedly identified three independent laboratories involved in testing compounded pentobarbital to be used for federal executions. *See* Christenson Decl. ¶¶ 117-18 & n. 24 & Ex. R. The news agency claimed that it had identified the independent laboratories by reviewing redacted laboratory reports that were produced as part of the administrative record in the *Execution Protocol Cases*. *See id*. This led to the announcement by one of the laboratories that it would no longer test pentobarbital unless it could confirm that the drug would not be used for executions. *See id*. The laboratory's co-founder was quoted as saying "[i]t's not that we don't agree with the death penalty. It wasn't worth the controversy—the picket line out front that would eventually take place." *Id*. (citations omitted). Although the news agency did not purport to identify by name entities other than the three laboratories that might be involved in BOP's use of compounded pentobarbital for lethal injection purposes, the article and its consequences serve as a stark reminder that BOP's fears of interference are reasonable. *See id*.

In light of this history, the disclosure of the identity of former, current, or potential suppliers of lethal injection drugs to the federal government (and related critical services) is reasonably likely to endanger law enforcement proceedings related to the government's efforts to effectuate capital sentences.

Even if BOP is able to procure a quantity of compounded pentobarbital prior to disclosure, disclosure will interfere with current and anticipated enforcement proceedings. Suppliers have filed numerous lawsuits in the past to enjoin executions by states that had obtained their lethal

injection drugs from those businesses after the business's identity was disclosed.  *See* Christenson Decl. ¶ 120 & n. 26; *see also In re Lombardi*, 741 F.3d 888, 894 (8th Cir. 2014) (noting that after the 2013 disclosure of the identity of the pharmacy that supplied Texas with its lethal injection drug, the pharmacy "demanded the . . . return [of] a supply of compounded pentobarbital sold for use in executions, because of a 'firestorm,' . . . that resulted from publication of the pharmacy's identity") (quoting from the record).

BOP is well aware of the sensitivities at play here.  *See* Winter Decl. ¶¶ 16-17.  And its efforts to obtain lethal injection drugs for purposes of carrying out federal capital sentences have been limited as a result.  As a practical matter, few companies are even willing to manufacture, produce, distribute, or otherwise engage in conversation with BOP regarding the purchase of lethal injection substances.  *Id*. ¶ 20.  As for those that are willing, BOP has had extensive discussions with them regarding the need for privacy as companies have expressed extreme concern about the need to maintain confidentiality over their potential participation in the federal use of lethal injection drugs.  *Id*. ¶¶ 20-22.  In fact, BOP has provided its suppliers of Pentobarbital and related critical services express assurances that, to the extent possible, their identities, contact information, and the fact or substance of any communication with BOP, would remain confidential.  *Id*. ¶ 24. It can be reasonably expected that the disclosure of information leading to the identity of BOP's current suppliers of API and compounded pentobarbital and other related critical services will cause them to cease their participation in BOP's lethal injection protocol.  *Id*. ¶ 23.

Consequently, BOP took great care in applying Exemption 7(A) to all information that could lead to the disclosure of the identity of those companies and individuals involved in BOP's procurement of Pentobarbital during the relevant time period.  *See* Christenson Decl. ¶¶ 114-17,

26

121-22; DOJ SMF ¶ 88.  For various records, information in those records that BOP withheld under Exemption 7(A) may also be exempt under one or more of the following:  Exemptions 4, 5, 6, 7(C), 7(E), and 7(F).  While every effort was made to release all segregable information, including by conducting a page-by-page and line-by-line review, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.  *See* Christenson Decl. ¶ 122 & Ex. F.  *EPIC v. DOJ*, 82 F. Supp. 3d 307, 322 (D.D.C. 2015) (deeming sufficient agency's detailed declaration supporting its determination under Exemption 7(A)).  BOP's determination here and for all the exemptions discussed below is entitled to a "presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman v. U.S. Marshals Serv*., 494 F.3d 1106, 1117 (D.C. Cir. 2007).

### 3.    Exemption 7(C) and Exemption 6

FOIA Exemption (7)(C) protects "records or information compiled for law enforcement purposes [when disclosure] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  In applying the exemption, agencies are required to balance the privacy interests of individuals against the public interest in disclosure. *See DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989) (Exemption (b)(7)(C)); *Davis v. DOJ*, 968 F.2d 1276, 1281 (D.C. Cir. 1992).  Likewise, Exemption 6 protects from disclosure "personnel and medical files and similar files" when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy.  5 U.S.C. § 552(b)(6).  "Similar files" is interpreted broadly and includes "[g]overnment records on an individual which can be identified as applying to that individual," *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982).  Exemption 6 can be applied to "bits of personal

27

information, such as names and addresses, the release of which would create[ ] a palpable threat to privacy." *Walston v. DoD*, 238 F. Supp. 3d 57, 66 (D.D.C. 2017) (citing *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006)).

While Exemption 6 requires a "clearly unwarranted" invasion to justify nondisclosure, Exemption 7(C) is more protective of privacy than Exemption 6 and, thus, establishes a lower bar for withholding material. *Am. Civil Liberties Union v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011). Accordingly, the analysis under Exemption (7)(C) tilts more in favor of nondisclosure than it would under Exemption 6. *See Reporters Comm.*, 489 U.S. at 756. Because the analyses under both exemptions are similar, case law pertaining to one exemption is often germane in considering the other. *See, e.g.*, *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

In this case, the information that BOP and DOJ OIP withheld meets the requirements of both Exemption 6 and Exemption 7(C) and were thus appropriately withheld from disclosure. Throughout all of the records responsive to CREW's FOIA request, BOP and applied Exemptions 6 and 7(C) to the following types of information—names, initials, signatures, email addresses, telephone/fax numbers, job titles, and department titles—any of which could be used to identify BOP or DOJ staff or third-party individuals involved in BOP's procurement of Pentobarbital who have not consented to the release of their personal information.[7]  DOJ SMF ¶¶ 84-86, 90.  DOJ OIP also applied Exemption 6 to protect a reporter's mobile number and PGP fingerprint. *See* Brinkmann Decl. ¶ 41; DOJ SMF ¶ 100.

---

[7] See Christenson Decl. ¶¶ 96-97, 124 & Ex. F, *Vaughn* Index for a more detailed description of information that was withheld by BOP under Exemptions 6 & 7(C).

28

Due to the nature of their work in a sensitive occupation, as well as the nature of the records at issue here, the BOP or DOJ employees and third-party individuals whose identifying information was withheld have substantial privacy interests in such information.  *See, e.g.*, Christenson Decl. ¶ 99 & Exs. L-N (describing attacks on correctional officers).  While incidents of violence are thankfully rare, BOP or DOJ employees and third-party individuals face a risk of harm as a result of their participation in the federal government's lawful law enforcement activities.  *See* Winter Decl. ¶ 26 ("I have personally supervised and/or worked collaboratively with many of these individuals and am aware of the concerns they have about their personal safety, and that of their families and friends.").  *See also* Christenson Decl. ¶¶ 53-57, 132 (describing risks of threats/harassment faced by suppliers of lethal injection substances).  That is why the court in *Roane* entered a Protective Order (still governing the Master Consolidated Case), which expressly protects the disclosure of the identities of the staff involved in past or future executions and prohibiting individuals from conducting investigations into their backgrounds and qualifications.  *See Roane*, 05-02337 (D.D.C.), ECF No. 30-1; *see also* Winter Decl. ¶¶ 10-13, 27-29 & Ex. A.

Courts have overwhelmingly found that, where information pertaining to the identity of law enforcement officers is at issue, Exemptions 6 and 7(C) protect such information.  *See e.g., Lesar v. DOJ*, 636 F.2d 472, 487 (D.C. Cir. 1980) (finding legitimate interest in concealing identities of government employees where disclosure "could subject them to annoyance or harassment in either their official or private lives"); *Walston*, 238 F. Supp. 3d at 67 (holding that Department of Defense investigators are "employed in a 'sensitive agenc[y]' and have 'sensitive occupations,'" and thus, "have a cognizable privacy interest in keeping their names from being

disclosed."); *Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*, 405 F. Supp. 3d 127, 144 (D.D.C. 2019) ("civilian federal employees have a right to . . . avoid disclosures that 'could conceivably subject them to annoyance or harassment in either their official or private lives'") (quoting *EPIC v. DHS*, 384 F. Supp. 2d 100, 116 (D.D.C. 2005)).  Similarly, courts have found third parties whose names and identifying information appear in law enforcement records have a substantial privacy interest in that information.  *See e.g., SafeCard Servs.*, 926 F.2d at 1206 (holding names and addresses of private individuals appearing in law enforcement files to be categorically exempt from disclosure, subject to rare exceptions not applicable here).

Where, as here, substantial privacy concerns are present, the requestor bears the burden of establishing a legitimate public interest that would outweigh such interests.  *Ctr. for Biological Diversity*, 405 F. Supp. 3d at 145.  Here, CREW fails to allege that the public's interest in information related to BOP's procurement of Pentobarbital outweighs the privacy interests of individuals involved in the process.  Christenson Decl. ¶ 102.  As such, the names and direct contact information for BOP and DOJ employees and third-party individuals involved BOP's procurement of Pentobarbital were properly withheld pursuant to both Exemptions 6 and 7(C).  And, as for DOJ OIP's withholding of personally-identifying information of a third-party reporter, CREW has identified no public interest that outweighs the reporter's privacy interests.

For various records, information in those records that BOP withheld under Exemption 6 and 7(C) may also be exempt under one or more of the following:  Exemptions 4, 5, 7(A), 7(E) and 7(F).  While every effort was made to release all segregable information, including by conducting a page-by-page, line-by-line review, BOP withheld the entirety of those records in

which exempt information was inextricably intertwined with non-exempt information.  *See*

Christenson Decl. ¶¶ 103, 125 & Ex. F.

### 4.    Exemption 7(E)

To withhold information pursuant to Exemption (7)(E), an agency must demonstrate that

release of the information "would disclose techniques and procedures for law enforcement

investigations or prosecutions," or would "disclose guidelines for law enforcement investigations

or prosecutions if such disclosure could reasonably be expected to risk circumvention of the

law."  5 U.S.C. § 552(b)(7)(E).  Courts within the D.C. Circuit and elsewhere are divided as to

whether the phrase "if such disclosure could reasonably be expected to risk circumvention of the

law" applies only to "guidelines," or also applies to "techniques and procedures."  *See PEER*,

740 F.3d at 204 & n.4 (discussing, but issuing no holding on the issue).  But the Court need not

resolve that nuance here, because even if an additional showing that "disclosure could reasonably

be expected to risk circumvention of the law" were required to protect these "techniques and

procedures" from disclosure, the "risk circumvention of the law" requirement presents a "low

bar" that would be satisfied here.  *See id*. at 204-05 & n.4.

"'Rather than requiring a highly specific burden of showing how the law will be

circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the

release of [the requested] information might create a risk of circumvention of the law.'"

*Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir.

2009)).  Therefore, Exemption 7(E) "exempts from disclosure information that could *increase*

*the risks* that a law will be violated or that past violators will escape legal consequences."  *Mayer*

*Brown*, 562 F.3d at 1193.  Exemption 7(E) also permits an agency to withhold information

31

regarding non-public details about commonly-known procedures if the disclosure of such details could reduce or nullify their effectiveness.  *See, e.g.*, *Barnard v. DHS*, 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (recognizing that an agency is not required "to release all details concerning these and similar techniques simply because some aspects of them are known to the public").

BOP has applied Exemption 7(E) here to withhold information that would reveal the strategy undertaken in order to procure Pentobarbital, and information regarding the method by which BOP procured or attempted to procure Pentobarbital.[8]  DOJ SMF ¶ 92.  The disclosure of this information greatly increases the risk that BOP will be unable to procure Pentobarbital, which in turn would greatly interfere with BOP's legal mandate to carry out capital sentences. *Id*.  *See PEER*, 740 F.3d at 205 (upholding the invocation of Exemption 7(E) as to emergency action plans for two dams in the event of dam failure out of concern for sabotage or terroristic efforts to thwart the plans).  Although the public may be aware that the government purchases Pentobarbital from outside sources, the process is not subject to full and open competition, as the disclosure of the agency's needs would compromise its ability to obtain Pentobarbital and would subject the parties involved to threats, harassment, or even physical injury.  Christenson Decl. ¶ 127.  As such, the specific techniques and procedures used to procure Pentobarbital are not well known to the public, and in fact, are only shared with particularly identified BOP and DOJ personnel, and even those individuals are prohibited from sharing this information, even within their own agencies.  *Id*.  *See also* Winter Decl. ¶ 31.

---

[8] *See* Christenson Decl. ¶ 128 & Ex. F, *Vaughn* Index, for a full description of the records and withheld information under Exemption 7(E).

Accordingly, the law enforcement techniques and procedures utilized by BOP are subject to withholding under Exemption 7(E).  For various records, information in those records that BOP withheld under Exemption 7(E) may also be exempt under one or more of the following: Exemptions 4, 5, 6, 7(A), 7(C) and 7(F).  While every effort was made to release all segregable information, including by conducting a page-by-page and line-by-line review, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.  Christenson Decl. ¶ 129 & Ex. F.

## 5.    Exemption 7(F)

Exemption 7(F) protects "records or information compiled for law enforcement purposes [that] . . . could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).  In evaluating the validity of an agency's invocation of Exemption 7(F), the court should, within limits, defer to the agency's assessment of danger. *Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, CIV.A. 04-00377, 2006 WL 1826185 (D.D.C. June 30, 2006).  In contrast to Exemption (7)(C), agencies are not required to balance privacy and public interests in applying this exemption.  *See Raulerson v. Ashcroft*, 271 F. Supp. 2d 17, 29 (D.D.C. 2002).

Here, disclosure of the names, personal identifiers and direct contact information of BOP or DOJ staff or third parties associated with BOP's procurement of Pentobarbital for purposes of carrying out the death penalty could reasonably be expected to endanger their lives or physical safety.  Christenson Decl. ¶¶ 131-32; Winter Decl. ¶¶ 25-30 & n.5.  *Boehm v. FBI*, 948 F. Supp. 2d 9, 36 (D.D.C. 2013) (holding that Exemption 7(F) justifies withholding names and identifying information of federal employees).  *See also Texas Dep't of Criminal Justice*, 572 S.W.3d at 685

33

(identifying a comment left on the website of a pharmacy associated with Missouri's use of lethal injection as sufficient evidence of a substantial threat of physical harm).

Because disclosure of individuals' names, identifying information, and direct contact information could reasonably be expected to result in harassment, threats or other harms to their lives and safety, this information is exempt pursuant to Exemption 7(F).  BOP applied this exemption to the same identifying information throughout the records as was described under Exemption 6 and Exemption 7(C).  Christenson Decl. ¶ 133; DOJ SMF ¶ 93.  Information in those records that BOP withheld under Exemption 7(F) may also be exempt under one or more of the following:  Exemptions 4, 5, 6, 7(A), 7(C) and 7(E).  While every effort was made to release all segregable information, including by conducting a page-by-page, line-by-line review, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.  Christenson Decl. ¶ 134 & Ex. F.

## B.   FOIA EXEMPTION 4

Exemption 4 protects "[t]rade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  The exemption protects the interests of both the government and the submitter of the information.  *See, e.g., Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767-70 (D.C. Cir. 1974), *abrogated on other grounds by Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019)  (concluding that the legislative history of the FOIA "firmly supports an inference that [Exemption 4] is intended for the benefit of persons who supply information as well as the agencies which gather it").  Specifically, it encourages submitters to provide the government with confidential information that is accurate and reliable and provides assurances that such information will be safeguarded, thereby protecting

34

submitters from competitive disadvantage if disclosed.  *See Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992).

When information does not contain trade secrets, Exemption 4 applies if the withheld information is shown to be "commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  Information provided by a "person" includes "an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2); *see also Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996).  It also includes submitter-generated information summarized or reformulated by the agency.  *See EPIC v. DHS*, 117 F. Supp. 3d 46, 63 (D.D.C. 2015) (information is protected even if the government summarized information obtained from another person).  Similarly, this Court has held the fact that particular information is "arrived at through negotiation" with the government does not necessarily preclude it from being regarded as "obtained from a person."  *See Pub. Citizen Health Research Group v. NIH*, 209 F. Supp. 2d 37, 44-45 (D.D.C. 2002) (concluding that although a licensee's final royalty rate was the result of negotiation with the agency, that did "not alter the fact that the licensee is the ultimate source of [the] information," in as much as the licensee "must provide the information in the first instance").

The term "commercial or financial" "reaches . . . broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency."  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  "Commercial or financial" information is considered "confidential" under Exemption 4 "whenever it is customarily kept private, or at least closely held, by the person imparting it."  *Argus Leader*, 139 S. Ct. at 2363.  In *Argus Leader*, the Supreme Court noted that

an additional requirement for confidentiality may be whether the party receiving the information has provided some assurance that it will remain secret.  *Id.*  The Court declined to adopt such a requirement, as it found the condition to be clearly satisfied in the case before it, but did note that particularly "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."  *Id.* at 2366.

In this case, BOP applied Exemption 4 to records that contain confidential commercial or financial information provided to BOP by a "person," as required by Exemption 4, including from sources of BOP's supply of Pentobarbital to be used for lethal injection purposes, and individuals/companies who performed testing services on that Pentobarbital supply (including information reformulated into government records by using information provided by sources under assurances of confidentiality).  Such confidential or financial information includes any information that could lead to the identity of any such individual or company, including names, titles, department titles, purchase order/reference numbers, account numbers, contract numbers, phone and fax numbers, web addresses, physical addresses, video conference ID numbers, IT information,  as well as company logos, brochures, quotations, invoices, testing results, dates of purchase, service, and/or delivery, substance description, item/stock/UPC numbers, price, quantity, concentration, packaging details, expiration dates, container units, lot numbers, and product identification numbers.  *See* Christenson Decl. ¶¶ 43, 48 & Ex. F; DOJ SMF ¶ 80.

BOP also applied Exemption 4 to price and contract term negotiations, pricing and business strategies, instructions for ordering and purchase, unique order and purchase requirements, and production and/or testing capability, to include formulas, quantity, timing of

36

production and/or testing, and specific production/testing methods or standards.  The information was provided either directly from a source provider, was encompassed into the negotiation with the source provider for a transaction, or was forwarded or incorporated into email communications between BOP staff.  Christenson Decl. ¶ 49 & Ex. F.

Finally, BOP applied Exemption 4 to withhold in full invoices, quotations, and protocols for third party testing services, as well as test results, as these documents reflect price and contract term negotiations, specific methods of testing, and descriptions of how testing was or can be completed, including formulas, quantities and time frames required for testing.  *Id*. ¶ 50.

This material is of the type that courts have routinely found to be commercial in nature for purposes of Exemption 4.  *See e.g., EPIC*, 117 F. Supp. 3d at 62 (finding the name and identity of a company to be "commercial" for Exemption 4 purposes when disclosure could have a commercial or financial impact on the company involved); *Gellman v. DHS*, --- F.3d ---, 2020 WL 1323896, at *10 (D.D.C. Mar. 20, 2020) (access to how a vendor formats, designs, and organizes its product could implicate the "commercial interest" in the vendor's ability to maintain its government contract).

The withheld information is also confidential as defined by the Supreme Court in *Argus Leader*.  As discussed exhaustively above, disclosure of this information, and any other commercial information that could be used to identify those associated with BOP's procurement of Pentobarbital, could subject such individuals and/or companies to harm to their competitive business interests.  *See, e.g.*, *Texas Dep't of Criminal Justice*, 572 S.W.3d at 682 (recognizing that a fear of negative publicity and declining sales was one of the reasons pharmacies do not want to be publicly identified as supplied lethal injection drugs).  Due to these fears, during the times

37

relevant to the Complaint, BOP restricted communications with, and knowledge of, providers of Pentobarbital and related critical services only to those within BOP who were directly involved in the process of obtaining the substances or had a need to know the information in the performance of their duties.   Christenson Decl. ¶ 58.   Companies keep their identity as a supplier of Pentobarbital or related critical services, or even the fact that they have engaged in communications with state or federal governments for the purpose of discussing Pentobarbital, private.   Winter Decl. ¶ 21-22.   BOP has provided such companies express assurances that, to the extent possible, their identities and contact information will remain confidential.   *Id.* ¶ 24.

Because the withheld information is customarily and actually kept private by the person(s) who provided it under some assurance that the information would remain private, the information is "confidential" for purposes of Exemption 4.   *Argus Leader*, 139 S. Ct. at 2363.   Because revealing the withheld commercial information is likely to impair the government's ability to obtain necessary information for the procurement of Pentobarbital and other lethal substances in the future, information in those records that BOP withheld under Exemption 4 may also be exempt under one or more of the following:   Exemptions 5, 6, 7(A), 7(C), 7(E) and 7(F).   While every effort was made to release all segregable information, including by conducting a page-by-page, line-by-line review, BOP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.   Christenson Decl. ¶ 60 & Ex. F.

## C.   **FOIA Exemption 5**

Exemption 5 of the FOIA protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."   5 U.S.C. § 552(b)(5).   Documents that would ordinarily be privileged in a civil discovery

context are protected from public disclosure.  *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148-149 (1975); *Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1184-87 (D.C. Cir. 1987).  Exemption 5 encompasses three different privileges:  the attorney-client privilege, the attorney work-product doctrine, and the deliberative process privilege.  *Sears, Roebuck & Co.*, 421 U.S. at 149; *see also Gellman*, 2020 WL 1323896, at *11.

### 1.   Deliberative Process, Attorney-Work Product and Attorney-Client Privileges

#### (a)   *Deliberative Process Privilege*

"The deliberative process privilege, also known as the 'executive' or 'governmental' privilege serves many purposes."  *Eugene Burger Mgmt. Corp. v. U.S. Dep't of Hous. and Urban Dev.*, 192 F.R.D. 1, 4 (D.D.C. 1999).  In particular, it serves to assure that subordinates within an agency will feel free to provide the decision maker with their uninhibited opinions and recommendations without fear of being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's actions.  *Id.* (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).  The main purpose of this privilege is to "prevent injury to the quality of agency decisions."  *Sears Roebuck & Co.*, 421 U.S. at 151.  The privilege does so by shielding the opinions, conclusions, and reasoning used in the administrative and decision-making process.  *See Petroleum Info. Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992); *Access Reports v. DOJ*, 926 F.2d 1192, 1194-95 (D.C. Cir. 1991).

39

The privilege remains even after a final decision has been made, because "disclosure at any time could inhibit the free flow of advice." *Fed. Open Market Comm. v. Merrill*, 443 U.S. 340, 360 (1979). The privilege covers communications which are themselves deliberative in nature, as well as communications which, if revealed, would expose to public view the deliberative process of an agency. *Heggestad v. DOJ*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000).

For a document to be covered by the deliberative process privilege, it must be both "predecisional," i.e., generated prior to the adoption of an agency policy, and "deliberative," i.e., reflecting the give-and-take of the consultative process. *Coastal States*, 617 F.2d at 866. Because agency deliberations do not always ripen into agency decisions, the privilege is meant to protect the decisional *process*. *Id.*; *see also Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). To show that a document is predecisional, the agency need only establish "what deliberative process is involved, and the role played by the documents at issue in . . . that process." *Heggestad*, 182 F. Supp. 2d at 7 (citing *Coastal States*, 617 F.2d at 868).

Documents are deliberative in nature if they are "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975). Thus, the exemption covers recommendations, draft documents, proposals, analyses, suggestions, discussions, and other subjective documents that reflect the give-and-take of the consultative process. *Coastal States*, 617 F.2d at 866.

*(b)*     *The Attorney Work-Product Doctrine*

The attorney work-product doctrine protects against the disclosure of material "prepared in anticipation of litigation or for trial or for another party or by or for that other party's

representative." *McKinley v. Bd. Of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 341 (D.C. Cir. 2011); *Judicial Watch, Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005). Protected work product is not limited to "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *FTC v. Grolier*, 462 U.S. 19, 25 (1983). Rather, "factual material is itself privileged when it appears within documents that are attorney work-product," and if a record may be withheld under the attorney work-product protection of Exemption 5, "then segregability is not required." *Judicial Watch*, 432 F.3d at 371.

*(c)    The Attorney-Client Privilege*

The attorney-client privilege protects confidential communications between an attorney and her client relating to a legal matter for which the client has sought legal advice or services. *Mead Data Cent. Inc. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977). In the FOIA context, the agency is the "client" and the agency's lawyers are the "attorneys" for the purposes of attorney-client privilege. *Coastal States*, 617 F.2d at 863. The privilege applies to facts supplied by a client to his attorney, opinions by an attorney based upon and reflecting those facts, and communications between attorneys reflecting the client-supplied information. *See id.* at 862; *see also EPIC v. DHS*, 384 F. Supp. 2d 100, 114 (D.D.C. 2005) The attorney-client privilege is not limited to the litigation context. *Mead Data*, 566 F.2d at 252-253; *EPIC*, 384 F. Supp. 2d at 114.

**2.    BOP's Application of Exemption 5 and the Privileges**

In this case, CREW's FOIA request seeks records from February 14, 2019 to the present, which BOP construed as August 8, 2019. Because BOP did not adopt the Addendum until July 25, 2019, many of the responsive records CREW seeks contains pre-decisional, deliberative

41

information regarding BOP's efforts to procure Pentobarbital for purposes of carrying out capital sentences. Christenson Decl. ¶ 81. In particular, BOP applied Exemption 5 to intra or inter-agency email records between BOP attorneys, BOP and DOJ attorneys, BOP/DOJ attorneys and BOP staff, and between two or more BOP non-attorney staff, which contain information that was considered as part of BOP's effort to procure Pentobarbital for use in the execution of a federal death sentence. Such records are covered by the deliberative process privilege. The application of Exemption 5 to these records was also appropriate because they are privileged in that they include communications between attorneys or between attorneys and their client(s), and contain opinions or guidance regarding compliance with the regulations that require BOP to implement federal death sentences and other regulatory requirements concerning procurement of lethal injection substances, pending or anticipated legal proceedings, laws, regulations, or case decisions, or because it was a document created by or obtained at the direction of an attorney in anticipation of litigation, *e.g.*, litigation challenging BOP's implementation of a federal capital sentence. Christenson Decl. 83.

The specific records to which Exemption 5 was applied are described in detail in the declaration of BOP's declarant, Kara Christensen, *see id.* ¶¶ 85-93, and in the *Vaughn* Index attached thereto, see *id.* at Ex. F. They include:

- Drafts of a "processing summary" document concerning the procurement and proposed use of Pentobarbital that was prepared by a BOP attorney in preparation for the finalization of BOP's Protocol Addendum, as well as in anticipation of litigation concerning the Protocol. *Id.* ¶¶ 85-86;

- Communications regarding available testing services and the status of, or descriptions of such services, which reflect BOP's deliberative process in evaluating the availability, efficacy, and reliability of third party testing services

42

associated with the procurement of Pentobarbital for inclusion in the revised Protocol. *Id.* ¶ 87;

- Communications between BOP and DOJ attorneys and staff regarding the status of the finalization of the Protocol Addendum, including BOP staff's assessment, analysis, recommendations and opinions, as well as back and forth discussions regarding the information, data, or actions that were complete or needed to be completed in order to finalize the revised Protocol. *Id.* ¶ 88;

- Drafts of a memorandum—and related emails between BOP attorneys discussing the memorandum—addressed to and prepared for the Attorney General by a BOP attorney regarding BOP's proposed addendum to the revised Protocol. *Id.* ¶ 89-90;

- Communications that would reveal BOP's deliberative process in identifying, obtaining, and selecting an appropriate substance to be included in the revised Protocol. *Id.* ¶ 91;

- Drafts of memorandum concerning BOP's justification for procuring Pentobarbital other than through full and open competition. *Id.* ¶ 92; and

- Email communications between BOP attorneys and staff discussing proposed answers, including draft talking points, to media inquiries about the Protocol. *Id.* ¶ 93.

CREW's request to DOJ OIP also seeks records related to BOP's procurement of Pentobarbital from February 14, 2019, to the present, but DOJ OIP has construed the "present" as October 2, 2019 because that is when OIP started its search. Brinkmann Decl. ¶ 20. All of the information withheld by OIP in this litigation under Exemption 5 is protected in full or in part by the deliberative process privilege as it consists of communications and working drafts generated by, exchanged within, and wholly internal to DOJ about the following categories of records: (1) Deliberative Discussions Regarding Federal Execution Protocol Addendum, (2) Draft Meeting Agenda, and (3) Deliberative Discussions Regarding Specific Press Inquiry. *Id.* ¶¶ 21-22. The specific records to which Exemption 5 was applied are described in detail in the declaration of

DOJ OIP's declarant, Vanessa R. Brinkmann, *see id*. ¶¶ 24-33, and in the *Vaughn* Index attached thereto, *see id*. at Ex. F

The first category of records consists of portions of internal email communications among DOJ employees engaged in deliberations over a proposed addendum to the former execution protocol.  These communications were pre-decisional and are deliberative as they reflect the internal evaluations and recommendations of draft, non-final memoranda being prepared to inform Department leadership.  *Id*. ¶ 25.  The second category or records consists of an internal draft meeting agenda among ODAG, BOP, and other DOJ components related to the proposed addendum, including issues related to the procurement of Pentobarbital.  *Id*. ¶ 26.  These drafts do not confirm or memorialize the final topics actually discussed at the meeting and thus are predecisional, and are deliberative as they reflect the evaluations and assessments on important topics to discuss at a proposed meeting related to the proposed addendum.  Moreover, the selection of topics itself is revelatory of a deliberative process, inasmuch as that selection reveals matters that staff from the Department components which authored the proposed agenda thought were appropriate to brief Department leadership on.  *Id*. ¶ 28.  The third category of records consists of internal DOJ discussions regarding how best to respond to press inquiries related to the federal government's execution policy and the procurement of Pentobarbital.  These records, which were created prior to the final, approved or released to the public response, if any, reflect internal Department discussions regarding the content, language, and strategy on how to respond to this press specific inquiry.  As such, they are both pre-decisional and deliberative.  *Id*. ¶¶ 31-32.

The disclosure of these records—both BOP's and DOJ's—would severely hamper the efficient day-to-day workings of both BOP and DOJ, as individuals would no longer freely share

their ideas and advice on matters under consideration by DOJ officials often while those viewpoints are still developing. This lack of candor would seriously impair the ability to foster the forthright discussions that are essential for proper decision-making.  See, e.g., Brinkmann Decl. ¶ 33; Christenson Decl. ¶ 66.  It would also result in public confusion from the disclosure of various rationales, information, or characterizations of the issues that were not ultimately the grounds for DOJ and BOP's final actions.  Brinkmann Decl. ¶¶ 25, 29; Christenson Decl. ¶ 67.

Information in those records that BOP withheld under Exemption 5 may also be exempt under one or more of the following:  Exemptions 4, 6, 7(A), 7(C), 7(E) and 7(F).  While every effort was made to release all segregable information, including by conducting a page-by-page, line-by-line review, BOP and OIP withheld the entirety of those records in which exempt information was inextricably intertwined with non-exempt information.  Christenson Decl. ¶ 94 & Ex. F; Brinkmann Decl. ¶¶ 34-35.

## CONCLUSION

For the aforementioned reasons, DOJ respectfully request that this Court grant judgment as a matter of law in its favor.

November 6, 2020                          Respectfully submitted,


                                          JEFFREY BOSSERT CLARK
                                          Acting Assistant Attorney General

                                          ELIZABETH J. SHAPIRO
                                          Deputy Director, Federal Programs Branch

                                          /s/ Jonathan D. Kossak

                                          JONATHAN D. KOSSAK
                                          Trial Attorney (DC Bar # 991478)
                                          U.S. Dep't. of Justice, Federal Programs Branch
                                          1100 L Street, NW
                                          Washington, D.C. 20005
                                          Tel. (202) 305-0612; Fax. (202) 616-8460
                                          Email:  jonathan.kossak@usdoj.gov