**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON,

      Plaintiff,

      v.

U.S. DEPARTMENT OF JUSTICE, ET AL.,

      Defendants.

No. 19-cv-03626-DLF

<u>DECLARATION OF RICK WINTER</u>

I, Richard M. Winter, do hereby declare and state as follows:

1.     I am employed by the United States Department of Justice, Federal Bureau of Prisons ("BOP"), as the Regional Counsel for the North Central Regional Office, located in Kansas City, Kansas ("NCRO"). I have worked for BOP since 1994, and have been employed as an attorney with the agency since 1995. During this time, I have held several different positions within BOP, including Staff Attorney for the United States Penitentiary in Leavenworth, Kansas, Senior Attorney for BOP's Labor Relations Branch, and Deputy Regional Counsel at the NCRO.

2.     I am familiar with the Complaint filed by Citizens for Responsibility and Ethics in Washington ("CREW") seeking disclosure of the records from February 14, 2019 to the present related to the procurement of lethal injection substances, specifically pentobarbital, pentobarbital sodium, and Nembutal (collectively, "Pentobarbital") sought through its Freedom of Information Act ("FOIA") Request No. 2019-05579, which was submitted to BOP and separately to the Department of Justice.

3.     The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by

1

me through the performance of my official duties.  As Regional Counsel for the NCRO, I am familiar with BOP's execution protocol, including past and active litigation concerning the protocol, BOP's efforts to determine an appropriate protocol, and its efforts to obtain and maintain substances to carry out lethal injection procedures.  I am also familiar with the FOIA, its requirements for releasing government information and documents, and exemptions to protect against the release of certain categories of records.

4.      BOP's Special Confinement Unit ("SCU"), located at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute"), is the designated unit to house inmates facing a sentence of death.  USP Terre Haute, and consequently, the SCU, is geographically and operationally located within the NCRO.  As Regional Counsel for the NCRO, I have oversight responsibilities for legal issues arising out of the NCRO, including USP Terre Haute and the SCU. In addition, I am responsible for providing advice and guidance to NCRO's Executive Staff, and I provide general oversight over all legal issues arising within the NCRO.

5.      I have been involved, in some way or another, with BOP's efforts to develop a federal death penalty protocol since approximately 2008, when I was employed as the Deputy Regional Counsel for the NCRO. Over the years, my role has evolved, but I have always provided advice and guidance to those involved in the process to implement BOP's responsibility for carrying out federal death sentences.  In addition, I have served and continue to serve as one of the liaisons between BOP and DOJ concerning litigation in which BOP's execution protocol was and is being challenged.  Further, I have played and still play an integral role in BOP's efforts to investigate potential sources of lethal injection substances, to obtain such substances, and to ensure proper laboratory testing is completed.  I was also intimately involved in BOP's efforts to revise the execution protocol between 2011 and 2019 and to create and publish the addendum to the execution protocol in July 2019.  Finally, as Regional Counsel for the NCRO, and more so in my

previous capacity as Deputy Regional Counsel, I oversee the processing of FOIA requests arising out of the NCRO, and I consult with agency counsel and FOIA processors concerning requests that seek information specifically related to the execution protocol.  As such, I have extensive knowledge and experience related to the topics discussed below.

## I.     Procedural History of Federal Death Penalty Protocol Litigation

6.     BOP, under the supervision of the United States Marshal Service, is responsible for implementing federal death sentences.  *See* 18 U.S.C. § 3596(a); 28 C.F.R. Part 26. Prior to the adoption of BOP's addendum to the federal execution protocol in July 2019, the federal lethal injection protocol involved the use of three drugs: sodium thiopental, pancuronium bromide, and potassium chloride.

7.     Beginning in 2005, the federal government, including BOP, has been defending civil litigation concerning the death penalty, and specifically concerning BOP's lethal injection protocol.  *See Roane, et al. v. Gonzales*, No. 05-2337 (D.D.C.).  In 2006, the *Roane* plaintiffs secured injunctions barring their executions and the parties engaged in extensive discovery over a period of five years.  *See id.* at Doc. 5.

8.     In 2011, the federal government acknowledged that it did not have any reserves of one of the lethal substances used in the execution protocol, sodium thiopental.  *See Roane*, 05-02337, Doc. 281 (Joint Status Report referencing the Attorney General's March 4, 2011, memorandum). Thereafter, the *Roane* litigation was stayed and BOP began a years-long effort to revise its execution protocol.  *See id.* at Doc. 288.

9.     On July 25, 2019, the federal government informed the parties and the Court in the *Roane* litigation that the government had adopted a revised addendum to the BOP's federal execution protocol that provides for the use of a single drug, pentobarbital, as the lethal injection agent. *See id.* at Doc. 385.  At the same time, DOJ publically announced the adoption of the addendum and

scheduled the executions of five federal death row inmates: Alfred Bourgeois, Daniel Lee, Dustin Honken, Wesley Purkey, and Lezmond Mitchell. *See* Decl. of Kara Christenson, ¶ 73, Ex. K (July 25, 2019 DOJ Press Release).

10. Following the announcement of the execution protocol addendum, litigation challenging the protocol became active again. *See Roane*, Doc. 392.[1] On November 20, 2019, the district court enjoined four (4) of the five (5) inmates who had been scheduled for execution (Bourgeois, Lee, Honken, and Purkey). *See In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-00145 (TSC) (D.D.C.) [hereinafter "*Execution Protocol Cases*"], Doc. 51. On appeal by the government, the injunctions were vacated by the United States Court of Appeals for the District of Columbia, and proceedings were remanded to the district court. *See Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020). While the appeal concerning the district court's preliminary injunction unfolded, proceedings in the district court have continued. Plaintiffs took depositions of several Rule 30(b)(6) witnesses, including for the BOP and for DOJ's senior leadership offices, all in anticipation of filing an amended complaint. *See e.g., Execution Protocol Cases*, 19-mc-00145 (D.D.C.) at Docs. 70, 71, 82. This limited discovery took place under the cover of a protective order initially issued in the *Roane* litigation in 2007 that remains in place in the consolidated litigation. *See Roane*, Doc. 30-1. The protective order is attached hereto as Exhibit A, and states in pertinent part:

> It appears that certain documents, information and tangible objects that may be produced during the course of discovery in this lawsuit contain confidential information relating to security procedures of defendants or to

---

[1] On August 20, 2020, the Court consolidated all cases in which the execution protocol was being challenged into a newly established Master Case: *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-00145 (TSC). At the time, *Roane* and three additional cases were consolidated into the Master Case. Since that time, several other federal death row inmates have intervened as plaintiffs, or have filed separate civil cases which have been consolidated into the Master Case.

the identity of persons performing sensitive tasks in connection with the execution of condemned prisoners protected by, inter alia, the Privacy Act of 1974, 5 U.S.C. § 552a and the discovery limitations of the Federal Rules of Civil Procedure.  The public disclosure of this information would be contrary to law and the public interest.

Ex. A.

11.    The protective order permits the parties to designate material as "Confidential."  *Id*. ¶ 2. Material designated as confidential "may be used only for the purposes of this litigation and shall not be given, shown, made available, discussed, or otherwise communicated in any form to plaintiffs . . ., nor to anyone other than:  (i) counsel for plaintiffs" and various others involved in the litigation (e.g., court reporters, witnesses, and government employees with a need to know). *Id*. ¶ 4(a).

12.    In addition, the protective order makes clear that "the names and personally-identifying information of any officers, employees, agents and contractors involved in past executions or expected to be involved in the executions of plaintiffs or in the development of the protocol(s) for the same shall not be revealed in connection with the litigation of this lawsuit to anyone other than counsel for defendants."  *Id*. ¶ 13.

13.    Further, the protective order prohibits counsel for the plaintiffs from "conduct[ing] independent investigations or background investigations of those persons counsel for plaintiffs believe to be involved in past executions, nor of those expected to be involved in the executions of plaintiffs, nor of those involved in the development of the protocol(s) for the executions of plaintiffs, nor of those involved in the development of the federal execution protocols applicable to past executions. . . .  [T]o do so would pose an unacceptable risk that their participation and identities would be made public."  *Id*.

14.    Plaintiffs in the *Execution Protocol Cases* filed an amended complaint on June 1, 2020. *Execution Protocol Cases*, Doc 92.  Since then, the parties in that case have engaged in extensive

litigation, much of which is described in the court's Memorandum Opinion, *see* Doc. 261 at 4-8 (describing the filing of preliminary injunction motions, dispositive motions, interim and final rulings, and appeals, including to the Supreme Court on multiple occasions).  Although seven federal inmates have been executed and nearly all of the claims in that litigation have been decided, it is still very much active.  As described in the *Execution Protocol Cases* parties' September 29, 2020 Joint Status Report, several motions to alter or amend judgment are outstanding as are at least two as-applied challenges.  *See id.* Doc. 279 at 1-3.  At the moment, three additional executions have been scheduled for November 19, 2020 (Orlando Hall), December 8, 2020 (Lisa Montgomery), and December 10, 2020 (Brandon Bernard).  Based on my experience of the seven executions that have occurred since July of this year (2020), I am confident that as long as there are scheduled executions, there will be litigation to forestall them at the trial and appellate levels wherever the condemned inmates and their attorneys can feasibly file challenges.

15.     Throughout the *Execution Protocol Cases* litigation, the Government has maintained, pursuant to the protective order in place and the law-enforcement privilege, the confidentiality of the sources of the pentobarbital BOP has used to fulfill its duty to carry out capital sentences. None of the plaintiffs in that litigation or any other litigation over the past year filed by condemned inmates have sought or challenged the Government's withholding of such information.

## II.     Harm Resulting From the Disclosure of Sources of Pentobarbital and Providers of Related Critical Services

16.     Based on my decade-plus of experience with lethal injection protocol litigation and with BOP's efforts to obtain lethal injection drugs and revise its lethal injection protocol, I am personally aware that the disclosure of sources of lethal injection substances and related critical services, as well as the methods used to investigate and/or procure such substances and services, can reasonably be expected to foreclose the future use of such sources and services, which in turn,

would prohibit BOP from implementing its lawfully mandated enforcement action against federal inmates who have been sentenced to death.

17.     It is no secret that substances used in lethal injection procedures, for a variety of reasons, are difficult to obtain.  One such reason is the pressure placed by anti-death penalty advocates on manufacturers, pharmacies, or distributors of substances sold for use in lethal injection procedures. *See e.g., Gray v. McAuliffe*, No. 3:16CV982-HEH, 2017 WL 102970, at *7 (E.D. Va. Jan. 10, 2017), *appeal dismissed* (4th Cir. Jan. 11, 2017) (noting that "[i]n light of the pressure waged by death penalty opponents, it has become increasingly difficult to obtain the drugs Virginia traditionally used to render a prisoner unconscious during the initial stage of the execution process…." and that "[b]ecause death penalty opponents have made it difficult to obtain FDA-approved drugs customarily used in executions, Virginia has recently resorted to obtaining drugs from compounding pharmacies instead of traditional suppliers.").  *See also* Ex. B (May 13, 2016, The New York Times article)[2] (citing human rights groups and shareholder resolutions as sources of pressure for drug manufacturer Pfizer to discontinue the distribution of drugs used in lethal injections); Ex. C (Oct. 18, 2013, U.S. Pharmacist article)[3] (stating Hospira, a U.S. drug manufacturing company, announced its decision to cease production of a drug used in lethal injections following a "global campaign by death penalty opponents and pressure by Italian government officials after the company sought to shift production of the drug to a plant in Italy," and indicating that "[p]harmacies and pharmaceutical suppliers are increasingly concerned with backlashes from anti-death penalty protestors for being known as suppliers of ingredients used to

---

[2] Eric Eckholm, Pfizer Blocks the Use of Its Drugs in Executions, (May 13, 2016), https://www.nytimes.com/2016/05/14/us/pfizer-execution-drugs-lethal-injection.html.
[3] Jesse C. Vivian, RPh, JD (Oct. 18, 2013), https://www.uspharmacist.com/article/lethal-injections-drug-shortages-and-pharmacy-ethics-44470.

intentionally end a person's life"); Ex. D (Feb. 20, 2018, Stltoday.com Article) [4] (reporting a St. Louis-based pharmacy owned by Centene Corp., would no longer provide drugs used for executions after it was identified in a news report as a supplier of drugs used for executions in Missouri); *see also* Christenson Decl., ¶ 113, Ex. P (Aug. 7, 2013, TIME article) (explaining that once it became known that Missouri was intending to incorporate propofol into its lethal-injection protocol, the German drug manufacturer that produced propofol announced it would no longer sell the drug to states for executions and shifted its distribution model with help from the anti-death penalty organization Reprieve) & Ex. Q (Oct. 10, 2013 REUTERS Article) (indicating the German maker of propofol also stopped shipments to Louisiana distributor Morris & Dickson, LLC, after it discovered the distributor sent a carton containing 20 vials to Missouri's Department of Corrections.).  In fact, the federal execution protocol was inoperative for a number of years, due in part to the government's inability to purchase sodium thiopental, as a result of such pressure.

18.     Additionally, such companies, if revealed as a supplier of lethal injection substances or related critical services, face the risk of harassment, threats, and, in particular, harm to their competitive business interests.  For example, when it was disclosed that Woodlands Compounding Pharmacy was providing lethal injection substances to be used in the State of Texas's lethal injection protocol, the owner of the pharmacy reported receiving death threats, and asked for the return of the substances, citing a "firestorm" of angry emails, protests, and media coverage.  *See* Christenson Decl., ¶ 53, Ex. G, (Oct. 9, 2013 Fox News Article); *see also Texas Dep't of Criminal Justice v. Levin*, 572 S.W.3d 671, 682 (Tex. 2019) (recognizing that a fear of negative publicity

---

[4] Samantha Lis, *Centene says subsidiary will no longer provide drugs for Missouri executions*, SLTTODAY.COM, (Feb. 20, 2018), https://www.stltoday.com/business/local/centene-says-subsidiary-will-no-longer-provide-drugs-for-missouri/article_6bef9695-a5d0-56d3-b74b-70f27f948410.html.

and declining sales was one of the reasons pharmacies do not want to be publicly identified as supplied lethal injection drugs); *McGehee v. Texas Dept. of Criminal Justice*, 2018 WL 3996956 (S.D. Tex., Aug. 21, 2018), at *7 (not reported in Fed. Supp.).  In another example, a threat directed at a pharmacy that was discovered to have been supplying lethal injection substances to the State of Missouri read as follows:

> Your site says nothing about pentobarbital.  Do you compound it for the state of Missouri's department of corrections, as has been publicly alleged in an AP story that ran this morning, and if so, now that the story has gone public, do you think that is prudent?  Seems to me that manufacturing a drug expressly to kill people flies in the face of one of those commandments Moses got from Jehovah on Sinai, but maybe I'm just being old-fashioned.  Still, were I you I'd at least want to beef up my security now that you've been put in the spotlight as a likely supplier and failed to issue a flat denial.  As the folks at the federal building can tell you, it only takes one fanatic with a truckload of fertilizer to make a real dent in business as usual.  In your place, I'd either swear to the nation that my company didn't make execution drugs of ANY sort, and then make dang sure that's true, or else openly accept the burden of putting my employees and myself at unacceptable (and possibly uninsurable) risk.  Just sayin'.

*See* Christenson Decl., ¶ 132 Ex. U (August 29, 2016 BUZZFEED, Inc. Article).

19.     Even in the absence of direct threats or harassment, the possibility of negative publicity that results from public disclosure of a source/potential source of lethal injection substances or those providing/potentially providing related critical services related to the procurement of lethal injection substances, is enough to cause such sources to refuse to engage in business with the federal government for this purpose. For example, and as described more fully in the declaration of Kara Christenson, a news article published in July 2020 purported to identify three (3) laboratories who were allegedly involved in testing compounded pentobarbital intended to be used for federal executions. *See* Christenson Decl., ¶ 117, Ex. R, (July 10, 2020 Reuters Article).  After the article was published, one of the purportedly identified laboratories, DynaLabs, announced that it would no longer test pentobarbital unless its client(s) submitted a declaration indicating the drug

would not be used for executions. *See* Christenson Decl., ¶ 118, Ex. S (DynaLabs Announcement re: Testing Pentobarbital). The article quoted DynaLabs' co-founder as stating, "[i]t's not that we don't agree with the death penalty. It wasn't worth the controversy – the picket line out front that would eventually take place." *See* Christenson Decl., ¶ 118, Ex. R.

20.     Based on the risks described above, the few companies that are willing to manufacture, produce, distribute, or otherwise engage in conversation for the procurement of lethal injection substances, do so only under assurance of confidentiality, and would cease to maintain involvement in the process if their information was revealed.   By way of example, the compounding pharmacy that supplied pentobarbital to Texas, expressly indicated its unwillingness to provide the substance to the state if its identity was revealed to the general public. *See McGehee*, 2018 WL 3996956 at *9.  Similarly, the supplier for Missouri's lethal injection procedure indicated it would cease to supply the drugs should its identity be disclosed. *Id.* at *8.

21.     As such, a company's identity as a supplier of lethal injection substances or as someone providing critical related services, and even the mere fact that the company has engaged in communications with states or the federal government for the purpose of discussing their involvement in the lethal injection process, is customarily and actually kept private, and as such, is confidential.

22.     I have personally communicated with such companies in order to investigate the availability of certain substances, including Pentobarbital, for use in the BOP's lethal injection protocol.  As such, I have personal knowledge that this type of information is confidential business information that the companies keep private, or at least closely held.  In fact, this point has been the matter of extensive discussion during communications with such companies, including and particularly BOP's current supplier of Pentobarbital in active pharmaceutical ingredient ("API")

form and its current supplier of compounded Pentobarbital, who are extremely concerned about maintaining the confidentiality of their participation in BOP's lethal injection procedures.

23.     It can be reasonably expected—or, put another way, it is almost assured—that the disclosure of information leading to the identity of BOP's current suppliers of API and compounded pentobarbital and other related critical services will cause them to cease their participation in BOP's lethal injection protocol.

24.     I am personally aware that BOP has provided such companies with express assurances that, to the extent possible, their identities, contact information, and the fact or substance of any communication with BOP, including among other discussions, any negotiations regarding capability, price, and delivery of such substances or services, would remain confidential.

### III.    Harm Resulting From the Disclosure of Identifying Information of BOP and DOJ Staff

25.     I am also personally aware that disclosure of identifying information of BOP and DOJ staff involved in the development and implementation of the revised lethal injection protocol, and any deliberative communications they had concerning the protocol, can reasonably be expected to discourage these individuals from performing their duties related to lethal injection protocols or procedures.

26.     I have personally supervised and/or worked collaboratively with many of these individuals and am aware of the concerns they have about their personal safety, and that of their families and friends.

27.     Concealing and protecting the names and other identifying information about individuals involved in a state or federal execution protocol is a matter of standard practice.  As discussed above, in 2007, these privacy concerns were incorporated into a protective order issued in the *Roane* litigation, which remains in place in the consolidated litigation.  *See* Ex. A.  The protective

order protects, in part, the identity of persons performing sensitive tasks in connection with the execution of condemned prisoners.

28.     Specifically, the protective order makes clear that "the names and personally-identifying information of any officers, employees, agents and contractors involved in past executions or expected to be involved in the executions of plaintiffs or in the development of the protocol(s) for the same shall not be revealed in connection with the litigation of this lawsuit to anyone other than counsel for defendants." *Id.* ¶ 13.

29.     Further, the protective order prohibits counsel for the plaintiffs from "conduct[ing] independent investigations or background investigations of those persons counsel for plaintiffs believe to be involved in past executions, nor of those expected to be involved in the executions of plaintiffs, nor of those involved in the development of the protocol(s) for the executions of plaintiffs, nor of those involved in the development of the federal execution protocols applicable to past executions. . . . [T]o do so would pose an unacceptable risk that their participation and identities would be made public." *Id.*

30.     Further, BOP, as a matter of standard practice, redacts staff names and identifying information during the FOIA process, pursuant to Exemptions 6 and 7(C).  This practice, which has been upheld through the course of numerous litigation, is due to the sensitive nature of an occupation in the correctional environment, one that makes staff vulnerable to threats of harassment or harm.[5]

---

[5] For example, in September 2018, a BOP inmate was found guilty for paying individuals in the free community to murder a BOP Lieutenant as he went home from work because he, and other inmates, "were angered that [the Lieutenant], a member of BOP's Special Investigations Section, was consistently searching for contraband in the facility and challenged the leadership of the inmate population . . . ."  *See* Christenson Decl., ¶ 99, Ex. L (Sept. 20, 2018 USAO for D. Puerto Rico Press Release).  In another case, an inmate in Pennsylvania stabbed a correctional officer at

## IV.    Harm from Disclosure of Law Enforcement Guidelines & Techniques & Procedures

31.    As described above, BOP is responsible for carrying carry out federal death sentences.  In order to fulfill this law enforcement duty, BOP is also responsible for creating and implementing the lethal injection protocol.  An integral part of this process is to select and obtain substances to carry out a sentence of death.  The specific techniques and procedures used to obtain lethal injection substances are not well known to the public.  Disclosure of such information raises the risk of obstructing BOP's ability to procure the necessary substances for use in the lethal injection protocol.  As such, the specific guidelines, techniques and procedures utilized by BOP are only shared with specifically identified BOP and DOJ personnel, and even those individuals are prohibited from sharing this information, even within their own agencies.

32.    The records and/or information withheld in this case reveal, or could potentially reveal, BOP's specific guidelines, techniques and procedures used to investigate potential sources of lethal injection substances, including Pentobarbital, to procure such substances, and to use them to carry out lawful capital sentences.

---

200 times and mutilated his body because of what he told prison officials was "a disrespect issue."  *See* Christenson Decl., ¶ 99, Ex. M (July 11, 2017 DOJ Press Release) & Ex. N (June 5, 2017 WNEP Article).  Similarly, in March 2013, the Executive Director of the Colorado Department of Corrections was shot and killed when he answered the front door of his house.  *See* Ex. E (March 20, 2013 Associated Press Article), https://www.oregonlive.com/today/2013/03/colorado_department_of_correct.html.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of November 2020.

**RICHARD WINTER**

Digitally signed by
RICHARD WINTER
Date: 2020.11.05
12:29:55 -06'00'

Rick Winter
Federal Bureau of Prisons
Regional Counsel
North Central Regional Office

14

## TABLE OF EXHIBITS

| A | Protective Order, *Roane*, 05-2337, Doc. 30-1 |
|---|---|
| B | May 13, 2016, The New York Times article |
| C | Oct. 18, 2013, U.S. Pharmacist article |
| D | Feb. 20, 2018, Stltoday.com Article |
| E | March 20, 2013 Associated Press Article |

Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES ROANE, JR., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 05-2337 (RWR/DAR) |
| | ) |
| ALBERTO GONZALES, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PRIVACY ACT PROTECTIVE ORDER

This is an action in which plaintiffs James H. Roane, Jr., Richard Tipton and Cory Johnson, and intervenor-plaintiff Bruce Webster, federal inmates facing execution, inter alia, challenge the Constitutionality of the federal government's procedure for performing executions. Compl. at ¶¶ 2-4. It appears that certain documents, information and tangible objects that may be produced during the course of discovery in this lawsuit contain confidential information relating to security procedures of defendants or to the identity of persons performing sensitive tasks in connection with the execution of condemned prisoners protected by, inter alia, the Privacy Act of 1974, 5 U.S.C. § 552a and the discovery limitations of the Federal Rules of Civil Procedure. The public disclosure of this information would be contrary to law and the public interest. In fact, through their Requests for Production of Documents, plaintiffs already have sought certain information and records protected by the Privacy Act of 1974, 5 U.S.C. § 552a, or otherwise subject to confidential treatment. The Federal Rules of Civil Procedure empower the Court to enter, for "good cause shown" and when "justice [so] requires," protective orders designed to

prevent "a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c).

In order to permit plaintiffs to discover information relevant to this case without undermining these legitimate confidentiality concerns, and pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the parties stipulate, and it is hereby ORDERED:

1. This Order shall govern any interrogatory responses, documents or other materials produced during discovery as well as all testimony at any deposition or pre-trial hearing or proceeding in this action, whether in response to any discovery request or subpoena made pursuant to the Federal Rules of Civil Procedure or otherwise, and any copies, abstracts, excerpts, analyses, summaries, or other materials (whether in written, electronic, or other form) which contain, reflect or disclose information from such documents, testimony or other materials. The testimony, documents and materials referenced in this paragraph collectively shall constitute "Discovery Materials." Counsel for defendant is hereby authorized, pursuant to 5 U.S.C. § 552a(b)(11) and consistent with 28 C.F.R. § 16.23, to release to counsel for plaintiff information covered by the Privacy Act, 5 U.S.C. § 552a, whether such release is pursuant to discovery or otherwise in this case.

2. Counsel for either party to this litigation may initially designate as "Confidential" hereunder any material exchanged in this case if counsel deems, in good faith, that release of such material would otherwise constitute an unreasonable invasion of privacy or present any of the legal and public policy concerns expressed above. Thus, for example, Defendants have the right, before disclosure to plaintiffs' counsel, to designate as "Confidential" any Discovery Material they produce or provide, if counsel deems, in good faith, that release of such material

- 2 -

would otherwise constitute an unreasonable invasion of privacy or present any of the legal and

public policy concerns expressed above, including but not limited to disclosing defendants'

security procedures. Either party designating material as "confidential" hereunder represents

thereby that it has done so in good faith and pursuant to a bona fide belief that such materials are

in fact confidential and deserving of protection. Counsel and parties are referred to Local Civil

Rule 5.4(f) and this Court's "Notice Regarding Privacy and Public Access to Electronic Case

Files," dated September 2004 [available at www.dcd.uscourts.gov/civil-privacy.pdf], for typical

examples of material deserving "protected" or "confidential" designation.

3.      In designating material as "Confidential," the party so designating it shall identify

the protected material with specificity in writing or on the record during a deposition or other

legal proceeding. Either party's counsel may, at any time, object to the designation of material as

protected. In the event of any such objection, the designating party's counsel agrees to confer

with counsel for the objecting party as promptly as practicable to attempt to resolve the objection

informally. Should the designating and objecting parties be unable to resolve the objection

informally, the objecting party may submit such dispute to the Court for resolution. Until the

Court resolves the dispute, the material shall be treated as protected and subject to the conditions

set forth in this Order.

4.      Confidential material provided formally or informally during the course of this

litigation shall be handled and disclosed by the parties only as follows:

(a)      Confidential material may be used only for the purposes of this litigation

and shall not be given, shown, made available, discussed, or otherwise communicated in any

form to plaintiffs James H. Roane, Jr., Richard Tipton, Cory Johnson, or Bruce Webster, nor to

anyone other than: (i) counsel for plaintiffs, including counsel's employees only insofar as is

necessary for purposes of this litigation, outside consultants and experts retained by plaintiffs to

assist such counsel specifically for purposes of this litigation, to the extent necessary for such

expert to prepare a written opinion, prepare to testify, or to assist counsel for plaintiffs in the

prosecution of this action, provided that such use is solely in connection with this action and not

for any other purpose; (ii) any person agreed upon in writing by all counsel in this lawsuit; (iii)

court reporters and persons preparing transcripts of depositions; (iv) witnesses in the course of

deposition where counsel has a reasonable and good faith belief that examination with respect to

the document is necessary for legitimate discovery purposes, and any person who is being

prepared to testify where counsel has a reasonable and good faith belief that preparation with

respect to the document is necessary in connection with that person's expected testimony and (v)

counsel for the defendant and other employees of the United States government who have a need

to review the protected material for the defense or prosecution of this case, or outside consultants

or experts retained by the defendant, specifically for purposes of this litigation.

        (b)     It shall be the responsibility of counsel to bring this order to the attention

of all persons within their respective firms and all outside consultants and experts to whom they

disclose protected material, and to insure that all such persons comply with the terms of this

order.  Except for counsel of record in this action and those persons described in paragraph

4(a)(iii), prior to disclosing any "Confidential" material, counsel shall obtain from such person

and retain in their files a signed written acknowledgment that such person has reviewed and

understands that they are bound by the terms of this Order.

- 4 -

(c)     The filing of materials designated under this order shall conform with Local Civil Rule 5.4(f) and the Court's "Notice Regarding Privacy and Public Access to Electronic Case Files."

(d)     All copies made of any material that is subject to this order shall be clearly labeled on each page as containing "Confidential" material and shall be returned to the party who originally produced them or destroyed at the conclusion of this litigation (including any and all appeals). All materials designated "Confidential" shall be so marked prior to the exchange of those materials between the parties. Where it is not possible to affix a stamp or mark indicating that the material is "Confidential," counsel for defendants shall take reasonable steps to give counsel for plaintiffs notice of the materials' status as "Confidential." Legal memoranda and briefs containing protected material and any work product materials containing protected material may be retained if such documents shall be kept in the possession of a private litigant's counsel or in the possession of a governmental entity, and shall not in the future be disclosed contrary to the provisions of this Order.

(e)     Deposition testimony may be designated as "Confidential" before the testimony is transcribed by so stating on the record at the deposition or by providing written notice to all counsel, the court reporter, and all attendees at the deposition prior to the taking of the testimony. If deposition testimony is so designated prior to transcription, the transcript of the designated testimony shall be bound in a separate volume from any testimony that has not been so designated and marked "Confidential" by the reporter and shall not be made part of the public record. Regardless of designation made prior to transcription, each deposition transcript in its entirety shall be treated as "Confidential" until ten days after the receipt of the transcript by

- 5 -

counsel for defendants. Until ten days after defendants' counsels' receipt of the transcript, defendants may designate testimony as "Confidential" by giving written notice to plaintiffs' counsel.

(f)     Counsel shall endeavor to avoid revealing protected material in any oral proceedings before the Court, including oral argument. If any counsel finds it necessary to refer to protected material in any such oral proceeding, counsel shall notify the Court and all other counsel of record as soon as such necessity becomes apparent and shall propose whatever mechanism(s) may be available and appropriate to prevent disclosure of confidential material as a consequence of such oral proceedings to persons other than those authorized by this order.

5.     Counsel shall promptly report any breach of the provisions of this order to the Court and counsel for the party whose protected material was divulged or compromised. Upon discovery of any breach, counsel shall immediately take appropriate action to cure the violation and retrieve any confidential material that may have been disclosed to persons not covered by this order. Counsel shall also cooperate fully in any investigation of such breach conducted by the Court.

6.     By providing any document or other information in its possession, no party waives any privileges, objections, or protection otherwise afforded to it by law or equity.

7.     Pursuant to 5 U.S.C. § 552a(b)(11), the parties are hereby authorized to seek the admission into evidence at the trial of this case any materials, or the contents thereof, that are subject to this Stipulation, and nothing contained herein shall be construed as precluding plaintiffs or defendant from introducing any such materials, or the contents thereof, into

- 6 -

evidence, subject to such measures as the Court may deem appropriate or necessary at that time in order to protect the privacy of the individual(s) involved.

      8.     Nothing contained herein shall restrict the government's use of its records for official business or for other purposes consistent with other applicable laws and regulations.

      9.     Any specific part or parts of the restrictions imposed by this protective order may be terminated at any time by a letter from counsel for the designating party or by an Order of the Court.

      10.     This Order is without prejudice to the rights of any party to make any objection to discovery permitted by the Federal Rules of Civil Procedure, or by any statute or other authority, or to the rights of any party to make evidentiary objections at trial.

      11.     Nothing in this Order may be taken or construed as a ruling or statement concerning the admissibility of any documents or information.

      12.     This Order is without prejudice to the rights of any party to seek from the Court the modification of this Order.

      13.     Notwithstanding any of the previous provisions of this Order to the contrary, and excepting any expert consultant retained by defendants and subject to Fed. R. Civ. P. 26(a)(2), the names and personally-identifying information of any officers, employees, agents and contractors involved in past executions or expected to be involved in the executions of plaintiffs or in the development of the protocol(s) for the same shall not be revealed in connection with the litigation of this lawsuit to anyone other than counsel for defendants.  Counsel for defendants will provide counsel of record for plaintiffs with a generic identifier for the aforementioned individuals that would include only the person's credential or title, for example "Nurse" or

- 7 -

"Emergency Medical Technician." Counsel for plaintiffs may not conduct independent investigations or background investigations of those persons counsel for plaintiffs believe to be involved in past executions, nor of those expected to be involved in the executions of plaintiffs, nor of those involved in the development of the protocol(s) for the executions of plaintiffs, nor of those involved in the development of the federal execution protocols applicable to past executions. For example, neither counsel, nor anyone acting on their behalf, may contact schools, former employers or credentialing agencies in an effort to determine the identity of, or gain background information on, the aforementioned persons because to do so would pose an unacceptable risk that their participation and identities would be made public. During the course of this litigation, those involved in past executions, those expected to be involved in the executions of plaintiffs and those involved in the development of the protocol(s) for federal executions shall be referenced by generic identifiers only such as "Witness No. 1," "Employee No. 1," or "Technician No. 1" as may suit the convenience and needs of the parties.

14.     This order is of limited duration and will expire upon the Court's resolution of Defendants' motion for a protective order and the Court's entry of this or another order permanently governing the exchange of information and materials during discovery in this case.

It is so ORDERED by the Court this 23rd day of February, 2007.

_____
United States District Judge
Deborah A. Robinson
United States Magistrate Judge

- 8 -

Exhibit B

Case 1:19-cv-03626-DLF Document 17-5 Filed 11/06/20 Page 26 of 48

**The New York Times** | https://nyti.ms/1WvQljv

# Pfizer Blocks the Use of Its Drugs in Executions

By Erik Eckholm

May 13, 2016

The pharmaceutical giant Pfizer announced on Friday that it had imposed sweeping controls on the distribution of its products to ensure that none are used in lethal injections, a step that closes off the last remaining open-market source of drugs used in executions.

More than 20 American and European drug companies have already adopted such restrictions, citing either moral or business reasons. Nonetheless, the decision from one of the world's leading pharmaceutical manufacturers is seen as a milestone.

"With Pfizer's announcement, all F.D.A.-approved manufacturers of any potential execution drug have now blocked their sale for this purpose," said Maya Foa, who tracks drug companies for Reprieve, a London-based human rights advocacy group. "Executing states must now go underground if they want to get hold of medicines for use in lethal injection."

The obstacles to lethal injection have grown in the last five years as manufacturers, seeking to avoid association with executions, have barred the sale of their products to corrections agencies. Experiments with new drugs, a series of botched executions and covert efforts to obtain lethal chemicals have mired many states in court challenges.

The mounting difficulty in obtaining lethal drugs has already caused states to furtively scramble for supplies.

Some states have used straw buyers or tried to import drugs from abroad that are not approved by the Food and Drug Administration, only to see them seized by federal agents. Some have covertly bought supplies from loosely regulated compounding pharmacies while others, including Arizona, Oklahoma and Ohio, have delayed executions for months or longer because of drug shortages or legal issues tied to injection procedures.

A few states have adopted the electric chair, firing squad or gas chamber as an alternative if lethal drugs are not available. Since Utah chooses to have a death penalty, "we have to have a means of carrying it out," said State Representative Paul Ray as he argued last year for authorization of the firing squad.

Lawyers for condemned inmates have challenged the efforts of corrections officials to conceal how the drugs are obtained, saying this makes it impossible to know if they meet quality standards or might cause undue suffering.

"States are shrouding in secrecy aspects of what should be the most transparent government activity," said Ty Alper, associate director of the death penalty clinic at the University of California, Berkeley, School of Law.

Before Missouri put a prisoner to death on Wednesday, for example, it refused to say in court whether the lethal barbiturate it used, pentobarbital, was produced by a compounding pharmacy or a licensed manufacturer. Akorn, the only approved company making that drug, has tried to prevent its use in executions.

Pfizer's decision follows its acquisition last year of Hospira, a company that has made seven drugs used in executions including barbiturates, sedatives and agents that can cause paralysis or heart failure. Hospira had long tried to prevent diversion of its products to state prisons but had not succeeded; its products were used in a prolonged, apparently agonizing execution in Ohio in 2014, and are stockpiled by Arkansas, according to documents obtained by reporters.

Because these drugs are also distributed for normal medical use, there is no way to determine what share of the agents used in recent executions were produced by Hospira, or more recently, Pfizer.

Campaigns against the death penalty, and Europe's strong prohibitions on the export of execution drugs, have raised the stakes for pharmaceutical companies. But many, including Pfizer, say medical principles and business concerns have guided their policies.

"Pfizer makes its products to enhance and save the lives of the patients we serve," the company said in Friday's statement, and "strongly objects to the use of its products as lethal injections for capital punishment."

Pfizer said it would restrict the sale to selected wholesalers of seven products that could be used in executions. The distributors must certify that they will not resell the drugs to corrections departments and will be closely monitored.

David B. Muhlhausen, an expert on criminal justice at the Heritage Foundation, accused Pfizer and other drug companies of "caving in to special interest groups." He said that while the companies have a right to choose how their products are used, their efforts to curb sales for executions "are not actually in the public interest" because research shows, he believes, that the death penalty has a deterrent effect on crime.

Case 1:19-cv-03626-DLF Document 17-5 Filed 11/06/20 Page 27 of 48

Pressure on the drug companies has not only come from human rights groups. Trustees of the New York State pension fund, which is a major shareholder in Pfizer and many other producers, have used the threat of shareholder resolutions to push two other companies to impose controls and praised Pfizer for its new policy.

"A company in the business of healing people is putting its reputation at risk when it supplies drugs for executions," Thomas P. DiNapoli, the state comptroller, said in an email. "The company is also risking association with botched executions, which opens it to legal and financial damage."

Less than a decade ago, lethal injection was generally portrayed as a simple, humane way to put condemned prisoners to death. Virtually all executions used the same three-drug combination: sodium thiopental, a barbiturate, to render the inmate unconscious, followed by a paralytic and a heart-stopping drug.

In 2009, technical production problems, not the efforts of death-penalty opponents, forced the only federally approved factory that made sodium thiopental to close. That, plus more stringent export controls in Europe, set off a cascade of events that have bedeviled state corrections agencies ever since.

Many states have experimented with new drug combinations, sometimes with disastrous results, such as the prolonged execution of Joseph R. Wood III in Arizona in 2014, using the sedative midazolam. The state's executions are delayed as court challenges continue.

Under a new glaring spotlight, deficiencies in execution procedures and medical management have also been exposed. After winning a Supreme Court case last year for the right to execute Richard E. Glossip and others using midazolam, Oklahoma had to impose a stay only hours before Mr. Glossip's scheduled execution in September. Officials discovered they had obtained the wrong drug, and imposed a moratorium as a grand jury conducts an investigation.

A majority of the 32 states with the death penalty have imposed secrecy around their drug sources, saying that suppliers would face severe reprisals or even violence from death penalty opponents. In a court hearing this week, a Texas official argued that disclosing the identity of its pentobarbital source "creates a substantial threat of physical harm."

But others, noting the evidence that states are making covert drug purchases, see a different motive. "The secrecy is not designed to protect the manufacturers, it is designed to keep the manufacturers in the dark about misuse of their products," said Robert Dunham, executive director of the Death Penalty Information Center, a research group in Washington.

Georgia, Missouri and Texas have obtained pentobarbital from compounding pharmacies, which operate without normal F.D.A. oversight and are intended to help patients meet needs for otherwise unavailable medications.

But other states say they have been unable to find such suppliers.

Texas, too, is apparently hedging its bets. Last fall, shipments of sodium thiopental, ordered by Texas and Arizona from an unapproved source in India, were seized in airports by federal officials.

For a host of legal and political reasons as well as the scarcity of injection drugs, the number of executions has declined, to just 28 in 2015, compared with a recent peak of 98 in 1999, according to the Death Penalty Information Center.

Exhibit C



---

ℹ **COVID-19 Resources »**

---

PUBLISHED OCTOBER 18, 2013

# Lethal Injections, Drug Shortages, and Pharmacy Ethics

**Jesse C. Vivian, RPh, JD**
*Professor, Department of Pharmacy Practice*
*College of Pharmacy and Health Sciences*
*Wayne State University*
*Detroit, Michigan*

*US Pharm*. 2013;38(10):38-40.

Most pharmacists probably think about the lethal injection of convicted prisoners in abstract philosophical terms. Is the death penalty a morally acceptable way of dealing with those found guilty of heinous crimes? Should it be legal to put criminals to death, or is life in prison without the possibility of parole a better alternative? Is this final solution to a terrible social problem a punishment for the offender or a deterrent to others who might consider engaging in the aberrant behavior that could lead to the death penalty?

Perhaps the dilemma is more concrete: Is a lethal injection a more humane way to end a person's life than other forms of execution like the electric chair, gas chamber, hanging, or a firing squad? The relevance of these questions may depend on whether one lives in a state where the death penalty is legal. Even in states where the practice is not legal, pharmacists may be asked to ship drugs to states that do execute the condemned.

## Drug Shortages

Case 1:19-cv-03626-DLF Document 17-5 Filed 11/06/20 Page 30 of 48

Irrespective of how one feels about the death penalty, pharmacists may have to face some ethical decisions if they become involved in distributing drugs for lethal injection.[1,2] Recent shortages of drugs used for lethal injections has brought some of these questions into media scrutiny.

Currently, there are 32 states where the death penalty is legal.[3] Three other states (New Mexico, Connecticut, Maryland) ruled more recently that the death penalty is unconstitutional but still have prisoners on death row because the laws were not retroactive.[4] All states that permit the death penalty allow execution to be conducted by lethal injection.[5] Certain federal crimes also warrant the death penalty by lethal injection.[6] Although the concept of lethal injection for the purpose of executing a prisoner was first introduced in 1888, it was not until 1982 that Texas became the first to use it.[7] The method by which a lethal injection is carried out has wide variability ranging from the use of a single drug to a combination of three various and different drugs.[6] The three-drug "cocktail" typically involves use of a barbiturate, a paralytic, and potassium chloride solution.

Most states once used sodium thiopental as the barbiturate. However, no domestic company has produced this drug since 2009.[8] A supplier of the drug from outside the United States was not registered with the FDA, thereby causing it to be misbranded under the Food, Drug, and Cosmetic Act.[9] Nonetheless, the FDA stated in 2011 it would not block the importation of the product under its "enforcement discretion." On July 23, 2013, a federal Court of Appeals ruled that the FDA must prohibit the importation of misbranded or unapproved new drugs, including those made by unapproved manufacturers abroad.[10] Under that ruling, the FDA cannot release any of the products currently on hand for the purpose of conducting an execution by lethal injection of this drug. As a result, many states have switched to sodium pentobarbital as the "drug of choice" for the three-drug cocktail.

In June 2013, the only U.S. company approved to manufacture thiopental (Hospira) announced it will no longer produce the drug. This decision came after a global campaign by death penalty opponents and pressure by Italian government officials after the company sought to shift production of the drug to an Italian plant.[11] The Italian government has stated it will not allow the export of any drugs that will be used in executions.[12] As the shortage of thiopental became acute in 2012, California and Arizona obtained shipments of the drug

from England. The British government has since refused to allow exports of drugs for use in capital punishment, a policy that is under consideration by the entire European Union. As a result, many states have been forced to substitute pentobarbital, which has been used alone or in concert with other drugs in all executions in the U.S. over the past 2 years. This drug, commonly used as a sedative, is more readily available. Pentobarbital is widely used in veterinary medicine for animal euthanasia and is also used in physician-assisted suicide in Oregon.[11]

Some states (Arizona, Georgia, Idaho, Ohio, South Dakota, Texas, Washington) have used a single anesthetic, primarily pentobarbital, to induce death, and three others (Arkansas, Kentucky, Louisiana) have announced their intent to use this method of execution in the future. However, pentobarbital has become a concern when used for capital punishment. It was used in a U.S. execution for the first time in December 2010, when it was administered as the first ingredient in a three-drug cocktail for a lethal injection given to an Oklahoma inmate. The drug also has limited FDA approval in smaller doses as a mild anesthetic and to treat some seizures. Many physicians say they no longer administer it to people for medical purposes. Recently, a domestic manufacturer of pentobarbital has stated it will no longer supply the drug for purposes of assisting executions.[13]

Missouri has announced plans to use propofol as its single drug.[6] As might be expected, this decision was met with criticism. Propofol, made famous by its role in Michael Jackson's death, has never been used in a lethal injection and could cause unnecessary pain, opponents argue. "This is an experiment with a human subject," said Richard Dieter, a death penalty opponent and executive director of the Death Penalty Information Center in Washington, DC. "This will be sort of a brute force approach where you give them enough and they die."[14] If administered incorrectly, propofol could lead to serious and painful muscle contractions. The drug is generally injected by a medical professional, but Missouri state law no longer requires a physician to be present for an execution.[15]

## Supply Issues

One of the major problems in death penalty states is finding suppliers of the drugs used for lethal injection. Texas has 317 inmates on death row, but as of August 2013 it had only one dose of thiopental left. Its supply of pentobarbital has an expiration date of September 2013 and, to date, no alternative source

has been determined.[16] This is a significant problem because Texas performs about half the executions in the country right now. The states must scramble to obtain these drugs, including using overseas sources, but this is complicated by the fact that many of the manufacturers based in Europe do not want to participate in U.S. executions.[11] A recent court filing indicated that Ohio's supply of pentobarbital will be gone by the end of September 2013.[15]

Many of the states purchase the drugs used for lethal injections from pharmacies. In the states where a combination of drugs is utilized, compounding pharmacies may become a source for the medications. Regardless, many states are having problems obtaining sufficient quantities of drugs to carry out lethal injection sentences. Pharmacies and pharmaceutical suppliers are increasingly concerned with backlashes from anti-death penalty protestors for being known as suppliers of ingredients used to intentionally end a person's life.

## Lethal Injection Secrecy Act

Georgia recently enacted the Lethal Injection Secrecy Act, which protects the identity of companies or individ-uals that manufacture, supply, or prescribe drugs used in executions.[17] The constitutionality of this Act has been challenged, in part, on the basis that there is no evidence that the drug set to be used to execute a prisoner, pentobarbital, will work as intended. The attorney for the condemned man has stated that the drug was made by an "unregulated" out-of-state compounding pharmacy and, as such, could be expired or otherwise tainted, thus having the potential for causing problems during the execution. A trial court judge has blocked the execution saying that the law allows the state to withhold information that is essential in determining the effectiveness of the drugs. The Georgia Attorney General's office argued that there is no evidence to show that the drug is substandard. Further, there are valid reasons for the state to protect the supplier of pharmaceutical preparations: "Once that compounding pharmacy's identity is revealed, how will the Department of Corrections ever get another compounding pharmacy to sell to us?" [18] The Georgia Supreme Court will make a final determination. North Dakota has a similar secrecy law.

"States are having a tough time finding supplies; but that doesn't mean officials should hide information about the process," says Fordham University law professor Deborah Denno. "If, in fact, these drugs are not problematic, then

Case 1:19-cv-03626-DLF Document 17-5 Filed 11/06/20 Page 33 of 48

Department of Corrections should have no concern about revealing what their sources are."[17]

## Analysis

The implications of drug shortages used for lethal injections for the pharmacy profession and individual pharmacists should be obvious. Some commentators allege, wrongfully, that compounding pharmacies are unregulated. Others question the very credibility of pharmacy ethics. And others wonder if pharmacists, cloaked behind a wall of secrecy, are supplying drugs that are tainted, out of date, unapproved, or mislabeled. Pharmacists who do supply drugs for lethal injections may be intimidated from doing so by vocal anti-death penalty advocates.

The American Pharmacists Association (APhA) Code of Ethics for Pharmacists does not directly address lethal injections or the death penalty, although several statements in the code could be construed to have implications on the subject.[1,19] Ultimately, each pharmacist must decide if supplying drugs for the purpose of ending another person's life by lethal injection is something he or she might want to engage in. There is no one right or wrong answer.

## REFERENCES

1. Vivian JC, Fink JL, Whisman TR. Use of legally marketed drugs for lethal injection. *US Pharm*. 2008;33(11):40-42. www.uspharmacist.com/content/d/pharmacy_law/c/11470/. Accessed September 9, 2013.

2. Romanelli F. Lethal injection as a component of a therapeutics toxicology module. *Am J Pharm Educ*. 2011;75:117. www.ncbi.nlm.nih.gov/pmc/articles/PMC3175686/. Accessed September 9, 2013.

3. States with and without the death penalty. Death Penalty Information Center (DPIC). www.deathpenaltyinfo.org/states-and-without-death-penalty. Accessed September 7, 2013.

4. Authorized methods. DPIC. www.deathpenaltyinfo.org/methods-execution. Accessed September 7, 2013.

5. Authorized methods by state. DPIC. www.deathpenaltyinfo.org/methods-execution#state. Accessed September 7, 2013.

6. State by state lethal injection. DPIC. www.deathpenaltyinfo.org/state-lethal-injection. Accessed September 7, 2013.

7. Groner JL. Lethal injection: a stain on the face of medicine. 2002;325:1026-1028. www.ncbi.nlm.nih.gov/pmc/articles/PMC1124498/. Accessed September 8, 2013.

8. Price N. Importing unapproved drugs: lethal injections and shortages. *Harvard Law*. July 25, 2013. http://blogs.law.harvard.edu/billofhealth/2013/07/25/importing-unapproved-drugs/. Accessed September 8, 2013.

9. 21 USC §§ 331(a), 352(c).

10. *Cook v. FDA*, Slip Op No. 12-5176 (1st Cir). www.cadc.uscourts.gov/internet/opinions.nsf/2E33B7631B436F6385257BB1005178CC/$file/12-5176-1448004.pdf. Accessed September 8, 2013.

11. Horne J. Lethal injection drug shortage. *Capitol Ideas E-Newsletter*. Sept-Oct 2013. www.csg.org/pubs/capitolideas/enews/issue65_4.aspx. Accessed September 9, 2013.

12. Eckholm E, Zezima K. States face shortage of key lethal injection drug. *NY Times*. January 21, 2011. www.nytimes.com/2011/01/22/us/22lethal.html?_r=0. Accessed September 9, 2013.

13. Mears B. States urge feds to help import lethal injection drugs. *CNN*. May 21, 2012. www.cnn.com/2012/05/21/politics/states-lethal-injection-drugs. Accessed September 9, 2013.

14. Sterbenz C. America is getting desperate for drugs to execute people. *Business Insider*. August 19, 2013. www.businessinsider.com/lethal-injection-drug-shortage-2013-8. Accessed September 9, 2013.

15. Lethal drug shortage has states scrambling for new execution methods. *RT USA*. August 15, 2013. http://rt.com/usa/lethal-drug-shortage-execution-methods-548/. Accessed September 9, 2013.

16. Graczyk M. Texas execution drug shortage: state running out of pentobarbital. *Huffington Post*. August 1, 2013. www.huffingtonpost.com/2013/08/01/texas-execution-drug-shortage-running-out_n_3690893.html. Accessed September 9, 2013.

17. Lohr K. Where do drugs for lethal injections come from? Few know. *National Public Radio*. July 30, 2013. www.npr.org/2013/07/30/207026540/where-do-drugs-for-lethal-injections-come-from-nobody-knows. Accessed September 7, 2013.

18. Beasley D. State of Georgia high court to hear appeal on lethal injections. *Reuters*. August 26, 2013. www.reuters.com/article/2013/08/26/us-usa-execution-georgia-idUSBRE97P0QQ20130826. Accessed September 7, 2013.

19. Code of Ethics. APhA. www.pharmacist.com/code-ethics. Accessed September 9, 2013.

To comment on this article, contact rdavidson@uspharmacist.com.

Copyright © 2000 - 2020 Jobson Medical Information LLC unless otherwise noted. All rights reserved. Reproduction in whole or in part without permission is prohibited.

Exhibit D

Centene says subsidiary will no longer provide drugs for

https://www.stltoday.com/business/local/centene-says-subsidiary-will-no-longer-provide-drugs-for-missouri-executions/article_6bef9695-a5d0-56d3-b74b-70f27f948410.html

# Centene says subsidiary will no longer provide drugs for Missouri executions

By Samantha Liss St. Louis Post-Dispatch
Feb 20, 2018

Subscribe for $1 a month

A fter a local pharmacy tied to Centene Corp. was identified on Tuesday as the supplier of drugs used for executions in Missouri, Centene said the pharmacy would no longer provide the drugs used for executions.

"Under Centene's ownership, Foundation Care has never supplied, and will never supply any pharmaceutical product to any state for the purpose of effectuating executions," according to an emailed statement from Centene.

The pharmacy, St. Louis County-based Foundation Care, was first cited in **a report** by Chris McDaniel of BuzzFeed News.

The state had gone to great lengths to keep the pharmacy's identity a secret, including making it illegal to disclose the name of the pharmacy that supplies the drugs.

Centene subsidiary AcariaHealth acquired Foundation Care in October 2017. Missouri has not executed an inmate in more than a year. **The next execution is scheduled for March**.

As McDaniel reported, many suppliers have stopped producing the drugs used to kill prisoners sentenced to death, making it harder for states to procure the drugs.

Foundation Care had a troubled history with federal regulators and was flagged as a "high-risk" pharmacy by the Food and Drug Administration in 2013, BuzzFeed reported. Foundation Care's CEO declined through an assistant to talk to McDaniel.



**The 47 murderers Missouri has executed since 2000**

In 2014, the FDA sent a letter to the Missouri Board of Pharmacy warning that the pharmacy's practices "could lead to contamination of drugs, potentially putting patients at risk," according to McDaniel's report.

Foundation Care was founded in 2004 and had 245 employees at the time Foundation Care was acquired by AcariaHealth, **the statement** announcing the deal said.

Centene says subsidiary will no longer provide drugs for

Centene acquired AcariaHealth, a specialty pharmacy company, in 2013. AcariaHealth focuses on patients living with complex diseases such as multiple sclerosis and cystic fibrosis. Centene is a health insurance company.

Centene's core business is contracting with states to manage the care of Medicaid recipients, or individuals with low incomes who qualify for subsidized health care. Centene manages the care of about 7.1 million Medicaid recipients across the country, according to its most recent annual filing.

Samantha Liss • 314-340-8017

@samanthann on Twitter

**sliss@post-dispatch.com**

 0 comments



Daily updates on the latest news in the St. Louis business community.

| Email Address | Centene says subsidiary will no longer provide drugs for |
|---|---|

* I understand and agree that registration on or use of this site constitutes agreement to its user agreement and privacy policy.

## Most Popular

### Ameristar St. Charles says furloughs could become permanent for up to 947 workers

May 27, 2020



### Mercy furloughs, layoffs will affect hundreds across St. Louis

May 26, 2020



### Hospitals, a buffer for St. Louis in last recession, now share economic pain

May 24, 2020

### As unemployment claims dip, some Missouri businesses struggle to lure back workers

May 22, 2020

# High stakes: Yard-sign companies hustle to keep up with deluge of stay-at-home milestones

Centene says subsidiary will no longer provide drugs for

May 22, 2020

---

# Dentists across St. Louis searching for critical PPE needed to see patients

May 26, 2020

---

# Coronavirus lawsuit takes on McDonald's like it was a rowdy bar

May 26, 2020

---

# Mercy furloughs, layoffs will affect hundreds across St. Louis

May 26, 2020

---

# Sweet strawberry news: You can pick your own this weekend at Eckert's

May 26, 2020

---

# BJC furloughs nearly 3,000 workers

May 20, 2020

Case 1:19-cv-03626-DLF   Document 17-5   Filed 11/06/20   Page 43 of 48

Centene says subsidiary will no longer provide drugs for

Exhibit E

Set Weather

Subscribe

Advertisement

**U.S./World**

# Colorado Department of Corrections director shot and killed at home

Updated Jan 10, 2019; Posted Mar 20, 2013





Tom Clements

**By** <u>**The Associated Press**</u>

<u>MONUMENT, Colo.</u>

— The executive director of the Colorado Department of Corrections was shot and killed when he answered the front door of his house, and police are searching for the gunman and trying to figure out if the attack had anything to do with his position.

Authorities are also looking for a dark-colored "boxy" car seen near the house of <u>Tom Clements</u>, 58, when he was shot around 8:30 p.m. Tuesday in Monument, north of Colorado Springs. The vehicle's engine was running and a witness reported seeing one person driving away in the car.

Advertisement

Lt. Jeff Kramer, of the El Paso County Sheriff's Office, said investigators have not ruled anything out, but the shooting could have been related to Clements' job.

"As the director of the Department of Corrections or any similar type position, it could in fact open someone up to be a target of a crime such as this. Although we remain sensitive to that, we also want to make sure that we remain open-minded to other possibilities as well," Kramer said.

Colorado Gov. John Hickenlooper appointed Clements to the post in 2011 after he served for more than three decades in the Missouri Department of Corrections. He replaced Ari Zavaras, a former Denver police chief who led the department under two governors. The department operates 20 adult prisons and a juvenile detainment system.

Hickenlooper was red-eyed and somber and spoke haltingly Wednesday morning at a news conference in which he said he doesn't think the killing was part of any larger attack against his cabinet, members of which stood behind him, several of them crying. Others dabbed their eyes.

"Corrections is a very different job. You make difficult decisions every time that affect different people," Hickenlooper said, calling Clements dedicated, funny, caring and an expert on the latest and best methods in his field who chose the Colorado job over retirement.

"Tom Clements dedicated his life to being a public servant, to making our state a better place and he is going to be deeply, deeply missed."

Hickenlooper planned to go to Monument to meet with Clements' family after signing gun-control bills.

A family member called 911 to report the shooting. Search dogs were called in to comb through a wooded area around Clements' home, and authorities were going house to house trying to find out what neighbors heard and saw.

Clements lived in a wooded neighborhood of large, two-story houses on expansive 2-acre lots dotted with evergreen trees in an area known as the Black Forest. Long driveways connect the homes to narrow, winding roads that thread the hills. Clements' home was out of view, behind a barricaded of crime-scene tape in the road.

After Clements was appointed, Hickenlooper praised Clements for his approach to incarceration, saying he relied on proven methods to improve prison safety inside and programs that have been shown to improve successful outcomes after offenders are released from prison.

While Clements generally kept a low profile, his killing comes a week after he denied a Saudi national prisoner's request to be sent to his home country to serve out his sentence. Homaidan al-Turki was convicted of sexually assaulting a housekeeper and keeping her as a virtual slave. Clements said state law

requires sex offenders to undergo treatment while in prison and that an imam had declined to participate.

Hickenlooper ordered flags lowered to half-staff at public buildings until the day after Clements' funeral. Arrangements are pending.

Clements is survived by his wife, Lisa, and two daughters, Rachel and Sara.

Clements received a bachelor's degree in sociology and a master's degree in public administration from the University of Missouri. He started with the Missouri Department of Corrections in 1979 and over his 31 years there worked in prisons as well as probation and parole services. He was director of adult institutions when he left.

Missouri leaders also mourned his death.

George Lombardi, director of Missouri's Department of Corrections, said Clements was "just a very good, decent person."

Missouri Gov. Jay Nixon said in an emailed statement that Clements "dedicated his professional life and his considerable skills to public service and protection, and the citizens of Missouri join the people of Colorado in mourning this tremendous loss."

--The Associated Press

Note to readers: if you purchase something through one of our affiliate links we may earn a commission.

---

# Around the web



Registration on or use of this site constitutes acceptance of our **User Agreement**, **Privacy Policy and Cookie Statement**, and **Your California Privacy Rights** (each updated 1/1/20).

© 2020 Advance Local Media LLC. All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

**Community Rules** apply to all content you upload or otherwise submit to this site.

Ad Choices