**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   Civ. Action No. 1:19-cv-03626 (DLF) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Citizens for Responsibility and

Washington respectfully cross-moves for summary judgment against Defendant U.S. Department

of Justice. As grounds for this motion, the Court is respectfully referred to the accompanying

memorandum of points and authorities; statement of undisputed material facts; and Declaration

of Jessica A. Lutkenhaus and supporting exhibits. A proposed order is also submitted herewith.

Dated: December 23, 2020                    Respectfully submitted,

/s/ Jessica A. Lutkenhaus
Jessica A. Lutkenhaus
(D.C. Bar No. 1046749)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 663-6640
Facsimile: (202) 663-6363
jessica.lutkenhaus@wilmerhale.com

Nikhel S. Sus
(D.C. Bar No. 1017937)
Citizens for Responsibility and

1

Ethics in Washington
1101 K St. NW, Suite 201
Washington, D.C. 20005
Telephone: (202) 408-5565
Fax: (202) 588-5020
nsus@citizensforethics.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON** | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civ.  Action No. 1:19-cv-03626 (DLF) |
| **UNITED STATES DEPARTMENT OF JUSTICE** | ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................2

I.    BOP's Procurement of Pentobarbital...........................................................................2

II.   CREW's FOIA Requests ...........................................................................................4

LEGAL STANDARD ..........................................................................................................5

ARGUMENT .......................................................................................................................7

I.    Defendant Is Improperly Withholding Material Under Exemption 7.................................7

    A.    The Requested Records Were Not Compiled For Law Enforcement Purposes ......8

    B.    Exemption 7(A) .........................................................................................11

    C.    Exemption 7(E)..........................................................................................17

    D.    Exemptions 6, 7(C), 7(F) ............................................................................18

II.   Defendant Is Improperly Withholding Information Under Exemption 4 .........................20

    A.    Information That Purportedly Could Lead To The Identity Of Companies ..........20

        1.    Suppliers' And Vendors' Identities Are Not "Commercial Or Financial Information"...............................................................................21

        2.    Certain Withheld Information Is Not Confidential Because It Does Not Identify A Company Involved In Pentobarbital Procurement............25

    B.    BOP Does Not Show The Remaining Information Is Confidential......................29

III.  Defendant Is Improperly Withholding Information Under Exemption 5 .........................31

CONCLUSION...................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### Cases

*Abrams v. United States,*
250 U.S. 616 (1919)......................................................................................15

*FBI v. Abramson,*
456 U.S. 615 (1982)........................................................................................7

*Baker & Hostetler LLP v. Dep't of Commerce,*
473 F.3d 312 (D.C. Cir. 2006)......................................................................21

*Benavides v. BOP,*
774 F. Supp. 2d 141 (D.D.C. 2011) ...............................................................9

*Blackwell v. FBI,*
646 F.3d 37 (D.C. Cir. 2011) ..................................................................10, 17

*Brady v. Maryland,*
373 U.S. 83 (1963)........................................................................................16

*Burka v. Dep't of Health & Human Servs.,*
87 F.3d 508 (D.C. Cir. 1996) ..........................................................................6

*Campbell v. Dep't of Justice,*
164 F.3d 20 (D.C. Cir. 1998) ........................................................................30

*Citizens for Healthy Cmty. v. Dep't of Interior,*
No. 1:12-cv-01661-RPM (D. Colo. Feb. 13, 2013) ......................................24

*\*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice,*
746 F.3d 1082 (D.C. Cir. 2014) ............................................................. *passim*

*\*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice,*
658 F. Supp. 2d 217 (D.D.C. 2009) .........................................................12, 14

*Coastal States Gas Corp. v. Dep't of Energy,*
617 F.2d 854 (D.C. Cir. 1980) ......................................................................32

*Ctr. for Investigative Reporting v. CBP,*
436 F. Supp. 3d 90 (D.D.C. Dec. 31, 2019)...........................................6, 16, 18

*Elec. Frontier Found. v. Dep't of Justice,*
384 F. Supp. 3d 1 (D.D.C. 2019) ..................................................................20

*Elec. Privacy Information Ctr. v. Dep't of Homeland Security*,
117 F. Supp. 3d 46 (D.D.C. 2015) ...................................................................21, 22

*Elec. Privacy Information Ctr. v. CBP*,
160 F. Supp. 3d 354 (D.D.C. 2016) ...........................................................................18

*Food Marketing Institute v. Argus Leader Media*,
139 S. Ct. 2356 (2019)........................................................................26, 27, 30

*Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*,
610 F.2d 824 (D.C. Cir. 1979) ...................................................................................30

*Glossip v. Gross*,
576 U.S. 863 (2015)................................................................................................3

*Harrison v. Exec. Office for U.S. Attorneys*,
377 F. Supp. 2d 141 (D.D.C. 2005) ..........................................................................7

*Henderson v. Dep't of Justice*,
157 F. Supp. 3d 42 (D.D.C. 2016) ...........................................................................10

*Hodes v. Dep't of Housing & Urban Dev.*,
532 F. Supp. 2d 108 (D.D.C. 2008) ..........................................................................24

*Hussain v. Dep't of Homeland Security*,
674 F. Supp. 2d 260 (D.D.C. 2009) ...........................................................................7

*Judicial Watch, Inc. v. FDA*,
449 F.3d 141 (D.C. Cir. 2006) ....................................................................................7

*Judicial Watch, Inc. v. Dep't of Commerce*,
375 F. Supp. 3d 93 (D.D.C. 2019) ..............................................................................6

*Judicial Watch, Inc. v. Rossotti*,
285 F. Supp. 2d 17 (D.C. Cir. 2003)...........................................................................8

*Kahn v. Federal Motor Carrier Safety Admin.*,
648 F. Supp. 2d 31 (D.D.C. 2009) ............................................................................21

*Kay v. FCC*,
976 F. Supp. 23 (D.D.C. 1997) .................................................................................15

*King v. Dep't of Justice*,
830 F.2d 210 (D.C. Cir. 1987) ....................................................................................7

*Kubik v. BOP*,
No. 10-6078-TC, 2011 WL 2619538 (D. Or. July 1, 2011) ......................................9

*Lewis v. Dep't of Treasury*,
No. 17-cv-0943 (DLF), 2020 WL 1667656 (D.D.C. Apr. 3, 2020) ...................................8, 31

*Maydak v. Dep't of Justice*,
254 F. Supp. 2d 23 (D.D.C. 2003) ...........................................................................9

*Maydak v. Dep't of Justice*,
218 F.3d 760 (D.C. Cir. 2000)................................................................................14

*Mayer Brown LLP v. IRS*,
562 F.3d 1190 (D.C. Cir. 2009) ..............................................................................18

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011).........................................................................................6, 12

*Moorefield v. U.S. Secret Serv.*,
611 F.2d 1021 (5th Cir. 1980) .........................................................................12, 13

*Morley v. CIA*,
508 F.3d 1108 (D.C. Cir. 2007) ..............................................................................30

*Nat'l Ass'n of Home Builders v. Norton*,
309 F.3d 26 (D.C. Cir. 2002) .......................................................................7, 21, 25

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214, 224 (1978).................................................................................13, 14

*Performance Coal Co. v. Dep't of Labor*,
847 F. Supp. 2d 6 (D.D.C. 2012) ............................................................................15

*Pub. Citizen Health Res. Grp. v. FDA*,
704 F.2d 1280 (D.C. Cir. 1983) .........................................................................20, 21

*Pub. Citizen v. Dep't of Health & Human Servs.*,
975 F. Supp. 2d 81 (D.D.C. 2013) ...................................................................21, 23, 24

*Public Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*,
740 F.3d 195 (D.C. Cir. 2014) ...............................................................................17

*Raher v. BOP*,
No. CV-09-526-ST, 2011 WL 2014875 (D. Or. May 24, 2011) ...........9*Dep't of State v. Ray*,
502 U.S. 164 (1991)...........................................................................................9

*Dep't of Justice v. Reporters Comm. for Freedom of Press*,
489 U.S. 749 (1989).................................................................................... *passim*

*Dep't of Air Force v. Rose*,
    425 U.S. 352 (1976) .............................................................................................12

*Jefferson v. Dep't of Justice*,
    284 F.3d 172 (D.C. Cir. 2002) ...........................................................................8

*Mapother v. Dep't of Justice*,
    3 F.3d 1533 (D.C. Cir. 1993). .............................................................................11

*Rosenberg v. Dep't of Defense*,
    342 F. Supp. 3d 62 (D.D.C. 2018) ..................................................................6, 7

*Sarno v. Department of Justice*,
    278 F. Supp. 3d 112 (D.D.C. 2017) .......................................................13, 14, 16

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) .........................................................................16

*Texas Dep't of Criminal Justice v. Levin*,
    572 S.W.3d 671 (Tex. 2019)..........................................................................22, 23

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) .............................................................................7

*Wash. Post Co. v. Dep't of Health & Human Servs.*,
    690 F.2d 252 (D.C. Cir. 1982) ...........................................................................15

*\*WP Co. v. U.S. Small Bus. Admin.*,
    -- F. Supp. 3d --, 2020 WL 6504534 (D.D.C. Nov. 5, 2020).........................20, 27, 28, 29, 30

## Statutes

5 U.S.C. § 552 ........................................................................................... *passim*

50 U.S.C. §§ 3121-3122 .................................................................................24

Ark. Code Ann. § 5-4-617(h)(i)(1)(B)..............................................................24

FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 ...........6

Miss. Code. Ann. § 99-19-51(6)(c).................................................................24

Tex. Crim. Proc. Code Ann. Art. 43.14(b)(2)..................................................24

## Other Authorities

85 Fed. Reg. 75,846, 75,848 (Nov. 27, 2020) (to be codified at 28 C.F.R. Part 26).......................4

FAR 3.302-2(c)(1) ..........................................................................................20

FAR 6.301(a) ...................................................................................................31

FAR 6.303-2(a) ...............................................................................................31

Chris McDaniel, *Inmates Said The Drug Burned As They Died.  This Is How
    Texas Gets Its Execution Drugs.*, Buzzfeed (Nov. 28, 2018),
    https://www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-
    burned-as-they-died-this-is-how-texas?bfsource=relatedmanual ......................................3, 25

Jonathan Allen, *Special Report: How The Trump Administration Secured A Secret
    Supply Of Execution Drugs*, Reuters (July 10, 2020), https://reut.rs/3h1UybG ................3, 28

Josiah Bates, *Why The Justice Department's Plan To Use A Single Drug For
    Lethal Injection Is Controversial*, Time (July 29, 2019),
    https://time.com/5636513/pentobarbital-executions-justice-department/ ...............................3

Justin L. Mack, *DOJ Amendment Opens the Door to Use of Firing Squad, Gas
    Chamber in Terre Haute Executions*, Indianapolis Star (Dec. 16, 2020),
    https://www.indystar.com/story/news/crime/2020/12/16/federal-executions-
    what-rule-allowing-firing-squads-means-terre-haute/3896266001/ ........................................4

Federal Bureau of Prisons, *Capital Punishment* (last visited Dec. 23, 2020),
    https://www.bop.gov/about/history/federal_executions.jsp.................................................4, 16

Federal Bureau of Prisons, *Federal Execution Information: Scheduled Executions*
    (last visited Dec. 23, 2020),
    https://www.bop.gov/resources/federal_executions_info.jsp ...................................................4

S. Rep. No. 109-329 (2006) ............................................................................24

S. Rep. No. 98-221 (1983) ..............................................................................10

Susie Neilson, *Lethal Injection Drugs' Efficacy and Availability for Federal
    Executions*, NPR (July 26, 2019),
    https://www.npr.org/2019/07/26/745722219/lethal-injection-drugs-efficacy-
    and-availability-for-federal-executions.........................................................................3

## INTRODUCTION

In this suit under the Freedom of Information Act ("FOIA"), Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks information related to the United States' procurement of pentobarbital, pentobarbital sodium, and Nembutal (collectively, "Pentobarbital") for use in federal executions.  The Department of Justice's ("DOJ") Office of Information Policy ("OIP") and the Federal Bureau of Prisons ("BOP") withheld information responsive to CREW's FOIA requests on the basis of FOIA Exemptions 4, 5, 6, 7(A), 7(C), 7(E), and 7(F).  The parties have now cross-moved for summary judgment.

Through this case, CREW seeks to vindicate the public's right to be informed about matters of significant interest: the distribution of taxpayer funds and BOP's compliance with federal law in procuring a drug to carry out capital sentences.  The government wishes to transact with vendors and testing companies without revealing their identities, the scope of their work, when they were engaged, or the cost to taxpayers—all because the government believes that the public will find the spending unpopular.  Yet it is precisely unpopular government actions that must be brought to light through FOIA.  Indeed, the core purpose of the law is to shed light on "what the[] government is up to."  *Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989).  Disclosure of the requested records will contribute to the public's understanding of the government's procurement process and allow the public to analyze this expenditure of public resources.

CREW is entitled to summary judgment regarding the government's improper withholdings.[1]  First, the requested procurement records were not "compiled for law enforcement purposes," which dooms the government's Exemption 7 claims.  Second, Exemption 7(A) does

---

[1] CREW does not challenge the adequacy of BOP's or OIP's searches.

not apply because the government has not shown disclosure of the requested information would interfere with an enforcement proceeding.  Third, the government improperly applies Exemptions 6, 7(C), and 7(F) to withhold the dates on which a document was certified and approved.  Fourth, Exemption 7(E) does not apply to BOP's procurement strategy, which is not a "technique" or "procedure" tied to "law enforcement investigations or prosecutions," as required by the exemption.  Nor does the disclosure of procurement information risk circumvention of the law.  Fifth, companies' identities are not "commercial or financial information" protected by Exemption 4, and BOP fails to show other information withheld under this exemption is "confidential."  Sixth, BOP incorrectly invokes the deliberative process privilege over its final justification for proceeding with the Pentobarbital procurement without open and full competition.

For all these reasons, the Court should grant CREW's motion for summary judgment and deny the government's motion as to its withholdings.

## BACKGROUND

### I.      BOP's Procurement of Pentobarbital

On July 25, 2019, DOJ filed an addendum to BOP's execution protocol providing for the use of Pentobarbital as the lethal agent in federal executions (the "2019 Protocol").  Notice of Adoption of Revised Protocol, *Roane v. Barr*, No. 05-cv-2337 (D.D.C. July 25, 2019), ECF No. 385.  That same day, DOJ published a press release confirming that Attorney General William Barr had directed BOP to adopt the addendum and resume capital punishment after a multi-year hiatus.  ECF No. 17-4, Declaration of Kara Christenson ("Christenson Decl."), Ex. K (DOJ Press Release No. 19-807, *Federal Government to Resume Capital Punishment After Nearly Two Decade Lapse*).  DOJ also announced execution dates for five death-row inmates.  *Id.*

Questions immediately arose about how BOP planned to acquire Pentobarbital.  *See, e.g.*, Susie Neilson, *Lethal Injection Drugs' Efficacy and Availability for Federal Executions*, NPR (July 26, 2019).  The Pentobarbital supply for use in executions was known to be limited.  *Id.* Years before the adoption of 2019 Protocol, one of the main manufacturers of Pentobarbital took steps to block its use in executions.  *Glossip v. Gross*, 576 U.S. 863, 871 (2015).  In addition, about a year before the adoption of the 2019 Protocol, botched executions in Texas raised questions about the source and quality of the Pentobarbital used.  *See* Chris McDaniel, *Inmates Said The Drug Burned As They Died.  This Is How Texas Gets Its Execution Drugs.*, Buzzfeed (Nov. 28, 2018).  When one of Texas's suppliers was disclosed, the public learned it was a pharmacy that had been repeatedly cited by regulators for unsafe practices and was on probation with the Texas State Board of Pharmacy.  *Id.*

Despite substantial public interest in BOP's procurement of Pentobarbital, the government has kept critical information secret.  It has not named any of the companies in its supply chain, including the suppliers of the drug and the companies involved in testing.  *See* Jonathan Allen, *Special Report: How The Trump Administration Secured A Secret Supply Of Execution Drugs*, Reuters (July 10, 2020); *see also, e.g.*, Josiah Bates, *Why The Justice Department's Plan To Use A Single Drug For Lethal Injection Is Controversial*, Time (July 29, 2019) ("The DOJ would not comment on where the pentobarbital it plans to use in executions will come from, or how it will be administered.").  As described more below, BOP also has withheld from public view the key terms of its contracts with Pentobarbital suppliers and related companies—meaning the public does not know how much the government has spent on Pentobarbital, when the orders were placed, or the government's full reasoning for seeking to procure Pentobarbital through no-bid contracting procedures.  BOP has executed 10 individuals

with Pentobarbital since the adoption of the 2019 Protocol.  Federal Bureau of Prisons, *Capital Punishment* (last visited Dec. 23, 2020).

On December 28, 2020, a new DOJ rule takes effect that authorizes implementation of additional methods of execution beyond lethal injection.  Manner of Federal Executions, 85 Fed. Reg. 75,846, 75,848 (Nov. 27, 2020) (to be codified at 28 C.F.R. Part 26) (noting that the amendments "ensure that the Department would be authorized to use the widest range of manners of execution permitted by law" and provide for federal executions "by lethal injection 'or by any other manner prescribed by the law of the State in which the sentence was imposed or which has been designated by a court'").  Three executions are currently scheduled, at least two of which will be by lethal injection through use of Pentobarbital.  *See* Justin L. Mack, *DOJ Amendment Opens the Door to Use of Firing Squad, Gas Chamber in Terre Haute Executions*, Indianapolis Star (Dec. 16, 2020); *see also* Federal Bureau of Prisons, *Federal Execution Information: Scheduled Executions* (last visited Dec. 23, 2020).

## II.     CREW's FOIA Requests

Days after the adoption of the 2019 Protocol, CREW submitted FOIA requests to DOJ and BOP seeking records relating to the procurement of Pentobarbital for use in federal executions.  CREW specifically requested:

> records from February 14, 2019 to the present relating to the procurement of pentobarbital, pentobarbital sodium, or Nembutal to be used in federal executions, including but not limited to notifications to or communications with vendors, solicitation information, requests for information, subcontracting leads, and contract awards.

Declaration of Jessica A. Lutkenhaus ("Lutkenhaus Decl."), Ex. 1 (FOIA Request to BOP); ECF No. 17-6, Declaration of Vanessa R. Brinkmann ("Brinkmann Decl."), Ex. A (FOIA Request to OIP); *see also* CREW's Statement of Undisputed Material Facts in Support of Plaintiff's Cross-Motion for Summary Judgment ("CREW SMF") ¶¶ 1-2, 8-9.  CREW's request noted that states

using Pentobarbital in executions had used "compounding pharmacies" as a means of acquiring the drug, and that compounded drugs may not be reviewed by the FDA for safety, effectiveness, or quality.  CREW cited concerns from attorneys that compounded Pentobarbital could expire or degrade over time, potentially causing painful death.  The requested records, CREW explained, would shed light on the government's process in obtaining Pentobarbital.  *See* Lutkenhaus Decl., Ex. 1; Brinkmann Decl., Ex. A; CREW SMF ¶¶ 3, 10.

Both agencies acknowledged CREW's requests.  Christenson Decl., Ex. B; Brinkmann Decl., Ex. B; CREW SMF ¶¶ 4, 11.  BOP determined the records were "categorically exempt from disclosure" pursuant to multiple FOIA exemptions, Christenson Decl., Ex. C; CREW SMF ¶ 5, which CREW timely appealed, Lutkenhaus Decl., Ex. 2; CREW SMF ¶ 6.  DOJ indicated that it required more time to come to a determination but provided no timeline for its response. Brinkmann Decl., Ex. B; CREW SMF ¶ 11.  By December 2019, BOP had not ruled upon CREW's appeal and DOJ had provided no further information about its response, forcing CREW to seek relief in this Court.  *See* CREW SMF ¶¶ 7, 12; ECF No. 1 (Complaint).

CREW filed suit on December 4, 2019.  ECF No. 1; CREW SMF ¶ 13.  DOJ answered the complaint on January 15, 2020.  ECF No. 6; CREW SMF ¶ 14.  Over the next several months, BOP and OIP searched for and processed responsive records pursuant to a schedule agreed upon by the parties.  *See* ECF Nos. 7-9, 12, 13, 15 (joint status reports); CREW SMF ¶ 15.  Both agencies redacted and withheld certain information based on various FOIA exemptions.  Lutkenhaus Decl., Exs. 3-4; Brinkmann Decl., Exs. C-E; CREW SMF ¶¶ 16-20. The parties have now cross-moved for summary judgment.

## LEGAL STANDARD

FOIA "mandates that an agency disclose records on request, unless they fall within one of nine exemptions.  These exemptions are 'explicitly made exclusive,' and must be 'narrowly

construed.'"  *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (citations omitted); *cf. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (noting FOIA "was designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." (quotation marks omitted)).  "[T]he burden is on the agency to show that requested material falls within a FOIA exemption."  *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 514 (D.C. Cir. 1996) (quotation marks and citation omitted); *see also Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action.'" (quoting 5 U.S.C. § 552(a)(4)(B)).

For any document withheld as exempt, the agency must separately satisfy the "foreseeable harm" standard of the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538.  Under those amendments, an agency shall withhold information "only if … (I) the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption …; or (II) disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i).  Thus, "'an agency must release a record—even if it falls within a FOIA exemption—if releasing the record would not reasonably harm an exemption-protected interest' and if the law does not prohibit the disclosure."  *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 98 (D.D.C. 2019) (quoting *Rosenberg v. Dep't of Defense*, 342 F. Supp. 3d 62, 72 (D.D.C. 2018)).  "[T]he foreseeable-harm requirement impose[s] an independent and meaningful burden on agencies," which is "intended to restrict agencies' discretion in withholding documents under FOIA."  *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 106 (D.D.C. Dec. 31, 2019) (quotation marks and citation omitted) (second bracket in original).

Disputes involving the propriety of agency withholdings are commonly resolved at the summary judgment stage. *Harrison v. Exec. Office for U.S. Attorneys*, 377 F. Supp. 2d 141, 145 (D.D.C. 2005). The Court reviews the government's withholding of agency records de novo. 5 U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755. "To enable the Court to determine whether documents properly were withheld, the agency must provide a detailed description of the information withheld through the submission of a so-called '*Vaughn* Index,' sufficiently detailed affidavits or declarations, or both." *Hussain v. Dep't of Homeland Security*, 674 F. Supp. 2d 260, 267 (D.D.C. 2009) (citing, among others, *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973)); *see also Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006). Although there is no set formula for a *Vaughn* index, the agency must "disclos[e] as much information as possible without thwarting the exemption's purpose." *King v. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987). "Because of FOIA's critical role in promoting transparency and accountability, '[a]t all times courts must bear in mind that FOIA mandates a strong presumption in favor of disclosure.'" *Rosenberg*, 342 F. Supp. 3d at 72 (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)) (brackets in original).

## ARGUMENT

## I.   Defendant Is Improperly Withholding Material Under Exemption 7

Under FOIA Exemption 7, agencies are authorized to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information" would cause an enumerated harm. 5 U.S.C. § 552(b)(7)(A)-(F); *FBI v. Abramson*, 456 U.S. 615, 622 (1982) ("Exemption 7 authorizes disclosure of law enforcement records unless the agency can demonstrate one of six specific harms."). Thus, law enforcement records are exempt from production only if their disclosure:

(A) could reasonably be expected to interfere with enforcement proceedings, … (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, … (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

5 U.S.C. § 552(b)(7). Here, Defendant seeks to withhold information under Exemptions 7(A), 7(C), 7(E), and 7(F). CREW challenges each of these withholdings.

### A.    The Requested Records Were Not Compiled For Law Enforcement Purposes

To withhold records under any of the exemptions under Exemption 7, the agency must make a threshold showing that the records were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). "Documents are compiled for 'law enforcement purposes' if 'the investigatory activity that gave rise to the documents is related to the enforcement of federal laws, and there is a rational nexus between the investigation at issue and the agency's law enforcement duties.'" *Lewis v. Dep't of Treasury*, No. 17-cv-0943 (DLF), 2020 WL 1667656, at *2 (D.D.C. Apr. 3, 2020) (quoting *Judicial Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 24 (D.C. Cir. 2003)). Whether a set of records meets this standard depends on "how and under what circumstances the requested files were compiled" and "whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Id.* (quoting *Jefferson v. Dep't of Justice*, 284 F.3d 172, 176-77 (D.C. Cir. 2002)).

The government claims that records requested by CREW "all qualify" because they "focus on a core law enforcement function – the implementation of a federal criminal sentence." ECF No. 17-1, Mem. of Points & Authorities in Support of Defendant's Motion for Summary Judgment ("MSJ") 15. The government then argues that the death penalty serves the law enforcement purpose of deterrence, and BOP "is tasked with helping to implement that purpose

by, *inter alia*, determining which substance or substances shall be used to implement a federal death sentence." MSJ 16-17.

This argument is insufficient to show that the requested procurement records were compiled for law enforcement purposes. As an initial matter, not all records related to BOP's duties are "compiled for law enforcement purposes." Courts have repeatedly distinguished between BOP's law enforcement and custodial or other functions. *See Raher v. BOP*, No. CV-09-526-ST, 2011 WL 2014875, at *9 (D. Or. May 24, 2011) (finding that although disclosure of information pertaining to "security electronics," "security inspection system," and staffing vulnerabilities raise security concerns with respect to BOP's "custodial functions," the agency did not explain how those documents pertain to law enforcement functions); *Kubik v. BOP*, No. 10-6078-TC, 2011 WL 2619538, at *10 (D. Or. July 1, 2011) (holding BOP did not satisfy the "law enforcement purposes" threshold for records that were "largely related to administrative functions" and were unconnected to "a potential violation of law"); *Benavides v. BOP*, 774 F. Supp. 2d 141, 146-47 (D.D.C. 2011) ("Here, the BOP suggests that its status as a law enforcement agency responsible for the welfare of inmates in its custody, its staff and the public at large, sufficiently establishes that recordings of inmate telephone conversations are compiled for law enforcement purposes. Not so."); *Maydak v. Dep't of Justice*, 254 F. Supp. 2d 23, 38 (D.D.C. 2003) (finding BOP failed to show records in its Inmate Central Records System were "compiled for law enforcement purposes" when the records concerned "day-to-day activities and events occurring during the confinement of an inmate").

Moreover, to be compiled for law enforcement purposes, non-investigatory records must evidence a "rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or

violation of federal law." *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011).  The government

has offered no such nexus here.  The records responsive to CREW's requests do not relate to an

ongoing "investigation," nor a "security risk" or "violation of federal law."  Rather, they are

contracts, invoices, and other documents related to BOP's purchase of Pentobarbital.  That BOP

aims to use this Pentobarbital in federal executions—which, in turn, and regardless of method of

execution, relate to deterrence of crime—does not somehow convert the procurement records to

law enforcement records.  *See Henderson v. Dep't of Justice*, 157 F. Supp. 3d 42, 49-50 (D.D.C.

2016) (holding stenographic expense records were not "compiled for law enforcement purposes"

when "the apparent connection between stenographic services and the EOUSA's law

enforcement function in prosecuting plaintiff's criminal case" was "highly attenuated").

Indeed, when Congress amended Exemption 7 to broaden its scope from "investigatory

records" to "records or information" compiled for law enforcement purposes, its concern was

with "sensitive law enforcement information" "such as an informant's identity."  S. Rep. No. 98-

221, at 23 (1983).  Congress particularly noted concerns that release of information under the

narrower version of Exemption 7 had allowed people to "to evade criminal investigation or to

retaliate against informants."  *Id.*  The government's position here would extend Exemption 7

well beyond its application in the courts and Congress's intent—procurement records are a far

cry from records revealing confidential source information or investigative leads.  Meanwhile,

such records are likely to inform the public "what their government is up to," *Reporters Comm.*,

489 U.S. at 771-72, for example whether the government paid reasonable rates for Pentobarbital

and whether the government is contracting with a pharmacy with a record of safety violations.

Because the disputed records were not compiled for law enforcement purposes, all of the

government's Exemption 7 claims should be rejected.

**B.      Exemption 7(A)**

Even assuming that the requested records were compiled for law enforcement purposes, the government's claims under Exemption 7 still fail.  Exemption 7(A) applies when the disclosure of records "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  To justify withholding under this exemption, the government must demonstrate that "disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated."  *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice ("CREW I")*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).  The government fails to satisfy these requirements.

BOP invokes Exemption 7(A) over "all information that could lead to the disclosure of the identity of those companies and individuals involved in BOP's procurement of Pentobarbital during the relevant time period."  MSJ 26 (citing Christenson Decl. ¶¶ 114-17).  This purportedly includes not only the name of the companies but also the contract terms and other information that would allow the public to analyze the expenditure of taxpayer funds.  *See* Christenson Decl. ¶ 114 (withholdings include "company brochures, quotes for services, invoices, testing results, dates and times of purchase and/or delivery of products or services, and specific descriptions of the substance(s) and/or service(s), such as item/stock/UPC numbers, price, quantity, concentration, packaging details, expiration dates, container units, and lot numbers").

Exemption 7(A) does not sweep so broadly.  In particular, it requires BOP to identify an "enforcement proceeding" with which the release of records would interfere.  The government initially argues that the carrying out of the death penalty itself qualifies as a "law enforcement proceeding" for purposes of the exemption.  MSJ 17-19.  The government acknowledges that no court has addressed this question.  *Id.* 17.  Yet courts have found that the enforcement

proceeding covered by Exemption 7(A) "can generally be equated with a trial" or adjudicatory proceeding. *Moorefield v. U.S. Secret Serv.*, 611 F.2d 1021, 1024-25 (5th Cir. 1980); *cf.*, *e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice ("CREW II")*, 658 F. Supp. 2d 217, 229 & n.6 (D.D.C. 2009) (noting "the narrow scope of proceedings that Congress intended to be covered under Exemption 7(A)"). A federal execution—in a prison, following the conclusion of legal challenges to an inmate's conviction—is clearly not equal to a trial; at most, it is a consequence of a completed trial. It therefore falls outside of courts' general understanding of the scope of Exemption 7(A).

Unable to cite any on-point precedent, the government invokes the Fifth Circuit's decision in *Moorefield v. U.S. Secret Service* to support an "expansive reading of Exemption 7(A) in exceptional cases such as this one." MSJ 18. To the extent *Moorefield* stands for this proposition, it has not been adopted by the D.C. Circuit. It is also inconsistent with the Supreme Court's repeated admonition that FOIA exemptions must be "narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 366 (1976) ("[W]e have repeatedly stated that the policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly." (alteration and quotation marks omitted)).

Moreover, *Moorefield* is distinguishable from this case. There, a FOIA requester who had previously threatened the life of the President sought access to his Secret Service file. *Moorefield*, 611 F.3d at 1022. The Fifth Circuit applied Exemption 7(A) to cover the Secret Service's investigatory records, recognizing an "exception" to the general rule that "enforcement proceedings" means judicial proceedings. *Id.* at 1025. The court emphasized "[t]he release of information in investigatory files prior to the completion of an actual, contemplated enforcement

proceeding was precisely the kind of interference that Congress continued to want to protect against." *Id.* at 1026; *cf. CREW I*, 746 F.3d at 1096 ("Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978))).  By contrast, the implementation of the death penalty (and the particular procurement records requested here) implicates no ongoing law enforcement investigation or judicial proceedings.  This Court should accordingly reject the government's invitation to "expan[d]" the meaning of Exemption 7(A) to cover executions.

In the alternative, the government argues that pending or anticipated habeas proceedings or civil litigation brought by death row inmates are the relevant enforcement proceedings.  MSJ 19-22.  The government points to one case where a court applied Exemption 7(A) to ongoing habeas proceedings, *Sarno v. Department of Justice*, 278 F. Supp. 3d 112 (D.D.C. 2017).  MSJ 20.  The government identifies no authority suggesting that other types of civil litigation qualify as an enforcement proceeding.  *See id.* 20-21.

But *Sarno* does not stand for the proposition that all pending or contemplated habeas proceedings are "law enforcement proceedings."  *See Sarno*, 278 F. Supp. 3d at 125 (noting "the Court can identify no controlling precedent, in which Exemption 7(A) was held to be applicable solely on the basis of an ongoing habeas proceeding").  In applying Exemption 7(A), Judge Collyer first recognized that "Exemption 7(A) exists because Congress 'recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be *hindered in their investigations* or *placed at a disadvantage when it came time to present their cases'* in court." *Id.* (emphases added).  She accordingly focused on the fact that the prisoner

was "attacking the basis for his conviction." *Id.* at 112; *see also id.* at 126 (noting the ongoing habeas proceeding required prosecutors to "defend their prosecution and [the prisoner's] convictions").  Judge Collyer further emphasized that "a new trial would be a reasonable likelihood" if the habeas motion succeeded.  *Id.* at 127.  The release of withheld material in that case—the Bureau of Alcohol, Tobacco and Firearms' "records on [the prisoner's] criminal case," including grand jury material, reports of investigations, and wiretap, pen register, and GPS tracking information—could therefore interfere with a later prosecution.  *Id.* at 124-25, 127.

Here, the government makes no similar showing that new trials are reasonably anticipated, nor does it connect the requested procurement records to the claims made in any particular proceeding.  Applying Exemption 7(A) whenever the government raises the specter of a future habeas proceeding could allow the government to indefinitely shield records requested by any person in federal custody—a result inconsistent with the "the narrow scope of proceedings that Congress intended to be covered under Exemption 7(A)."  *CREW II*, 658 F. Supp. 2d at 229 & n.6; *see also NLRB*, 437 U.S. at 230 (noting Exemption 7(A) "[does] not endlessly protect material simply because it was in an investigatory file").

Even assuming that the government had identified an enforcement proceeding, that alone would not justify withholding under Exemption 7(A).  *See CREW I*, 746 F.3d at 1096.  Because this exemption applies only when disclosure *could reasonably be expected to interfere* with an enforcement proceeding, the government must also demonstrate how release of the requested records would "prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence.'"  *CREW II*, 658 F. Supp. 2d at 230 (quoting *Maydak v. Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000)).  Consistent

with this guidance, courts have previously applied Exemption 7(A) when, for example, the agency showed that disclosure of witness statements could lead to witness intimidation, *Kay v. FCC*, 976 F. Supp. 23, 39 (D.D.C. 1997), or disclosure of handwritten notes could reveal the content of potential testimony, *Performance Coal Co. v. Dep't of Labor*, 847 F. Supp. 2d 6, 16 (D.D.C. 2012).

BOP does not show that the requested procurement records would interfere with any enforcement proceedings.  Indeed, the government does not attempt to tie its claims of harm to a particular proceeding nor to inmates' habeas proceedings more generally.  The government claims that disclosure of the companies associated with BOP's procurement of Pentobarbital may make it more difficult to acquire the drug.  MSJ 22.  The government then devotes many pages to arguing that popular pressure may discourage companies from contracting with the government, which might in turn lead to a lack of Pentobarbital for a future execution.  *Id.* 22-26.  But BOP does not explain how either the lack of Pentobarbital or the actions of third parties in an open marketplace would or could affect the claims made by an inmate in a habeas proceeding.  Such broad claims of harm unconnected to any law enforcement proceeding are antithetical to the nation's longstanding view that "the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market."  *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting); *see also Wash. Post Co. v. Dep't of Health & Human Servs.*, 690 F.2d 252, 264 (D.C. Cir. 1982) ("[T]he purpose of FOIA is to permit the public to decide for itself whether government action is proper.").

BOP's failure to demonstrate "interference" distinguishes this case from *Sarno*, where the court specifically concluded that release of an individual's criminal case file—including grand

jury material and wiretap information—could interfere with a later prosecution. *Sarno*, 278 F. Supp. 3d at 126. The most BOP offers here is the case of Brandon Bernard, who the government explains brought a recent habeas challenge based on alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963). MSJ 21-22. Yet BOP does not attempt to connect disclosure of the requested procurement records to interference with that challenge. *See id*. Mr. Bernard has since been executed. Federal Bureau of Prisons, *Capital Punishment* (last visited Dec. 23, 2020); *see also CREW I*, 746 F.3d at 1097 ("We therefore require a law enforcement agency invoking the exception to show that the material withheld relates to a concrete prospective law enforcement proceeding." (quotation marks omitted)).

In sum, Exemption 7(A) does not protect against every difficulty the government may face—only "interfere[nce] *with enforcement proceedings*." 5 U.S.C. § 552(b)(7)(A) (emphasis added). It is the government's burden to show that disclosure of the cost of its purchases and the other procurement information requested here could reasonably be expected to interfere with such a proceeding. It fails to carry that burden. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 114 (D.C. Cir. 2007) (rejecting application of Exemption 7(A) when the agency failed to provide "specific information about the impact of the disclosures" on the enforcement proceeding); *CREW I*, 746 F.3d at 1098 ("[I]t is not sufficient for the agency to simply assert that disclosure will interfere with enforcement proceedings; 'it must rather demonstrate *how* disclosure' will do so.").

For similar reasons, the government's withholdings must also be rejected for failure to satisfy FOIA's foreseeable harm standard. *See Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (agency cannot offer "generic" and "conclusory" claims of harm, but rather must "identify specific harms to the relevant protected interests that [it] can

reasonably foresee would actually ensue from disclosure of the withheld materials," and "connect[] the harms in [a] meaningful way to the information withheld").

C.      Exemption 7(E)

Exemption 7(E) is limited in scope.  It permits withholding of law enforcement records only if (1) the records would reveal "techniques," "procedures" or "guidelines" for "law enforcement investigations or prosecutions," and (2) "such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E); *Public Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 205 n. 4 (D.C. Cir. 2014) (citing *Blackwell v. FBI*, 646 F.3d 37, 41-42 (D.C. Cir. 2011)) (noting the D.C. Circuit "has applied the 'risk circumvention of the law' requirement both to records containing guidelines and to records containing techniques and procedures").  With respect to the first requirement, the agency "must at least provide *some* explanation of what procedures are involved and how they would be disclosed."  *CREW I*, 746 F.3d at 1102.  With respect to the second requirement, the agency must "demonstrate logically how the release of the requested information might create a risk of circumvention of the law."  *Blackwell*, 646 F.3d at 42.  BOP does not meet either requirement.

As a threshold matter, BOP does not sufficiently specify "what procedures are at stake" or how disclosure of the requested records "could reveal such procedures."  *CREW I*, 746 F.3d at 1102.  The agency invokes Exemption 7(E) to withhold "information that would reveal the strategy undertaken in order to procure Pentobarbital, and information regarding the method by which BOP procured or attempted to procure Pentobarbital."  MSJ 32; Christenson Decl. ¶ 128.  BOP's *Vaughn* index adds only that the information withheld comprises "[t]echniques and procedures utilized to procure lethal injection substances" or "BOP efforts to procure lethal injection substances."  *See, e.g.*, Christenson Decl., Ex. F at 2, 53-54, 60.  No further elaboration

17

is provided.  Nor does BOP attempt to connect the purported "techniques and procedures" to law enforcement "investigations" or "prosecutions."  This does not suffice.  The agency must "provide *some* explanation of what procedures are involved and how they would be disclosed." *CREW I*, 746 F.3d at 1102.  BOP's "near-verbatim recitation of the statutory standard" is plainly "inadequate." *Id.*; *see also Elec. Privacy Information Ctr. v. CBP*, 160 F. Supp. 3d 354, 359 (D.D.C. 2016) (holding that agency failed to provide the court "with sufficient detail regarding the law enforcement techniques or procedures the defendant seeks to protect").

Though this failure alone is sufficient to doom BOP's Exemption 7(E) claims, the agency also fails to identify how disclosure of procurement information will "risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  BOP claims that disclosure will "greatly increase[] the risk that BOP will be unable to procure Pentobarbital, which in turn would greatly interfere with BOP's legal mandate to carry out capital sentences."  MSJ 32.  On their face, neither justification relates to circumvention of the law.  As the D.C. Circuit has recognized, Congress's focus in Exemption 7(E) was on whether disclosure of particular information "could increase the risks that a law will be violated or that past violators will escape legal consequences." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).  Yet it is unclear how disclosure of, for example, how much BOP has paid to procure Pentobarbital leads to increasing the risk that (an unnamed) law will be violated or that past violators (of unnamed laws) will escape legal consequences.  BOP's showing fails to satisfy not only the elements of Exemption 7(E), but also FOIA's foreseeable harm standard. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106.  BOP's invocation of Exemption 7(E) should accordingly be rejected.

### D.     Exemptions 6, 7(C), 7(F)

Exemption 7(C) and Exemption 6 both protect against the "unwarranted invasion of personal privacy." *See* 5 U.S.C. § 552(b)(6) (exempting from disclosure "personnel or medical

18

files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"); *id.* § 552(b)(7)(C) (exempting "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy"). Exemption 7(F) exempts from disclosure information that "could reasonably be expected to endanger the life or physical safety of any individual." *Id.* § 552(b)(7)(F).

BOP applied these three exemptions to withhold information that would identify BOP, DOJ, or third-party individuals involved in BOP's procurement of Pentobarbital.[2]  MSJ 28; *id.* at 34 (noting BOP applied Exemption 7(F) "to the same identifying information throughout the records as was described under Exemption 6 and Exemption 7(C)"). BOP did not invoke these exemptions over the identity of *companies* involved in Pentobarbital procurement; only over information related to individuals. CREW does not challenge these withholdings.

BOP also invokes Exemptions 6, 7(C), and 7(F) to withhold several dates in non-email Record 8, BOP's Justification for Other than Full and Open Competition. This document describes BOP's "urgent an[d] compelling need to procure" Pentobarbital through the use of other than full and open competition under Federal Acquisition Regulations ("FAR") Part 6.302-2. BOP has redacted the dates that the contracting officer and technical manager certified the document, as well as the date of approval.[3]  Neither the *Vaughn* index, the government's briefing, nor BOP's declarants explain why the dates implicate the privacy or security concerns

---

[2] The withheld information includes "names, initials, signatures, email addresses, telephone/fax numbers, job titles, and department titles." MSJ 28. OIP also withheld a reporter's mobile number and PGP fingerprint. *Id.*

[3] In addition to Exemptions 6, 7(C), and 7(F), BOP claims Exemptions 4 and 7(A) over the dates of the technical manager's certification and approval by a BOP decisionmaker, although not the contracting officer's certification. CREW disputes the applicability of Exemptions 4 and 7(A), *see* Sections I.B and II.

of Exemptions 6, 7(C), and 7(F).  This alone justifies denying summary judgment as to these

redactions.  *See, e.g.*, *Elec. Frontier Found. v. Dep't of Justice*, 384 F. Supp. 3d 1, 9, 18 (D.D.C.

2019) (emphasizing agency bears the burden of showing FOIA exemptions apply).  Moreover,

the FAR allows an agency to complete its justification before *or after* the contract award.  FAR

3.302-2(c)(1).  Accordingly, disclosure of the dates will not reveal other information that the

government has sought to keep secret in this action.  The dates in the Justification for Other than

Full and Open Competition should be disclosed.

## II.     Defendant Is Improperly Withholding Information Under Exemption 4

Exemption 4 protects from disclosure "commercial or financial information obtained

from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  To demonstrate this

exemption applies, an agency must establish that withheld information is "(1) commercial or

financial, (2) obtained from a person, and (3) privileged or confidential."  *WP Co. v. U.S. Small*

*Bus. Admin.*, -- F. Supp. 3d. --, 2020 WL 6504534, at *5 (D.D.C. Nov. 5, 2020) (quoting *Pub.*

*Citizen Health Res. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).  BOP here fails to meet

the first and third requirements for some of its withholdings.

### A.     Information That Purportedly Could Lead To The Identity Of Companies

BOP redacted "any information that could lead to the identity" of BOP's suppliers of

Pentobarbital or of those companies who "performed related critical services."  Christenson

Decl. ¶ 48.  The withheld information in this category sweeps broadly, including "names, titles,

department titles, purchase order/reference numbers, account numbers, contract numbers, phone

and fax numbers, web addresses, physical addresses, video conference ID numbers, IT

information, as well as company logos, company brochures, quotations, invoices, testing results,

dates of purchase, service, and/or delivery, substance description, item/stock/UPC numbers,

price, quantity, concentration, packaging details, expiration dates, container units, lot numbers, and product identification numbers." *Id.*

### 1. Suppliers' And Vendors' Identities Are Not "Commercial Or Financial Information"

The identity of the entities involved in BOP's procurement of Pentobarbital is not "commercial or financial" information.  "The terms in Exemption 4 are to be given their ordinary meanings, and information is 'commercial' under this exemption if, in and of itself, it serves a commercial function or is of a commercial nature." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002).  The exemption applies to records that "reveal basic commercial operations or relate to the income-producing aspects of a business" as well as "when the provider of the information has a commercial interest in the information submitted to the agency." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (ellipsis omitted). "[N]ot every bit of information submitted to the government by a commercial entity qualifies for protection." *Pub. Citizen Health Res. Grp.*, 704 F.2d at 1290.

The names of entities that contract with BOP are unlike information that is routinely held to be "commercial or financial"—for example, "revenue, net worth, income, and EBITDA," *Kahn v. Federal Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 35-36 (D.D.C. 2009), or "sales statistics, profits and losses, and inventories," *Pub. Citizen v. Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81, 99 (D.D.C. 2013).  The government nonetheless contends that the companies have a commercial interest in their identities, citing only *Electronic Privacy Information Ctr. ("EPIC") v. Dep't of Homeland Security*, 117 F. Supp. 3d 46 (D.D.C. 2015). In that case, Judge Kessler applied Exemption 4 to the identities of companies that participated in a cyber-security pilot program conducted by the Departments of Defense and Homeland Security.  She concluded that the identities were commercial "in this particular context" because

disclosure "could have a commercial or financial impact on the companies involved." *Id.* at 62-63 ("[A] company may not always have a commercial interest in its name and identity …."). The government's declarant explained, "If a company's participation in the [cyber-security program] were publicly known, that company could face increased cyber targeting, exposing the company to greater business or financial loss ... [and] participation ... could be viewed as an admission of cyber vulnerability; a company could face competitive disadvantages or market loss if its participation were revealed." *Id.* at 64 (ellipses and bracket in original).

*EPIC* does not support the application of Exemption 4 in this case. For one, the government here primarily focuses on the purported impact that *BOP*, not the companies, will experience as a result of disclosure. It argues that disclosure may lead some companies to cease dealing with BOP, thus limiting BOP's access to Pentobarbital. MSJ 23-25. This argument does not demonstrate "a commercial or financial impact on *the companies* involved." *EPIC*, 117 F. Supp. 3d at 62-63 (emphasis added).

On that front, the government asserts only vaguely that disclosure of the identities of its corporate suppliers and vendors could subject those companies "to harm to their competitive business interests." MSJ 37. The government's brief does not spell out further what this competitive harm might be. BOP's declarant points to "negative publicity and subsequent financial injury" as a "strategy" that death penalty advocates employ to urge lethal injection substance suppliers to cease providing the drugs to the government. Christenson Decl. ¶ 52-57. The government also cites to a Supreme Court of Texas case for the proposition that "a fear of negative publicity and declining sales was one of the reasons pharmacies do not want to be publicly identified as suppl[ying] lethal injection drugs." MSJ 37 (citing *Texas Dep't of Criminal Justice v. Levin*, 572 S.W.3d 671, 681-82 (Tex. 2019)). Yet the Texas Supreme Court

did not adopt this proposition—it was a statement offered by Texas's Department of Criminal Justice, which the court did not probe, and indeed rejected as irrelevant, because the issue that case was the potential for physical harm. *Levin*, 572 S.W.3d at 681-82. Nor does the government here provide any evidence beyond its bare assertion of "harm to [the companies'] competitive business interests," or explain why a company's potential decision to cease doing business with the government leads to that competitive harm. *See Pub. Citizen v. U.S. Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81, 107 (D.D.C. 2013) (noting the government and the two companies failed to explain their bare assertion that the release of information would "cause competitive harm or be of some use to 'adversaries in current litigation.'"). This showing fails to satisfy Exemption 4.

More importantly, while revealing companies' involvement in BOP's procurement of Pentobarbital may lead to negative publicity, "the law is well-settled that this potential consequence of a disclosure does not convert the information into 'commercial' under Exemption 4." *Pub. Citizen*, 975 F. Supp. 2d at 107. In *Public Citizen*, the Department of Health and Human Services ("HHS") sought to withhold from disclosure the identity of government agencies conducting investigatory or legal proceedings against Pfizer, Inc. and Purdue Pharma L.P., who were required to notify HHS of such proceedings. Judge Howell said that the investigating agencies' identities were not "commercial" under Exemption 4. She acknowledged that "revealing the existence of an investigation, even if the status is closed, may be embarrassing or harmful to the reputation of a company," but concluded that this harm was not protected against by Exemption 4:

> The D.C. Circuit made this point clearly in *United Technologies*. There, defense contractors sought to use Exemption 4 to shield the release of information on the ground that they would suffer competitive harm because "their competitors will use the documents to discredit them in the eyes of current and potential customers" and

23

> their "reputation will suffer as a result."  The court bluntly rejected this argument,
> stating "Exemption 4 does not protect against this species of harm," and further
> explaining that "[c]alling customers' attention to unfavorable agency evaluations
> or unfavorable press does not amount to an 'affirmative use of proprietary
> information by competitors.'"  In short, "Exemption 4 does not guard against mere
> embarrassment in the marketplace or reputational injury."

*Id.* at 107 (internal citations omitted); *see also Hodes v. Dep't of Housing & Urban Dev.*, 532 F.

Supp. 2d 108, 117-18 (D.D.C. 2008) (rejecting application of Exemption 4 to identity of

companies involved in Ginnie Mae's mortgage-backed securities program); *cf.* Order on

Summary Judgment Motions, *Citizens for Healthy Cmty. v. Dep't of Interior*, No. 1:12-cv-

01661-RPM (D. Colo. Feb. 13, 2013) (rejecting invocation of Exemption 4 over identity of

submitters of Expressions of Interest in federal oil and gas leases).  Accordingly, the purported

commercial impact flowing from "negative publicity" and reputational damage does not convert

the companies' identities into commercial information.  It is thus not protected by Exemption 4.

If Congress wanted to exempt BOP's suppliers and testing companies from disclosure, it

could have passed (or could still pass) a law protecting their identities.  The federal legislature

has passed such laws protecting, for example, the identities of covert agents, 50 U.S.C. §§ 3121-

3122, while many states have specifically ordered the identity of entities that participate in their

lethal injection processes to be kept confidential, *see, e.g.*, Ark. Code Ann. § 5-4-617(h)(i)(1)(B),

Miss. Code. Ann. § 99-19-51(6)(c), Tex. Crim. Proc. Code Ann. Art. 43.14(b)(2).  Yet Congress

has not passed such a law.  Indeed, Congress recently highlighted the importance of "a rigorous

and transparent accountability system" to "provide visibility into who is receiving Federal funds

through contracts and grants, and for what purpose" and to "allow[] taxpayers to judge whether

government funds are being used for purposes they consider valuable."  S. Rep. No. 109-329, at

3 (2006) (report accompanying Federal Funding Accountability and Transparency Act of 2006).

BOP cannot get around this reality by shoehorning information into Exemption 4 when the

identities of the companies involved in its procurement process do not "in and of [themselves], … serve[] a commercial function or [are] of a commercial nature." *Nat'l Ass'n of Home Builders*, 309 F.3d at 38.

Of course, that the information is not commercial does not mean it has no value to the public. As noted above, the identification of one of Texas's Pentobarbital suppliers revealed that the state was contracting with a compounding pharmacy whose license had been on probation for years. Chris McDaniel, *Inmates Said The Drug Burned As They Died. This Is How Texas Gets Its Execution Drugs.*, Buzzfeed (Nov. 28, 2018). The pharmacy was reportedly cited by state regulations for 48 violations in recent years, including for "keeping out-of-date drugs in stock, using improper procedures to prepare IV solutions, and inadequate cleaning of hands and gloves." *Id.* Whether the federal government is contracting with entities of similarly questionable safety pedigree is a matter of compelling public interest. And the people's right to know "what their government is up to" is FOIA's guiding principle. *Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 771-72 (1989).

### 2. Certain Withheld Information Is Not Confidential Because It Does Not Identify A Company Involved In Pentobarbital Procurement

Even assuming that Exemption 4 shields identities of the companies involved in BOP's procurement of Pentobarbital, it does not apply to information regarding the drug's price, quantity, expiration dates, container units, lot numbers, purchase order/reference numbers, substance description, concentration, packaging details, and dates of purchase, service, and/or delivery. *See* Christenson Decl. ¶ 48 (claiming Exemption 4 over this information). Disclosure of this information would not identify BOP's suppliers or testing companies. Accordingly, disclosure would not reveal any commercial or financial information that is "confidential" as required by Exemption 4.

The Supreme Court recently addressed when "commercial or financial" information should be considered "confidential." In *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019), the Supreme Court suggested "two conditions that might be required for information communicated to another to be considered confidential": (1) "information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it," and (2) "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Id.* at 2363. The Court went on to hold that Exemption 4 makes the first condition mandatory, but it declined to rule on the second condition as it was clearly satisfied in the case before it. *Id.* The Court thus concluded that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 2366.

BOP's withholdings hinge on the premise that disclosure "could lead to the identity" of one of the companies involved in the procurement process. In other words, BOP claims that, because companies involved in Pentobarbital procurement treat their participation as confidential, any information that could lead to their identities is also confidential. BOP includes in this category price, expiration dates, container units, lot numbers, purchase order/reference numbers, substance description, concentration, packaging details, and dates of purchase, service, and/or delivery.[4] *Compare* Christenson Decl. ¶ 48, *with id.* ¶¶ 49-50. Because BOP does not

---

[4] BOP also claims that additional information falls within this category, including names, titles, department titles, account numbers, phone and fax numbers, web addresses, physical addresses, video conference ID numbers, IT information, company logos, and company brochures. If the Court concludes that the identities of the companies involved in BOP's Pentobarbital procurement process are confidential commercial information, CREW does not dispute that the foregoing pieces of information are also identifying.

argue that this information is otherwise confidential, BOP's invocation of Exemption 4 turns on whether the information actually is or could be identifying.  Without that link, BOP has not offered any evidence that the information is "customarily and actually treated as private."  *Argus Leader Media*, 139 S. Ct. at 2366.

BOP fails to demonstrate, as it must, that this information is identifying.  For example, BOP makes no effort to explain how the cost of a contract or invoice could reveal the identity of a Pentobarbital supplier.  Similarly, BOP does not attempt to explain why the concentration of the drug is identifying for either the supplier of the drug or any other company involved in the procurement process.  Because the agency must provide "'detailed and specific information' to justify its withholding," *WP Co.*, 2020 WL 6504534, at *9, the complete lack of justification means BOP's invocation of Exemption 4 over this information must fail.

BOP offers somewhat more with respect to "dates, times, or the specific description of a substance or service."  The agency claims that this information "could be compared to heightened email activity, or activity reported in accordance with government reporting requirements, within a certain timeframe to determine, or at least narrow down, the identity" of companies involved.  Christenson Decl. ¶ 114.  It suggests that suppliers could be identified by comparing (1) "dates of purchases or potential purchases" and "[e]xpiration dates" to "reporting logs or databases maintained by the Drug Enforcement Agency (DEA)," or (2) "the description of a particular substance, including the manner in which it is produced, packaged, sold or identified" to publicly available information "if a particular company is known or discovered to package or price a substance in a particular way."  Christenson Decl. ¶¶ 115-16.  This explanation remains inadequate.

The connections BOP draws are speculative.  For example, only "[c]ertain information"—undefined—is stored in the "reporting logs or databases maintained by [the DEA]."  Christenson Decl. ¶¶ 115.  Further, only "some"—it is not clear which—"of [the DEA's] databases and logs are publicly available, or can be obtained through other means." *Id.* Similarly, BOP's claims with respect to the manner of packaging are dependent on "*if* a particular company is known or discovered to package or price a substance in a particular way," *id.* ¶ 116 (emphasis added), with no indication as to whether this hypothetical has any basis.  The purportedly revealing "heightened email activity" is likewise a mystery as to whose emails are involved, how those emails are observed, and what their connection is to the information at issue. BOP points to a news article where the reporter purportedly identified three independent testing companies by reviewing redacted laboratory reports, "presumably through the process of comparison and elimination." *Id.*  ¶¶ 117-18.  But the article itself does not explain how the organization identified the companies and each company "confirmed that [it] had produced the test results."  *See* Jonathan Allen, *Special Report: How The Trump Administration Secured A Secret Supply Of Execution Drugs*, Reuters (July 10, 2020).

Courts in this district have rejected similar speculation with respect to demonstrating confidentiality.  In *WP Co. v. U.S. Small Bus. Admin. ("SBA")*, the SBA argued that loan data related to the Paycheck Protection Program had to be withheld because—although the loan data was not itself confidential—it would necessarily reveal confidential payroll information for the borrowing companies.  2020 WL 6504534, at *6.  Judge Boasberg concluded that SBA offered "only bare speculation as to any connection between the two figures for a given borrower."  *Id.* at *9.  In particular, Judge Boasberg noted that, for the loan data to reveal payroll data, the borrower would have had to take out a loan for the maximum amount allowed and pay few, if

any, of its employees more than $100,000.  *Id.* at *7.  These were unfounded assumptions, the court concluded.  *Id.* at *7-9.  Judge Boasberg then rejected the application of Exemption 4 because without the link to payroll information, the requested loan data was not "confidential." *Id.* at *9.

The same result follows here.  BOP offers only speculation—not even that the withheld information will identify the companies involved in the procurement of Pentobarbital, but that it will at "least narrow down" the companies involved.  Christenson Decl. ¶ 114.  Under such circumstances, the link between the identity of the company and the other procurement information is too attenuated.  BOP's conjecture is insufficient to meet its burden under Exemption 4.

### B.     BOP Does Not Show The Remaining Information Is Confidential

In addition to the purportedly identifying information discussed above, BOP withheld two additional categories of information under Exemption 4.  First, BOP withheld "price and contract term negotiations, pricing and business strategies, instructions for ordering and purchase, unique order and purchase requirements, and production and/or testing capability, to include formulas, quantity, timing of production and/or testing, and specific production/testing methods or standards."  Christenson Decl. ¶ 49.  Second, BOP withheld "invoices, quotations, and protocols for third-party testing services, as well as test results, as these documents reflect price and contract term negotiations, specific methods of testing, and detailed descriptions of how testing was or can be completed, including formulas, quantities and time frames required for testing."  *Id.* ¶ 50.  BOP does not carry its burden to show this wide variety of information is exempt under Exemption 4.

In particular, BOP fails to justify the confidentiality of the non-identifying information. BOP's declarant sweeps with a broad brush, asserting that "individuals/companies providing the

information have typically kept it private, have specifically designated the information as
proprietary and/or confidential, and have expressly required or requested that the Government
maintain the information as confidential to the greatest extent possible under the law, a condition
to which the Government has agreed to abide."  Christenson Decl. ¶ 51.  BOP adds that "the
commercial information" withheld could "reveal companies' contract negotiation strategies, their
physical capabilities in terms of quantity or quality of manufacturing, obtaining, compounding,
or testing such substances, as well as pricing, advertising, and other business strategies," which
would "subject the companies to a competitive disadvantage." *Id.* ¶ 59.

Such "conclusory and generalized allegations of exemptions are unacceptable." *Morley
v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) (quoting *Founding Church of Scientology of
Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 830 (D.C. Cir. 1979)).  BOP must do more
than "recit[e] statutory standards."  *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir.
1998).  Yet BOP offers nothing beyond the bare assertions described above.  For example, BOP
withholds in full the invoices for third-party testing services, as well as quotations, protocols, and
test results.  BOP fails to explain that testing services companies keep the cost of their services
and test results "customarily and actually treated as private."  *Argus Leader Media*, 139 S. Ct. at
2366; *cf.* MSJ 37-38 (discussing confidentiality with respect to identifying information only, and
noting BOP has provided companies "express assurances that … *their identities and contact
information* will remain confidential").  BOP nowhere explains how such an invoice reveals
information about a company's *capability*, as opposed to the fulfillment of a specific order.  Nor
does BOP explain how disclosure could lead to a competitive disadvantage.  The agency has
accordingly failed to provide "'detailed and specific information' to justify its withholding." *WP
Co.*, 2020 WL 6504534, at *9.

**III.     Defendant Is Improperly Withholding Information Under Exemption 5**

FOIA Exemption 5 exempts from disclosure "inter-agency or intra-agency

memorandums or letters that would not be available by law to a party other than an agency in

litigation with the agency." 5 U.S.C. § 552(b)(5).  The deliberative process privilege, which is

encompassed within Exemption 5, "allows agencies to withhold 'documents reflecting advisory

opinions, recommendations and deliberations comprising part of a process by which

governmental decisions and policies are formulated.'"  *Lewis*, 2020 WL 1667656, at *6 (quoting

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)).  Accordingly,

to invoke the privilege, an agency "must show that the information withheld is both [1]

'predecisional' and [2] deliberative.'"  *Id.* at *7.

BOP invokes the deliberative process privilege to withhold certain information from non-

email Record 8, its executed Justification for Other Than Full and Open Competition.[5]

Typically, agencies are prohibited by law from contracting without providing for full and open

competition.  FAR 6.301(a).  The FAR provides an exception to this prohibition when "the

agency's need for the supplies or services is of such an unusual and compelling urgency that the

Government would be seriously injured unless the agency is permitted to limit the number of

sources from which it solicits bids or proposals."  *Id.* 6.302-2(a).  Agencies must prepare written

justifications when invoking this authority.  *Id.* 6.302-2(c)(1).  The justification must include

enumerated categories of information that "contain sufficient facts and rationale to justify the use

of the specific authority cited."  *Id.* 6.303-2.

---

[5] BOP also invoked Exemption 5 to withhold draft versions of this document.  CREW does not
challenge withholding of the drafts.  Nor does CREW challenge BOP or OIP's other
withholdings under Exemption 5.

Here, Record 8 is the written justification required by FAR 6.303-2(a) for BOP to proceed with procurement of Pentobarbital without full and open competition.  BOP's *Vaughn* index indicates that the agency has redacted from various sections of the justification "[d]eliberations of BOP staff re: efforts to select and obtain lethal injection substances prior to adoption of revised protocol."  Christenson Decl., Ex. F at 167-68.

Record 8 is clearly not predecisional and is therefore outside the scope of Exemption 5.  "[E]ven if [a] document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).  That is the case here:  the written justification supports—as required by the FAR—BOP's *final* decision to pursue procurement without open and full competition.  It was certified to be "accurate and complete to the best of [the individual's] knowledge and belief" by the contracting officer and technical manager, and approved by a final decisionmaker within BOP.  That the written justification incorporates past efforts or prior deliberations does not change the nature of the document from one explaining a final agency decision.  Because this record is not predecisional, but rather reflects the reasoning for the agency's final decision, BOP's invocation of Exemption 5 must be rejected.

## CONCLUSION

For the foregoing reasons, the Court should grant CREW's cross-motion for summary judgment and deny the government's motion as to its withholdings.

Dated:  December 23, 2020                    Respectfully submitted,

                                             */s/ Jessica A. Lutkenhaus*
                                             Jessica A. Lutkenhaus
                                             (D.C. Bar No. 1046749)
                                             Wilmer Cutler Pickering Hale and Dorr LLP
                                             1875 Pennsylvania Avenue NW
                                             Washington, D.C. 20006
                                             Phone: (202) 663-6640
                                             Facsimile: (202) 663-6363
                                             jessica.lutkenhaus@wilmerhale.com

                                             Nikhel S. Sus
                                             (D.C. Bar No. 1017937)
                                             Citizens for Responsibility and
                                                     Ethics in Washington
                                             1101 K St. NW, Suite 201
                                             Washington, D.C. 20005
                                             Telephone: (202) 408-5565
                                             Fax: (202) 588-5020
                                             nsus@citizensforethics.org

                                             *Attorneys for Plaintiff*