UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**<br>1101 K Street, NW, Suite 201<br>Washington, D.C. 20005 | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Civ.  Action No. 1:19-cv-03626 (DLF) |
| **UNITED STATES DEPARTMENT OF JUSTICE**<br><br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530 | ) ) ) ) ) ) ) | |
| Defendant. | ) ) | |

**DEFENDANT'S REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

   I.    APPLICATION OF EXEMPTIONS ............................................................. 4

        A.    FOIA Exemption 7 ............................................................................ 4

              1.    Exemption 7(A) ................................................................. 7

              2.    Exemption 7(E) ................................................................. 10

        B.    FOIA Exemption 4 ............................................................................ 13

        C.    FOIA Exemptions 6, 7(C) and 7(F) .................................................. 20

        D.    FOIA Exemption 5 ............................................................................ 21

CONCLUSION ................................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*100Reporters LLC v. U.S. Dep't of Justice*,
  248 F. Supp. 3d 115 (D.D.C. 2017) ....................................................................... 4, 7

*Anderson v. BOP*,
  806 F. Supp. 2d 121 (D.D.C. 2011) ........................................................................ 6

*Benavides v. Bureau of Prisons*,
  774 F. Supp. 2d 141 (D.D.C. 2011) ........................................................................ 5

*Blackwell v. FBI*,
  646 F.3d 37 (D.C. Cir. 2011) ............................................................................ 6, 11

*CREW v. DOJ*,
  746 F.3d 1082 (D.C. Cir. 2014) .................................................................. 7, 10, 11

*Electronic Privacy Information Center v. Department of Homeland Security*,
  117 F. Supp. 3d 46 (D.D.C. 2015) ................................................................ 2, 13, 14

*EPIC v. U.S. Drug Enf't Agency*,
  401 F. Supp. 3d 37 (D.D.C. 2019) ........................................................................ 12

*EPIC v. DHS*,
  777 F.3d 518 (D.C. Cir. 2015) ............................................................................ 5, 6

*EPIC v. DOJ*,
  -- F. Supp. 3d -- , 2020 WL 5816218 (D.D.C. Sept. 30, 2020)................................. 11

*Execution Protocol Cases*,
  955 F.3d 106 (D.C. Cir. 2020) .............................................................................. 15

*Food Marketing Institute v. Argus Leader Media*,
  139 S. Ct. 2356 (2019) ............................................................................... 3, 15, 17

*Glossip v. Gross*,
  576 U.S. 863 (2015) ........................................................................................... 8, 10

*Griffin v. EOUSA*,
  774 F. Supp. 2d 322 (D.D.C. 2011) ........................................................................ 6

*Helvering v. Hallock*,
  309 U.S. 106 (1940) ................................................................................................ 15

*Hodes v. Department of Housing & Urban Development*,
  532 F. Supp. 2d 108 (D.D.C. 2008) ........................................................................ 15

*Karantsalis v. DOJ*, 248 F. Supp.
  635 F.3d 497 (11th Cir. 2011) .................................................................................. 6

*Mayer Brown LLP v. IRS*,
  562 F.3d 1190 (D.C. Cir. 2009) ......................................................................... 11, 12

*Mil. Audit Project v. Casey*,
  656 F.2d 724 (D.C. Cir. 1981) ................................................................................ 18

*Moorefield v. United States Secret Service*,
  611 F.2d 1021 (5th Cir. 1980) ................................................................................... 8

*Pratt v. Webster*,
  673 F.2d 408 (D.C. Cir. 1982) .................................................................................. 4

*Public Citizen v. United States Department of Health & Human Services*,
  975 F. Supp. 2d 81 (D.D.C. 2013) .......................................................................... 14

*Public Employees for Enviromental Responsibility v. United States Section, International
  Boundary & Water Commission, United States-Mexico*,
  740 F.3d 195 (D.C. Cir. 2014) ............................................................................. 6, 13

*Sack v. Department of Defense*,
  823 F.3d 687 (D.C. Cir. 2016) ............................................................................... 5, 6

*SafeCard Services v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ............................................................................ 18

*Sarno v. DOJ*,
   278 F. Supp. 3d 112 (D.D.C. 2017) ..................................................................... 8, 9

*Tax Analysts v. IRS*,
   294 F.3d 71 (D.C. Cir. 2002) ................................................................................. 7

*United States v. Higgs*,
   141 S. Ct. 645 (2021) ............................................................................................. 9

*United Technologies v. United States Department of Defense*,
   60 F.3d  (D.C. Cir. 2010) ...................................................................................... 14

*WP Co. v. U.S. Small Bus. Admin.*,
   -- F. Supp. 3d --, 2020 WL 6504534 (D.D.C. Nov. 5, 2020) ........................... 13, 19

**Statutes**

5 U.S.C. § 552(b)(4) ......................................................................................... 4, 13

5 U.S.C. § 552(b)(5) ............................................................................................. 4

5 U.S.C. § 552(b)(6) ............................................................................................. 4

5 U.S.C. § 552(b)(7) ...................................................................................... *passim*

5 U.S.C. § 8401 .................................................................................................... 4

18 U.S.C. § 3050 .................................................................................................. 4

18 U.S.C. § 4012 .................................................................................................. 4

18 U.S.C. § 4042 .................................................................................................. 4

21 U.S.C.A § 353b .............................................................................................. 16

**Regulations**

28 C.F.R. § 26.3(a) ................................................................................................... 5

28 C.F.R. § 26.3(a) (1993) ....................................................................................... 5

28 C.F.R. § 511 ......................................................................................................... 4

28 C.F.R. § 552 ......................................................................................................... 4

**Other Authorities**

Jonathan Allen, *Special Report: How the Trump administration secured a secret supply of execution drugs*, REUTERS (July 10, 2020), https://www.reuters.com/article/us-usa-executions-specialreport/special-report-how-the-trump-administration-secured-a-secret-supply-of-execution-drugs-idUSKBN24B1E4 ................................... 2, 18, 19

S. Rep. No. 98-221 (1983) ........................................................................................ 7

S. Rep. No. 109-329 (2006) ...................................................................................... 16

## INTRODUCTION

Plaintiff's opposition, ECF No. 20 ("Opp'n"), to Defendant's Motion for Summary Judgment, *see* ECF Nos. 17, 17-1 ("Def.'s MSJ"), argues that the Federal Bureau of Prisons ("BOP") and the U.S. Department of Justice's ("DOJ") Office of Information Policy ("OIP") are seeking to protect the identities of third-parties with whom BOP has contracted to procure pentobarbital for purposes of carrying out lethal injections "because the government believes that the public will find the spending unpopular." Opp'n at 1. But the popularity of the federal death penalty is not at issue in this litigation. The Federal Death Penalty Act ("FDPA") is the law of the land. Congress can act to overturn it and the public can lobby its representatives to do so. The information BOP and OIP seek to protect in this litigation, however, is exempt from disclosure under FOIA and Plaintiff fails to identify any supportable rationale to the contrary. The Court should grant summary judgment to Defendant for the reasons set forth in Defendant's opening motion, as well as those set forth below.

*First*, Plaintiff does not challenge the adequacy of Defendant's searches. Accordingly, Defendant should be granted summary judgment on that question.

*Second*, Plaintiff argues that records related to BOP's efforts to procure lethal injection drugs for the purpose of carrying out federal capital sentences were not "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). To the contrary, BOP's efforts to carry out legal sentences are quintessential law enforcement efforts, and BOP's characterization of them as such is entitled to deference. Thus, Defendant easily satisfies this low threshold barrier of Exemption 7. Plaintiff further focuses on hyper-technical readings of Exemptions 7(A) and 7(E) in arguing that the disclosure of the records at issue cannot "reasonably be expected to interfere with enforcement proceedings," *id*. § 552(b)(7)(A), and cannot "reasonably be expected to risk

circumvention of the law," *id*. § 552(b)(7)(E).  But Plaintiff fails to identify any case law that precludes the application of Exemptions 7(A) and 7(E) to BOP's efforts to implement a lawful federal criminal sentence and ignores the legion of case law at the state and federal level upholding the confidentiality of suppliers of lethal injection drugs against challenges by death-sentenced inmates.  Moreover, in arguing that disclosure of the procurement records at issue would not risk interfering with BOP's ability to carry out lawful sentences, Plaintiff both ignores the history of BOP's difficulties in obtaining lethal injection drugs and fails to acknowledge that BOP's concerns were borne out by a significant news agency investigation and report in July 2020, *see* ECF No. 17-4, Ex. R.[1]  The report purported to disclose the identities of independent laboratories who may have performed quality assurance testing on lethal drugs supplied to BOP for use in its lethal injection protocol despite Defendant's efforts to redact identifying information in lab reports filed in the public docket.  At least one of the purportedly identified laboratories then publicly proclaimed that it would no longer conduct such testing.

Plaintiff also relies on legislative intent arguments in challenging Defendant's application of Exemptions 7(A) and 7(E), but fails to identify any language in the FDPA or any other statute to suggest that Congress wanted to foreclose Defendant's invocation of those exemptions in this context.  Accordingly, Plaintiff's arguments fail, and Defendant is entitled to judgment regarding BOP's and OIP's application of Exemptions 7(A) and 7(E).

---

[1] Jonathan Allen, *Special Report: How the Trump administration secured a secret supply of execution drugs*, REUTERS (July 10, 2020), *available at*, https://www.reuters.com/article/us-usa-executions-specialreport/special-report-how-the-trump-administration-secured-a-secret-supply-of-execution-drugs-idUSKBN24B1E4.

*Third*, Plaintiff challenges Defendant's application of Exemption 4 to protect the identities of third-party suppliers and related vendors involved in BOP's efforts to procure pentobarbital and the confidentiality of other related information.  But the case law supports Defendant's position. Under *Electronic Privacy Information Center [EPIC] v. Department of Homeland Security [DHS]*, 117 F. Supp. 3d 46 (D.D.C. 2015), a company's identity can be considered confidential commercial information when supplied to the government under confidential terms for purposes of supporting a government program.  Moreover, under *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019), information is considered "confidential" under Exemption 4 "whenever it is customarily kept private, or at least closely held, by the person imparting it."  *Id*. at 2363.  BOP's declarations, which are accorded a presumption of good faith, are sufficient to show that the suppliers and vendors at issue provided information to BOP under the express assurance that BOP would take all lawful steps to keep the information private or at least closely held.  Plaintiff has no rebuttal to BOP's declarations on this issue.

*Fourth*, Plaintiff concedes Defendant's application of Exemptions 6, 7(C), and 7(F), with the exception of Defendant's application of those exemptions to certain dates in a single document. Defendant withdraws its application of those exemptions to those dates while maintaining certain other exemptions to one of the dates, as explained in further detail below.

*Fifth*, Plaintiff concedes Defendant's application of Exemption 5, with the exception of Defendant's application of that exemption to a single document.   Defendant withdraws its application of Exemption 5 to that document while maintaining certain other exemptions applied to that document, as explained in further detail below.

3

For these reasons, and those expressed in Defendant's opening brief, judgment should be entered in Defendant's favor and against Plaintiff.

## ARGUMENT

## I.   APPLICATION OF EXEMPTIONS

As explained in Defendant's opening brief, Defendant conducted a reasonable search, produced all non-exempt requested records, and properly withheld all responsive documents pursuant to FOIA Exemptions 7(A), 7(C), 7(E), and 7(F), as well as Exemptions 4, 5, and 6, *see* 5 U.S.C. § 552(b)(4)-(b)(7).   Plaintiff's counterarguments are unavailing.

### A.   FOIA Exemption 7

BOP is a law enforcement agency and its employees perform law enforcement functions. ECF No. 17-4 ¶ 105; *see* 5 U.S.C. § 8401(17)(D)(i); 18 U.S.C. §§ 3050, 4012, 4042; 28 C.F.R. §§ 511, 552.   Plaintiff does not quibble with these basic points.   Rather, it contends that Defendant has not met the threshold requirement of demonstrating that the information BOP has withheld was "compiled for law enforcement purposes."   5 U.S.C. § 552(b)(7)(A)-(F).   Plaintiff relies on the basic but irrelevant proposition that "not all records related to BOP's duties are 'compiled for law enforcement purposes,'" and notes the distinction between "BOP's law enforcement and custodial or other functions."   Opp'n at 9.   But Exemption 7's threshold requirement establishes a low bar, and agencies are entitled to deference when identifying whether records have been compiled for law enforcement purposes. *100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 161 (D.D.C. 2017) (citing *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982)).   And none of the cases Plaintiff cites state that BOP's duty to carry out a lawful federal sentence falls outside of BOP's law enforcement purposes. Opp'n at 9 (citing district court cases from 2011 and

earlier, from the District Court of Oregon, and cases unrelated to BOP's carrying out of a federal death sentence).

For example, Plaintiff cites *Benavides v. Bureau of Prisons*, 774 F. Supp. 2d 141 (D.D.C. 2011), a case involving BOP's collection of recordings of an inmate's telephone conversations from prison to his own attorney. *Benavides* simply confirmed the basic point that BOP cannot carry its threshold burden under Exemption 7 by rote recitation of its "status as a law enforcement agency responsible for the welfare of inmates in its custody, its staff and the public at large." *Id.* at 146-47. Here, BOP is not relying on "a *per se* rule of this sort," *id.* at 147; rather, it is relying on its duty to set the date, time, place and method of execution when a sentence of death has been imposed, and its responsibility to carry out the judgment of a sentence of death. Christenson Decl. ¶¶ 106-07, ECF No. 17-4.[2] Moreover, three D.C. Circuit decisions subsequent to *Benavides* make clear that an agency's burden to overcome Exemption 7's threshold requirement is a relatively light one. In *Sack v. Department of Defense*, 823 F.3d 687 (D.C. Cir. 2016), the plaintiff submitted FOIA requests to the Department of Defense seeking reports about the agency's use of polygraph examinations. The agency used the polygraphs generically "to screen applicants for . . . security clearances." *Id.* at 695. The D.C. Circuit concluded that the polygraph reports were compiled for law enforcement purposes because they "assist law enforcement agencies in taking 'proactive steps' to deter illegal activity and ensure national security." *Id.* at 694. Likewise, in *EPIC v. DHS*, 777 F.3d 518 (D.C. Cir. 2015), the D.C. Circuit found that the Department of Homeland Security's

---

[2] BOP previously cited language in 28 C.F.R. § 26.3(a) (1993), *see* Christenson Decl. ¶ 106, ECF No. 17-4. That language has been superseded by a new regulation, also codified at 28 C.F.R. § 26.3(a), which retains the language pertinent to this litigation.

5

Standard Operating Procedures for "shutting down wireless networks during critical emergencies" were compiled for law enforcement purposes, *id*. at 520. And in *Public Employees for Environmental Responsibility v. United States Section, International Boundary & Water Commission, United States-Mexico*, 740 F.3d 195 (D.C. Cir. 2014) ("*PEER*")), the D.C. Circuit determined the same for emergency action plans and inundation maps created to prevent attacks on two dams on the U.S.-Mexico border. *Id*. at 204. Records related to the procurement of pentobarbital to carry out capital sentences are at least as law enforcement-related as the records in *Sack*, *EPIC*, and *PEER*.

While Defendant cited all three cases in its opening brief, Plaintiff failed to discuss them in its threshold inquiry section.[3] Instead, Plaintiff argues that the law requires that "non-investigatory records must evidence a 'rational nexus between the investigation and one of the agency's law enforcement duties,'" Opp'n at 9 (quoting *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011)). But none of the three D.C. Circuit decisions discussed above even mentions the "rational nexus" test, nor would it make sense for Defendant to have to show that non-investigatory records were related to an investigation. As Plaintiff recognizes, Defendant argued that BOP's duty to assist in the carrying out of the death penalty serves the law enforcement purposes of deterrence, *see* Opp'n at 8. Even though deterrence is a prime law enforcement purpose, *see Sack*,

---

[3] Indeed, Plaintiff does not distinguish any of the cases Defendant identified in its opening brief in which courts found non-investigatory records to satisfy the law enforcement purpose standard. *See* Def.'s MSJ at 15 (citing *Karantsalis v. DOJ*, 635 F.3d 497, 502 (11th Cir. 2011); *Anderson v. BOP*, 806 F. Supp. 2d 121, 126-27 (D.D.C. 2011); and *Griffin v. EOUSA*, 774 F. Supp. 2d 322, 325 (D.D.C. 2011)).

6

823 F.3d at 694, Plaintiff contends conclusorily that "[t]his argument is insufficient."  Opp'n at 9.

Given D.C. Circuit precedent, Plaintiff's position is untenable.

In a final attempt to undermine Defendant's withholdings under Exemption 7, Plaintiff incongruously argues that, "when Congress amended Exemption 7 to broaden its scope from 'investigatory records' to 'records or information' compiled for law enforcement purposes," its concern was narrowly aimed at protecting "confidential source information or investigative leads." Opp'n at 10 (quoting S. Rep. No. 98-221, at 23 (1983)).  But the D.C. Circuit has found otherwise. Congress's "intent [was] to protect 'sensitive non-investigative law enforcement materials" and to *broaden* the exemption to include records 'regardless of whether they may be investigatory or noninvestigatory.'" *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002) (emphasis added) (citing S. Rep. No. 98-221, at 23); *see also 100Reporters*, 248 F. Supp. 3d at 161 (same).

In light of the deference owed to Defendant, as well as the clear connection between the compilation of the procurement records at issue and BOP's law enforcement duty to carry out lawful federal capital sentences, the Court should find that Defendant here has met Exemption 7's threshold requirement.

### 1.      Exemption 7(A)

Exemption 7(A) protects records or information "compiled for law enforcement purposes" when disclosure "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  "To justify withholding, [an agency] must therefore demonstrate that disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated."  *CREW v. DOJ*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) ("*CREW I*") (citations omitted).

In its opening brief, Defendant amply demonstrated how disclosure of information that could lead to the identity of suppliers of lethal injection drugs or related vendors reasonably could be expected to interfere with the federal government's carrying out of lawful capital sentences. *See* Def.'s MSJ at 17-27 (citing cases over the last five years, including *Glossip v. Gross*, 576 U.S. 863 (2015)).  Plaintiff fails to address, let alone distinguish these cases.

Instead, Plaintiff argues that there is no "law enforcement proceeding" to interfere with in the death penalty context and therefore Exemption 7(A) does not apply.  Opp'n at 11-12.  Plaintiff criticizes Defendant for failing to "cite any on-point precedent," *id*. at 12, but cannot point to any of its own.  The *sui generis* nature of the death penalty context compares favorably to *Moorefield v. United States Secret Service*, 611 F.2d 1021 (5th Cir. 1980).  There, the Fifth Circuit found Exemption 7(A) to cover Secret Service files sought by a man twice convicted for threatening the life of the President even though the records were "not directed toward trials or hearings," but were "certainly directed toward an active and concrete effort to enforce the law."  *Id*. at 1025.  In *Moorefield*, the "active and concrete effort to enforce the law," involved the Secret Service's efforts to maintain the safety of the President and others, *id*.; here, it involves the active and concrete effort to enforce the law by ensuring the availability of lethal injection drugs.

Plaintiff also challenges Defendant's invocation of *Sarno v. DOJ*, 278 F. Supp. 3d 112 (D.D.C. 2017), in which the court concluded that a prisoner's civil post-conviction habeas challenge qualified as a "law enforcement proceeding" under Exemption 7(A) because the challenge was "an ongoing proceeding in which prosecutors must defend their prosecution and his convictions."  *Id*. at 126.  Plaintiff argues that *Sarno* merely stands for the proposition that habeas suits count as law enforcement proceedings for purposes of Exemption 7(A) because there is a

reasonable anticipation of a new trial. Opp'n at 14. But Plaintiff misses the point of Defendant's highlighting *Moorefield* and *Sarno*. The fact is that the term "law enforcement proceeding" is not statutorily defined. Courts have been forced to determine when a "law enforcement proceeding" begins and ends, but no court has developed a definitive answer. *See Sarno*, 278 F. Supp. 3d at 125 ("[V]ery little caselaw discusses at what point an investigation can be said to be no longer pending.") In *Moorefield*, the Court held that an investigation with no anticipated trial or adjudication qualifies, and in *Sarno*, the Court held that a post-conviction civil proceeding qualifies. Plaintiff provides no rationale for why the implementation of a federal capital sentence, i.e., the end goal of a law enforcement proceeding, or litigation challenging it, should not qualify as well.

Plaintiff argues that even if Defendant has identified an "enforcement proceeding," it has not shown that "the requested procurement records would interfere with any enforcement proceedings." Opp'n at 15 (emphasis omitted). Relatedly, they argue in conclusory fashion that Defendant cannot satisfy FOIA's foreseeable harm standard. *Id*. at 16-17. Plaintiff further argues that the "government does not attempt to tie its claims of harm to a particular proceeding nor to inmates' habeas proceedings more generally." *Id*. at 15. But Defendant identified in its opening brief all sorts of litigation engendered by the implementation of capital sentences that could be delayed if BOP was unable to obtain lethal injection drugs. *See* Def.'s MSJ at 22-23 (identifying various challenges by highlighting those filed by Brandon Bernard). And just recently, Justice Breyer in his dissenting opinion in *United States v. Higgs*, 141 S. Ct. 645 (2021), noted the extended delay between federal death penalty convictions and the carrying out of the recent federal executions, and commented that "[t]he longer the delay, the weaker the basic penological

9

justifications for imposing the death penalty become[s]." *Id*. at 646 (Breyer, J., dissenting).   It is

a matter of public record that challenges to BOP's previous federal execution protocol, first filed

in 2005, were stayed in 2011 as BOP re-evaluated and revised its lethal injection protocol due in

part to the unavailability of one of the three drugs used in the prior protocol.  Def.'s Statement of

Material Facts Not in Genuine Dispute ¶ 82, ECF No. 17-2; Christenson Decl. ¶¶ 70-73, ECF No.

17-4; Decl. of Rick Winter ¶ 8, ECF No. 17-5.  The drugs were unavailable due to pressure placed

on pharmaceutical companies, as recounted in *Glossip v. Gross*, 135 S. Ct. 2726, 2733-34 (2015).

The federal government did not schedule another execution for eight years.  Christenson Decl.

¶ 73.  Should the procurement records at issue in this litigation be disclosed, the interference with

law enforcement proceedings is foreseeable and reasonably anticipated.

Accordingly, Defendant is entitled to judgment on its application of Exemption 7(A).

### 2.    Exemption 7(E)

To withhold information pursuant to Exemption (7)(E), an agency must demonstrate that

release of the information "would disclose techniques and procedures for law enforcement

investigations or prosecutions," or would "disclose guidelines for law enforcement investigations

or prosecutions if such disclosure could reasonably be expected to risk circumvention of the

law."  5 U.S.C. § 552(b)(7)(E).  BOP's techniques, procedures, and guidelines for obtaining

lethal injection drugs for purposes of carrying out lawful capital sentences plainly fit under

Exemption 7(E).

Plaintiff argues that "BOP does not sufficiently specify 'what procedures are at stake' or

how disclosure of the requested records 'could reveal such procedures.'"  Opp'n at 17 (quoting

*CREW I*, 746 F.3d at 1102.  But Plaintiff ignores the fact that "Exemption 7(E) sets a 'low bar

for the agency to justify withholding.'" *CREW I*, 746 F.3d at 1102 (quoting *Blackwell*, 646 F.3d

at 42); s*ee also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) ("We are aware

the language of FOIA's exemptions 'must be narrowly construed.' But broad language—even

when construed narrowly—is still broad language. Although some FOIA exemptions set a high

standard, . . . the text of exemption 7(E) is much broader." (citations omitted)).  Plaintiff

selectively quotes the language Defendant used to invoke Exemption 7(E), Opp'n at 17, and

accuses Defendant of setting forth a "'near-verbatim recitation of the statutory standard.'"  *Id*. at

18.  But even Plaintiff's selective quotations show that Defendant did far more than regurgitate

the statutory standard.  BOP's declarant stated that information contained in the records withheld

under Exemption 7(E) "would reveal the strategy undertaken in order to procure [lethal

injection] substances, and information regarding the method by which BOP procured or

attempted to procure such substances."  Christenson Decl. ¶ 128.  That, in and of itself, should

satisfy Exemption 7(E).  *Cf. CREW I*, 746 F.3d at 1102 (noting that the FBI did not even say

something as simple as disclosure would reveal "how the FBI conducts witness interviews").

Further, BOP's declarant explained that:

> While the general lethal injection and procurement procedures for BOP may be
> known by the public, the specific techniques and procedures utilized are not.
> Although the public may be aware that the government must purchase lethal
> injection substances from outside sources, the process is not subject to full and
> open competition, as the disclosure of the agency's needs would compromise its
> ability to obtain such substances and would subject the parties involved to threats,
> harassment, or even physical injury.

Christenson Decl. ¶ 127; *see also* Winter Decl. ¶¶ 31-32.  Similar language has been found

sufficient under Exemption 7(E).  *Cf. EPIC v. DOJ*, -- F. Supp. 3d -- , 2020 WL 5816218, at

*12-13 (D.D.C. Sept. 30, 2020) (approving of FBI withholdings under Exemption 7(E) after

examining the declarant's representations), *appeal filed*, No. 20-5364 (D.C. Cir. Dec. 8, 2020).

Saying any more would "'necessarily reveal information about the techniques and procedures'"

used, *id*. at *13 (quoting *EPIC v. U.S. Drug Enf't Agency*, 401 F. Supp. 3d 37, 46-47 (D.D.C.

2019)), which would defeat the purpose of the withholdings.

Plaintiff also argues that BOP "fails to identify how disclosure of procurement

information will 'risk circumvention of the law.'"  Opp'n at 18 (quoting 5 U.S.C.

§ 552(b)(7)(E)).  That Plaintiff makes this argument at all is curious since it both recognizes that

disclosure will likely preclude BOP from being able to procure pentobarbital in the future and

therefore greatly interfere with BOP's ability to carry out lawful capital sentences, and

acknowledges that all BOP needs to show is that "disclosure of particular information 'could

increase the risks that a law will be violated or that past violators will escape legal

consequences.'"  *Id.* (quoting *Mayer Brown*, 562 F. 3d at 1193).  Plaintiff asks rhetorically how

the disclosure of how much BOP paid to procure pentobarbital could increase the risk that past

violators of the law will escape legal consequences, *id.*, but BOP's declarant addressed this

specifically:  "[I]f a particular company is known or discovered to package or price a substance

in a particular way, . . . the manner in which it is described in BOP's records could be used to

trace the substance back to the particular provider by the process of comparison and

elimination."  Christensen Decl. ¶ 116.  This process was presumably how Reuters purportedly

discovered the identities of independent laboratories that supposedly participated in the testing of

pentobarbital intended for BOP's use in carrying out lawful capital sentences even though

Reuters had reviewed only redacted versions of laboratory reports that DOJ had publicly

disclosed.  *Id*. ¶ 117.  And Defendant has amply demonstrated that such disclosures create a risk

that BOP's suppliers and related vendors will cease providing necessary services.  For eight years, between 2011 and 2019, BOP was forced to revise its execution protocol due to its inability to procure sodium thiopental.  Christenson Decl. ¶¶ 72-73; Winter Decl. ¶ 8.  This more than satisfies the "low bar" Defendant is required to overcome.  *PEER*, 740 F.3d at 204-05 & n.4.  Defendant is entitled to judgment on its application of Exemption 7(E).

   **B.**   **FOIA Exemption 4**

   Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  Defendant asserted Exemption 4 over "confidential commercial or financial information received by BOP from sources from whom BOP procured Pentobarbital during the relevant time to be used for lethal injection purposes, and individuals/companies who performed related critical services on that Pentobarbital supply."  Christenson ¶ 48.  Plaintiff admits that these records were "'obtained from a person,'" Opp'n at 20 (quoting *WP Co. v. U.S. Small Bus. Admin.*, -- F. Supp. 3d --, 2020 WL 6504534, at *5 (D.D.C. Nov. 5, 2020)), but argues that the records contain information that is neither commercial, financial, privileged nor confidential.

   Plaintiff principally argues that the identities of the suppliers and vendors at issue are not commercial or financial information.  In its opening brief, Defendant relied on *EPIC v. DHS*, 117 F. Supp. 3d 46 (D.D.C. 2015), in which the court approved of the withholding under Exemption 4 of the identities of companies that participated in a cyber-security pilot program conducted by two federal agencies.  Def.'s MSJ at 37; *see* Opp'n at 21.  Plaintiff struggles unsuccessfully to distinguish *EPIC v. DHS*.  As Plaintiff recognizes, in *EPIC*, the court was persuaded by the government's declaration stating that, "[i]f a company's participation in the [cyber-security]

13

program] were publicly known, that company could face increased cyber targeting, exposing the company to greater business or financial loss." *EPIC*, 117 F. Supp. 3d at 64.  Here, BOP's declarants explain that "companies involved in BOP's procurement of Pentobarbital are well aware that those individuals involved in the process . . . are commonly subject to harassment, threats, and negative publicity leading to commercial decline."  Christenson Decl. ¶ 52.  BOP's declarants cited a number of cases and media reports of this very thing.  *Id*. ¶¶ 53-57; Winter Decl. ¶¶ 17- 20.  Thus, *EPIC* is directly on point and justifies Defendant's assertion of Exemption 4.

Nevertheless, Plaintiff argues that negative publicity is not the sort of harm that converts a company's identity into "commercial" information.  Opp'n at 23.  That argument is belied by the district court's holding in *EPIC*.  As the court explained there, "while a company may not always have a commercial interest in its name and identity, the Court may also consider the context in which the issue arises."  117 F. Supp. 3d at 62-63.  In that specific context, where companies voluntarily agreed to conduct business with the government in exchange for the government's agreement to keep their identities confidential to the extent permissible under the law, the court found that the "names of participants in the [pilot program] [were] correctly considered commercial information."  *Id*. at 63.

None of the cases Plaintiff cites arises in such a context.  In *Public Citizen v. United States Department of Health & Human Services*, 975 F. Supp. 2d 81 (D.D.C. 2013), the Court rejected the notion that the identity of the *government agency* conducting an investigation into the potential wrongdoing of two companies could be considered "commercial."  *Id*. at 107.  *Public Citizen* relied on the D.C. Circuit's decision in *United Technologies v. United States Department of Defense*, 60 F.3d 557 (D.C. Cir. 2010), but in that case, the commercial nature of the information

14

was not at issue.  The question of competitive harm was bound up in an inquiry about "a 'substantial competitive harm' requirement," related to the confidential—not commercial—nature of the information.  That requirement was eliminated by the Supreme Court in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2365-66 (2019), rendering *United Technologies* inapposite.  Plaintiff's reliance on *Hodes v. Department of Housing & Urban Development*, 532 F. Supp. 2d 108, 117-18 (D.D.C. 2008), suffers from the same infirmity.  *Id*. at 117 ("The Parties agree that the only question raised as to Exemption 4 in this case is whether the requested information is 'confidential.'").  Plaintiff's final case is a two-page, unpublished, out-of-circuit, pre-*Argus Leader* case, *see Citizens for Healthy Community v. Department of Interior*, No. 1:12-cv-01661-RPM, ECF No. 27 (D. Colo. Feb. 13, 2013), that fails to reference a single case in support of its holding and relates to a competitive bid context that in no way mirrors this case.

Plaintiff attempts to buttress its weak case law with a legislative intent argument—that "if Congress wanted to exempt BOP's suppliers and testing companies from disclosure, it could have passed . . . a law protecting their identities."  Opp'n at 24.  Plaintiff notes that many states have passed such legislation.  *Id*.  First, Plaintiff's argument does not have any bearing on whether the information withheld under Exemption 4 is "commercial" in nature.  Second, Congress' silence is not indicative of congressional will.  *Helvering v. Hallock*, 309 U.S. 106, 121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle").  Rather, "[t]he FDPA leaves the federal government free to specify details regarding execution procedures, as it did in its protocol and addendum, subject to any contrary requirements of state law."  *Cf. Execution Protocol Cases*, 955 F.3d 106, 135 (D.C. Cir. 2020) (Rao, J., concurring).  Given that many states have enacted confidentiality provisions and that the BOP has

15

agreed to maintain the confidentiality of its suppliers to the extent permissible by law, Congress's silence on this issue cannot be read to mean that there are no applicable FOIA exemptions that protect the identities of the relevant suppliers and vendors.

Finally, Plaintiff argues that the Federal Funding Accountability and Transparency Act of 2006 was enacted to enable the public to know who is receiving federal funds through contracts so that the public can judge whether government funds are being used for valuable purposes. Opp'n at 24 (citing S. Rep. No. 109-329, at 3 (2006)). Plaintiff contends that this information should not be exempted by FOIA and as an example, notes that the identification of Texas's pentobarbital supplier "revealed that the state was contracting with a compounding pharmacy whose license had been on probation for years." Opp'n at 25. First, this is not a case about any alleged violation of the Federal Funding Accountability and Transparency Act of 2006, nor does Plaintiff suggest that any such violation has occurred. Further, the public has ample information to assess the safety of the pentobarbital BOP has procured and may procure in the future. It is a matter of public record that the compounding pharmacy that provides the compounded pentobarbital to BOP is registered as a Human Drug Compounding Outsourcing Facility under Section 503B of the Federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C.A § 353b. *See In re Fed. Bur. of Prisons Execution Protocol Cases*, 19-mc-145 (D.D.C.), ECF No. 97-2 (AR 1084). As described in a BOP Memorandum entitled, "General Guidelines for Compounding and Testing Pentobarbital Sodium for Use in Executions":

> Such facilities ordinarily must comply with Current Good Manufacturing Practice (CGMP) requirements, are inspected by the Food and Drug Administration (FDA), and must meet certain other conditions, such as reporting adverse events. The FDA's CGMP regulations require the Pharmacy to subject samples from each batch of compounded injectable solution it produces to quality assurance testing by an

> independent laboratory to ensure that the batch meets appropriate specifications and statistical quality control criteria before it is released.

*Id*. This information has been publicly available since June 8, 2020, prior to any of the federal executions that occurred in 2020.

In any event, all of this is far afield of whether the identities of the pharmacy and other related entities have properly been withheld as "commercial" under Exemption 4. *EPIC* demonstrates that they have.

Plaintiff next argues that the information withheld under Exemption 4, even if commercial, is not confidential. Opp'n at 25-30. As noted in *Argus Leader*, the confidentiality requirement is clearly met where "commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." 139 S. Ct. at 2366. Consistent with *Argus Leader*, BOP's declarants amply explained that companies keep their identity as a supplier of pentobarbital or related critical services private and BOP has provided them with express assurances that, to the extent possible, their identities and contact information will remain confidential. *See* Def.'s MSJ at 38 (citing Christenson Decl. ¶ 58; Winter Decl. ¶¶ 21-22, 24).

Plaintiff argues, without evidence, that information regarding the "drug's price, quantity, expiration dates, container units, lot numbers, purchase order/reference numbers, substance description, concentration, packaging details, and dates of purchase, service, and/or delivery . . . would not identify BOP's suppliers or testing companies." Opp'n at 25. Plaintiff argues that BOP has failed to demonstrate that this information is identifying, but BOP's declarant explains in detail how such information could be identifying. *See* Christenson Decl. ¶ 114-17. To take one example,

Plaintiff argues that "BOP makes no effort to explain how the cost of a contract or invoice could reveal the identity of a Pentobarbital supplier." Opp'n at 27.  But BOP's declarant explained that "dates of purchases . . . could be compared to reporting logs or databases maintained by the Drug Enforcement Agency (DEA), which tracks and regulates the manufacture, sale, and purchase of controlled substances." Christenson Decl. ¶ 115.  BOP's declarant further states that, "if a particular company is known or discovered to package or price a substance in a particular way, . . . the manner in which it is described in BOP's records could be used to trace the substance back to that particular provider by the process of comparison and elimination." *Id*. ¶ 116.

BOP should not be required to further spell out exactly how a member of the public or media might use information to trace the identity of BOP's lethal injection drug suppliers and related vendors, as doing so would provide a road map in the event such information is ever disclosed.  Rather, agency declarations are accorded "a presumption of good faith," *SafeCard Services v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and a court may award summary judgment in a FOIA action on the basis of information provided by the agency through declarations that describe "the justifications for nondisclosure with reasonably specific detail"; that "demonstrate that the information withheld logically falls within the claimed exemption[s]"; and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).

Plaintiff claims that the "connections BOP draws are speculative," Opp'n at 28, but Plaintiff fails to show contrary evidence in the record or evidence of agency bad faith.  Meanwhile, BOP identified a media report in which a reporter purportedly discovered the identity of laboratories involved in independently testing compounded pentobarbital supposedly intended for

18

BOP "through redacted laboratory reports that the Justice Department produced in response to lawsuits filed by death-row inmates."  ECF No. 17-4, Ex. R at 3.  *See* Christenson Decl. ¶ 117 & n.24 (describing the article).  The reporter claimed to have used the reports even though DOJ had "blacked out the companies' names, logos and other identifying information."  ECF No. 17-4, Ex. R at 3.  Plaintiff argues that the "article itself does not explain how the organization identified the companies," but the article clearly says the reporter did so through information in the redacted laboratory reports, despite the government's efforts to strip the reports of all identifying information.

Thus, BOP's declarants offer far more than the "bare speculation" described in *WP Co.,* 2020 WL 6504534, at *9, as Plaintiff contends.  Furthermore, *WP Co*. is inapposite.  That case involved data provided by companies seeking loans from the Small Business Administration under the Paycheck Protection Program ("PPP").  *Id*. at *1.  As the court explained, the companies seeking the fully forgivable loans never had any expectation that their identities or information would be kept private:  "the PPP loan application expressly notified potential borrowers . . . that their names and loan amounts would be 'automatically released' upon a FOIA request."  *Id*. at *9.  The court continued, "SBA does not explain how the loan data could remain 'confidential' for purposes of Exemption 4 when the Government not only provided no assurance of privacy, but also told borrowers explicitly that the information would be disclosed."  *Id*.  This case presents the opposite situation. As BOP's other declarant states, "the few companies that are willing to manufacture, produce, distribute, or otherwise engage in conversation for the procurement of lethal injection substances, do so only under assurance of confidentiality, and would cease to maintain involvement in the process if their information was revealed."  Winter Decl. ¶ 20.

19

Plaintiff also contends that BOP improperly withheld non-identifying commercial information under Exemption 4.  Opp'n at 29 (referencing Christenson Decl. ¶¶ 49-50).  However, Defendant never argued that the confidential or financial information described in paragraphs 49-50 of Kara Christenson's declaration is non-identifying.  Furthermore, as Plaintiff admits, BOP's declarant states that the information provided is "typically kept . . . private," and the companies who supplied the information "specifically designated the information as proprietary, and/or confidential, and have expressly required or requested that the Government maintain the information as confidential to the greatest extent possible under the law, a condition to which the Government has agreed to abide."  Christenson Decl. ¶ 51; *see also* Opp'n at 30 (quoting same). Plaintiff describes these as "bare assertions," but identify no evidence in the record that any of the companies failed to require or request confidentiality or failed to obtain assurances from Defendant.  Accordingly, Defendant is entitled to judgment on its application of Exemption 4.

C.      **FOIA Exemptions 6, 7(C) and 7(F)**

Defendant applied Exemptions 6, 7(C), and 7(F) to all information in responsive records that could disclose the names, personal identifiers and direct contact information of BOP or DOJ staff or third parties associated with BOP's procurement of pentobarbital for purposes of carrying out the death penalty.  Plaintiff does not challenge these withholdings with one exception:  certain dates in "non-email Record 8, BOP's Justification for Other than Full and Open Competition."  Opp'n at 19.  Accordingly, Defendant is entitled to summary judgment regarding its application of Exemptions 6, 7(C), and 7(F) to all responsive records aside from Record 8.

As to the dates withheld in Record 8, upon further reflection, Defendant believes it applied Exemptions 6, 7(C), and 7(F) in error and therefore withdraws them, but continues to assert Exemptions 4 and 7(A).[4]

### D.      FOIA Exemption 5

Plaintiff challenges only one of BOP's withholdings under Exemption 5 regarding its invocation of the deliberative process privilege over Record 8.  Accordingly, Defendant is entitled to judgment on its application of Exemption 5 for all but Record 8.  As to Defendant's application of Exemption 5 over Record 8, upon further reflection, Defendant believes it asserted Exemption 5 in error and therefore withdraws it, but otherwise maintain its assertions under Exemptions 4 and 7(A).  *See supra* n. 4.

### CONCLUSION

For the reasons stated above, Defendant respectfully request that this Court grant judgment in Defendant's favor and deny Plaintiff's cross-motion for summary judgment.

---

[4] As Plaintiff notes, BOP asserts Exemptions 4 and 7(A) over the dates of the technical manager's certification and approval by a BOP decisionmaker, although not the contracting officer's certification.  BOP withdraws its assertion of Exemptions 4 and 7(A) over the technical manager's certification, but maintains its assertions of those exemptions regarding the date of approval of the BOP decisionmaker.

21

February 17, 2021                          Respectfully submitted,


                                           MICHAEL D. GRANSTON
                                           Deputy Assistant Attorney General

                                           ELIZABETH J. SHAPIRO
                                           Deputy Director, Federal Programs Branch

                                           /s/ *Jonathan D. Kossak*

                                           JONATHAN D. KOSSAK
                                           Trial Attorney (DC Bar # 991478)
                                           U.S. Dep't. of Justice, Federal Programs Branch
                                           1100 L Street, NW
                                           Washington, D.C. 20005
                                           Tel. (202) 305-0612; Fax. (202) 616-8460
                                           Email:  jonathan.kossak@usdoj.gov

22

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing Reply in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment with the Clerk of the Court through the ECF system on February 17, 2021. This system provided a copy to and effected service of this document on all parties.

<u>/s/ Jonathan D. Kossak</u>
JONATHAN D. KOSSAK
Trial Attorney (DC Bar # 991478)
United States Department of Justice
Civil Div., Federal Programs Branch