# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:19-cv-03626 (DLF) |
| | ) | |
| **UNITED STATES DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| Defendant. | ) | |

_____

## PLAINTIFF'S REPLY IN SUPPORT OF
## CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................3

    I.     The Government Is Improperly Withholding Material Under Exemption 7...................3

          A.     The Requested Procurement Records Were Not Compiled For Law
                Enforcement Purposes ...............................................................................3

          B.     Exemption 7(A) ...........................................................................................8

          C.     Exemption 7(E) .........................................................................................14

    II.    The Government Is Improperly Withholding Material Under Exemption 4.................17

          A.     The Government's Suppliers' And Vendors' Identities Are Not Commercial
                Or Financial Information ...........................................................................17

          B.     The Government Fails To Show That Certain Information Is Identifying ...........19

          C.     The Government Fails To Show The Information Withheld Under Exemption
                4 Is Confidential.........................................................................................22

CONCLUSION....................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*100Reporters LLC v. Dep't of Justice,*
  248 F. Supp. 3d 115 (D.D.C. 2017) .................................................................4, 8

*Baker & Hostetler LLP v. Dep't of Commerce,*
  473 F.3d 312 (D.C. Cir. 2006) ........................................................................18, 19

*Benavides v. BOP,*
  774 F. Supp. 2d 141 (D.D.C. 2011) .........................................................................6

*Brady v. Maryland,*
  373 U.S. 83 (1963) ................................................................................................12

*Burka v. Dep't of Health & Human Servs.,*
  87 F.3d 508 (D.C. Cir. 1996) ................................................................................10

*Campbell v. Dep't of Justice,*
  164 F.3d 20 (D.C. Cir. 1998) ..........................................................................21, 22

*Crooker v. Bureau of Alcohol, Tobacco & Firearms,*
  670 F.2d 1051 (D.C. Cir. 1981) (en banc) ............................................................10

*\*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice,*
  658 F. Supp. 2d 217 (D.D.C. 2009) ......................................................................12

*\*Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice,*
  746 F.3d 1082 (D.C. Cir. 2014) ...................................................................8, 9, 15

*Citizens for Responsibility & Ethics in Wash. v. GSA,*
  No. 18-2071 (CKK), 2021 WL 765659 (D.D.C. Feb. 26, 2021) ........................15

*Elec. Privacy Information Ctr. v. Dep't of Homeland Security,*
  117 F. Supp. 3d 46 (D.D.C. 2015) ........................................................................18

*Elec. Privacy Information Ctr. v. Dep't of Homeland Security,*
  777 F.3d 518, 520 (D.C. Cir. 2015) ........................................................................8

*\*Food Marketing Inst. v. Argus Leader Media,*
  139 S. Ct. 2356 (2019) ..........................................................................10, 11, 19, 22

*Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency,*
  610 F.2d 824 (D.C. Cir. 1979) ..............................................................................22

*Henderson v. Dep't of Justice,*
  157 F. Supp. 3d 42 (D.D.C. 2016) ..........................................................................7

*Jordan v. Comm'r, Miss. Dep't of Corr.*,
    947 F.3d 1322 (11th Cir. 2020) ...................................................................13

*Kubik v. BOP*,
    No. 10-6078-TC, 2011 WL 2619538 (D. Or. July 1, 2011) ..................................6

*Lewis v. Dep't of Treasury*,
    No. 17-cv-0943 (DLF), 2020 WL 1667656 (D.D.C. Apr. 3, 2020) .............................3, 4

*Mapother v. Dep't of Justice*,
    3 F.3d 1533 (D.C. Cir. 1993)........................................................................8

*Maydak v. Dep't of Justice*,
    218 F.3d 760 (D.C. Cir. 2000) ......................................................................12

*Mayer Brown LLP v. IRS*,
    562 F.3d 1190 (D.C. Cir. 2009) .....................................................................16

*McGehee v. Tex. Dep't of Corr.*,
    No. H-18-1546, 2018 WL 3996956 (S.D. Tex. Aug. 21, 2018).........................13

*\*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011)............................................................10, 11, 14, 15, 17

*Morley v. CIA*,
    508 F.3d 1108 (D.C. Cir. 2007)......................................................................22

*Multi Ag Media LLC v. USDA*,
    515 F.3d 1224 (D.C. Cir. 2008) .....................................................................10

*N.L.R.B. v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978).....................................................................................9

*Nat'l Ass'n of Home Builders v. Norton*,
    309 F.3d 26 (D.C. Cir. 2002) .........................................................................17

*North v. Walsh*,
    881 F.2d 1088 (D.C. Cir. 1989) ......................................................................9

*Pub. Citizen v. Dep't of Health & Human Servs.*,
    975 F. Supp. 2d 81 (D.D.C. 2013) ..............................................................18, 19

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water
    Comm'n, U.S.-Mexico*, 740 F.3d 195 (D.C. Cir. 2014) ....................................4, 8

*Raher v. BOP*,
    No. CV-09-526-ST, 2011 WL 2014875 (D. Or. May 24, 2011) ........................6

*Sarno v. Dep't of Justice*,
   278 F. Supp. 3d 112 (D.D.C. 2017) ...................................................................11

*\*WP Co. v. U.S. Small Bus. Admin.*,
   Nos. 20-1240 (JEB) & 20-1614 (JEB), 2020 WL 6504534 (D.D.C. Nov. 5,
   2020) ...................................................................................................................21

## STATUTES, RULES, AND REGULATIONS

28 C.F.R. § 26.3(a) ..............................................................................................16

5 U.S.C. § 552(b)(2) ...........................................................................................10

5 U.S.C. § 552(b)(4) ...........................................................................................17

5 U.S.C. § 552(b)(7) .............................................................................................3

5 U.S.C. § 552(b)(7)(A) ..............................................................................8, 12, 14

5 U.S.C. § 552(b)(7)(E) ...............................................................................14, 15, 16

18 U.S.C. § 4042(a) ...............................................................................................5

## OTHER AUTHORITIES

Black's Law Dictionary (11th ed. 2019) ...............................................................9

U.S. Dep't of Justice, Federal Bureau of Prisons, *Legal Resource Guide to the
   Federal Bureau of Prisons* (2019),
   https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf ..................5

Jonathan Allen, *Special Report: How the Trump Administration Secured a Secret
   Supply of Execution Drugs*, Reuters (July 10, 2020),
   https://www.reuters.com/article/us-usa-executions-specialreport/special-
   report-how-the-trump-administration-secured-a-secret-supply-of-
   execution-drugs-idUSKBN24B1E4.................................................................13

**INTRODUCTION**

This case is about the public's right to know how taxpayer dollars are spent and how federal agencies attempted to comply with the law.  The Department of Justice ("DOJ") and Bureau of Prisons ("BOP") want to keep secret critical aspects of their procurement of Pentobarbital for use in federal executions—including the cost of contracts, the dates in which contracts were entered, who the government is contracting with, and the scope of what taxpayers received for their money.  Such basic procurement information is routinely disclosed to the public.  And its disclosure here will shed light on a matter of considerable public interest: the government's procurement of lethal injection drugs.  Yet the government aims to withhold the information because it believes the public will find its use of taxpayer dollars unpopular and may therefore encourage Pentobarbital suppliers to cease providing the drug for use in federal executions.  These are not grounds for withholding information under the Freedom of Information Act ("FOIA").

The only remaining issues in dispute are the government's improper withholdings under Exemption 7 and Exemption 4.  The government has withdrawn its reliance on the withholdings Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") challenged under Exemptions 5, 6, 7(C), and 7(F).[1]  ECF No. 22 ("Gov't Reply") at 21 & n.4.  CREW is entitled to summary judgment as to the remaining withholdings.

*First*, the government attempts to expand Exemption 7 well beyond its plain meaning.  It incorrectly claims that the requested procurement records were "compiled for law enforcement

---

[1] In so doing, the government withdrew all withholdings applicable to the dates of the technical manager's certification and the contracting officer's certification in non-email Record 8, BOP's Justification for Other than Full and Open Competition.  The Court should accordingly grant summary judgment to CREW on this issue and order the government to re-produce Record 8 without this information redacted.

purposes" because they purportedly relate to BOP's duty to carry out federal sentences—a position that disregards the well-settled distinction between BOP's custodial, administrative, law enforcement, and other functions.  Indeed, the requested records are nothing like the investigatory, crime prevention, and security-maintenance records courts have found to satisfy Exemption 7's threshold requirement; rather, they are procurement records that have no connection to—or are, at best, several steps removed from—any law enforcement investigation or security threat.

The government also fails to identify any "interfere[nce]" with "enforcement proceedings" as required by Exemption 7(A), or any connection between its procurement "procedures" and "law enforcement investigations or prosecutions" as required by Exemption 7(E).  The government distracts from these deficiencies by citing inapposite case law construing state public records statutes, in which public pressure supposedly led certain lethal injection drug suppliers not to provide those drugs for executions.  But to satisfy Exemption 7, the government must do more than show that disclosure may make it more difficult to acquire Pentobarbital; it must meet the statutory requirements to show a connection between the procurement records and an "enforcement proceeding" or "law enforcement investigations and prosecutions."  It has not done so.  The Court should reject the government's attempt to stretch the FOIA beyond its text.

*Second*, the government attempts to expand Exemption 4 such that it could agree with any contractor that its identity and a host of information related to its contracts are outside the scope of the FOIA.  The government further suggests in its reply that it invoked Exemption 4 here entirely to protect the identities of the suppliers and testing companies involved in the Pentobarbital procurement process.  But companies' identities are not "commercial or financial information" protected by Exemption 4, and they do not become so based on concerns of

reputational harm arising from dealings with the government.  Moreover, BOP fails to explain

how disclosure of much of the basic procurement information at issue—such as the cost of a

contract—would identify the suppliers or testing companies it contracts with to acquire and test

Pentobarbital.  BOP's anonymity rationale thus fails to justify treating all of the information

withheld under this exemption as "confidential."

 For these reasons, and those expressed in CREW's opening brief, the Court should grant

CREW's cross-motion for summary judgment and deny the government's motion as to the

disputed withholdings.

**ARGUMENT**

**I. The Government Is Improperly Withholding Material Under Exemption 7**

 **A. The Requested Procurement Records Were Not Compiled For Law
  Enforcement Purposes**

 The procurement records requested by CREW are a far cry from the types of records

courts have found to be "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  This

"threshold showing" for invoking Exemption 7 is met for records where there is a "rational

nexus" between investigatory activity and the agency's law enforcement duties as well as for

records "relating to guidelines, techniques, sources, and procedures for law enforcement

investigations and prosecutions, even when the materials have not been compiled in the course of

a specific investigation."  *Lewis v. Dep't of Treasury*, No. 17-cv-0943 (DLF), 2020 WL

3

1667656, at *2-3 (D.D.C. Apr. 3, 2020) (internal quotations omitted).[2]  Records withheld under

this exemption often relate to investigations of civil or criminal offenses, *see, e.g.*, *id.* (records

related to the agency's investigation of alleged money laundering), or to steps "designed to

prevent criminal activity and to maintain security," *see, e.g.*, *PEER*, 740 F.3d at 203-04, (records

describing "security precautions that law enforcement personnel should implement around the

dams during emergency conditions").

The records requested by CREW—invoices, contracts, communications regarding

procurement logistics—are unlike these types of investigatory and crime prevention records that

have been found to satisfy Exemption 7's threshold.  The requested records are not investigatory,

which the government concedes.  ECF No. 17-1 ("Gov't MSJ") at 16; Gov't Reply at 6-7.  Nor

do the records directly connect to any crime prevention measures or security threats like the

records in *PEER*, a case heavily relied upon by the government and discussed further below.  *See*

740 F.3d at 202-04 (discussing "emergency action plans" that "assist law enforcement personnel

in maintaining order and security during emergency conditions, and to help prevent attacks on

---

[2] The government's reply criticizes CREW's reliance on the "rational nexus" standard, noting
that three D.C. Circuit cases cited by the government do not use this test.  Gov't Reply at 6.  Of
course, the government cited the same standard in its opening brief.  *See* Gov't MSJ at 15 ("To
establish that information or records were compiled for law enforcement purposes, an agency
need only 'establish a rational nexus between an investigation and one of the agency's law
enforcement duties and a connection between an individual or incident and a possible security
risk or violation of federal law.'").  To the extent CREW's cross-motion indicated that the
"rational nexus" test was the exclusive way to demonstrate records are "compiled for law
enforcement purposes," the government is correct that it is not exclusive.  *See 100Reporters LLC
v. Dep't of Justice*, 248 F. Supp. 3d 115, 160 (D.D.C. 2017).  As explained above, courts have
found that records are "compiled for law enforcement purposes" when they meet the "rational
nexus" test, "relat[e] to guidelines, techniques, sources, and procedures for law enforcement
investigations and prosecutions, even when the materials have not been compiled in the course of
a specific investigation," *Lewis*, 2020 WL 1667656, at *2-3 (internal quotations omitted), or
were "designed to prevent criminal activity and to maintain security," *Pub. Emps. for Envtl.
Responsibility ("PEER") v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740
F.3d 195, 203-04 (D.C. Cir. 2014).

dams from occurring in the first place").  Indeed, the government has pointed to no case in which procurement records were found to be "compiled for law enforcement purposes."  Rather, the government effectively seeks to establish a blanket rule that all of BOP's records are compiled for law enforcement purposes—a rule that does not square with the statutory term "law enforcement purposes" or the case law construing that term.

The government purports to acknowledge that BOP is not always carrying out a law enforcement function and that not all BOP records are compiled for law enforcement purposes. Gov't Reply at 4.  Yet it goes on to argue that the requested procurement records were compiled for "law enforcement purposes" because they are related to BOP's "duty to carry out a lawful federal sentence" and are connected to "deterrence."  Gov't Reply at 4, 6; *see also* Gov't MSJ at 15 (arguing records were compiled for law enforcement purposes if they "focus" on "the implementation of a federal criminal sentence").  This sweeping claim could be made as to virtually any BOP record.  BOP is dedicated to managing federal correctional institutions and "provid[ing] for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a); U.S. Dep't of Justice, Federal Bureau of Prisons, *Legal Resource Guide to the Federal Bureau of Prisons* (2019). Many of BOP's activities relate to its "duty to carry out a lawful federal sentence"—including all of its procurement of, for example, fencing needed to enclose the prison or guns used to arm the prison guards.  Concluding that all these records were compiled for "law enforcement purposes" cannot be correct.

Indeed, courts have previously rejected BOP's expansive view of Exemption 7.  Records relating to administering a prison, for example, seem clearly related to BOP's "duty to carry out a lawful federal sentence" and to "deterrence."  Yet courts have held that such records are

unprotected by Exemption 7 because they relate to BOP's custodial functions rather than its law enforcement functions. *See, e.g.*, *Raher v. BOP*, No. CV-09-526-ST, 2011 WL 2014875, at *9 (D. Or. May 24, 2011) (holding information pertaining to "security electronics," "security inspection system," and staffing vulnerabilities—which related to BOP's "custodial functions"— did not fall within Exemption 7); *Benavides v. BOP*, 774 F. Supp. 2d 141, 146 (D.D.C. 2011) (agreeing that BOP cannot satisfy the threshold for Exemption 7 by "point[ing] to its mission as a blanket reference to the agency's law enforcement duties" (citation and internal quotation omitted)).  These courts rejected BOP's attempt to withhold records related to non-law-enforcement duties under Exemption 7.  This Court should do the same.

The government seeks to distinguish *Benavides* on the ground that the case "simply confirmed the basic point that BOP cannot carry its threshold burden under Exemption 7 by rote recitation of its 'status as a law enforcement agency responsible for the welfare of inmates in its custody, its staff and the public at large.'"  Gov't Reply at 5 (quoting *Benavides*, 774 F. Supp. 2d at 146-47).  Here, the government claims, it is relying not on a "*per se* rule" but on BOP's duty to "set the date, time, place and method of execution when a sentence of death has been imposed, and its responsibility to carry out the judgment of a sentence of death."  *Id.*  But that is the same type of generic rule rejected by *Benavides*.  The government draws no connection to how the requested *procurement* records—which have no relationship to, or are, at best, several steps removed from any investigations, crime prevention, or security threats—serve its law enforcement duties rather than, for example, its administrative duties.  Its invocation of Exemption 7 must accordingly be rejected.  *See, e.g.*, *Kubik v. BOP*, No. 10-6078-TC, 2011 WL 2619538, at *10 (D. Or. July 1, 2011) (holding BOP did not satisfy the "law enforcement purposes" threshold for records that were "largely related to administrative functions");

*Henderson v. Dep't of Justice*, 157 F. Supp. 3d 42, 49-50 (D.D.C. 2016) (holding stenographic expense records were not "compiled for law enforcement purposes" when "the apparent connection between stenographic services and the [agency's] law enforcement function in prosecuting plaintiff's criminal case" was "highly attenuated").

The cases cited by the government do not support its position.  In *Anderson v. BOP*, the only case the government cites on this point involving BOP, another judge in this district concluded that certain records were compiled for law enforcement purposes when they were related to a discrete "[i]nvestigation" of whether a particular inmate needed to be transferred to another facility "to prevent future violence" after an "incident" at the prison.  806 F. Supp. 2d 121, 127 (D.D.C. 2011).  The court found that the investigation was "fairly characterized as [an] enforcement proceeding[]."  *Id.*  The records were thus compiled not merely for the purpose of carrying out the inmate's sentence but rather as part of BOP's investigation of an incident that had occurred and subsequent steps "to prevent future violence."  *See id.*  Such records fall within the bounds of investigatory records traditionally within Exemption 7 and bear no resemblance to the non-investigatory procurement records at issue here.

Similarly, the non-BOP cases cited by the government do not stand for the proposition that any records related in any attenuated way to crime prevention or deterrence were compiled for law enforcement purposes.  Rather, these cases applied Exemption 7 to records that were closely tied to how a government agency carries out its investigations, uses particular investigative tools, or implements security precautions to address ongoing threats.  The D.C. Circuit held that the Department of Defense permissibly withheld reports about polygraph use in *Sack v. Department of Defense*—reports that the court described as "help[ing] ensure that law enforcement officers optimally use an important law enforcement tool," the polygraph, which

was used to "test the credibility of witnesses and criminal defendants" and assess applicants for security clearances."  823 F.3d 687, 694 (D.C. Cir. 2016).  In *PEER*, the D.C. Circuit held that records describing "security precautions that law enforcement personnel should implement around … dams during emergency conditions" passed Exemption 7's threshold.  740 F.3d at 203-04.  In *Electronic Privacy Information Center v. Department of Homeland Security*, the D.C. Circuit found the Department of Homeland Security compiled for law enforcement purposes a protocol for managing wireless services in the face of "critical emergencies such as the threat of radio-activated improvised explosive devices."  777 F.3d 518, 520, 523 (D.C. Cir. 2015) (internal quotation omitted) (noting the protocol was devised to "address deficiencies in the United States' ability to address and respond to such threats").  By contrast, records related to the procurement of Pentobarbital do not relate to any BOP investigative tools or security threats.

As a last resort, the government leans on what it describes as the "relatively light" burden to satisfy Exemption 7's threshold requirement.  Gov't Reply at 5.  But the Court's review— even if deferential for law enforcement agencies—is "not vacuous."  *100Reporters LLC*, 248 F. Supp. 3d at 159.  BOP must still demonstrate that the requested records actually were "compiled for law enforcement purposes."  It fails to do so with respect to records of Pentobarbital procurement.

## B.    Exemption 7(A)

Exemption 7(A) applies when the disclosure of records "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  To justify withholding under this exemption, the government must demonstrate that "disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated."  *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice ("CREW I")*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540

8

(D.C. Cir. 1993)).  As explained in CREW's opening brief, there is no plausible argument that the government has met any of these requirements here.  ECF No. 20 ("CREW CMSJ") at 11-17.

The government's primary argument is that the "implementation of a federal capital sentence" qualifies as an enforcement proceeding.  Gov't Reply at 9; Gov't MSJ at 17-19.  But the government's view is inconsistent with the plain meaning of the term "enforcement proceeding," which requires there to be a "proceeding."  *See* Black's Law Dictionary (11th ed. 2019) (defining "proceeding" as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment").  Courts, too, have generally equated an "enforcement proceeding" to an adjudicatory proceeding.  *See, e.g.*, *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 229 & n.10 (1978).  Such a proceeding must be pending or reasonably anticipated, *CREW I*, 746 F.3d at 1096, and not "already concluded," *North v. Walsh*, 881 F.2d 1088, 1100 (D.C. Cir. 1989).  As CREW previously explained, a federal execution takes place *after* an inmate has been convicted and exhausted their legal challenges—in other words, after any enforcement proceedings have concluded.  CREW CMSJ at 12.  An execution is accordingly not a pending or anticipated "enforcement proceeding" under the plain meaning of Exemption 7(A).

Perhaps recognizing that its interpretation of "enforcement proceeding" is disconnected from the statutory text, the government asks the Court to adopt an "expansive reading of Exemption 7(A)" for "exceptional cases such as this one."  Gov't MSJ at 18.  In its opening brief, CREW explained why the two cases cited by the government do not support its suggested departure from the text.  CREW CMSJ at 12-14.  The government's reply, seemingly admitting that it lacks on-point precedent, does not substantively respond to CREW's critique.  *See* Gov't Reply at 8.  Instead, the government turns to faulting CREW for not citing its own precedent on

this issue. *Id.*  Yet the government bears the burden of showing that its admittedly "expansive reading of Exemption 7(A)" is warranted.  *See* Gov't MSJ at 18; *see also Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 514 (D.C. Cir. 1996) ("[T]he burden is on the agency to show that requested material falls within a FOIA exemption." (internal quotation omitted)); *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (FOIA exemptions "must be 'narrowly construed'"); *Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) ("At all times, courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'").  It fails to do so.

The government's atextual approach to interpreting the FOIA has twice been rejected by the Supreme Court in recent years.  In *Milner*, the Supreme Court rejected decades of circuit precedent construing Exemption 2 based on "the simple device of confining the provision's meaning to its words."  562 U.S. at 572.  The D.C. Circuit had interpreted Exemption 2's protection of material "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b)(2), to prevent compelled disclosure of *both* personnel materials and "'predominantly internal' materials whose disclosure would 'significantly risk circumvention of agency regulations or statutes,'" *Milner*, 562 U.S. at 566 (quoting *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1056-57 (D.C. Cir. 1981) (en banc)) (cleaned up).  The Supreme Court rejected the D.C. Circuit's expansion of Exemption 2 beyond its text, noting "we have no warrant to ignore clear statutory language on the ground that other courts have done so." *Id.* at 576.  It thus directed courts to instead interpret Exemption 2 according to its "plain meaning."  *Id.* at 581.

The Supreme Court repeated this admonition in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019).  There, the Court rejected the D.C. Circuit's addition of a

"substantial competitive harm" requirement for withholdings under Exemption 4. Justice Gorsuch, writing for the majority, stated: "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, judges must stop." *Id.* at 2364 (citation omitted). The Supreme Court confirmed that courts "cannot properly *expand* Exemption 4 beyond what its terms permit" nor "arbitrarily *constrict* it either by adding limitations found nowhere in its terms." *Id.* at 2366.

The government's reading of "enforcement proceeding" to include the implementation of a federal capital sentence well after the conclusion of any enforcement proceedings is the same "text-light" approach rejected in *Milner* and *Argus Leader Media. See Milner*, 562 U.S. at 573. Like the Supreme Court, this Court should reject the government's attempt to expand the FOIA beyond its plain terms.

In the alternative, the government also initially suggested in its motion for summary judgment that pending or potential habeas challenges and "similar litigation" by death row inmates constitute "enforcement proceedings." Gov't MSJ at 20-21. CREW distinguished the one case relied upon by the government for this point,[3] CREW CMSJ at 13-14, and the government does not dispute CREW's analysis, *see* Gov't Reply at 8-9. Indeed, its reply provides no analysis specific to why habeas or other undefined litigation would constitute an enforcement proceeding. *See* Gov't Reply at 8-9. The Court should reject the government's

---

[3] As previously explained, *Sarno v. Department of Justice*, 278 F. Supp. 3d 112 (D.D.C. 2017), did not conclude that all pending or contemplated habeas proceedings are "enforcement proceedings" for purposes of Exemption 7(A). *See* CREW CMSJ at 13-14. Rather, the *Sarno* court found that records sought by an inmate during ongoing habeas proceedings fell within Exemption 7(A) because of the likelihood that "a new trial"—in other words, an enforcement proceeding—was reasonably anticipated in that particular case and the records sought could interfere with such a later prosecution. *Sarno*, 278 F. Supp. 3d at 125-27.

undefended attempt to expand "enforcement proceeding" to cover habeas challenges and undefined "similar litigation."

Even assuming the government had identified an "enforcement proceeding," it fails to demonstrate that the release of the requested procurement records will "interfere" with such a proceeding. *See* 5 U.S.C. § 552(b)(7)(A). The government posits that the relevant interference is "delay[]" of litigation that could result "if BOP was unable to obtain lethal injection drugs." Gov't Reply at 9. Yet the government makes no attempt to show how the disclosure of requested procurement records could delay (or otherwise impact) any particular proceeding, or habeas proceedings or other litigation more generally.[4] Nor does the government explain how the "delay" of litigation is the type of "interference" recognized for purposes of Exemption 7(A), which is concerned about disclosure of documents that "prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence.'" *Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 658 F. Supp. 2d 217, 230 (D.D.C. 2009) (quoting *Maydak v. Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000)). Without such interference with an enforcement proceeding, the government's invocation of Exemption 7(A) fails.

Finally, the government continues to rely upon irrelevant case law where courts upheld the confidentiality of lethal injection drug suppliers under *other laws*, claiming those cases

---

[4] The one example cited by the government is of Brandon Bernard, who the government explains brought several challenges to his conviction and sentence, including a recent habeas challenge based on alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963). Gov't MSJ 21-22; Gov't Reply at 9. Yet the government does not attempt to connect disclosure of the requested procurement records to interference with Mr. Bernard's challenges, and CREW can see no relevance between the procurement records and Mr. Bernard's habeas case. *See* CREW CMSJ at 16. Mr. Bernard has been executed.

demonstrate that public pressure is effective at convincing lethal injection drug suppliers not to provide those drugs to the government for executions.  Gov't Reply at 8, 10.[5]  Those cases have no bearing on how this Court should interpret the FOIA.  Indeed, many of the cases cite state statutes in which the legislature had explicitly exempted from disclosure the identity of its drug suppliers.  *See, e.g.*, *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1332 (11th Cir. 2020) (cited by Gov't MSJ at 23) ("Georgia's secrecy statute, which was enacted in 2013, states that the identity of any person or entity who participates in a lethal injection is 'a confidential state secret' that is not 'subject to disclosure ... under judicial process.'" (citing O.C.G.A. § 42-5-36(d))); *McGehee v. Tex. Dep't of Corr.*, No. H-18-1546, 2018 WL 3996956, at *7 (S.D. Tex. Aug. 21, 2018) (cited by Gov't MSJ at 24) ("Concerned about identity of compounding pharmacies, the Texas Legislature in 2015 exempted from PIA disclosure any 'identifying information ... including that of: … any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution.'" (quoting Tex. Gov't Code Ann. § 552.1081) (first ellipsis in original)).  Neither the FOIA nor any other federal law contains a similar exemption specific to lethal injection drug suppliers.

At bottom, the government believes that disclosure of the procurement records should be barred because it could—through a tenuous causal chain—make acquisition of Pentobarbital

---

[5] The government also repeatedly references a *Reuters* report from July 2020 that purported to identify three independent testing companies involved in testing Pentobarbital for use in federal executions.  *E.g.*, Gov't Reply at 2, 12, 18-19.  After the article's publication, one of the laboratories publicly announced it would no longer conduct such testing, *id.* at 2—apparently the laboratory, which had a policy against testing execution drugs, had not realized it was doing so until contacted by *Reuters*, *see* Jonathan Allen, *Special Report: How the Trump Administration Secured a Secret Supply of Execution Drugs*, Reuters (July 10, 2020).  The government identifies no "enforcement proceedings" impacted by the disclosure or the laboratory's decision not to test Pentobarbital going forward.

more difficult.  As noted in CREW's opening brief, however, Exemption 7(A) does not protect against every difficulty the government may face, but only "*interfere[nces] with enforcement proceedings.*" 5 U.S.C. § 552(b)(7)(A) (emphases added).  The government has identified neither an enforcement proceeding nor any interference that would result from the disclosure of the requested procurement records.  And the government's mere preference for confidentiality cannot supersede the statutory text.  As the Supreme Court explained in *Milner*, "[c]oncerns of this kind—a sense that certain sensitive information should be exempt from disclosure—in part led" to the D.C. Circuit's "text-light" interpretation of Exemption 2, which the Supreme Court rejected.  562 U.S. at 573, 580-81.  Like the Court in *Milner*, this Court should reject the government's atextual interpretation in favor of the FOIA's plain meaning.

### C.      Exemption 7(E)

The government's invocation of Exemption 7(E) is similarly disconnected from the statutory text.  This exemption permits withholding of law enforcement records only if (1) the records would reveal "techniques," "procedures" or "guidelines" for "law enforcement investigations or prosecutions," and (2) "such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  As explained in CREW's opening brief, BOP fails to demonstrate either prong with respect to its withholdings of "information that would reveal the strategy undertaken in order to procure Pentobarbital, and information regarding the method by which BOP procured or attempted to procure Pentobarbital."  Gov't MSJ at 32; *see also* CREW CMSJ at 17-18.

In its reply, the government focuses on arguing that it has sufficiently explained what "procedures" would be implicated by disclosure of the requested procurement records.  It includes a lengthy quote from BOP's declarant on this point:

> While the general lethal injection and procurement procedures for BOP may be known by the public, the specific techniques and procedures utilized are not. Although the public may be aware that the government must purchase lethal injection substances from outside sources, the process is not subject to full and open competition, as the disclosure of the agency's needs would compromise its ability to obtain such substances and would subject the parties involved to threats, harassment, or even physical injury.

Gov't Reply at 11.

The government still fails to sufficiently identify "what procedures are at stake." *CREW I*, 746 F.3d at 1102. BOP's declarant seems to be claiming that procedures related to the procurement being "not subject to full and open competition" are confidential, yet the government has already produced in this case BOP's Justification for Other Than Full and Open Competition. *See* CREW CMSJ at 31-32 (describing document). The high level of generality provided by the government makes it impossible to understand the procurement "procedures" at stake. *See Citizens for Responsibility & Ethics in Wash. v. GSA*, No. 18-2071 (CKK), 2021 WL 765659, at *3 (D.D.C. Feb. 26, 2021) (agency failed to "provide sufficient specificity pursuant to Exemption 7(E) regarding *what* investigative procedures or techniques are involved and *how* they would be disclosed by production of the document").

More importantly, the government still fails to make clear how any BOP procurement procedures are connected to "law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E); *see also* CREW CMSJ at 18. The government's reply—and its citations to BOP's declarant—are silent on this point. Per the government, BOP seeks to acquire Pentobarbital as part of "the implementation of a federal capital sentence." Gov't Reply at 9. By the point of execution, the investigation and prosecution of an individual's offenses has concluded. And even if any investigation or prosecution were ongoing—which they would not be—BOP's strategy for procurement of Pentobarbital bears no apparent relationship to any such investigation or prosecution. The government is not free to simply read "law enforcement

investigations or prosecutions" out of the statute. *See Milner*, 562 U.S. at 573 (criticizing interpretation of Exemption 2 that takes "a red pen to the statute—cutting out some words and pasting in others" (internal quotation omitted)). For this reason alone, the government's Exemption 7(E) claims must fail.

Moreover, the government offers no persuasive explanation for how the disclosure of procurement information "risk[s] circumvention of the law." *See* 5 U.S.C. § 552(b)(7)(E)(2). The government persists in its view that any disclosure that may make it more difficult for it to acquire Pentobarbital risks circumvention of the law—what that law is, the government does not say. Gov't Reply at 12. The government does not specify how a "law will be violated" or "that past violators will escape legal consequences" if it has reduced access to Pentobarbital. *See Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). To the extent it is implying that death row inmates may "escape legal consequences" by avoiding a lawfully imposed death sentence, the disclosure of information related to the government's procurement of Pentobarbital does not implicate the legality of the death penalty.[6] Moreover, lethal injection is no longer the exclusive authorized method for federal execution. *See* 28 C.F.R. § 26.3(a). Despite the opportunity, the government has failed to describe how disclosure of the requested records leads to increasing the risk that the law will be violated or that past violators will escape legal consequences.

---

[6] The government says that BOP's declarant "specifically" addressed CREW's question as to how the disclosure of the cost of Pentobarbital could increase the risk that past violators will escape legal consequences. Gov't Reply at 12. The government then quotes how price could serve to identify a supplier "[i]f a particular company is known or discovered to package or price a substance in a particular way." *Id.* This is non-responsive to CREW's point that the government has failed to describe which past violators will escape which legal consequences.

The government again seeks refuge in a "low bar" to justify its withholdings.  Gov't Reply at 10-11.  But it again fails to recognize that even a low bar for withholding cannot be met by disregarding the statutory requirements.  *See Milner*, 562 U.S. at 573 (rejecting reading of Exemption 2 that is "disconnected from [the exemption's] text").  The government's clear failure to identify how any BOP procurement procedure is related to "law enforcement investigations and prosecutions" means its invocation of Exemption 7(E) cannot stand.

## II.  The Government Is Improperly Withholding Material Under Exemption 4

Exemption 4 protects from disclosure "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  The government seeks to withhold a wide variety of information under this exemption, including (1) the identities of BOP's suppliers of Pentobarbital or of those companies who "performed related critical services"; (2) any other information that "could lead to the identity" of those entities, and (3) prices, quotations, invoices, and other information.  Under the government's view, it can simply agree with any contractor to keep the contractor's identity secret, which then brings the identity and a wide variety of tenuously-connected information outside the scope of the FOIA.  Such a boundless view of Exemption 4 is plainly incorrect.

### A.  The Government's Suppliers' And Vendors' Identities Are Not Commercial Or Financial Information

"The terms in Exemption 4 are to be given their ordinary meanings, and information is 'commercial' under this exemption if, in and of itself, it serves a commercial function or is of a commercial nature." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002).  This exemption applies to records that "reveal basic commercial operations or relate to the income-producing aspects of a business"—such as revenue, net worth, and income—as well as "when the provider of the information has a commercial interest in the information submitted to

17

the agency." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (ellipsis omitted).

The identity of a company is unlike the revenue, net worth, and information related to the "income-producing aspects of a business" typically held to be "commercial or financial."[7] The government's contrary argument relies entirely upon *Electronic Privacy Information Center ("EPIC") v. Dep't of Homeland Security*, 117 F. Supp. 3d 46 (D.D.C. 2015), a non-binding decision from another judge in this district. It does not cite—and CREW is not aware of—any other case endorsing the government's theory that the identity of its contractors are protected from disclosure by Exemption 4.

As CREW explained in its opening brief, *EPIC* is distinguishable from this case on multiple grounds. First, unlike in *EPIC*, the government here provides little justification to link its vendors' identities to their commercial or financial interests. The government focuses on the potential impediments to *BOP*'s ability to acquire Pentobarbital. It asserts only vaguely that disclosure of the identities of its corporate suppliers and vendors could subject those companies "to harm to their competitive business interests." Gov't MSJ at 37. In *EPIC*, by contrast, the government introduced evidence that a company who participated in a cyber-security pilot program conducted by the Departments of Defense and Homeland Security "could face competitive disadvantages or market loss if its participation were revealed" because the participation "could be viewed as an admission of cyber vulnerability" and the company "could face increased cyber targeting." *EPIC*, 117 F. Supp. 3d at 62-64.

---

[7] Indeed, solicitations and contracts with government agencies are generally posted to publicly available databases, e.g., https://beta.sam.gov/.

Second, while revealing companies' involvement in BOP's procurement of Pentobarbital may lead to negative publicity, "the law is well-settled that this potential consequence of a disclosure does not convert the information into 'commercial' under Exemption 4." *Pub. Citizen v. Dep't of Health & Human Servs.*, 975 F. Supp. 2d 81, 107 (D.D.C. 2013). The government criticizes *Public Citizen* for its citation to a case that analyzed the "substantial competitive harm" requirement under the confidential prong of Exemption 4, which was eliminated by *Argus Leader Media*, 139 S. Ct. at 2365-66. Gov't Reply at 14-15. But the government nowhere disputes *Public Citizen*'s conclusion that "mere embarrassment in the marketplace or reputational injury" is distinct from a company's "commercial or financial" interest. *See Pub. Citizen*, 975 F. Supp. 2d at 107. This issue was addressed neither in *EPIC* nor *Argus Leader Media.*

Under the government's theory, any contractor could claim that it had a commercial interest in keeping its identity secret because it feared unquantified reputational injury attenuated from any commercial harm. For example, a caterer could decide that it—as a supplier of food to public elementary schools—wants to keep its identity as a supplier of food for inmates confidential because it believes negative publicity will arise from its provision of food to BOP. The caterer does not suddenly gain a commercial interest in their identity based on that view. Whether information is "commercial" should turn instead, as case law directs, on whether the information would "reveal basic commercial operations or relate to the income-producing aspects of a business" or implicate a "commercial interest" of the company. *Baker & Hostetler LLP*, 473 F.3d at 319. The identity of BOP's Pentobarbital suppliers is not commercial.

**B.    The Government Fails To Show That Certain Information Is Identifying**

The government's reply clarifies that its Exemption 4 withholdings all rest on the premise that disclosure "*could be* identifying" of one of the companies involved in the procurement

process.  Gov't Reply at 17, 20 (emphasis added).  The government improperly includes a variety of information in this category, including the "drug's price, quantity, expiration dates, container units, lot numbers, purchase order/reference numbers, substance description, concentration, packaging details, and dates of purchase, service, and/or delivery."  ECF No. 17-4, Declaration of Kara Christenson, ¶ 48.[8]  As described in detail in CREW's opening brief, the government fails to show that this information is identifying.

The one example described in the government's reply demonstrates CREW's point.  In its opening brief, CREW highlighted that "BOP makes no effort to explain how the cost of a contract or invoice could reveal the identity of a Pentobarbital supplier."  CREW CMSJ at 27.  In response, the government points to the statement from BOP's declarant that "*if* a particular company is known or discovered to package or price a substance in a particular way, … the manner in which it is described in BOP's records could be used to trace the substance back to that particular provider by the process of comparison and elimination."  Gov't Reply at 18 (emphasis added) (quoting BOP declaration).[9]  Yet the government provides no indication that any company is known to price a substance in a particular way or even that the manner of pricing would be revealed by the overall cost of the contract.  The government thus fails to establish the

---

[8] As previously noted, CREW does not dispute that certain withheld information is identifying: names, titles, department titles, account numbers, phone and fax numbers, web addresses, physical addresses, video conference ID numbers, IT information, company logos, and company brochures.  CREW CMSJ at 26 n.4.  CREW disputes that the government has shown any other withheld information is identifying.

[9] The government also inexplicably points to the BOP declarant's unrelated statement about the "dates of purchases."  Gov't Reply at 18 (BOP's declarant asserted that "dates of purchases … could be compared to reporting logs or databases maintained by the Drug Enforcement Agency (DEA), which tracks and regulates the manufacture, sale, and purchase of controlled substances").  Whether the *dates of purchases* are identifying—a point CREW disputed in detail in its opening brief, *see* CREW CMSJ at 27-28—is irrelevant to whether the *cost* of the contract is identifying.

predicate to its own argument for invoking Exemption 4—that these categories of information are identifying.  As previously explained, BOP's claims with respect to the other "identifying" information are similarly unsupported.  CREW CMSJ at 26-28.

BOP claims that it should not be required to "further spell out" how particular information might be identifying.  Gov't Reply at 18.  Yet the D.C. Circuit requires agencies to provide "detailed and specific information" to justify their withholdings.  *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).  As shown by the above example, BOP fails to do so. Indeed, it offers no justification whatsoever with respect to how the cost of a contract is identifying, let alone a justification with "detailed and specific information."

Courts in this district have rejected speculation similar to what BOP offers here as insufficient to demonstrate confidentiality under Exemption 4.  *See WP Co. v. U.S. Small Bus. Admin. ("SBA")*, Nos. 20-1240 (JEB) & 20-1614 (JEB), 2020 WL 6504534, at *5 (D.D.C. Nov. 5, 2020).  The government seeks to distinguish *WP Co.* on the basis that, in that case, companies seeking loans from the SBA were notified that their names and loan amounts may be released. Gov't Reply at 19.  But the question at issue was whether the requested loan data would necessarily reveal a company's payroll information—which the court agreed *was* confidential. *WP Co.*, 2020 WL 6504534, at *7.  The court found the SBA offered only "bare speculation" as to the connection between the loan data and the payroll information, and thus ordered that the loan data could be disclosed.  *Id.* at *9.  This Court should come to the same conclusion with respect to the purported connection between the identity of the governments' suppliers and testing companies and the cost of the government's procurement contracts and other information.

21

**C.      The Government Fails To Show The Information Withheld Under Exemption 4 Is Confidential**

BOP also withheld details related to its contractors' procurement negotiations, strategies, logistics, and payments.  The government offers only impermissible "conclusory and generalized allegations" that its suppliers and testing companies customarily keep this information confidential.  *See Morley v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 830 (D.C. Cir. 1979)).  In its opening brief, CREW noted as an example that BOP withheld in full the invoices for third-party testing services, as well as quotations, protocols, and test results without explaining that testing services companies keep the cost of their services and test results "customarily and actually treated as private."  CREW CMSJ at 30 (quoting *Argus Leader Media*, 139 S. Ct. at 2366).  CREW also noted that BOP nowhere explains how such an invoice reveals information about a company's capability, as opposed to the fulfillment of a specific order.  *Id.* The government does not address this example or seek to specifically justify this withholding.  It claims only that CREW "offered no evidence in the record that any of the companies failed to require or request confidentiality or failed to obtain assurances from Defendant."  Gov't Reply at 20.  But it is the government's burden to offer "detailed and specific information" to justify its withholdings.  *Campbell*, 164 F.3d at 30.  The government's invocation of Exemption 4 as to this information is accordingly unwarranted.

## CONCLUSION

For the foregoing reasons, CREW respectfully requests that the Court grant CREW's cross-motion for summary judgment and deny the government's motion as to the disputed withholdings.


Dated:  March 17, 2021                    Respectfully submitted,

                                          */s/ Jessica A. Lutkenhaus*
                                          Jessica A. Lutkenhaus
                                          (D.C. Bar No. 1046749)
                                          Wilmer Cutler Pickering Hale and Dorr LLP
                                          1875 Pennsylvania Avenue NW
                                          Washington, D.C. 20006
                                          Phone: (202) 663-6640
                                          Facsimile: (202) 663-6363
                                          jessica.lutkenhaus@wilmerhale.com

                                          Nikhel S. Sus
                                          (D.C. Bar No. 1017937)
                                          Citizens for Responsibility and
                                                  Ethics in Washington
                                          1101 K St. NW, Suite 201
                                          Washington, D.C. 20005
                                          Telephone: (202) 408-5565
                                          Fax: (202) 588-5020
                                          nsus@citizensforethics.org


                                          *Attorneys for Plaintiff*