**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

    *Plaintiff*,

  v.

U.S. DEPARTMENT OF JUSTICE,

    *Defendant.*

No. 19-cv-3626 (DLF)

**MEMORANDUM OPINION**

In this action, Citizens for Responsibility and Ethics in Washington (CREW) challenges

the Department of Justice's (Department) withholding of documents from its Freedom of

Information Act (FOIA), 5 U.S.C. § 552, request.  Before the Court is Plaintiff's Motion for

Summary Judgment, Dkt. 17, and the Department's Cross-Motion for Summary Judgment,

Dkt. 19.  For the reasons that follow, the Court will grant each motion in part and deny each

motion in part.

**I.**    **BACKGROUND**

On August 8, 2019, CREW submitted a FOIA request to the Federal Bureau of Prisons

(BOP).  Def.'s Stmt. of Material Facts ¶ 1, Dkt. 17-2.  CREW requested "all records from

February 14, 2019, to the present related to the procurement of pentobarbital, pentobarbital

sodium, or Nembutal[1] to be used in federal executions, including without limitation any

notifications to or communications with vendors, solicitation information, requests for

---

[1] Hereinafter these are collectively referred to as "pentobarbital."

information, subcontracting leads, and contract awards."  Pl.'s Cross-Mot. for Summ. J. Ex. 1, Dkt. 19-3.[2]

Six days later, on August 14, BOP sent CREW an acknowledgement letter, indicating that the FOIA request had been received and assigned to the complex processing track.  Def.'s Stmt. of Material Facts ¶ 4.  BOP then determined that any records responsive to CREW's request would be exempt from disclosure under FOIA exemption 5, 6, 7(A), 7(B), 7(C), 7(E), and 7(F).  *Id.* ¶ 5.  BOP informed CREW of these determinations in a letter dated September 30, 2019, and CREW appealed the determinations to the Department of Justice's (DOJ) Office of Information Policy (OIP) on October 10, 2019.  *Id.* ¶ 6–7.  OIP filed a response to the appeal on February 19, 2020, acknowledging that the instant lawsuit had already been filed and therefore closing CREW's appeal.  *Id.* ¶ 9; *see also* Pl.'s Stmt. of Material Facts ¶ 7, Dkt. 19-1.

On August 9, 2019, CREW submitted an identical FOIA request to DOJ's OIP, targeting records from the Offices of the Attorney General (OAG), Deputy Attorney General (ODAG), and Associate Attorney General (OASG).  Def.'s Stmt. of Material Facts ¶ 10; Joint Status Report of Jan. 30, 2020, ¶ 1, Dkt. 7.  OIP acknowledged the request in a letter dated September 6, 2019.  Def.'s Stmt. of Material Facts ¶ 11.  OIP submitted search requests of email and computer files for custodians in OAG, ODAG, and OASG on October 2, 2019.  *Id.* ¶ 49.

The instant litigation commenced on December 4, 2019.  *Id.* ¶ 12.  DOJ filed its answer on January 15, 2020.  *Id.* ¶ 13.  Over the following months, both BOP and OIP searched their records pursuant to CREW's FOIA requests.

---

[2] CREW further noted in its FOIA request that the "compounding pharmacies" providing pentobarbital to states may not be subject to FDA review and cited concerns about the effects of the drug to demonstrate the need for the documents to be disclosed.  Pl.'s Stmt. of Material Facts ¶ 3, Dkt. 19-1.

BOP conducted a search of non-email records pursuant to CREW's FOIA request. *Id.* ¶¶ 38–41. The agency determined that any pentobarbital that it purchased during the relevant period would have been purchased through the North Central Regional Office, and therefore that any documents related to those purchases would be stored in a filing cabinet at that office. *Id.* ¶¶ 39–40. BOP then determined that fifty-six pages of files were responsive to CREW's FOIA request, and, after reviewing those fifty-six pages, organized the information into categorical records reported in the *Vaughn* Index, *id.* ¶¶ 41–44; Def.'s Mot. for Summ. J. Ex. F (Christenson Decl.), at 163–168, Dkt. 17-4, and provided CREW with the remaining information and the Index on September 11, 2020, *see* Def.'s Stmt. of Material Facts ¶ 46. The September 11 release included forty-five pages, of which forty-three included some redactions pursuant to FOIA exemptions listed above. Pl.'s Stmt. of Material Facts ¶ 18.

BOP also conducted a search for email records responsive to CREW's FOIA request. Def.'s Stmt. of Material Facts ¶ 16. There, BOP began by identifying twelve BOP custodians involved in the procurement of pentobarbital from February 14, 2019, to August 8, 2019, the date CREW filed its FOIA request. *Id*. ¶¶ 24–25. BOP searched the emails of the twelve custodians for key words related to the procurement of pentobarbital. *Id.* ¶¶ 26–27. BOP identified 1,095 responsive email records, of which 848 were duplicative. *Id.* ¶¶ 28–34. BOP then redacted and applied FOIA exemptions to those records, describing the records and exemptions in an attached *Vaughn* Index, *id.* ¶¶ 35–36; Christenson Decl. at 1–163, and provided the remaining email records to CREW on November 6, 2020, *see* Def.'s Stmt. of Material Facts ¶ 37; Pl.'s Resp. to Def.'s Stmt. of Material Facts ¶ 37. BOP released a total of 153 records with redactions and withheld entirely sixty-two records, pursuant to the same FOIA exemptions. Pl.'s Stmt. of Material Facts ¶ 20.

Simultaneously, DOJ's OIP conducted its own search for records responsive to CREW's August 9, 2019, FOIA request.  In the Joint Status Report of January 30, 2020, OIP (and BOP) agreed to prioritize two categories of records: those pertaining to "contract awards related to the procurement of pentobarbital" and those pertaining to "requests for information, solicitations, subcontracting leads, and other non-email materials related to the procurement of pentobarbital." Def.'s Stmt. of Material Facts ¶ 50.  OIP then contacted OAG, ODAG, and OASG, and after ascertaining that no hard-copy documents were available, focused the search on email and computer documents.  *Id.* ¶¶ 51–53.[3]

OIP identified the primary point of contact in ODAG for BOP and the lethal injection protocol issue during the relevant time period, *id.* ¶ 59, as well as four officials in OAG and ODAG who were reasonably likely to possess responsive records, *id.* ¶ 60.  OIP then searched the records of all five individuals for key terms related to the FOIA request and pursued additional leads into death penalty and execution protocol communications in the point person's records.  *Id.* ¶¶ 62–63.  Additional leads identified through these and subsequent searches turned up no further responsive records.  *Id.* ¶¶ 68–69.  OIP ultimately released twenty-seven pages of responsive records, including some redactions under FOIA's exemptions, and withheld thirteen full pages.  *Id.* ¶¶ 78–79; *see also* Dkt.  Pl.'s Stmt. of Material Facts ¶¶ 16–17, 19.

The Department filed its motion for summary judgment on November 6, 2020.  Dkt. 17. CREW in turn filed a cross motion for summary judgment and memorandum in opposition to the Department's motion on December 23, 2020.  Dkts. 19–20.  Replies were timely filed.  Dkts. 22–23, 25.  Both parties' motions are now ripe for review.

---

[3] OIP made a preliminary determination that no one at OASG would be reasonably likely to have responsive records, and so did not search the records of an OASG custodian.  *Id*. ¶¶ 55–57.

Here, CREW does not challenge the adequacy of the government's searches for responsive records. *See* Pl.'s Mem. in Supp. of Cross-Mot. for Summ. Judgment at 1 n.1, Dkt. 19. Additionally, the parties have conferred to narrow the scope of their disagreement. *See* Def.'s Notice at 2, Dkt. 28. CREW has conceded the government's application of Exemptions 5, 6, 7(C), and 7(F), except as applied to non-email Record 8. *See id.* at 2; *see also* Def.'s Reply at 3, Dkt. 22. The government has withdrawn its application of Exemptions 5, 6, 7(C), and 7(F) as to Record 8 and its application of Exemption 7(A) as to all documents. *See* Def.'s Notice at 2; Def.'s Reply at 20–21. Because of these concessions and withdrawals, the only issues that remain are the government's applications of FOIA Exemptions 4 and 7(E). *See* Def.'s Notice Ex. 2 (New *Vaughn* Index), Dkt. 28-2.

## II.   LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a federal agency moves for summary judgment in a FOIA case, the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA. *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

To prevail under Rule 56, a federal agency "must prove that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the [FOIA's] inspection requirements." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (citation omitted). The agency "must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents," *Weisberg v. U.S.*

*Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983), and must also explain why any of the

nine enumerated exemptions listed in 5 U.S.C. § 552(b) apply to withheld information, *see*

*Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006); *see also Mobley v. CIA*,

806 F.3d 568, 580 (D.C. Cir. 2015) (agency bears burden of justifying application of exemptions,

"which are exclusive and must be narrowly construed").

"The peculiarities inherent in FOIA litigation, with the responding agencies often in sole

possession of requested records and with information searches conducted only by agency

personnel, have led federal courts to rely on government affidavits to determine whether the

statutory obligations of the FOIA have been met."  *Perry*, 684 F.2d at 126.  Agency affidavits are

entitled to a presumption of good faith, *see SafeCard Servs. v. SEC*, 926 F.2d 1197, 1200

(D.C. Cir. 1991), and a court may grant summary judgment based on an affidavit if it contains

reasonably specific detail and if neither contradictory record evidence nor evidence of bad faith

calls it into question, *see Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215

(D.C. Cir. 2013).  The "vast majority of FOIA cases can be resolved on summary judgment."

*Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

## III.    ANALYSIS

### A.    FOIA Exemption 4

Exemption 4 exempts from disclosure "trade secrets and commercial or financial

information obtained from a person" that are "privileged or confidential."  5 U.S.C. § 552(b)(4).

Both parties agree that the information was "obtained from a person," so the dispute is centered

on (1) whether the information withheld is "commercial" and (2) whether it is "confidential."

*See* Pl.'s Mem. at 20.  The information withheld by the government under this exemption

includes "any information that could lead to the identity of any such individual or company,

including names, titles, department titles, purchase order/reference numbers, account numbers,

contract numbers, phone and fax numbers, web addresses, physical addresses, video conference

ID numbers, IT information, as well as company logos, brochures, quotations, invoices, testing

results, dates of purchase, service, and/or delivery, substance description, item/stock/UPC

numbers, price, quantity, concentration, packaging details, expiration dates, container units, lot

numbers, and product identification numbers," as well as "price and contract term negotiations,

pricing and business strategies, instructions for ordering and purchase, unique order and purchase

requirements, and production and/or testing capability, to include formulas, quantity, timing of

production and/or testing, and specific production/testing methods or standards."  Christenson

Decl. ¶¶ 48–49.  The withheld material also includes "invoices, quotations, and protocols for

third party testing services, as well as test results."  *Id.* ¶ 50.

> 1.  *Commercial*

Because FOIA does not define the term "commercial," the term should "be given [its]

'ordinary meaning.'"  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002)

(quoting *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).

"[T]he term 'commercial' is generally defined to mean 'engaged in commerce' or 'having

reference to, or bearing on commerce.'"  *Pub. Citizen v. U.S. Dep't of Health & Human Servs.*,

975 F. Supp. 2d 81, 101 (D.D.C. 2013) (quoting *Commercial*, New Oxford American Dictionary

341 (2d ed. 2005) ("concerned with or engaged in commerce; making or intending to make a

profit"); *Commercial,* Merriam–Webster's Collegiate Dictionary 231 (10th ed. 1999) ("occupied

with or engaged in commerce or work intended for commerce; viewed with regard to a

profit"); *Commercial Activity,* Black's Law Dictionary 38 (9th ed. 2009) ("An activity, such as

operating a business, conducted to make a profit")).  Information is "'commercial' . . . if, 'in and

of itself,' it serves a 'commercial function' or is of a 'commercial nature.'" *Nat'l Ass'n of Home Builders*, 309 F.3d at 38 (quoting *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978)).

Courts in this circuit have adopted a broad understanding of what information meets this definition. *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290 (declining to confine "commercial" to "records that actually reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business"). For example, customer lists constitute commercial information, *see Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986), as do "selling prices, inventory balances, . . . purchase activity, freight charges," and "costs of goods sold," *Braintree Elec. Light Dep't v. Dep't of Energy*, 494 F. Supp. 287, 289 (D.D.C. 1980); "design recommendations[,] . . . design concepts including methods and procedures," and information on key employees, *Audio Tech. Servs. Ltd. v. Dep't of the Army*, 487 F. Supp. 779, 782 (D.D.C. 1979); health and safety data, *see Pub. Citizen Health Research Grp.*, 704 F.2d at 1290; and general information about an industry's "commercial concerns," its strengths and weaknesses, and recommendations for international trade negotiations, *Baker & Hostetler LLP v. U.S. Dep't of Comm.*, 473 F.3d 312, 319 (D.C. Cir. 2006). The touchstone is whether the disclosure of the contested information "could . . . materially affect[]" the "commercial fortunes" of the business. *Baker & Hostetler*, 473 F.3d at 319 (quoting *Critical Mass Energy Project v. Nuclear Reg. Comm'n*, 830 F.2d 278, 281 (D.C. Cir. 1987), *vacated on other grounds by* 975 F.2d 871 (D.C. Cir. 1992) (en banc)).

Key to this case, "the identities of companies participating" in a government program can also be commercial information depending on the context. *Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.* (*EPIC*), 117 F. Supp. 3d 46, 62–63 (D.D.C. 2015). This court has

explained "that while a company may not always have a commercial interest in its name and identity," the identifying information of corporate contractors "are correctly considered commercial information" when the disclosure of their identity "could have a commercial or financial impact on the companies involved." *Id.* And the court found that condition to be met for corporations participating in a cyber-security pilot program that "monitor[ed] Internet traffic flowing through certain Internet Service Providers . . . from Internet users to a select number of defense contractors." *Id.* at 53; *see id.* at 52, 62–63. This has also been found to be the case for refineries that "claimed disproportionate economic hardship" in a request for an EPA exemption and did not want "competitors and other market participants " to have "key insights into the refinery's financial and competitive position" by knowing it had applied. *Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1, 9 (D.D.C. 2021).

The information that the government has withheld under Exemption 4 fits neatly into this context. Much like the pilot program participants in *EPIC*, the pentobarbital suppliers face a serious risk to their commercial fortunes should the public become aware that they supply the drug to the government. *See* Christenson Decl. ¶ 52. As the Department has explained, private companies that provide drugs for the death penalty "are commonly subject to harassment, threats, and negative publicity leading to commercial decline when" their provision of those drugs "is discovered." *Id.* This is not mere conjecture—the government points to a Texas pharmacy that received this treatment when the public learned that the pharmacy provided lethal injection drugs to the state of Texas. *See id.* ¶¶ 53–55. And the Supreme Court recognized this phenomenon and catalogued how the only American manufacturer of sodium thiopental left the market. *See id.* ¶ 56 (discussing *Glossip v. Gross*, 576 U.S. 863, 869–71 (2015)). The

manufacturers of pentobarbital thus have a credible fear that their businesses could suffer the same fate if their identities were released.

The plaintiff's arguments to the contrary are unavailing.  CREW claims that the government does not sufficiently focus on the impact to the companies of disclosure, but rather discusses the impact on the government's procurement strategy.  *See* Pl.'s Mem. at 22.  The briefest glance at the Christenson Declaration reveals that the Department explains the impact on the businesses.  *See* Christenson Decl. ¶¶ 51–58.  And its explanation is hardly "vague."  Pl.'s Mem. at 22.  The government describes the harassment experienced by a Texas pharmacy and how a manufacturer had to exit an entire drug market as a result of negative publicity surrounding its government contract to provide lethal injection drugs.  *See* Christenson Decl. ¶¶ 53–56.  The competitive harm here is quite clear—revelation of the companies' identity could lead to harassment, cost them business, or force them to exit the pentobarbital market entirely.  This is a "competitive disadvantage to the submitting entity" that "could result" from "disclosure."  *Judicial Watch*, 449 F.3d at 148.

The remainder of the information that the government has withheld under Exemption 4 is clearly commercial in nature, and CREW does not argue otherwise.  Contract terms, strategy, pricing, testing protocols, and the like, *see* Christenson Decl. ¶¶ 49–50, are well within the ambit of information this court has long recognized as "commercial."  *See, e.g.*, *Cornucopia Inst. v. U.S. Dep't of Agric.*, No. 16-cv-148-RC, 2018 WL 4637004, at *11 (D.D.C. Sep. 27, 2018) ("(1) the identities of sourcing inputs; (2) protocols, procedures, and processes used in organic dairy production; (3) farm descriptions and facility descriptions; and (4) production output information"); *Cornucopia Inst. v. Agric. Marketing Serv.*, 312 F. Supp. 3d 85, 93–94 (D.D.C. 2018) (corporations' "organic operation plans"); *100Reporters LLC v. U.S. Dep't of Justice*,

248 F. Supp. 3d 115, 133–38 (D.D.C. 2017) ("(1) the [corporate m]onitor's annual reports and related documents, (2) the [corporate m]onitor's work plans and related documents, and (3) [the company's] internal trainings, presentations, and compliance policies," *id.* at 135); *Braintree Elec. Light Dep't*, 494 F. Supp. at 289 ("selling prices, inventory balances, . . . purchase activity, freight charges," and "costs of goods sold").

Thus, the Court concludes that all the of information that the Department has withheld under Exemption 4 is properly considered "commercial."

   2. *Confidential*

To withhold this information under Exemption 4, the Department must also show that the information is "confidential." *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290. The Supreme Court recently provided guidance as to the definition of "confidential" in the context of FOIA Exemption 4. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019). The Court concluded that "[t]he term confidential" means "private or secret." *Id.* at 2363 (internal quotation marks omitted). The Court went on to describe "two conditions that might be required for information communicated to another to be considered confidential." *Id.* The first condition is that the information is "customarily kept private, or at least closely held, by the person imparting it." *Id.* This means that the information is "known only to a limited few," "not publicly disseminated," or "intended to be held in confidence or kept secret." *Id.* (citations omitted). The second condition is whether "the party receiving [the information] provides some assurance that it will remain secret." *Id.* The Court did not make a holding as to whether both conditions need be met, but it did hold that "[a]t least the first condition has to be," as "it is hard to see how information could be deemed confidential if its owner shares it freely." *Id.*

This Court need not determine whether the second condition is necessary because it has clearly been met. *See, e.g.*, *Flyers Rights Educ. Fund, Inc. v. FAA*, No. 19-3749 (CKK), 2021 WL 4206594, at *7–8 (D.D.C. Sep. 16, 2021) (declining to "determine whether the second prong of *Food Marketing* is mandatory because it is satisfied," *id.* at *8). "[T]he Government has agreed to abide" by the companies' request "that the Government maintain the information as confidential to the greatest extent possible under law." Christenson Decl. ¶ 51. As such, this Court need decide only whether the information withheld was "customarily kept private" by the companies.

In making that determination, the Court looks not at "how the industry as a whole treats the information," but at "how the particular party customarily treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001). The Department has represented that the pentobarbital providers "have typically kept" all of the withheld information "private, have specifically designated the information as proprietary and/or confidential, and have expressly required or requested that the Government maintain the information as confidential to the greatest extent possible under the law." Christenson Decl. ¶ 51. The plaintiff does not argue that companies do not keep the information private, but rather asserts that the Department has not shown that all the withheld information could identify the companies. *See* Pl.'s Mem. at 25–30. But this misunderstands the test.

The question the court must answer under the confidentiality prong is *not* whether any given piece of information could identify the companies, but rather whether the companies keep that information private. Companies need not justify why they keep information confidential; Exemption 4 only requires that they do keep it confidential. And after the Supreme Court overruled *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974),

which had conditioned Exemption 4 on showing "substantial competitive harm," *Food Mktg.*,

139 S. Ct. at 2364–65, this Court declines to read any new requirements into Exemption 4's text.

Here, the Department has represented that the companies do keep this information confidential,

*see* Christenson Decl. ¶ 51, and this declaration is entitled to "a presumption of good faith,"

*SafeCard Servs.*, 926 F.2d at 1200.  CREW has provided nothing that rebuts that presumption.

On this record, that is enough to support the government's withholdings under Exemption 4.[4]

Therefore, the Court concludes that the Department's withholdings under Exemption 4

were proper.

### B.    FOIA Exemption 7(E)

Exemption 7(E) protects "records or information compiled for law enforcement purposes,

but only to the extent that the production of such law enforcement records or information . . .

would disclose techniques and procedures for law enforcement investigations or prosecutions . . .

if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C.

§ 552(b)(7).  The exemption does not ordinarily protect "routine techniques and procedures

already well known to the public."  *Founding Church of Scientology of Washington, D.C. v.*

---

[4]  Section 552(a)(8) of FOIA separately provides that an agency may withhold information under FOIA's exemptions only if "the agency reasonably foresees that disclosure would harm an interest protected by [those exemptions.]"  5 U.S.C. § 552(a)(8)(A)(i)(I).  A withholding that satisfies FOIA's exemptions may not satisfy its harm requirement.  *See Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021); *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020).  Nonetheless, CREW does not raise a section 552(a)(8) challenge to the government's withholdings under Exemption 4.  *See* Pl.'s Mem. at 20–30; Pl.'s Reply at 17–22, Dkt. 25.  Nor does it argue, more generally, that releasing the information withheld under Exemption 4 would be harmless.  *See id.*  In contrast, CREW specifically argues that the government has failed to show foreseeable harm associated with its withholdings under Exemptions 7(A) and 7(E).  *See* Pl.'s Mem. at 16–18.  For this reason, CREW has forfeited any argument that the Exemption 4 withholdings violate section 552(a)(8).  *See, e.g.*, *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (explaining that arguments not raised are forfeited).

*NSA*, 610 F.2d 824, 832 n.67 (D.C. Cir. 1979) (internal quotation marks omitted); *see also*

*Judicial Watch v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004) (citation

omitted).  It does, however, protect "confidential details of . . . program[s]" if only their "general

contours [are] publicly known."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112

(D.C. Cir. 2007) (citing *Blanton v. Dep't of Justice*, 64 Fed. App'x 787, 788–89 (D.C. Cir.

2003) (per curiam)); *see also Shapiro v. DOJ*, 893 F.3d 796, 801 (D.C. Cir. 2018) (permitting the

government to withhold documents that would disclose the way in which the FBI uses a

particular publicly known database).  In this Circuit, Exemption 7(E) applies if the disclosure of

information related to even "commonly known procedures" could "reduce or nullify their

effectiveness."  *Vazquez v. Dep't of Justice*, 887 F. Supp. 2d 114, 116 (D.D.C. 2012) (internal

quotation marks omitted), *aff'd*, No. 13-5197, 2013 WL 6818207 (D.C. Cir. Dec. 18, 2013)

(per curiam).

        To withhold records under Exemption 7, the agency first must show that the withheld

information was "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  Although

plaintiffs take a very narrow view of this language, *see* Pl.'s Mem. at 8–10, the D.C. Circuit has

explained that "enforcement of the law fairly includes . . . the detection and *punishment* of

violations of law."  *Mittleman v. Office of Personnel Mgmt.*, 76 F.3d 1240, 1243 (D.C. Cir. 1996)

(per curiam) (internal quotations and citations omitted) (emphasis added).  The Department has

invoked Exemption 7(E) "to withhold information describing the guidelines, techniques and

procedures used to obtain Pentobarbital," which it does as part of its mandate to "implement[]

federal death sentences."  Christenson Decl. ¶ 127.  The effectuation of the death penalty is

unquestionably a punishment for violating the law.

Second, to meet the specific requirements of Exemption 7(E), the Department must show that the withheld records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. 5 U.S.C. § 552(b)(7).  Relevant here, the withholdings must be "techniques and procedures," and those must relate to "investigations or prosecutions."  From the Department's declaration, it is facially clear that the withheld records satisfy the first part of this exemption—that they be "techniques and procedures."  *See* Christenson Decl. ¶ 127 (explaining that the exemption was applied to withhold "the guidelines, techniques, and procedures used to obtain Pentobarbital").

These "techniques and procedures," however, have nothing to do with "law enforcement investigations or prosecutions."  Take first "investigation."  An investigation is an inquiry to discern a truth about the world.  *See, e.g.*, Black's Law Dictionary (11th ed. 2019) ("trying to find out the truth about something, such as a crime, accident, or historical issue; . . . an authoritative inquiry into certain facts[;] . . . or a systematic examination of some intellectual problem or empirical question"); Oxford English Dictionary (3d ed. 2019) ("examination; inquiry; research"); Webster's Third New International Dictionary 1189 (2002) ("detailed examination" or "searching inquiry"); Ballentine's Law Dictionary 662 (3d ed. 1969) ("an inquiry, judicial or otherwise, for the discovery and collection of facts concerning a certain matter or matters"); New Oxford American Dictionary (3d ed. 2015) ("formal or systematic examination or research"); *see also Investigate*, Merriam Webster's Collegiate Dictionary 616 (10th ed. 1999) ("to observe or study by close examination and systematic inquiry").

This meaning is reflected through common legal usage.  A grand jury is said to investigate potential criminal wrongdoing.  *See, e.g.*, *Lopez v. Dep't of Justice*, 393 F.3d 1345,

1347 (D.C. Cir. 2005) (examining drug crimes and money laundering).  An independent counsel is also said to investigate such wrongdoing.  *See, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 667 (1988) (discussing what the independent counsel had jurisdiction "to investigate").  And, unsurprisingly, the Federal Bureau of *Investigation* is also said to investigate the same.  *See, e.g.*, *Blackwell v. FBI*, 646 F.3d 37, 41–42 (D.C. Cir. 2011) (Kavanaugh, J.) (explaining that the FBI's techniques for procedures of forensic computer examination were "undoubtedly 'techniques' or 'procedures' used for 'law enforcement investigations'").  Altogether, these fit squarely into the mold of attempts to discern some truth about the world.

Take next "prosecution."  In this context, the most natural meaning of prosecution is a kind of court proceeding.  *See, e.g.*, Black's Law Dictionary ("A criminal proceeding in which an accused person is tried."); Oxford English Dictionary ("The instituting and conducting of legal proceedings against a person or persons in respect of a criminal charge[.]"); Webster's Third New International Dictionary 1820 ("the institution and carrying on of a suit or proceeding in a court of law or equity to obtain or enforce some right or to redress and punish some wrong"); Ballentine's Law Dictionary 1014 ("a criminal proceeding at the suit of the government"); Merriam Webster's Collegiate Dictionary 937 ("the institution and continuance of a criminal suit involving the process of pursuing formal charges against an offender to final judgment"); New Oxford American Dictionary ("the institution and conducting of legal proceedings against someone in respect of a criminal charge").  As Merriam Webster helpfully explains, this proceeding is complete at final judgment.

Here too, this meaning is reflected in common legal usage.  For example, the common law tort of malicious prosecution requires the "initiation or procurement of a criminal proceeding."  *Moore v. United States*, 213 F.3d 705, 710 (D.C. Cir. 2000).  As the Supreme

Court has explained, "[t]he term 'prosecution' clearly imports a beginning and an end." *Bradley v. United States*, 410 U.S. 605, 609 (1973).  In discussing undue governmental delay, the Supreme Court has said that prosecution begins when the defendant is formally "accused." *United States v. Marion*, 404 U.S. 307, 313 (1971).  This separates prosecution from investigation.  On the other side, "a prosecution terminates only when sentence is imposed." *Bradley*, 410 U.S. at 609; *see also Berman v. United States*, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case means sentence.  The sentence is the judgment." (citing *Miller v. Aderhold*, 288 U.S. 206, 210 (1933), and *Hill v. United States ex rel Wampler*, 298 U.S. 460, 464 (1936)).  This separates it from punishment.  In the FOIA context, records held by a U.S. Attorney's Office often relate to a criminal prosecution.  *See, e.g.*, *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 761 (D.C. Cir. 2000) (discussing prisoner's request for records compiled by the U.S. Attorney's Office in connection with his own prosecution).  All this fits neatly into what any native English speaker would understand "prosecution" to entail—a court proceeding that begins with a complaint, information, or indictment and ends with sentencing.

So explained, it is clear that what the Bureau of Prisons does in this context is neither an investigation nor a prosecution.  Its procurement of Pentobarbital to effect a punishment is a distinct phase in the broader scheme of law enforcement.  And "techniques and procedures" for punishment are not mentioned in the statute.

The Department fails to grapple with the text of the statute and focuses instead on whether disclosure creates a "risk of circumvention of the law," Defs.' Mem. at 31–32; Defs.' Reply at 12–13, and whether the procedures were described with sufficient specificity, Defs.' Reply at 10–11.  At most, that is a second-order concern.  "Statutory interpretation," the Supreme Court "always say[s], begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856

(2016).  Here, "as it turns out, it is not necessary to go any further."  *Babb v. Wilkie*, 140 S. Ct.
1168, 1172 (2020).  The plain meaning of the Exemption 7(E) covers the investigation and
prosecution phases of the criminal process but not the punishment phase.

For the reasons above, the Department's challenged withholdings under Exemption 7(E)
were improper.  Accordingly, the Department must disclose the two records it withheld under
Exemption 7(E), subject to any redactions that are proper under Exemption 4.

## CONCLUSION

For the foregoing reasons, the plaintiff's Motion for Summary Judgment is granted in
part and denied in part and the defendant's Cross-Motion for Summary Judgment is granted in
part and denied in part.  A separate order consistent with this decision accompanies this
memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

September 30, 2021