UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR ETHICS AND RESPONSIBILITY IN WASHINGTON, *Plaintiff,* v. U.S. DEPARTMENT OF JUSTICE, *Defendant.* | Civil Action No. 19-3626 (DLF) |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    A.    The Federal Execution Protocol and Related Litigation ......................................... 2

    B.    Procedural History ................................................................................................. 3

ARGUMENT ....................................................................................................................... 7

I.      THE CONTRACTORS' NAMES ARE COMMERCIAL. ................................................ 7

    A.    The Names of the Contractors Here are Intrinsically Commercial ....................... 8

    B.    The Contractors' Names Represent that the Contractors Participate in the
            Supply of Pentobarbital to the Government ......................................................... 11

II.    DISCLOSING THE REDACTED CONTRACT TERMS WILL REVEAL
      "CONFIDENTIAL" INFORMATION ............................................................................ 15

CONCLUSION ................................................................................................................... 19

# AUTHORITIES

## Cases

*Am. Mgmt. Servs., LLC v. Dep't of the Army*,
  842 F. Supp. 2d 859 (E.D. Va. 2012) ................................................................. 10

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
  473 F.3d 312 (D.C. Cir. 2006) ........................................................... 7, 8, 9, 14

*Bd. of Trade of City of Chicago v. CFTC*,
  627 F.2d 392 (D.C. Cir. 1980)*, abrogated on other grounds by U.S Dep't of State v.*
  *Washington Post Co.,* 456 U.S 595 (1982) ............................................... 8

*\*CREW v. DOJ*,
  58 F.4th 1255 (D.C. Cir. 2023) ......................................................... *passim*

*CREW v. DOJ*,
  567 F. Supp. 3d 204 (D.D.C. 2021),
  *rev'd and remanded,* 58 F.4th 1255 (D.C Cir. 2023) ........................... 4, 5

*Critical Mass Energy Project  v. Nuclear Regul. Comm'n*,
  975 F.2d 871 (D.C. Cir. 1992) ............................................................... 8

*Donnell v. Herring-Hall-Marvin Safe Co.*,
  208 U.S. 267 (1908) .............................................................................. 10

*Food Mktg. Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019) .......................................................................... 15

*Greenberg v. FDA*,
  803 F.2d 1213 (D.C. Cir. 1986) ........................................................... 14

*Johnson v. Exec. Off. for U.S. Att'ys*,
  310 F.3d 771 (D.C. Cir. 2002) ............................................................. 14

*Motschenbacher v. R. J. Reynolds Tobacco Co.*,
  498 F.2d 821 (9th Cir. 1974) ............................................................... 10

*National Ass'n of Home Builders v. Norton*,
  309 F.3d 26 (D.C. Cir. 2002) ......................................................... *passim*

*Nat'l Parks & Conservation Ass'n v. Morton*,
  498 F.2d 765 (D.C. Cir. 1974)*, abrogated on other grounds by Food Mktg. Inst. v. Argus*
  *Leader Media*, 139 S. Ct. 2356 (2019) ................................................ 8

*Pub. Citizen Health Rsch. Grp. v. FDA*,
  704 F.2d 1280 (D.C. Cir. 1983) ................................................ 8, 12, 13

*Wolfe v. HHS*,
  839 F.2d 768 (D.C. Cir. 1988) .................................................................................. 10

**Statutes**

5 U.S.C. § 552 ............................................................................................................. 1, 14

21 U.S.C. § 353b ....................................................................................................... 16, 17

**Legislative Materials**

H.R. Rep. No. 89-1497 (1966), *as reprinted in* 1966 U.S.C.C.A.N 2418 ................................... 14

S. Rep. No. 89-813 (1965) ................................................................................................ 14

**Administrative and Executive Materials**

28 C.F.R. § 26.3(a)(1993) .................................................................................................. 2

# **INTRODUCTION**

This Freedom of Information Act ("FOIA") litigation returns to this Court following remand by the D.C. Circuit.  Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks information regarding the Federal Bureau of Prison's ("BOP") procurement of pentobarbital for use in federal executions.  Compl. ¶ 13, ECF No. 1.  The government withheld many responsive records based in part on the ground that such records were exempt from disclosure under Exemption 4, which protects, among other things, confidential commercial information.  5 U.S.C. § 552(b)(4).

In particular, the government properly withheld under Exemption 4 the names of the contractors involved in the supply of pentobarbital to the government and the contract terms that could identify those contractors.  The D.C. Circuit remanded on two narrow questions related to the government's application of Exemption 4 to information that could identify the contractors that supplied it with pentobarbital for use in lethal injections: (1) whether the names of the contractors are "commercial"; and (2) whether the contract terms are identifying such that they are "confidential."

The contractors' names are commercial because the names are necessary for them to conduct business, especially with the government, and because they hold intrinsic market value as brands and trademarks.  The contractors' names are also commercial because in this context they represent, in and of themselves, that the contractors participate in the commercial supply of pentobarbital to the government.

Moreover, the contract terms are confidential because they can be cross-referenced with other information in the public domain to identify the contractors' confidential identities.  Indeed, a 2020 news article attempted to do just that in allegedly identifying three laboratories involved in testing pentobarbital for lethal injection purposes based on the redacted administrative record filed

1

in a separate case.  The government properly withheld the contract terms given the risk that an individual could use the contract terms to identify—or purport to identify—the contractors.

## BACKGROUND

### A.    The Federal Execution Protocol and Related Litigation

BOP is tasked with setting the date, time, place, and method of executions for carrying out federal death sentences.  Decl. of Kara Christenson ¶ 68, ECF No. 17-4 ("1st Christenson Decl.") (citing 28 C.F.R. § 26.3(a) (1993)).  Between 1964 and 2019, BOP exercised these responsibilities for only three executions: those of Timothy McVeigh and Juan Garza in 2001, and of Louis Jones in 2003.  *Id.* ¶ 69.

Beginning in 2005, some condemned federal inmates began filing civil actions in this district alleging that BOP's lethal-injection protocol using a combination of three drugs—sodium thiopental, pancuronium bromide, and potassium chloride—violated the United States Constitution and federal statutes.  *Id.* ¶ 70 (citing *Roane v. Gonzales*, No. 05-cv-2337 (D.D.C. filed Dec. 6, 2005); *Robinson v. Mukasey*, No. 07-cv-2145 (D.D.C. filed Nov. 28, 2007); *Bourgeois v. DOJ*, No. 12-cv-0782 (D.D.C. filed May 15, 2012); *Fulks v. DOJ*, No. 13-cv-0938 (D.D.C. filed June 21, 2013)).  On March 4, 2011, the Department of Justice announced that, at that time, it did "not have any reserves of sodium thiopental for lethal injections."  1st Christenson Decl. ¶ 71.  As a result, the cases challenging the execution protocol were stayed pending the issuance of a revised protocol.  *Id.* ¶ 72.

About eight years later, on July 25, 2019, the Department of Justice announced the adoption of an addendum to the execution protocol that replaced the three-drug procedure with one involving a single drug: pentobarbital.  1st Christenson Decl. ¶ 73 & Ex. K at 1.  The Department of Justice resumed carrying out executions following the announcement of the new protocol, which

generated intense litigation.  *Id.* ¶¶ 73–78; *see In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-0145 (D.D.C.).

On July 1, 2021, Attorney General Merrick B. Garland announced that the Department of Justice would review its policies and procedures for federal executions, including the addendum instituting the single-drug procedure using pentobarbital.  *See* Att'y Gen. Merrick Garland, *Moratorium on Federal Executions Pending Review of Policies and Procedures* (July 1, 2021), https://perma.cc/DP8Z-28CM.  The Attorney General directed the Office of Legal Policy, which would spearhead the review, to take into account "important questions about [the Department of Justice's] responsibility to treat individuals humanely and avoid unnecessary pain and suffering." *Id.* at 1.  In the meantime, the Attorney General directed that "[n]o federal executions will be scheduled during the pendency of these reviews" and directed BOP to "suspend the use of the Addendum" until further notice.  *Id.*

Following this announcement and pursuant to a stipulation by the parties, the litigation over the federal execution protocol was stayed.  *See* Min. Order, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-0145 (D.D.C. Sept. 8, 2021).  The parties have been filing periodic status reports in that case.  Most recently, on June 5, 2023, the parties filed a status report in which the Department of Justice informed the court that its review of the execution protocol remains ongoing and that there is no anticipated date when it will be complete.  Jt. Status Rep., *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-0145 (D.D.C. June 5, 2023), ECF No. 442.

### B.    Procedural History

BOP received a FOIA request from CREW on August 8, 2019.  1st Christenson Decl. ¶ 11. That request sought "all records from February 14, 2019 to the present related to the procurement

of pentobarbital, pentobarbital sodium, or Nembutal [a brand name for pentobarbital] to be used in federal executions, including without limitation any notifications to or communications with vendors, solicitation information, requests for information, subcontracting leads, and contract awards." *Id.* & Ex. A.  BOP promptly acknowledged receipt of the request and began processing it. *Id.* ¶ 12 & Ex. B.  Initially, BOP informed CREW that any information responsive to the request would be categorically exempt under FOIA Exemptions 5, 6, and 7. *Id.* ¶ 14 & Ex. C.  CREW administratively appealed that determination. *Id.* ¶ 15.

When it did not receive a timely decision on its appeal, CREW filed this lawsuit. *Id.*  Over the following months, BOP undertook a search for records responsive to the FOIA request and released some information to CREW, while withholding or redacting other information that it claimed to be exempt. *See CREW v. DOJ*, 567 F. Supp. 3d 204, 208–09 (D.D.C. 2021), *rev'd and remanded,* 58 F.4th 1255 (D.C. Cir. 2023).  The parties then cross-moved for summary judgment.  Over the course of briefing those motions, the parties narrowed their dispute to only the government's application of Exemptions 4 and 7(E). *Id.* at 209–10.

This Court sided with the government on Exemption 4.  It concluded that the identities of the government's pentobarbital suppliers constituted "commercial" information under Exemption 4 because the contractors "face a serious risk to their commercial fortunes should the public become aware that they supply the drug to the government." *Id.* at 212.  The Court also noted that the redacted contract terms were "clearly commercial in nature" and that "CREW does not argue otherwise." *Id.* at 212–13.  It held that any information that the contractors keep private is "confidential" within the meaning of Exemption 4 regardless of whether that information would identify the contractors. *Id.* at 214.  And the Court accepted the representation in the government's declaration that the companies do indeed keep the redacted information private. *Id.*

4

The Court rejected, however, the government's application of Exemption 7(E), concluding that the procurement of pentobarbital does not constitute a law enforcement "technique or procedure." *Id.* at 214–17.  It therefore ordered the government to disclose the two records that it had withheld under Exemption 7(E).  *Id.* at 217.  The government has done so.

CREW appealed, and the D.C. Circuit reversed and remanded.  *CREW v. DOJ*, 58 F.4th 1255 (D.C. Cir. 2023).  The issues on appeal were (1) whether the government had properly explained how information that could identify its pentobarbital suppliers was confidential commercial information and (2) whether the government had waived Exemption 4 by publicly disclosing certain information.  *Id.* at 1261.  On the first point, the court concluded that the government had yet to adequately show that the names of its contractors or the contract terms that could identify those contractors were covered by Exemption 4.

As to the names, the court acknowledged that CREW did not dispute that they would reveal "confidential" information, only whether they would reveal "commercial" information.  *Id.* at 1263.  The court agreed with CREW that the government had not done enough to make such a showing.  It particularly faulted the government for focusing on the commercial consequences of disclosing the withheld information rather than the commercial nature of the withheld information in and of itself.  *Id.* at 1263–69; *see also id.* at 1268 ("[W]e reaffirm that withheld information must be commercial in and of itself to qualify for withholding under Exemption 4; that disclosure might cause commercial repercussions does not suffice to show that information is 'commercial' under Exemption 4.").  The court remanded for further proceedings on this topic.

With regard to the contract terms, the court observed that CREW did not dispute that the terms were "commercial" in nature, only whether they were "confidential."  *Id.* at 1269.  The court determined that the government "did not seek to show the confidentiality of the contract terms"

independently, but rather "predicated its claim of confidentiality wholly on their potential to identify the contractors." *Id.* at 1270.  Accordingly, "[b]ecause the [government] chose to structure its exemption claim in two steps—that is, asserting first that the contractors keep identifying information private and second that the contract terms are identifying—particular contract terms are appropriately withheld under Exemption 4 only to the extent both steps have been demonstrated." *Id.* at 1270–71.  The court concluded that the government had failed to provide a detailed showing that the withheld information "could in fact reveal the identities of [BOP]'s pentobarbital contractors" and remanded for it to attempt to do so.  *Id.* at 1271.

Finally, on the topic of waiver, the court deferred.  It noted that CREW bears the burden of proving waiver but that the existing record did not permit the court to reach a conclusion on the topic.  *Id.* at 1271–72.  It therefore remanded to this Court to inquire "what specific expiration dates and drug concentrations have been publicly released and whether records containing those very same dates and concentrations are still being withheld because they include that information." *Id.* at 1272.  Because CREW bears the burden, the government does not address waiver in this motion and instead leaves the issue to CREW to raise and argue it in its cross-motion, if it so chooses.

Judge Sentelle concurred in the judgment.  He wrote separately to state that the commercial nature of a company's name "can vary depending upon how the question is phrased." *Id.* at 1272 (Sentelle, J., concurring).  He noted that the question could be reframed as "Can the identity of a party to a contract be commercial information?" *Id.*  And he observed that "the companies' contractual obligation to provide the Bureau of Prisons with lethal injection drugs 'pertains to the exchange of goods . . . or the making of a profit.'" *Id.* (quoting majority opinion).  Judge Sentelle

expressed "hope that full examination of the evidence with respect to this claimed exemption would be undertaken on remand." *Id.* at 1273.

## **ARGUMENT**

The D.C. Circuit remanded on two narrow questions related to the government's application of Exemption 4 to information that could identify the contractors that supplied it with pentobarbital for use in lethal injections: (1) whether the names of the contractors are "commercial"; and (2) whether the contract terms are identifying such that they are "confidential."

## I.  **THE CONTRACTORS' NAMES ARE COMMERCIAL.**

Because FOIA does not define the term "commercial," courts give the term its ordinary meaning. *See National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002).  In light of contemporaneous dictionary definitions defining "commercial" as "[r]elating to or connected with . . . commerce in general," *Commercial*, Black's Law Dictionary (rev. 4th ed. 1968), this Court has determined that the term "commercial" "reaches . . . broadly," *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  Thus, information is "commercial" if it "demonstrably pertains to the exchange of goods or services or the making of a profit." *CREW*, 58 F.4th at 1265 (quoting *Norton*, 309 F.3d at 38).  The D.C. Circuit has clarified that the "information must be commercial 'in and of itself,' meaning it 'serves a commercial function or is of a commercial nature.'" *CREW*, 58 F.4th at 1263 (quoting *Norton*, 309 F.3d at 38) (internal quotations omitted).

That "broad[]" definition, *Baker & Hostetler LLP*, 473 F.3d at 319, is consistent with the purpose of Exemption 4.  Exemption 4 protects the interests of both the government and the submitter of the information by encouraging submitters to provide the government with accurate, reliable information and assuring submitters that such information will be safeguarded. *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 767–70 (D.C. Cir. 1974), *abrogated*

*on other grounds by Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) (concluding

that the legislative history of FOIA "firmly supports an inference that [Exemption 4] is intended

for the benefit of persons who supply information as well as the agencies which gather it"); *Critical*

*Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992); *Bd. of Trade*

*of City of Chi. v. CFTC*, 627 F.2d 392, 406 (D.C. Cir. 1980) (noting "the unmistakable

congressional purpose of avoiding impairment of the Government's ability to obtain necessary

information"), *abrogated on other grounds by U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595

(1982).

Thus, "commercial" information "paradigmatically" includes information that "actually

reveal[s] basic commercial operations, such as sales statistics, profits and losses, and inventories,"

and information "[that] relate[s] to the income-producing aspects of a business." *CREW*, 58 F.4th

at 1263 (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).

It also includes information in which the provider "has a commercial interest," such as "a firm's

data or reports on its commercial service or its product's favorable or unfavorable attributes." *Id.*

at 1263, 1265 (quoting *Baker & Hostetler LLP*, 473 F.3d at 319). And although information is not

commercial merely because its public disclosure "could inflict commercial harm," *id.* at 1264,

such potential commercial harm can help "confirm[] . . . the commercial or noncommercial nature

of the information," *id.* at 1268.

Here, the names of the contractors are commercial both because they allow the contractors

to contract with the government and they hold intrinsic commercial value, and because they

represent particular information regarding the contractors' commercial operations.

### A.    The Names of the Contractors Here are Intrinsically Commercial.

The names of the contractors are commercial in and of themselves because they "serve[] a

commercial function" and "[are] of a commercial nature." *Id.* 1263 (quoting *Norton*, 309 F.3d at

38). As the newly submitted declarations from two of the contractors reflect, these specific contractors' company names are necessary for their involvement in the exchange of goods and services—especially with the government—and hold intrinsic value.

The contractors here each use their respective company names to conduct business and thus have a "commercial interest" in those names. *Id.* at 1263 (quoting *Baker & Hostetler LLP*, 473 F.3d at 319). A company name is a prerequisite for any person or entity wishing to conduct business as a company and engage in profit-making activities. Ex. D, Decl. of Joel E. Lesch ¶ 13. A company must generally register its company name with federal and state regulatory agencies before it is able to conduct business in a particular state. *Id.* ¶¶ 14–16. That company name is subsequently required to obtain a federal tax identification number (which in turn is a prerequisite for many other legal and regulatory requirements for conducting business), open a bank account, obtain insurance, and enter in into written contracts. *Id.* ¶¶ 17–20.

Moreover, any company wishing to commercially contract with the federal government must register their company name in the federal government's System for Award Management ("SAM"). *See* Ex. A, Decl. of Kara Christenson ¶ 5 ("2nd Christenson Decl."). As the contractors' declarations submitted in response to the D.C. Circuit's remand make clear, the names under which at least Contractor 1 and Contractor 2 entered into commercial agreements with the government here are the same trade names under which they are registered in a particular state to conduct all business. *See* Ex. B, Contractor 1 Decl. ¶¶ 4–5; Ex. C, Contractor 2 Decl. ¶ 5.[1] The contractors'

---

[1] The contractor declarations have been submitted as exhibits hereto in redacted form to withhold any information that could be identifying. Partially redacted versions—which redact only the names and addresses of the contractors as well as the names and any past dates of employment of their employees—have been submitted to this Court for *ex parte*, *in camera* review. *See, e.g.*, *Wolfe v. HHS*, 839 F.2d 768, 771 n.3 (D.C. Cir. 1988) (en banc) ("Where the index itself would reveal significant aspects of the deliberative process, this court has not hesitated to limit consideration of the Vaughn index to in camera inspection."); *Am. Mgmt. Servs., LLC v. Dep't of*

names therefore serve the "'commercial function,'" *CREW*, 58 F.4th at 1263 (quoting *Norton*, 309 F.3d at 38), of identifying them each as an entity authorized to engage in commercial activity in general and with the government specifically, *see* Ex. A, 2nd Christenson Decl. ¶ 5. Without those names, the contractors could not engage in profit-making activities, especially with the government.

The contractors' names also hold intrinsic market value based on their associated reputation and brand. Ex. D, Lesch Decl. ¶¶ 21–25. A name alone can have significant effect on a company's profitability and value. *Id.* ¶¶ 26–38; *see also Donnell v. Herring-Hall-Marvin Safe Co.*, 208 U.S. 267, 272 (1908) (explaining that the "name" Hall had "commercial value as an advertisement even when divorced from the notion of succession in business, a sort of general good will, owing to its long association with superior work"); *Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498 F.2d 821, 824 n.10 (9th Cir. 1974) ("It would be wholly unrealistic to deny that a name[] . . . can have commercial value."). The contractors' newly submitted declarations here establish that they have cultivated public goodwill around these names, which represents significant market value. Contractor 2 has spent many years "investing in the company's brand and reputation," Ex. C, Contractor 2 Decl. ¶ 6, and Contractor 1 credits "an incalculable commercial value" associated with its name, Ex. B, Contractor 1 Decl. ¶ 7. The contractors' names are thus "intrinsically valuable" in and of themselves. *CREW*, 58 F.4th at 1263.

Moreover, the trademarks associated with the contractors' names have market value based on the brand and values they represent. Trademarks can have substantial market value. Ex. D,

---

*the Army*, 842 F. Supp. 2d 859, 874 (E.D. Va. 2012) (finding in camera inspection appropriate for records withheld under deliberative process privilege because any additional detail in publicly filed Vaughn Index could undermine deliberative processes protected by Exemption 5). Defendant offers the Court the opportunity to view the fully unredacted versions of the declarations in person upon request.

Lesch Decl. ¶¶ 26–29.  Trademarks and trademarked names are highly protected and can be used to achieve injunctive relief and monetary damages against a trademark infringer attempting to use the company name and brand for their own financial gain.  *Id.* ¶ 25.  A company name thus inherently "pertains to the exchange of goods or services [and] the making of a profit."  *CREW*, 58 F.4th at 1265.  At least three of the contractors have company names that are trademarked and are therefore commercial property in and of themselves.  Ex. A, 2nd Christenson Decl. ¶ 6; Ex. B, Contractor 1 Decl. ¶ 6.

Accordingly, the contractors' names are commercial information.

**B.     The Contractors' Names Represent that the Contractors Participate in the Supply of Pentobarbital to the Government.**

The contractors' names are commercial in the context of the requested records because they represent, in and of themselves, that the contractors are involved in the commercial supply of pentobarbital to the government for lethal injection purposes.  Pursuant to the government's segregability obligations, redacting only the contractors' names (and additional identifying information) served the purpose of withholding that commercial information.  The contractors' names are thus commercial in nature not simply because disclosure could inflict commercial harm upon the contractors, but because the contractors' names represent this commercial information about the contractors.

Preliminarily, the contractors' involvement in the supply of pentobarbital to the government for lethal injection purposes is plainly commercial.  The government entered into contracts for the contractors' services and products related to the commercial manufacturing, compounding, and testing of pentobarbital to be used for lethal injection purposes.  *See* Ex. A, 2nd Decl. of Kara Christenson ¶ 4.  Such contracts axiomatically "pertain[] to the exchange of goods or services [and] the making of a profit."  *CREW*, 58 F.4th at 1265; *see also id.* at 1272 (Sentelle, J.,

concurring) ("[T]he companies' contractual obligation to provide the Bureau of Prisons with lethal injection drugs 'pertains to the exchange of goods . . . or the making of a profit.'" (quoting majority opinion)).   In other words, the relevant contracts establish the "basic commercial operation[al]" fact that the contractors are engaged in the commercial manufacturing, compounding, or testing of pentobarbital for use in lethal injections.   *Pub. Citizen*, 704 F.2d at 1290.   The fact that a company is engaged in a particular commercial operation is no less commercial than "a firm's data or reports on its commercial service."   *CREW*, 58 F.4th at 1265.   Indeed, CREW did not contest on appeal that the redacted contract terms themselves were commercial in nature.   *See id.* at 1262.   And while the court of appeals outlined "various reasons, not all of them commercial" for companies to make decisions regarding participation in the lethal-injection drug market, *CREW*, 58 F.4th at 1267, the newly submitted declarations from two of the contractors reflect that their transactions were conducted for commercial reasons, *see* Ex. B, Contractor 1 Decl. ¶ 4; Ex. C, Contractor 2 Decl. ¶ 4.

The commercial nature of the contractors' names in this context is established by the commercial nature of the contracts at issue.   These pentobarbital contracts stand in contrast to contracts that are noncommercial in nature.   For example, in *National Association of Homebuilders v. Norton*, the D.C. Circuit held that owl-sighting data created via a "partnership between the U.S. Fish and Wildlife Services and a state agency" was noncommercial because that "data exchange did 'not constitute a commercial transaction in the ordinary sense.'"   *CREW*, 58 F.4th at 1265 (quoting *Norton*, 309 F.3d at 38–39).   Although the data exchange was pursuant to a "government-to-government cooperative agreement," the data was provided not in pursuit of commercial goals but rather only as a condition of receipt of federal funds.   *Norton*, 309 F.3d at 38–39.   Logically, the "cooperative agreement" under which that noncommercial data was provided must also be

noncommercial in nature.  The noncommercial nature of that kind of "quid-pro-quo" contract, *see id.*, highlights the commercial nature of the contracts to supply pentobarbital to the government. Similarly, contracts to settle litigation, pay attorney's fees to a prevailing party in litigation, or submit to binding arbitration also do not necessarily "pertain to the exchange of goods or services or the making of a profit," *CREW*, 58 F.4th at 1265, and the names of the parties to such contracts thus may not constitute commercial information.  But the contracts at issue here bear no resemblance to such agreements and are plainly commercial.

Given the plainly commercial nature of the contracts, the contractors' names themselves are commercial because they necessarily establish that the contractors are party to those contracts. CREW's FOIA request was expressly cabined to records "related to the [government's] procurement of pentobarbital . . . to be used in federal executions."  1st Christenson Decl. ¶ 11. The contractors conducted business with the government under the same respective company names that have been redacted from the responsive records.  *See* Ex. A, 2nd Christenson Decl. ¶¶ 4–5.  Thus, the contractors' names alone, as they appear in the requested documents, represent that those contractors assisted the government with "the procurement of pentobarbital . . . to be used in federal executions."  1st Christenson Decl. ¶ 11; *see also* Ex. A, 2nd Christenson Decl. ¶ 7. In other words, disclosing the names of the contractors alongside the other commercial information in the records "actually reveal[s] basic commercial operations" about the contractors—that they are engaged in the manufacturing, compounding, or testing of pentobarbital for use in lethal injections, and that they commercially contract with the government for this activity.  *CREW*, 58 F.4th at 1263 (quoting *Pub. Citizen*, 704 F.2d at 1290).  Indeed, as Judge Sentelle wrote in concurrence on appeal, the commercial nature of a company's name "can vary depending on how the question is phrased," and the question here could be reframed as "Can the identity of a party

13

to a contract be commercial information?"  *CREW*, 58 F.4th at 1272 (Sentelle, J., concurring). Given the commercial nature of these contracts, the identity of the parties to those contracts is plainly commercial.

The contractors' names in this context also represent that these particular contractors count the government as a commercial customer.  The D.C. Circuit has confirmed that information such as "customer lists" is "intrinsically" commercial.  *Id.* at 1263 (quoting S. Rep. No. 89-813, at 9 (1965); H.R. Rep. No. 89-1497, at 10 (1966), *as reprinted in* 1966 U.S.C.C.A.N 2418, 2427); *see also Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986).  That a particular contractor counts the government as a customer is valuable proprietary information important to the contractors' position in the marketplace and in which the contractors have "'a commercial interest.'"  *CREW*, 58 F.4th at 1263 (quoting *Baker & Hostetler LLP*, 473 F.3d at 319).  The commercial harm that will redound to the contractors upon disclosure confirms the commercial nature of that information.  *See id.* at 1268; *see also* 1st Christenson Decl. ¶¶ 52–59.

Finally, while the government redacted only the contractor names, pursuant to the government's segregability obligations under FOIA, those redactions represent the minimum redaction necessary to prevent disclosure of the exempt information in the context of the narrow FOIA request.  *See Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA § 552(b) requires that even if some materials from the requested record are exempt from disclosure, any 'reasonably segregable' information from those documents must be disclosed after redaction of the exempt information unless the exempt portions are 'inextricably intertwined with exempt portions.'" (quoting 5 U.S.C. § 552(b))).

Accordingly, the contractors' names are commercial information in this context because they in and of themselves represent that the contractors are party to commercial contracts with the government involving the supply of pentobarbital for use in lethal injections.

## II.    DISCLOSING THE REDACTED CONTRACT TERMS WILL REVEAL "CONFIDENTIAL" INFORMATION.

The redacted contract terms, if revealed, could be cross-referenced with other information in the public domain to identify the contractors' confidential identities.  The Supreme Court explained in *Argus Leader* that "commercial or financial" information is considered "confidential" pursuant to Exemption 4 "[a]t least where [it] is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).  CREW has conceded that the contract terms are commercial and contest only whether they are confidential.  CREW has also conceded that the information was provided to the government under an assurance of privacy and thus the only issue is whether the contract terms are "customarily and actually treated as private by [the contractors]." *Id*.  And CREW further concedes that any information that could identify the contractors is confidential.  Thus, to establish that the contract terms are confidential, the D.C. Circuit held on appeal that the government need show only "that the contract terms could in fact reveal the identities of [BOP]'s pentobarbital contractors." *CREW*, 58 F.4th at 1271.[2]

The contract terms could be used to identify the contractors "if combined with or compared to other non-exempt information within the records, or with other information already available in

---

[2]    The government also maintains, consistent with the government's position in prior briefing before this Court and before the D.C. Circuit, that the contract terms are confidential regardless of whether they in fact reveal the identity of the contractors because pentobarbital contractors have customarily kept this information confidential and their justification for doing so is not relevant. *See* Def.'s Mot. for Summary J., ECF No. 17-1 at 37–38; Br. for Appellee, *CREW v. DOJ*, No. 21-5276 (D.C. Cir.), at 37–40.

the public domain." 2nd Christenson Decl. ¶¶ 8–9.  The government redacted certain contract terms—including drug prices, quantities, expiration dates, invoices, container units, lot numbers, purchase orders and reference numbers, substance descriptions, drug concentrations, and dates of purchase, service, and/or delivery—to keep confidential the identities of the contractors and thus the scope of the contractors' commercial activities regarding the supply of pentobarbital to the government.[3]  *See id*. For example, an individual could cross-reference these contract terms with publicly available information from government filings, the FDA's 503B registration database, DEA registration information available in the Federal Register, SAM, the Federal Procurement Data System ("FPDS-NG"), or other public databases to determine the contractors' identities.  *Id*. ¶¶ 12–19.

At the outset, an individual could greatly narrow the list of possible companies— specifically of possible manufacturers and pharmacies but not of possible laboratories—using information gleaned from the government's public filings in a separate case.  The government has publicly asserted that the government selected a domestic bulk manufacturer that was registered with the DEA and a compounding pharmacy that was registered with both the DEA and the FDA to supply pentobarbital for use in lethal injections.  *Id*. ¶ 13 (citing *In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-00145 (TSC) (D.D.C.), ECF No. 36 at 9, 40; ECF No. 39-1 at 4–5, 872; ECF No. 246 at 5–6, 29).  The FDA's 503B registration system is an online list of facilities that have registered with the FDA as a human drug compounding outsourcing facility pursuant to 21 U.S.C. § 353b.  *Id*.  Similarly, facilities must register with the

---

[3]     Exemption 4 was separately applied to withhold drug pricing and invoices because, in addition to being identifying, they also independently constitute confidential commercial information.  *See* 2nd Christenson Decl. ¶ 16 n.4 & n.5.  CREW does not appear to contest the withholding of drug pricing and invoices based on the fact that they independently constitute confidential commercial information.

DEA to manufacture or distribute controlled substantives, including pentobarbital, and applications for registration are published in the Federal Register. *Id*. Thus, an individual could substantially narrow the list of potential pharmacies involved in the supply of pentobarbital to the government based on which companies were properly registered or had applied for registration at the time of selection. *Id*.

As assisted by that narrowed list of possible manufacturers and pharmacies, an individual could then cross-reference certain contract term dates—including the dates of purchase, payment for services, or delivery—against certain dates listed in public databases. An individual could even cross-reference expiration dates, container unit number, and lot numbers against those databases, as these numbers are all based on the date of production and/or testing of the product and could thus be reverse-engineered into dates of purchase or testing. *Id.* ¶ 15. Even the dates of email communications discussing the purchase, testing, or delivery of pentobarbital could be cross-referenced with these databases. *Id*. For example, in addition to the relevant dates provided by the FDA and DEA databases, the SAM also includes a company's initial and most recent registration dates. *Id*. ¶ 14. An individual could cross-reference those dates against the relevant contract terms dates to further narrow the list or even to determine a contractor based on when the companies were operating. *Id*.

Moreover, the FPDS-NG system has a plethora of substantive information that could be further cross-referenced with contract terms such as drug pricing, quantities, concentrations, as well as purchase order or references numbers and invoices. *Id.* ¶ 16. The FPDS-NG system publicizes government contracts, is easily searchable online by company name, government entity, or topic, and provides substantial information regarding government contracts, including but not limited to contract dates, amounts obligated and paid, contract type, product codes, and

descriptions of services or products provided. *Id.* ¶¶ 16–17. Although the pentobarbital contracts at issue are not included in the FPDS-NG system, an individual could compare the contract terms with the contract terms of a company's other government contracts contained in the FPDS-NG system. *Id.* ¶ 17. A company's contract terms, including pricing patterns and reference numbers, are generally unique but consistent. *Id.* Thus, for example, an individual could find the government contracts of a company known to manufacture, develop, or test pentobarbital and could compare information line-by-line with the redacted contract terms. *Id.* An individual could even request a copy of any contract reported in the FPDS-NG system through FOIA, thereby potentially accessing information such as reference numbers and even the unique formatting and style of a particular company's contract or invoice. *Id.* ¶ 18–19.

Indeed, a 2020 news article purported to determine the identity of three laboratories allegedly involved in testing pentobarbital for lethal injection purposes based on the redacted administrative record filed in a separate case. *Id.* ¶ 9. As the laboratories' company names, logos, and other obviously identifying information had been redacted, the news article attempted to identify the alleged companies by comparing unredacted data—including drug concentrations, quantities, dates of testing, expiration dates, and partial lot numbers—to information already in the public domain. *Id.* ¶¶ 9–11.

Regardless of whether the attempt to piece together information from the public domain was successful, the risk is clear. That risk would be greatly exacerbated by revealing more information about the contracts on which to base allegations regarding contractors' identities. It is precisely for this reason that the contractors have customarily kept the withheld contract terms "private, have specifically designated the information as proprietary and/or confidential, and have expressly required or requested that the Government maintain the information as confidential to

the greatest extent possible under the law."  1st Christenson Decl. ¶ 51; *see also* Ex. B, Contractor 1 Decl. ¶ 4.  The contract terms provide significant fodder for identifying—and purporting to identify—the list of potential companies by cross-referencing them with information already available in the public domain through the above-referenced databases and other sources.

Accordingly, the contract terms are exempt from disclosure under Exemption 4 because they could in fact reveal the identity of the contractors.

## <u>CONCLUSION</u>

For the aforementioned reasons, the government respectfully requests that this Court enter summary judgment for the government.

Dated: July 21, 2023                          Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Cassandra M. Snyder*
CASSANDRA M. SNYDER (DC #1671667)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 451-7729
Email: cassandra.m.snyder@usdoj.gov

*Counsel for Defendant*