UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR ETHICS AND
RESPONSIBILITY IN WASHINGTON,

*Plaintiff,*

v.

U.S. DEPARTMENT OF JUSTICE,

*Defendant.*

Civil Action No. 19-3626 (DLF)

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.   The Contractors' Names Are Commercial Pursuant to Exemption 4. ............................... 2

    A.   The Names of the Contractors Are Intrinsically Commercial. ............................... 3

        1.   The Names of the Contractors Serve as Their Corporate Identities ........... 3

        2.   The Names of the Contractors Have Intrinsic Market Value. .................... 8

    B.   The Contractors' Names Represent that the Contractors Participate in the
        Supply of Pentobarbital to the Government .......................................................... 11

II.  Disclosing the Redacted Contract Terms Will Reveal "Confidential" Information
    Pursuant to Exemption 4. ............................................................................................. 15

III. No Disclosure Has Waived the Government's Ability to Withhold Information
    Under Exemption 4. ..................................................................................................... 18

CONCLUSION ................................................................................................................... 21

# AUTHORITIES

## CASES

*100Reporters LLC v. DOJ*,
  248 F. Supp. 3d 115, 136 (D.D.C. 2017) ................................................................. 11

*Afshar v. Dep't of State*,
  702 F.2d 1125 (D.C. Cir. 1983) ............................................................................... 18

*Am. Steel Foundries v. Robertson*,
  269 U.S. 372 (1926) ................................................................................................... 3

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
  641 F.3d 504 (D.C. Cir. 2011) ................................................................................. 21

*\*Baker & Hostetler LLP v. U.S. Dep't of Com.*,
  473 F.3d 312 (D.C. Cir. 2006) .................................................................... 2, 3, 4, 15

*British Airports Authority v. US. Department of State*,
  530 F. Supp. 47 (D.D.C. 1981) ............................................................................... 14

*Carlson v. USPS*,
  504 F.3d 1123 (9th Cir. 2007) .............................................................................. 4, 5

*Chicago Tribune Company v. Federal Aviation Association*,
  No. 97-cv-2363, 1998 WL 242611 (N.D. Ill. May 7, 1998) ............................ 6, 7, 14

*CIA v. Sims*,
  471 U.S. 159 (1985) ....................................................................................... 4, 17, 18

*\*Citizens for Resp. & Ethics in Wash. v. DOJ*,
  58 F.4th 1255 (D.C. Cir. 2023) ....................................................................... *passim*

*Citizens for Resp. & Ethics in Wash. v. DHS*,
  525 F. Supp. 3d 181 (D.D.C. 2021) ............................................................. 17, 20, 21

*COMPTEL v. FCC*,
  910 F. Supp. 2d 100 (D.D.C. 2012) ........................................................................ 4, 5

*COMPTEL v. FCC*,
  945 F. Supp. 2d 48 (D.D.C. 2013) ......................................................................... 5, 14

*Cottone v. Reno*,
  193 F.3d 550 (D.C. Cir. 1999) ................................................................................. 18

*Ctr. for Investigative Reporting v. CBP,*
  436 F. Supp. 3d 90 (D.D.C. 2019) ................................................... 4

*Ctr. for Med. Progress v. HHS,*
  No. 21-cv-642, 2022 WL 4016617 (D.D.C. Sept. 3, 2022)................... 12, 13, 14

*Ctr. for Nat'l Sec. Studies v. DOJ,*
  331 F.3d 918 (D.C. Cir. 2003) ........................................................ 20

*Electronic Privacy Information Center v. DHS,*
  117 F. Supp. 3d 46 (D.D.C. 2015) ................................................... 15

*Encino Motorcars, LLC v. Navarro,*
  138 S. Ct. 1134 (2018) ................................................................... 4

*Farmworker Just. v. U.S. Dep't of Agric.,*
  No. 19-CV-1946 (DLF), 2021 WL 827162 (D.D.C. Mar. 4, 2021) ......... 15

*Food Mktg. Inst. v. Argus Leader Media,*
  139 S. Ct. 2356 (2019).................................................................. 4, 14

*Founding Church of Scientology of Wash., D.C., Inc. v. NSA,*
  610 F.2d 824 (D.C. Cir. 1979) ........................................................ 11

*Getman v. NLRB,*
  450 F.2d 670 (D.C. Cir. 1971) ........................................................ 4, 5

*Globalaw Ltd. v. Carmon & Carmon L. Off.,*
  452 F. Supp. 2d 1 (D.D.C. 2006) ................................................... 3, 5, 6

*Heeney v. FDA,*
  No. 97-cv-5461, 1999 WL 35136489 (C.D. Cal. Mar. 16, 1999)........... 12

*Herrick v. Garvey,*
  298 F.3d 1184 (10th Cir. 2002) ...................................................... 4

*Immerso v. DOL,*
  No. 19-cv-3777, 2020 WL 6826271 (E.D.N.Y. Nov. 20, 2020),
  *aff'd*, No. 20-4064, 2022 WL 17333083 (2nd Cir. Nov. 30, 2022)......... 11

*Int'l News Service v. Associated Press,*
  248 U.S. 215 (1918).................................................................... 3

*John Doe Agency v. John Doe Corp.,*
  493 U.S. 146 (1989).................................................................... 4

*Jordan v. DOL*,
   273 F. Supp. 3d 214 (D.D.C. 2017) ............................................................... 2, 11, 15

*Jud. Watch, Inc. v. FDA*,
   449 F.3d 141 (D.C. Cir. 2006) ............................................................................. 19

*Jud. Watch, Inc. v. HHS*,
   525 F. Supp. 3d 90 (D.D.C. 2021) ...................................................................... 15

*Kahn v. Fed. Motor Carrier Safety Admin.*,
   648 F. Supp. 2d 31 (D.D.C. 2009) ........................................................................ 2

*Kolbusz v. FBI*,
   No. 17-cv-00319, 2021 WL 1845352 (D.D.C. Feb. 17, 2021),
   *R. & R. adopted*, No. 17-cv-00319, 2023 WL 2072481 (D.D.C. Feb. 17, 2023) .................... 20

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007) ........................................................................... 11

*N.Y. Pub. Int. Rsch. Grp. v. EPA*,
   249 F. Supp. 2d 327 (S.D.N.Y. 2003) ................................................................. 11

*National Business Aviation Association v. FAA*,
   686 F. Supp. 2d 80 (D.D.C. 2010) ........................................................... 6, 7, 8, 13

*\*Nat'l Ass'n of Home Builders v. Norton*,
   309 F.3d 26 (D.C. Cir. 2002) ....................................................................... *passim*

*Nat'l W. Life Ins. Co. v. United States*,
   512 F. Supp. 454 (N.D. Tex. 1980) .................................................................... 4, 5

*Neary v. FDIC*,
   104 F. Supp. 3d 52 (D.D.C. 2015) ...................................................................... 18

*Pike v. DOJ*,
   306 F. Supp. 3d 400 (D.D.C. 2016) ..................................................................... 21

*Pub. Citizen Health Rsch. Grp. v. FDA*,
   704 F.2d 1280 (D.C. Cir. 1983) .......................................................................... 2, 4

*Pub. Citizen v. HHS*,
   66 F. Supp. 3d 196 (D.D.C. 2014) ....................................................................... 11

*Pub. Citizen v. HHS*,
   975 F. Supp. 2d 81 (D.D.C. 2013) ................................................................ 5, 6, 12

*Renewable Fuels Ass'n v. EPA*,
   519 F. Supp. 3d 1 (D.D.C. 2021) ................................................................... *passim*

*S. Poverty L. Ctr. v. IRS*,
   589 F. Supp. 3d 79 (D.D.C. 2022) ................................................................... 18, 19

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.D.C. 1991) ......................................................................... 20

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
   483 U.S. 522 (1987) ....................................................................................... 3

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
   978 F.2d 947 (7th Cir. 1992) ......................................................................... 3

*Seife v. FDA*,
   43 F.4th 231 (2d Cir. 2022) ........................................................................... 3, 4

*Students Against Genocide v. Dep't of State*,
   257 F.3d 828 (D.C. Cir. 2001) ....................................................................... 18

*ViroPharma Inc. v. HHS*,
   839 F. Supp. 2d 184 (D.D.C. 2012) ............................................................... 12

*Watkins v. CBP*,
   643 F.3d 1189 (9th Cir. 2011) ....................................................................... 4

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ....................................................................... 18

*WP Co. LLC v. U.S. Small Bus. Admin.*,
   502 F. Supp. 3d 1 (D.D.C. 2020) ................................................................... 15

## **INTRODUCTION**

Plaintiff attempts to undermine the congressional intent of Exemption 4 to force the release of commercial information provided to the government in confidence. The names of the contractors that supplied pentobarbital to the government are clearly commercial. The mere fact that those contractors contracted with the government should not destroy their right to protect their confidential commercial information. Plaintiff's quibbles with the breadth of the term "commercial" should be taken up with Congress, not with this Court.

As the government's expert witness attests, company names are instrumental to a company's basic business operations. The contractors have commercial interest in their names both because they serve the commercial function of singularly identifying the contractors and because the names have intrinsic commercial value. Additionally, and alternatively, the contractors' names are commercial because they establish that the contractors are involved in particular contracts with a particular customer over a particular item or service for a particular business purpose, which is itself plainly commercial information.

Plaintiff does not negate any of these points as a factual matter. Nor does Plaintiff present expert testimony to rebut the intrinsic commercial nature of company names. Instead, Plaintiff attempts to analogize the contractors' names to other information with tenuous, if any, connection to a company's business. But the contractors' names are not comparable to administrative information in which the employer has no commercial interest. Nor are the names comparable to information arising out of non-commercial contexts such as random events that just happened to occur during commercial operations, or regulatory fees imposed by governments. Rather, the names are both intrinsically commercial and represent clearly commercial information about the contractors' business operations.

Plaintiff's attempt to undermine the application of Exemption 4 through other means also fails. First, Plaintiff warps the language of the Bureau of Prison's ("BOP") declaration to argue that the declarant fails to explain how an individual could "in fact" use the withheld contract terms to identify the contractors. But as BOP explains, there are many different ways that an individual could use the contract terms to identify the contractors. Second, Plaintiff fails to establish that the government has waived its ability to assert Exemption 4 based on prior public disclosure. Plaintiff has not shown that the government is withholding the same specific information that is already public, especially given that the government is not required to release information where complete disclosure would provide a more holistic composite picture.

For these reasons, the Court should grant the government's motion for summary judgment.

## **ARGUMENT**

## I. **THE CONTRACTORS' NAMES ARE COMMERCIAL PURSUANT TO EXEMPTION 4.**

Consistent with Exemption 4's expansive purpose, *see infra* pp. 3–4, courts have emphasized the "broad definition" of "commercial." *Jordan v. DOL*, 273 F. Supp. 3d 214, 230–31 (D.D.C. 2017) (quoting *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006)). Information is commercial if it "serves 'a commercial function' or is of a 'commercial nature,'" *Citizens for Resp. & Ethics in Wash. v. DOJ*, 58 F.4th 1255, 1263 (D.C. Cir. 2023) ("*CREW*") (quoting *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002)), or if the provider has a "commercial interest" in that information, *id.* (quoting *Baker & Hostetler*, 473 F.3d at 319). Thus, "[t]he question of whether information is 'commercial' boils down to a common sense inquiry into whether the proponent has a business interest in that information." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (citing *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). Here, the contractors'

names are "commercial" both because they are intrinsically commercial and because they represent that the contractors participate in the supply of pentobarbital to the government.

### A.    The Names of the Contractors Are Intrinsically Commercial.

The names of the contractors are commercial in and of themselves because they uniquely identify the contractors as legitimate conveyors of particular goods or services, both as a legal matter and a general matter.  As the government explained, the contractors have a "commercial interest" in that singular identity by which they engage in profit-making activities.  *CREW*, 58 F.4th at 1263 (quoting *Baker & Hostetler*, 473 F.3d at 319).

### 1.    The Names of the Contractors Serve as Their Corporate Identities.

Both in general and via their respective trademarks, each contractors' name serves as its "corporate identity."  *Globalaw Ltd. v. Carmon & Carmon L. Off.*, 452 F. Supp. 2d 1, 56 (D.D.C. 2006) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992)); *see also* Decl. of Joel E. Lesch ¶¶ 13–20, ECF No. 46-7 ("Lesch Decl.").  That corporate identity is proprietary.  *See, e.g.*, *Am. Steel Foundries v. Robertson*, 269 U.S. 372, 380 (1926) ("The effect of assuming a corporate name by a corporation under the law of its creation is to exclusively appropriate that name.  It is an element of the corporation's existence.").  That identity carries "value 'as the result of organization and the expenditure of labor, skill, and money' by an entity." *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 532 (1987) (quoting *Int'l News Service v. Associated Press*, 248 U.S. 215, 239 (1918)); *see also* Lesch Decl. ¶¶ 26–32. The contractors' names therefore "serve[] 'a commercial function'" and "[are] of a 'commercial nature.'"  *CREW*, 58 F.4th at 1263 (quoting *Norton*, 309 F.3d at 38).

Plaintiff's insistence that the contractors' names are not "commercial" narrows that definition far beyond congressional intent.  The bare purpose of Exemption 4 is to "protect[]" the "economic or business interests" of entities who provide information to the government.  *Seife v.*

*FDA*, 43 F.4th 231, 239 (2d Cir. 2022) (quoting *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 113 (D.D.C. 2019)).  Since Congress did not expressly define "commercial," it takes on its "broad," *Baker & Hostetler*, 473 F.3d at 319, "ordinary meaning[]," *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983).  That reflects Congress' recognition "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166–67 (1985), especially regarding "information which is obtained by the Government . . . but which would customarily not be released to the public by the person from whom it was obtained." *Watkins v. CBP*, 643 F.3d 1189, 1196 (9th Cir. 2011) (quoting *Herrick v. Garvey*, 298 F.3d 1184, 1193 (10th Cir. 2002)).  Indeed, as the Supreme Court recently explained, FOIA's "exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement," *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (cleaned up) (citing *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)), and courts must thus give them "meaningful reach and application," *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

Plaintiff attempts to diminish the proprietary nature of the contactors' names by citing cases in which courts held that the names of individual employees were not commercial.  *See* Mem. of P. & A. in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp. to Def.'s Mot. for Summ. J. at 14, ECF 49-1 ("Mem.") (citing *Getman v. NLRB*, 450 F.2d 670, 673 (D.C. Cir. 1971); *COMPTEL v. FCC*, 910 F. Supp. 2d 100, 116 (D.D.C. 2012); *Carlson v. USPS*, 504 F.3d 1123, 1129 (9th Cir. 2007); *Nat'l W. Life Ins. Co. v. United States*, 512 F. Supp. 454, 462 (N.D. Tex. 1980)).  But even setting aside the differences between an employee's name and a company name, Plaintiff's cited cases confirm that employee names can be commercial in certain contexts.  The court in *COMPTEL* expressly recognized that "corporations can have a commercial interest in the names

4

of certain staff." *COMPTEL*, 910 F. Supp. 2d at 116.  Rather than diminish the commercial nature

of employee names or company names, Plaintiff's cited cases merely emphasize that an agency

must do more than summarily assert that information is commercial without explanation.[1]  In other

words, "even with an incredibly broad definition of commercial or financial information, the

government must at least provide the court with sufficient, non-conclusory detail to show that the

information falls into this category." *COMPTEL v. FCC*, 945 F. Supp. 2d 48, 57 (D.D.C. 2013).

Here, the government has provided significant "non-conclusory detail" and supporting evidence

establishing that the contractors' names are commercial.

Moreover, contrary to Plaintiff's assertions, holding the contractors' names to be

commercial would not sweep any and all "anodyne, administrative information" within that

definition.  Pl.'s Mem. 18.  The contractors' names are not commercial merely because they are

"necessary for the contractors to exist and to conduct their operations." *Id*. at 16–17.  Rather, as

explained, the contractors' names are proprietary information that singularly and exclusively

identify the contractors—legally and publicly—as legitimate businesses.  The names are thus more

than simply "necessary for the contractors to exist and to conduct their operations" in a technical

sense, *id.* at 16–17; they are "'*instrumental*' to conducting business," *Pub. Citizen v. HHS*, 975 F.

---

[1]    *See COMPTEL*, 910 F. Supp. 2d at 114–17 (rejecting agency's application of Exemption 4 to list of employee names where the agency failed to explain "why this information is commercial in nature," instead making "conclusory assertion[]" that the information was "competitively sensitive"); *Getman*, 450 F.2d at 673 (rejecting agency's application of Exemption 4 to "a bare list of names and addresses of employees" based on agency's summary assertion that the exemption "applies to any information given [to] the Government in confidence"); *Carlson*, 504 F.3d at 1129–30 (rejecting application of analogous law to exempt from disclosure "the names and duty stations of USPS employees" over agency's mere objection that it "may not be good business practice" to disclose); *see also Nat'l W. Life Ins. Co.*, 512 F. Supp. at 459–60 (rejecting agency's application of Exemption 4 to "list of [employee] names and duty stations" based on agency's assertion that information is commercial based solely on "the purpose to which the information may be put by the requesting party").

Supp. 2d 81, 104 (D.D.C. 2013) (emphasis added).  In contrast, "information like addresses, contact information, entity size, and types of goods and services," Pl.'s Mem. 18—without more—is not "a prerequisite for any person or entity wishing to conduct business as a company and engage in profit-making activities," Mem. in Supp. of Def.'s Mot. for Summ. J. at 9, ECF 46-1 ("Def.'s Mem."), ECF No. 46-1, nor does it serve the commercial function of "identifying [a business] as an entity authorized to engage in commercial activity in general and with the government specifically," *id.* at 10, nor does it "hold intrinsic market value," *id.*, nor can it be trademarked for exclusive use and profit by the trademark holder, *see id.* at 11.  Plaintiff's argument that the government seeks to designate as commercial "all records that relate to every aspect of the company's trade or business," Pl.'s Mem. 15 (citation omitted), is thus unfounded.

Plaintiff also attempts to compare the contractors' names to the identifying information considered non-commercial in *Chicago Tribune Company v. Federal Aviation Association*, No. 97-cv-2363, 1998 WL 242611, at *2 (N.D. Ill. May 7, 1998), and *National Business Aviation Association v. Federal Aviation Association*, 686 F. Supp. 2d 80, 87 (D.D.C. 2010).  *See* Pl.'s Mem. 15–16.  But these two cases only highlight the commercial nature of the contractors' names at issue here.  Unlike in *Chicago Tribune Company*, where the requestor sought data from the Federal Aviation Administration ("FAA") related to in-flight medical emergencies, the contractor names here are not related to information regarding "chance events which happened to occur" during "revenue-producing operations" that otherwise had no relation to those "revenue-producing operations."  1998 WL 242611, at *2.  There, the agency withheld "information which could identify the airline that provided the data," arguing that it was commercial because it concerned "events that occurred while aircraft were in revenue-producing operations."  *Id.* at *1 (citation omitted).  The court rejected that argument, explaining that the medical emergencies were "chance

events which happened to occur while the airplanes were in flight," and that "[t]he mere fact that an event occurs in connection with a commercial operation does not automatically transform documents regarding that event into commercial information." *Id.* at *2.  In contrast, Plaintiff here does not request information concerning "chance events which happened to occur while [the contractors] were in revenue-producing operations," but seeks commercial details regarding the "revenue-producing operations" themselves.  *Id.*

Indeed, *National Business Aviation Association* implicitly confirms that identifying information can be commercial if it can be used to obtain "insight into the nature of a company's business dealings."  686 F. Supp. 2d at 87; *see also Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1, 7 (D.D.C. 2021).  In that case, an aviation industry association sought to block the release under FOIA of the list of aircraft registration numbers that had been filtered out of an FAA data feed tracking the movements of aircraft in U.S. airspace.  *See Nat'l Bus. Aviation Ass'n*, 686 F. Supp. 2d at 87.  The court first rejected the association's expansive argument that anything "pertain[ing] to airplanes used by companies, in commerce, . . . is thus part of a commercial enterprise."  *Id.* at 85 (citation omitted).  This holding is consistent with courts' longstanding position that the government must explain why the information itself is commercial, not merely "pertain[ing] to [items] used by companies."  *Id.*

More importantly, the court proceeded on the assumption that the information may have been commercial if it could have been used to subsequently obtain "insight into the nature of the company's business dealings."  *Id.*; *see also Renewable Fuels Ass'n*, 519 F. Supp. 3d at 7 (describing *National Business Aviation Association* as "assuming that if release of aircraft registration numbers would allow 'discovery [of] sensitive commercial information,' withholding would be justified under Exemption 4").  The court then rejected as a *factual* matter the

association's argument that the list of aircraft registration numbers was commercial because it could be used to discover sensitive commercial information. *See id*. at 86. The court emphasized the FAA's opposing determination that the list was not commercial and noted the presumption of regularity afforded to that determination. *See id*. In particular, the FAA had explained that the information would enable the recipient to determine only certain limited information (including "the owner of the aircraft, a description of the aircraft, and historical location information") but not any sensitive commercial information (including the identity of flight occupants, the "business purpose of any flight," real-time flight tracking, or the reasons that the aircraft owner sought for the flight to be included on the list and thereby filtered out of the FAA data feed). *Id.* at 87.

Thus, the association's mere "speculation" that the list could be used to obtain historical information which could then be used to obtain "insight into the nature of the company's business dealings," did not suffice as a factual matter to establish commerciality. *See id*. Here, however, the release of identifying information—including the contractors' names—would lead to the disclosure of commercial information, including the fact of the contractors' particular contracts supplying pentobarbital to the government. *See infra* § I.B (explaining that contractors' names are commercial because they represent that the contractors were involved in the supply of pentobarbital to the government). Accordingly, that information is commercial.

### 2. The Names of the Contractors Have Intrinsic Market Value.

Plaintiff next makes a series of incorrect assumptions in asserting that the reputational value of the contractors' names has no bearing on the commercial inquiry. Preliminarily, Plaintiff is wrong that the only relationship between "the contractors' names" and "their actual businesses" is reputational value. Pl.'s Mem. 20. As explained above, the contractors' names *are* the businesses. *See supra* § I.A.1. The names "serve[] [the] commercial function" of singularly and exclusively representing the contractors' identities, not only as a reputational matter but also as a

legal matter. *CREW*, 58 F.4th at 1263 (quoting *Norton*, 309 F.3d at 38). Indeed, the contractors'

names are able to convey a particular reputation and brand *because* they serve more broadly as the

contractors' corporate identities. Plaintiff's attempt to dissociate the contractor names from their

corporate identities thus fails.

Second, Plaintiff is wrong that the reputational value of the contractors' names bears only

a "'tenuous[]' and 'indirect[]' relationship to the 'exchange of goods and services' or the 'making

of a profit.'" Pl.'s Mem. 20 (quoting *CREW*, 58 F.4th at 1265). Plaintiff argues that the relationship

is indirect because "the only mechanism through which disclosure of the contractors' names could

impact their commercial fortunes is through reputational 'knock-on' effects." *Id.* at 20. But

Plaintiff mischaracterizes the D.C. Circuit's holding. The D.C. Circuit held only that "the

commercial consequences of disclosure are not on their own *sufficient*" to establish that

information is itself commercial. *CREW*, 58 F.4th at 1267 (emphasis added). Rather, "[w]hat

matters is whether the contractors' names in and of themselves are commercial." *Id.* at 1269. The

fact that disclosure of the information may result in "reputational 'knock-on' effects," Pl.'s Mem.

20, thus does not negate the commercial character of the information. And, as the government's

expert witness on financial analysis has explained, the contractors' names hold intrinsic

commercial value based in part on their associated reputation and brand. The names are used to

"position [the contractors] in the marketplace," Lesch Decl. ¶ 25, and thus bear directly on "the

exchange of goods or services or the making of a profit." *CREW*, 58 F.4th at 1263. The contractors

therefore have commercial interest in those names.

Notably, Plaintiff provides no expert rebuttal to the government's expert witness testimony

explaining why companies have commercial interest in their names. Indeed, Plaintiff provides no

expert testimony at all to support Plaintiff's motion for summary judgment, instead proffering only

lay interpretation from counsel regarding whether a company's name can be commercial.  Plaintiff attempts to undermine the government's expert witness as "irrelevant and insufficiently specific to establish that *these particular contractors' names* have value."  Pl.'s Mem. 22 n.5 (emphasis added).  But the D.C. Circuit did not require the government to establish these contractors' names meet some designated threshold level of commercial value.  The relevant inquiry on remand is "whether Exemption 4 applies to a business's name," *CREW*, 58 F.4th at 1266; or, in other words, "whether the contractors' names demonstrably pertain to the exchange of goods or services or the making of a profit," *id.* at 1269.  The government's expert witness explains how and why company names are commercial.  That expert need not have "personal knowledge" of the particular contractors to establish that "[a] company's name and associated trademarks . . . are used to build a company brand and position in the marketplace."  Lesch Decl. ¶ 25.  Moreover, the declarations submitted by two of the four contractors simply confirm what commerce the companies engaged in.

On top of that foundation, the government submitted a declaration from BOP explaining why these specific contractors' names are consistent with the commercial nature of company names in general.  *See* Decl. of Kara Christenson, ECF No. 46-4 ("2nd Christenson Decl.").  In particular, the contractors "engaged in commercial activities involving the supply of pentobarbital to the federal government," *id.* ¶ 4; the contractors "did so under the company names that are redacted from the records responsive to CREW's FOIA request" and thus the contractors' names "identify[] each as the business entity providing the services and/or products to the federal government," *id.*; the contractors' names "serve[] the commercial function of identifying it as an entity authorized to engage in commercial activity with the government," *id.* ¶ 5; and "at least three of the contractors [are] companies whose names are trademarked," *id.* ¶ 6.  Contrary to Plaintiff's

assertions, these are not merely "conclusory and generalized allegations of exemptions.'" *Morley v. CIA*, 508 F.3d 1108, 1115 (D.C. Cir. 2007) (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. NSA*, 610 F.2d 824, 830 (D.C. Cir. 1979)); *see also* Pl.'s Mem. 25.

Accordingly, the contractors' names are commercial because they are intrinsically valuable.

## B.   The Contractors' Names Establish that the Contractors Participate in the Supply of Pentobarbital to the Government.

The contractors' names in this context also necessarily represent the commercial information that the contractors are involved in the supply of pentobarbital to the government. *See Renewable Fuels Ass'n*, 519 F. Supp. 3d at 7 (collecting cases for proposition that information can be commercial when it "would necessarily imply or 'reveal [other] information that' itself meets all three Exemption 4 prongs"). District courts have repeatedly emphasized that information concerning "basic commercial operations" such as "business contract[s]," *Jordan v. DOL*, 273 F. Supp. 3d 214, 230–31 (D.D.C. 2017), and "actual . . . 'projects, contracts, and bids,'" *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 136 (D.D.C. 2017) (citation omitted), constitutes commercial information. This is because "[b]usiness organizations plainly have a commercial interest in their contracts and matters affecting such contracts." *Immerso v. DOL*, No. 19-cv-3777, 2020 WL 6826271, at *5 (E.D.N.Y. Nov. 20, 2020), *aff'd*, No. 20-4064, 2022 WL 17333083 (2nd Cir. Nov. 30, 2022).

In the same vein, the fact that an entity has entered into a particular contract or type of contract is commercial because it concerns its "basic business operations and techniques," which is "clear[ly] commercial." *Pub. Citizen v. HHS*, 66 F. Supp. 3d 196, 207 (D.D.C. 2014). It necessarily establishes information "about the nature and character of [the contractors'] business[es]." *N.Y. Pub. Int. Rsch. Grp. v. EPA*, 249 F. Supp. 2d 327, 332–33 (S.D.N.Y. 2003). In other words, "information about the companies' activities in a specific place, at a specific time,

and involving specific activity with respect to a particular product and customer" is "considered 'commercial' information." *Pub. Citizen*, 975 F. Supp. 2d at 104. To borrow Plaintiff's analogy, a soda manufacturer has commercial interest in information linking it to a particular contract with a particular customer involving a particular soda.

The contractors' names here represent both that those contractors participate in the supply of pentobarbital and that they have entered into specific contracts with a specific customer, *i.e.* the government. *See ViroPharma Inc. v. HHS*, 839 F. Supp. 2d 184, 190 (D.D.C. 2012) (noting that parties agreed that identities of abbreviated new drug application filers was commercial). The names therefore reveal "details about the relationship between [them] and [the government]." *Heeney v. FDA*, No. 97-cv-5461, 1999 WL 35136489, at *7 (C.D. Cal. Mar. 16, 1999) (finding "the identity of the company that manufactures Boston Scientific's catheter" commercial because it reveals "details about the relationship between it and Boston Scientific"). The names also establish that the contractors have the operational capacity to supply pentobarbital at a level consistent enough and sufficient to supply to the government. *See Ctr. for Med. Progress v. HHS*, No. 21-cv-642, 2022 WL 4016617, at *6 & n.6 (D.D.C. Sept. 3, 2022) (finding information that would reveal "university's volume of business" to be commercial). As BOP confirmed, the information could reveal "companies' contract negotiation strategies, their physical capabilities in terms of quantity or quality of manufacturing, obtaining, compounding, or testing such substances, as well as pricing, advertising, and other business strategies." Decl. of Kara Christenson ¶ 59, ECF No. 17-4 ("1st Christenson Decl.").

Thus, contrary to Plaintiff's assertions, *see* Pl.'s Mem. 29–30, the fact that the contractors count the government as a customer is indeed commercial. Plaintiff's argument that "everyone knows that the federal government is the pentobarbital buyer" is irrelevant. Pl.'s Mem. 30.

Whether information is "public," Pl.'s Mem. 29, has no bearing on whether that information is commercial, *see Ctr. for Med. Progress*, 2022 WL 4016617, at *6 n.6 (rejecting argument that "confuses the commercial interest prong with the confidential prong" because "[c]ommercial information simply covers information that discloses the basic operations of a business or reveals information that is vital or helpful to its functions," which "is a completely separately matter" from confidentiality).  The relevant point is that the contractors' names link those contractors to the government and thereby establish certain facts about the contractors' relationship with the government and their operational capacities.

Plaintiff is thus also incorrect that "facts . . . about the nature of a company" or "information that may give 'insight into the nature of a company's business dealings'" is not commercial.  Pl.'s Mem. 28 (quoting *Nat'l Bus. Aviation Ass'n*, 686 F. Supp. 2d at 87).  Indeed, even Plaintiff's own cited case law is directly contrary to Plaintiff's assertion.  As explained above, the court in *National Business Aviation Association* assumed that information that could be used to obtain "insight into the nature of a company's business dealings" may be commercial.  686 F. Supp. 2d at 87 (rejecting argument that the information could *in fact* be used to obtain such information based on agency's opposing determination); *see also Renewable Fuels Ass'n*, 519 F. Supp. 3d at 7 (describing *National Business Aviation Association* as "assuming that if release of aircraft registration numbers would allow 'discovery [of] sensitive commercial information,' withholding would be justified under Exemption 4").

Plaintiff's citations to *Chicago Tribune Company* and *British Airports Authority v. Department of State* are also inapt because neither concerns information pertaining to "the making of a profit."  *CREW*, 58 F.4th at 1265; *see also Norton*, 309 F.3d at 38–39 (finding information not commercial because it did not pertain to a "commercial transaction").  Instead, as explained,

*Chicago Tribune Company* concerned "chance events which happened to occur" during "revenue-producing operations." 1998 WL 242611, at *2; *see supra* pp. 6–7. And *British Airports Authority v. Department of State* concerned regulatory fees imposed on airlines by the British Airports Authority ("BAA"). *See* 530 F. Supp. 47, 49 (D.D.C. 1981) (finding that "information relating to the strategy of airline companies in negotiating with BAA" "concerning the fees imposed by BAA on airlines for facilities and services at London's Heathrow Airport" was not commercial). Neither "chance events" nor government regulation directly pertains to profit-making activities or basic business operations, unlike information establishing that a particular business entity is engaged in particular profit-making activities with a particular customer.

Plaintiff complains that the government's definition of commercial "could encompass any company's name simply because that name reveals the company's involvement in a particular business or supply chain." Pl.'s Mem. 31. But the definition of "commercial" is intentionally and necessarily "incredibly broad," *COMPTEL*, 945 F. Supp. 2d at 57, so as to effect congressional intent, *see supra* pp. 3–4. Moreover, Exemption 4 is limited only to commercial information that is also confidential. *See Food Mktg. Inst.*, 139 S. Ct. at 2366 (holding information to be "confidential" pursuant to Exemption 4 "[a]t least where [it] is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy"). And again, whether information is commercial has no bearing on whether information is confidential, and vice versa. *See Ctr. for Med. Progress*, 2022 WL 4016617, at *6 n.6. Of course, as the D.C. Circuit acknowledged, contractors' names are not generally considered confidential. *See CREW*, 58 F.4th at 1266 ("[M]ost businesses . . . eagerly disclose their names, whether to publicize their identities, develop their brands, register their names as trademarks, or use them as website domains."). And contrary to Plaintiff's assertion that the confidential inquiry is "lenient,"

14

Pl.'s Mem. 27, agencies routinely fail to establish confidentiality, *see, e.g.*, *Jud. Watch, Inc. v. HHS*, 525 F. Supp. 3d 90, 103 (D.D.C. 2021); *Farmworker Just. v. U.S. Dep't of Agric.*, No. 19-CV-1946 (DLF), 2021 WL 827162, at *2 (D.D.C. Mar. 4, 2021); *WP Co. LLC v. U.S. Small Bus. Admin.*, 502 F. Supp. 3d 1, 16 (D.D.C. 2020).

Plaintiff's doomsday prophecy of a cascade of withholdings over company identities is also negated by history. For example, there was no such cascade of withholdings of the identity of companies following *Electronic Privacy Information Center v. Department of Homeland Security*, 117 F. Supp. 3d 46, 62 (D.D.C. 2015), in which the court held that the identity of the companies was "commercial" under Exemption 4. In the unlikely scenario that the opposite result follows here, Congress is free to amend the statute such that the term "commercial" is not as "broad" as courts have consistently interpreted it to be. *Jordan*, 273 F. Supp. 3d at 230–31 (citing *Baker & Hostetler*, 473 F.3d at 319). Plaintiff's attempt to appeal to the alleged overbreadth of the commercial inquiry or the "lenie[cy]" of the confidentiality inquiry, Pl.'s Mem. 27, therefore fails.

## II.    DISCLOSING THE REDACTED CONTRACT TERMS WILL REVEAL "CONFIDENTIAL" INFORMATION PURSUANT TO EXEMPTION 4.

Plaintiff deliberately misreads BOP's declaration establishing how the redacted contract terms could in fact identify the contractors. To establish that the withheld contract terms are confidential, the D.C. Circuit held on appeal that the government need show only "that the contract terms could in fact reveal the identities of [BOP]'s pentobarbital contractors." *CREW*, 58 F.4th at 1271. The D.C. Circuit explained that the government must present "detailed and specific information" rather than "conclusory, vague, or sweeping assertions as to [the contract terms'] identifying power." *Id.* (citations omitted). In particular, the D.C. Circuit noted that the government's existing declaration—which noted only that the withheld contract terms "could lead

to the identity of any such individual or company," 1st Christenson Decl. ¶ 48—failed "to explain how the contract terms are identifying." *CREW*, 58 F.4th at 1271.

In response, the government submitted a declaration from BOP explaining how an individual could cross-reference the contract terms with other information in the public domain to identify the contractors' confidential identities. *See* 2nd Christenson Decl. ¶¶ 8–19. In that declaration, the declarant attested: "While each of these contract terms on their own do[es] not directly identify any of the Bureau's contractors, I determined that each could be identifying if combined with or compared to other non-exempt information within the records, or with other information already available in the public domain." 2nd Christenson Decl. ¶ 8. The declarant "explain[ed] how the contact terms are identifying," *CREW*, 58 F.4th at 1271, with reference to specific public databases and other public information, and she noted that she herself had conducted test searches, *see* 2nd Christenson Decl. ¶¶ 13, 17. She explained "in fact," *CREW*, 58 F.4th at 1271, which of the withheld contract terms could be compared to information in which databases, *see* 2nd Christenson Decl. ¶¶ 13–19.

Plaintiff attempts to undermine the meaning of this clear language by deliberately misreading it. Plaintiff protests that the declaration does not establish "that the withheld contract terms *are in fact identifying*," Pl.'s Mem. 33 (quoting *CREW*, 58 F.4th at 1271 (emphasis added by Plaintiff)), but rather "only that the 'contract terms *could be* used to identify the contractors," *id.* at 33 (quoting Defs.' Mem. 15 (emphasis added by Plaintiff)). Plaintiff apparently quibbles with the declarant's use of the conditional "could" instead of the absolute "will." *See* Pl.'s Mem. 33 ("The Government does not claim that cross referencing the key contractual terms with these federal databases and other public information will *actually* result in disclosure of the contractors' identities."). But that conditional language does not reflect uncertainty about whether the search

terms are in fact identifying.  Rather, that language reflects only that an individual may not conduct the necessary searches or may not make the necessary connections upon conducting the searches. And the D.C. Circuit required the government to "explain how the contract terms are identifying," *CREW*, 58 F.4th at 1271, not to provide a step-by-step playbook for each individual contractor.[2]

Indeed, it is not possible for the government to attest, as Plaintiff demands, "that the searches *will in fact*[] identify each of the contractors."  Pl.'s Mem. 35.  As the declarant exemplified, there are many different ways an individual could theoretically use the various withheld contract terms to identify the contractors.  And it is not always a science: for example, one individual may be able to successfully identify a contractor using the "unique invoicing systems, formats, or style" of invoices or contracts, while another individual may not.  2nd Christenson Decl. ¶ 19.  What matters—both practically and legally—is that an individual *could* use any of the contract terms to identify the contractors.[3]  Indeed, courts routinely allow withholdings based on the "mosaic" theory, which recognizes a requestor's ability to piece together scattered portions of records so as to reconstruct information that would otherwise be withheld. *See Citizens for Resp. & Ethics in Wash. v. DHS*, 525 F. Supp. 3d 181, 190 (D.D.C. 2021) ("[C]ourts recognize that 'bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'" (quoting *CIA*,

---

[2]       The limited nature of the D.C. Circuit's instruction is especially clear when considered in light of the information that the D.C. Circuit ruled was insufficient on appeal, which was a mere summary assertion that the contract terms were identifying.  *See* 1st Christenson Decl. ¶ 48 (asserting only that the withheld contract terms "could lead to the identity of any such individual or company" and providing no further explanation).

[3]       Plaintiff faults the government for not "conclusively confirm[ing]" whether the referenced 2020 news article successfully identified certain contractors involving in testing pentobarbital by cross-referencing contract data to information in the public domain.  Mem. 33–34.  Yet Plaintiff simultaneously recognizes that avoiding such confirmation is "necessary . . . given the Government's position in this case."  *Id.* at 34.  Regardless, the point stands that the contract terms were used to allegedly identify a company.

471 U.S. at 178)).   And, consistent with the declarant's declaration dated July 21, 2023, the declarant has reaffirmed in the attached supplemental declaration that "the contract terms could in fact lead to the identification of the contractors."   Ex. A, Second Suppl. Decl. of Kara Christenson ¶ 9 ("3rd Christenson Decl.").   Plaintiff's deliberate misreading of BOP's declaration therefore fails.

## III.   NO DISCLOSURE HAS WAIVED THE GOVERNMENT'S ABILITY TO WITHHOLD INFORMATION UNDER EXEMPTION 4.

Under the public domain doctrine, "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *CREW*, 58 F.4th at 1271 (citing *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)).   The D.C. Circuit has emphasized, "however, that 'while the logic of FOIA postulates that an exemption can serve no purpose once information . . . becomes public, [courts] must be confident that the information sought is truly public and that the requester receives no more than what is publicly available before [courts] find a waiver.'"   *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) (quoting *Cottone*, 193 F.3d at 555).   This is because the mere "fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption."   *Neary v. FDIC*, 104 F. Supp. 3d 52, 60 (D.D.C. 2015) (quoting *Wolf*, 473 F.3d at 378).

Thus, under this "exacting" standard, *Neary*, 104 F. Supp. 3d at 60, Plaintiff "bears the burden of production and must 'point[] to specific information in the public domain that appears to duplicate that being withheld,'" *CREW*, 58 F.4th at 1271 (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).   "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure."   *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)); *see also S.*

*Poverty L. Ctr. v. IRS*, 589 F. Supp. 3d 79, 86 (D.D.C. 2022) ("Plaintiff[] must show that the requested information is as specific as the information previously disclosed [and] it matches the information previously released . . . .").

As BOP confirms, none of the records that Plaintiff points to are identical to the records already released. *See* 3rd Christenson Decl. ¶¶ 4–8. Upon review, however, the government has released in part seven additional records to Plaintiffs. In particular, the government has released in part records 50, 51, 52, 111, 112, 139, and 140. Although these records are not identical to the records already released, they do contain descriptions of pentobarbital amounts that are both identical to information already released and reasonably segregable. *See id.* ¶¶ 6(b), 6(c), 6(d), 6(e), 7(a), 8(a), 8(b).

Plaintiff has not and cannot meet the demanding standard of establishing that the remaining records include specific information that has already been released. Plaintiff argues that "the exact information in the newly released documents also appears in documents that the Government continues to withhold in full." Pl.'s Mem. 36. Plaintiff's sole alleged support for this argument is similarity across the Vaughn index descriptions for some of the records. This falls far short of Plaintiff's burden. Vaughn index descriptions—as here—may be brief. *See Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006) ("As past cases demonstrate, we focus on the functions of the *Vaughn* index, not the length of the document descriptions, as the touchstone of our analysis."). And "[e]specially where the agency has disclosed and withheld a large number of documents, categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons." *Id.* at 147. It is therefore unsurprising and inconclusive that a small amount of the records have Vaughn index descriptions that are similar or even identical. This is especially true given both the narrow nature of Plaintiff's

initial request—records over a six-month period related to the government's procurement of pentobarbital for use in lethal injections, *see* 1st Christenson Decl. ¶¶ 11, 23—and the homogenous nature of the withheld records—"the names of companies involved in the supply . . . of pentobarbital" to the government and related "contract terms," 2nd Christenson Decl. ¶¶ 4, 8. Thus, for example, it is unsurprising that several records are "Quotation[s] for testing" within a similar timeframe that each withhold information concerning "Testing requirements/capabilities." *See* Pl.'s Ex. B at 1.

Regardless of Plaintiff's failure to meet its burden of production, BOP has confirmed that the remaining withheld records—including records 22, 94, 56, 59, 63, 78, 105, 55, and 136—are not identical to the specific information already in the public domain. *See* 3rd Christenson Decl. ¶¶ 4(a)–(f), 5(a), 6(a), 8(c). In particular, BOP has confirmed that many of the allegedly similar records involve entirely different quotes, contracts, invoices, or tests. *See* 3rd Christenson Decl. ¶¶ 4(b), 4(f), 5(a), 6(a), 8(c). And even for records that may concern the same quotes, contracts, invoices, or tests, the records contain additional information and context relative to the released records. *See id.* ¶¶ 4(a), 4(c)–(e), 5(a). Those statements are afforded the presumption of good faith. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.D.C. 1991).

Indeed, disclosure is not required where, as here, "complete disclosure would provide a composite picture" of the information. *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 930–31 (D.C. Cir. 2003) (stating, in the Exemption 7 context, that "[t]he disclosure of a few pieces of information in no way lessens the government's argument that complete disclosure would provide a composite picture of its investigation and have negative effects on the investigation"); *see also Kolbusz v. FBI*, No. 17-cv-00319, 2021 WL 1845352, at *19 (D.D.C. Feb. 17, 2021), *R. & R. adopted*, No. 17-cv-00319, 2023 WL 2072481 (D.D.C. Feb. 17, 2023) (rejecting application of

public waiver doctrine where the public information was "more detailed and include[d] more individual's names than the testimony Plaintiff points to in his brief"); *Citizens for Resp. & Ethics in Wash.*, 525 F. Supp. 3d at 190. Moreover, "it is clear beyond cavil that, 'as a simple factual matter, publication of part of a document does not put the rest into the public domain." *Pike v. DOJ*, 306 F. Supp. 3d 400, 411 (D.D.C. 2016) (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 510 (D.C. Cir. 2011)).

Accordingly, Plaintiff has failed to establish that any additional records should be released pursuant to the public waiver doctrine.

## <u>CONCLUSION</u>

For the aforementioned reasons, the government respectfully requests that this Court enter summary judgment for the government.

Dated: October 3, 2023                    Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Cassandra M. Snyder*
CASSANDRA M. SNYDER (DC #1671667)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Phone: (202) 451-7729
Email: cassandra.m.snyder@usdoj.gov

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed this brief with the Clerk of the Court through the CM/ECF system on October 3, 2023.  This system provided a copy to and effected service of this document on all parties.

*/s/ Cassandra M. Snyder*
CASSANDRA M. SNYDER
Trial Attorney
