**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

*Plaintiff*,

v.

U.S DEPARTMENT OF JUSTICE,

*Defendant.*

No. 19-cv-3626

**MEMORANDUM OPINION**

Citizens for Responsibility and Ethics in Washington (CREW) filed suit against the Department of Justice (Department) under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, based on the Department's decision to withhold certain records of the government's pentobarbital supply. The Court previously granted in part and denied in part the parties' cross-motions for summary judgment. *CREW v. U.S. Dep't of Just.*, 567 F. Supp. 3d 204 (D.D.C. 2021). On appeal, the D.C. Circuit reversed and remanded for further proceedings on a narrow set of records that the Department withheld under FOIA Exemption 4, which applies to confidential commercial information. *CREW v. U.S. Dep't of Just.*, 58 F.4th 1255 (D.C. Cir. 2023). Now before the Court are the Department's renewed motion for summary judgment, Dkt. 46, and CREW's renewed cross-motion for summary judgment, Dkt. 49, with a supplemented record. For the reasons that follow, the Court will grant the Department's motion and grant in part and deny in part CREW's motion.

# I. BACKGROUND

The Court's previous opinion more fully describes the factual background of this case. *See CREW*, 567 F. Supp. 3d at 208–10. As relevant here, CREW submitted two FOIA requests to the Department's Federal Bureau of Prisons (BOP) and to the Department itself seeking "all records from February 14, 2019 to the present related to the procurement of pentobarbital, pentobarbital sodium, or Nembutal to be used in federal executions, including without limitation any notifications to or communications with vendors, solicitation information, requests for information, subcontracting leads, and contract awards." First CREW Cross-Mot. for Summ. J. Ex. 1, Dkt. 19-3 (BOP request); *see also* Joint Status Report of Jan. 30, 2020, ¶ 1, Dkt. 7 (Department request). The Court refers to all three drugs collectively as "pentobarbital." Following the Department's disclosures and withholdings, CREW filed this suit. Compl., Dkt. 1. Over the following months, the Department further searched the government's records pursuant to CREW's FOIA requests but maintained that FOIA Exemptions 4 and 7(E) shielded certain records and information. *See* Updated *Vaughn* Index, Dkt. 28-2. Both parties then moved for summary judgment. First Dep't Mot. for Summ. J., Dkt. 17; First CREW Cross-Mot. for Summ. J., Dkt. 19.

The Court granted in part and denied in part each summary judgment motion. *CREW*, 567 F. Supp. 3d at 217. The Court held that the Department's withholdings were proper under FOIA Exemption 4, 5 U.S.C. § 552(b)(4), which exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential," *CREW*, 567 F. Supp. 3d at 210–14. But it found that the Department's withholdings under FOIA Exemption 7(E) were improper. *Id.* at 214–17. CREW appealed the Court's Exemption 4 holding. Dkt. 32.

After CREW filed its appeal but before the D.C. Circuit ruled, BOP discovered that seven records withheld under Exemption 4 had entered the public domain through the course of other litigation. *CREW*, 58 F.4th at 1261. BOP turned those records over to CREW. *Id.*

CREW raised two issues on appeal. First, the D.C. Circuit considered whether the Department demonstrated that certain information—chiefly, the names of the government's pentobarbital contractors; and key contract terms, such as drug prices, quantities, and expiration dates—constituted confidential commercial information under Exemption 4. *Id.* at 1262. Second, the D.C. Circuit considered whether the Department had waived Exemption 4 with respect to the information disclosed through other litigation. *Id.* at 1271–72. The D.C. Circuit reversed and remanded on the first question, *id.* at 1269, 1271, and remanded on the second question, *id.* at 1272.

On the first question, the D.C. Circuit's inquiry was narrow. It considered only (1) whether the pentobarbital contractors' names were commercial and (2) whether key contract terms were confidential. *Id.* at 1262. Put differently, CREW conceded—and the D.C. Circuit accepted—that the contractors' names were confidential and the contract terms were commercial. With respect to the commerciality of the contractors' names, the D.C. Circuit held that the Department had not "demonstrate[d] that the [contractors'] names are commercial *in and of themselves*," *id.* at 1263 (emphasis added), apart from whether the disclosure of the names "could have commercial or financial repercussions," *id.*, or "might reveal the existence of a contract likely to attract public scrutiny," *id.* at 1269, as the Department had argued. With respect to the confidentiality of the contract terms, the D.C. Circuit held that the Department must provide "'detailed and specific information'" showing that "the contract terms could in fact reveal the identities of the Bureau's pentobarbital contractors." *Id.* at 1271 (quoting *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30

(D.C. Cir. 1998), *as amended on denial of reh'g* (Mar. 3, 1999)). The D.C. Circuit remanded to allow this Court to determine whether the Department could make the required showings. *Id.*

On the second question, the D.C. Circuit remanded because the Department's disclosure of records to the public in other litigation was discovered for the first time on appeal. *Id.* at 1272. The Circuit left it to this Court to determine in the first instance "whether and to what extent any information in the public domain is the basis on which the government seeks to withhold any records or reasonably segregable portions thereof under Exemption 4." *Id.*

## II. LEGAL STANDARDS

### A. Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the movant is a federal agency in a FOIA case, the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it has complied with FOIA. *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

To prevail under Rule 56, a federal agency "must prove that each document . . . is wholly exempt from [FOIA's] inspection requirements." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (per curiam) (citation omitted). The agency bears the burden of showing that any of the nine enumerated exemptions listed in 5 U.S.C. § 552(b) apply to withheld information. *Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015). These exemptions "are exclusive and must be narrowly construed." *Id.*

Courts generally rely on "government affidavits to determine whether the statutory obligations of the FOIA have been met," but courts need not "accept glib government assertions

of complete disclosure." *Perry*, 684 F.2d at 126. That said, agency affidavits are entitled to a presumption of good faith. *Mobley*, 806 F.3d at 581. A court may grant summary judgment based on a government affidavit when it justifies nondisclosure with "reasonably specific detail," *CREW*, 58 F.4th at 1262 (citation omitted); when neither contradictory record evidence nor evidence of bad faith calls it into question, *id.*; and when the withheld information "is logically within the domain of the exemption claimed," *Campbell*, 164 F.3d at 30. The "vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

**B. FOIA**

FOIA "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). "Consistent with the basic policy that disclosure, not secrecy, is the dominant objective of [FOIA]," FOIA requires that agencies disclose all requested agency records, unless certain statutory exemptions apply. *Muslim Advocs. v. Dep't of Just.*, 833 F. Supp. 2d 92, 98 (D.D.C. 2011) (cleaned up) (citations omitted). Accordingly, the burden to justify non-disclosure falls on the agency. *Id.* The government may meet this burden with sworn statements that describe "the justifications for withholding the information with specific detail" and demonstrate "that the information withheld logically falls within the claimed exemption." *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). "An agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (citation omitted).

## III. ANALYSIS

### A. Exemption 4

To withhold information under Exemption 4 that is not a trade secret, the government "must demonstrate that the withheld information is '(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential.'" *CREW*, 58 F.4th at 1262 (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). The parties agree that the withheld records were "obtained from a person." *See* First Dep't Mot. for Summ. J. at 46; First CREW Cross-Mot. for Summ. J. at 20. But the parties disagree whether (1) the pentobarbital contractors' names are commercial and (2) key contract terms are confidential. For the reasons that follow, the Department has shown that they are.

#### *1. The Contractors' Names and Commerciality*

Information is "commercial" for Exemption 4 purposes when it is "commercial in and of itself, meaning it serves a commercial function or is of a commercial nature." *CREW*, 58 F.4th at 1265 (citation omitted). Information meets this standard "if it pertains to the exchange of goods or services or the making of a profit," *id.* at 1263, such as records that "actually reveal basic commercial operations," *id.* (quoting *Pub. Citizen*, 704 F.2d at 1290), or "customer lists," *id.* (quoting S. Rep. No. 89-813, at 9 (1965)); *Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C. Cir. 1986). The concept "reaches more broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency." *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006); *see also COMPTEL v. FCC*, 910 F. Supp. 2d 100, 115 (D.D.C. 2012) ("The terms 'commercial' or 'financial" in Exemption 4 . . . are construed broadly."). But information is not "commercial" under Exemption 4 just because "public disclosure of [it] could inflict commercial harm," *CREW*, 58 F.4th at 1264,

or "reveal the existence of a contract likely to attract public scrutiny," *id.* at 1269. "[T]he commercial consequences of disclosure are not on their own sufficient to bring confidential information within the protection of Exemption 4 as commercial." *Id.* at 1267.

The D.C. Circuit has not yet addressed whether contractors' names in and of themselves are "commercial" within the meaning of Exemption 4. *See id.* at 1266. As such, the Court must reason from first principles, gleaning what it can from Circuit precedent. Taking into account the plain language of Exemption 4 and precedent, the Court concludes that the contractors' names are commercial information because their disclosure would reveal that the contractors have sold a product and/or service to the government, thereby "actually reveal[ing] basic commercial operations" of the contractors. *Id.* at 1263 (quoting *Pub. Citizen*, 704 F.2d at 1290). That the contractors operate specifically in the pentobarbital market, which is "likely to attract public scrutiny," does not bear on the Court's analysis. *CREW*, 58 F.4th at 1269.

It is undisputed that the contractors' work for the government is a commercial operation. The contractors engage in commercial manufacturing, compounding, and testing of pentobarbital for the government's lethal-injection program, *see* Dep't Mot. for Summ. J. Ex. A (Second Christenson Decl.) ¶ 4, Dkt. 46-4, for their own profit-seeking purposes, *see id.* Ex. B (Contractor 1 Decl.) ¶ 4, Dkt. 46-5 (referring to this as "commercial activity"); *id.* Ex. C (Contractor 2 Decl.) ¶ 4, Dkt. 46-6 (same).[1] In other words, as Judge Sentelle put it, the contractors' "contractual

[1] Although CREW notes that only two of the four contractors submitted declarations attesting to the reputational value of their names, CREW Reply at 9-11, it does not question that all the contractors manufacture, compound, and test pentobarbital for the government's lethal-injection program for their own profit-seeking purposes, *id.* Nor does it challenge the validity or admissibility of the government declarant's representations that the contractors with which "the government entered into contracts for services and/or products . . . engaged in [] commercial activities" and that "three of the four" are registered in a government contracting database. Second Christenson Decl. ¶¶ 4, 5, 7. In any event, such representations are presumed to have been made

obligation to provide the Bureau of Prisons with legal injection drugs 'pertains to the exchange of goods . . . or the making of a profit.'" *CREW*, 58 F.4th at 1272 (Sentelle, J., concurring) (quoting *id.* at 1263 (majority)).

Insofar as the contractors' contracts with the government concern this commercial operation, the records contain commercial information. As this Court has already recognized, information that "addresses a business contract of [a] company" is commercial. *Jordan v. U.S. Dep't of Lab.*, 273 F. Supp. 3d 214, 230–31 (D.D.C. 2017). After all, "[b]usiness organizations plainly have a commercial interest in their contracts and matters affecting such contracts." *Immerso v. U.S. Dep't of Lab.*, No. 19-CV-3777, 2020 WL 6826271, at *5 (E.D.N.Y. Nov. 20, 2020), *aff'd*, No. 20-4064, 2022 WL 17333083 (2d Cir. Nov. 30, 2022).

And few things are more material to a contract than the parties which it binds. "The identity of a party to a contract" necessarily signifies *whose* goods and profits are at issue. *See CREW*, 58 F.4th at 1272 (Sentelle, J., concurring). The disclosure of that identity would reveal that commerce. It follows that in certain circumstances, the identity of a contractor is commercial information. Granted, not every company name (or piece of similarly identifying information) subject to a FOIA request is commercial. *See Pub. Citizen*, 704 F.2d at 1290. But at least some can be. *Cf. COMPTEL*, 910 F. Supp. 2d. at 116 ("[C]orporations can have a commercial interest in the names of certain staff."). And here, the fact of the contractors' names is intrinsically linked to the fact of their commercial activity in a particular market. Where a contractor's identity cannot be separated from its commercial activity, its identity is commercial information. Put another way,

---

in good faith, *see Mobley*, 806 F.3d at 581, and could easily be "converted into admissible evidence" at trial, *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (cleaned up). For these reasons, the Court finds there is no material issue of disputed fact regarding the commercial and for-profit nature of the four contractors and contracts at issue.

the names of the pentobarbital contractors are necessarily commercial not because they are names but because they are names *that appear in government contracts*.

As such, this case is readily distinguishable from *National Business Aviation Association, Inc. v. FAA*. There, this Court held that the FAA reasonably concluded that Exemption 4 did not protect the disclosure of aircraft registration numbers that were blocked from public view. 686 F. Supp. 2d 80, 87 (D.D.C. 2010). The registration numbers were not commercial information because they could reveal only "the owner of the aircraft, a description of the aircraft, and historical location information," but not, among other things, "the business purpose of any flight" or "real-time or near real-time" data about the flights. *Id.* at 86–87. Here, in contrast, disclosure of the contractors' names would reveal an ongoing "business purpose"—the contractors' commercial activity in a specific market. The Court need not engage in "speculation" about how the contractors' names "might be used for insight into the nature of a company's business dealings" with the government, *id.* at 87; the presence of the contractors' names in the government contracts reveals that information itself.

*Renewable Fuels Ass'n v. EPA*, 519 F. Supp. 3d 1 (D.D.C. 2021), further illustrates this point. There, Chief Judge Boasberg held that the names of refineries that applied to the EPA for regulatory exemptions were commercial because "[c]ommon sense counsels that an oil refinery has a 'business interest' in the fact[] that it applied for . . . a small-refinery exemption." *Id.* at 8. Chief Judge Boasberg reasoned that the "identities of which companies have participated in a government program or have sought to participate in that program" would yield "key insights into the refinery's financial and competitive position" and thereby constitute commercial information. *Id.* at 9 (citation omitted) (cleaned up). If the fact of a company's *attempted* participation in a government program constitutes commercial information because it generates implications about

the company's market position, then plainly the contractors' *actual* participation in a commercial government contract does, too. A contractor's name—here, providing proof of the contractor's transactions—is all the more commercial.

Moreover, beyond revealing their commercial participation in a specific market, the disclosure of the contractors' names would also partially reveal their customer lists—principally, by publicizing that the government is a customer. "[I]t is clear that at least in some circumstances customer lists may be considered confidential information protected by the exemption." *Greenberg*, 803 F.2d at 1216. Not only is the government's role as a customer itself a valuable data point about the contractors' position in the marketplace, it also can implicate other commercial information, such as whether a contractor has the manufacturing capacity to consistently and reliably meet the government's demand for a product and that the government has authorized the contractor to operate this kind of business. Such is the case here.

It is true that this Court has held in other contexts that identifying information, such as the names and addresses of companies and employees, is *not* commercial. But, unlike here, the identifying information in those cases was *also* not confidential. *See Getman v. NLRB*, 450 F.2d 670, 673 (D.D.C. 1971) ("Obviously, a bare list of names and addresses of employees . . . *without any express promise of confidentiality*, . . . is not exempted from disclosure by [Exemption] 4." (emphasis added)); *COMPTEL*, 910 F. Supp. 2d. at 116 ("In any case, the FCC likewise has not shown that the information is confidential."); *Nat'l W. Life Ins. Co. v. United States*, 512 F. Supp. 454, 462 (N.D. Tex. 1980) ("The list of names and addresses is neither privileged nor confidential."). The instant action—in which the plaintiff has conceded the confidentiality of certain identifying information—is the rare case. Because the confidentiality prong of Exemption 4 substantially limits the impact of this holding, it is not nearly as "expansive" as CREW suggests.

*See* CREW Cross-Mot. for Summ. J. at 27. Further, this decision does not address identifying information in records other than government contracts or documents closely related to those contracts. *See, e.g.*, *Getman*, 450 F.2d at 673 (holding that Exemption 4 does not exempt identifying information that "employers are required by law to give to the [National Labor Relations] Board").

2. *The Contract Terms and Confidentiality*

In the context of Exemption 4, "confidential" means "private or secret." *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (cleaned up). To qualify, information must be "customarily kept private, or at least closely held, by the person imparting it." *Id.* Although it is unclear if the government must also assure the person imparting the information that the information will remain secret, information is confidential when both conditions are met. *See CREW*, 58 F.4th at 1269 (citing *Argus Leader*, 139 S. Ct. at 2363). CREW has not disputed the second requirement, so the Court's inquiry centers on the first.

To establish that the contract terms are private in this case, the Department must show that the terms themselves are identifying. This unusual syllogism results from the Department's litigation strategy. The Department "structure[d] its exemption claim in two steps—that is, asserting first that the contractors keep identifying information private and second that the contract terms are identifying." *CREW*, 58 F.4th at 1270–71. This Court previously credited the Department's representation that the contractors keep identifying contract terms private. *CREW*, 567 F. Supp. 3d at 214. Thus, the only remaining question is whether the contract terms contain such "'detailed and specific information'" that "[they] could in fact reveal the identities of the Bureau's pentobarbital contractors." *CREW*, 58 F.4th at 1271 (quoting *Campbell*, 164 F.3d at 30). For reference, the contract terms at issue include "drug prices, quantities, expiration dates,

invoices, container units, lot numbers, purchase order/reference numbers, substance descriptions, drug concentrations, and dates of purchase, service, and/or delivery." *Id.* at 1269.

The Department has met this burden. In various ways, it has shown how the contract terms at issue could be cross-referenced with public information to identify the contractors. Dep't Reply at 22, Dkt. 51. The Second Christenson Declaration, which is entitled to a presumption of good faith, *see Mobley*, 806 F.3d at 581, explains in reasonably specific detail how an individual could match delivery dates or product lot numbers with public information (disclosed in cases or with information available on the Internet or in public databases, like the Food and Drug Administration registration system or the Federal Register) to identify pentobarbital contractors. *See* Second Christenson Decl. ¶¶ 12–19. For example, in *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-00145 (D.D.C.), the government revealed that it stores pentobarbital with a DEA-registered compounding pharmacy that is registered as a 503B facility and that, as a result, this particular pharmacy appears in a publicly accessible FDA database among a list of fewer than 80 pharmacies. *Id.* ¶ 13. Thus, by comparing the registration dates of the pharmacies listed in the database to various contract terms, including the dates of pentobarbital sales and deliveries, an individual could dramatically reduce the number of potential pentobarbital contractors. *Id.* ¶¶ 13, 14, 17. As further support for the contention that the contract terms could be combined with other publicly available information to identify the pentobarbital contractors, the declarant cites to a 2020 news article that purported to identify, even without the help of contract terms, three laboratories involved in pentobarbital testing. *Id.* ¶ 11; *see also id.* ¶¶ 9–10.

CREW presents no contradictory evidence in the record, and no evidence of bad faith calls the Second Christenson Declaration into question. *CREW*, 58 F.4th at 1262. And CREW's point that the Department has shown that the contract terms are only *possibly* identifying, rather than *in*

*fact* identifying, does not persuade. *See* CREW Cross-Mot. for Summ. J. at 33. The D.C. Circuit directed this Court to determine if the Department "demonstrate[d] that the contract terms *could* in fact reveal the identities" of the contractors by "explain[ing]" how they are identifying. *CREW*, 58 F.4th at 1271 (emphasis added). The D.C. Circuit was careful not to require the Department to demonstrate to an absolute certainty that the withheld information would reveal the identities of the contractors. *See id.* at 1270 ("[T]he withheld contract terms are logically within the domain of the Bureau's Exemption 4 claim only to the extent they constitute information that *could* lead to the identity of individuals or companies in the Bureau's pentobarbital supply chain." (emphasis added) (cleaned up)). Indeed, to require absolute certainty would oblige district courts in this position to conduct *in camera* review of withheld documents to determine whether they could solve the identity puzzle for themselves. The Court will not assume the D.C. Circuit imposed such a heavy obligation without saying so directly. By illustrating how the release of key contract terms, combined with public information, can be used identify pentobarbital contractors, the Department has met its burden of demonstrating that the contract terms are confidential and properly withheld under Exemption 4.

*3. Foreseeable Harm*

The Department also has shown that foreseeable harm would result from disclosure of the contractors' names and contract terms. "To meet this requirement, the [Department] must explain how disclosing, in whole or in part, the specific information withheld under Exemption 4 would harm an interest protected by this exemption, such as by causing genuine harm to the submitter's economic or business interests and thereby dissuading others from submitting similar information to the government." *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 113 (D.D.C. 2019) (internal citation omitted) (cleaned up). The government has explained that identified

companies are "commonly subject to harassment, threats, and negative publicity leading to commercial decline." First Dep't Mot. for Summ. J., Ex. A at ¶ 52, Dkt. 17–4 ("First Christenson Decl."). Upon identification, at least one laboratory decided not to test pentobarbital anymore without assurances that the drug will not be used for executions, *id.* ¶ 118, and a lethal-injection-drug manufacturer left the market altogether after public identification and harassment, *id.* ¶ 56 (discussing *Glossip v. Gross*, 576 U.S. 863, 869–71 (2015)). As the Court has previously explained, "[t]he competitive harm here is quite clear—revelation of the companies' identity could lead to harassment, cost them business, or force them to exit the pentobarbital market entirely." *CREW*, 567 F. Supp. 3d at 212.

*4. Segregability*

For purposes of segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). The D.C. Circuit has not identified the exact level of detail required to justify non-segregability. But "[a]ffidavits attesting to the agency's line-by-line review of each document withheld in full and the agency's determination that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions, in conjunction with a *Vaughn* index describing the withheld record, suffice." *Ecological Rts. Found. v. EPA*, 541 F. Supp. 3d 34, 66 (D.D.C. 2021) (citing *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002)).

The Department has satisfied those requirements. In its initial summary-judgment motion, the Department represented that it conducted a "thorough search and careful review of records responsive to CREW's FOIA request" and that it had released all "segregable, non-exempt information." First Dep't Mot. for Summ. J. at 1. It stated repeatedly that "every effort was made

to release all segregable information, including by conducting a page-by-page and line-by-line review." *Id.* at 27, 30, 33, 34, 38, 45. Further, in its renewed motion, the Department represents that it engaged in further "review" of the records and released the segregated portions of an additional seven records. *See Ecological Rts. Found.*, 541 F. Supp. 3d at 66 (concluding that the government had met its burden to justify its segregability finding where it attested that a careful review confirmed that all reasonably segregable material had been disclosed and where the agency "provided supplemental releases of information where possible"). The *Vaughn* index provides further insight into the Department's record-by-record review, including details about the scope of particular redactions and releases. *See generally* Updated *Vaughn* Index. The Department's declarations and *Vaughn* index, combined with the presumption of agency compliance, establish that the Department has complied with its segregability obligations.

**B. Waiver**

Finally, CREW argues that the Department waived FOIA Exemption 4 over material in some withheld documents by publicly sharing the withheld information elsewhere. While the Department was preparing its brief in the appeal of this Court's previous ruling, it released seven additional documents after it realized that "it had previously released some drug-concentration and expiration-date information as part of the administrative record in other litigation over its execution protocol." *CREW*, 58 F.4th at 1271. On remand, CREW seeks the release of an additional sixteen records. *See* CREW Cross-Mot. for Summ. J. at 37. While preparing its summary judgment briefing this round, the Department released an additional seven records, with redactions, numbered in the *Vaughn* index as Record 50, 51, 52, 111, 112, 139, and 140. Dep't Reply at 19. CREW now seeks the release of the remaining nine records—Records 22, 55, 56, 59, 63, 78, 94, 105, 136—and it asks the Court to conduct an *in camera* review of all sixteen

records, including the seven partly disclosed records, to confirm their non-segregability.

"Under [the] public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999). This doctrine follows from the "logic of FOIA" because "where information requested is truly public, then enforcement of an exemption cannot fulfill its purposes." *Id.* (citation omitted) (cleaned up). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007). As such, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Id.* (citation omitted).

The parties' briefing does not resolve the issue of whether the information sought by CREW is already in the public domain. On one hand, CREW has not, as of this point, satisfied its "burden of production" by pointing "to specific information in the public domain that appears to duplicate that being withheld." *CREW*, 58 F.4th at 1271. CREW attempts to identify duplication by pinpointing *Vaughn* index entries of withheld records that have similar captions and timeframes as the entries of now-disclosed records. CREW Cross-Mot. for Summ. J., Hurley Decl. at 2–3, Dkt. 49-3. But the fact that certain captions appear repeatedly does not mean that the entries under the captions are necessarily identical. Indeed, "[c]ategorization and repetition provide efficient vehicles by which a court can review withholdings" and are altogether commonplace. *Jud. Watch v. FDA*, 449 F.3d 141, 147 (D.D.C. 2016). Waiver occurs when the sought-after information is the exact same matter as the released information. *See, e.g.*, *Cottone*, 193 F.3d at 554–55 (finding waiver over identifiable audio tapes played in open court). Although CREW has identified

information that might be similar to information in the public domain, it has not shown that the information is the same.

On the other hand, the Department concedes that it has waived exemption of at least some of the information contained in withheld records. It states that some withheld records contain "the same quotes, contracts, invoices, or tests" as the publicly released records. Dep't Reply at 20. Though the Department asserts that the captioned records are not identical to the released records, *see id.*, this context is beside the point. When identical *information* appears in a "reasonably segregable portion[]" of a withheld record, the government must release the public portions of the document with redactions. *See CREW*, 58 F.4th at 1273.

Against this muddy backdrop, the Court will order the Department to produce for *in camera* review the sixteen challenged records without redactions, along with the five publicly disclosed records for comparison. In doing so, the Court heeds the D.C. Circuit's directive to "determine in the first instance whether and to what extent any information in the public domain is the basis on which the government seeks to withhold any records or reasonably segregable portions thereof under Exemption 4." *Id*. Given the factual history of this case, including the Department's multiple and belated releases, as well as the nature of the requested information, this is the rare case in which a closer review of the record is warranted. Accordingly, the Court will exercise its "broad discretion" and "conduct *in camera* inspection" of the sixteen challenged records. *ACLU v. Dep't of Def.*, 628 F.3d 612, 626 (D.D.C. 2012); 5 U.S.C. § 552(a)(4)(B).

## CONCLUSION

For the foregoing reasons, the Court grants the Department's motion for summary judgment; grants CREW's cross-motion for summary judgment with respect to the sixteen withheld records and otherwise denies CREW's cross-motion; and orders the Department to produce the sixteen challenged records and five public records for *in camera* review. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

March 31, 2024